UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
MATILDA BELOVIC, by her next friend,
SUELLEN TOZZI; GENEVIEVE C.;
MADELAINE ANDREWS; MARY B.; and
MAUREEN CURRAN, by her next friend,                                **COMPLAINT**
SARAH T. GILLMAN, individually, and on
behalf of all others similarly situated,

      Plaintiffs,       07 Civ. _____

   -against-

ROBERT DOAR, as Commissioner of the New
York City Human Resources Administration;
GLADYS CARRION, as Commissioner of the
New York State Office of Children & Family
Services; DAVID HANSELL, as Acting
Commissioner of the New York State Office of
Temporary & Disability Assistance; and
RICHARD F. DAINES, as Acting Commissioner
of the New York State Department of Health,

      Defendants.

------------------------------------------------------------------ X

## PRELIMINARY STATEMENT

1.  Plaintiffs MATILDA BELOVIC, by her next friend, SUELLEN TOZZI;

GENEVIEVE C.; MADELAINE ANDREWS; MARY B.; and MAUREEN CURRAN, by her

next friend, SARAH T. GILLMAN, bring this class action pursuant to 42 U.S.C. § 1983, 42

U.S.C. § 12132 et seq., and 29 U.S.C. § 794 et seq., for declaratory and injunctive relief on

behalf of themselves and a class of all current and future clients of the New York City Human

Resources Administration's Adult Protective Services program ("APS") who are not receiving or

will not receive the protective services from APS to which they are legally entitled.

2.  Plaintiffs challenge Defendants' customs and practices of, inter alia, (1)

discriminating against Plaintiffs on the basis of their disabilities by (a) failing to provide

reasonable accommodations adequate to enable Plaintiffs to obtain and maintain eligibility for Food Stamps and/or Medicaid benefits to which they are entitled, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130; and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51; (b) subjecting Plaintiffs to continued, unnecessary segregation in institutions and failing to provide them with services in the most integrated setting appropriate to their needs, in violation of 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(d); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(d); (c) utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs, in violation of 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(b)(3)(ii); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(b)(3)(ii); (2) depriving Plaintiffs of their liberty interests without due process when involuntarily transferring Plaintiffs from their homes without any form of notice or an opportunity to challenge such involuntary transfer, in violation of the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1; and of the New York State Constitution, N.Y. Const., art. I, § 6; and (3) failing to provide mandated protective services in a timely manner, adequate to maintain Plaintiffs in the community, in violation of N.Y. Soc. Serv. Law §§ 473 and its implementing regulation, 18 N.Y.C.R.R. § 457.1; and Article XVII of the New York State Constitution, N.Y. Const., art. XVII.

3.      Plaintiffs seek a preliminary injunction enjoining Defendants to provide all necessary protective services and reasonable accommodations to Named Plaintiffs MATILDA BELOVIC, GENEVIEVE C., MADELAINE ANDREWS, MARY B., and MAUREEN

CURRAN as requested in Plaintiffs' Order to Show Cause for a preliminary injunction and class certification.

4.     Plaintiffs seek a permanent injunction enjoining Defendants to (i) provide the reasonable accommodations Plaintiffs need to obtain and maintain eligibility for Food Stamp and/or Medicaid benefits to which they are entitled; (ii) provide Plaintiffs with services in the most integrated setting appropriate to their needs and refrain from discriminating against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions; (iii) refrain from discriminating against Plaintiffs by utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs; (iv) provide Plaintiffs with notice and an opportunity to challenge involuntary removals from their home; and (v) provide Plaintiffs with timely and adequate protective services to which they are legally entitled.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, providing for original jurisdiction of this Court in suits arising under the Constitution or laws of the United States; under the American with Disabilities Act, 42 U.S.C. § 12117(a); and under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(2).

6.     Jurisdiction is also predicated on 28 U.S.C. § 1367, providing for supplemental jurisdiction. Declaratory judgment is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

7.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), because it is the judicial district in which a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

8.      Matilda Belovic is a 94-year-old Holocaust survivor temporarily residing in Jewish Home and Hospital, a nursing home in the Bronx.  Ms. Belovic normally lives alone in an apartment in the Bronx.  Ms. Belovic has been an APS client since 2004.

9.      Genevieve C. is a 47-year-old woman living alone in an apartment in Queens. Ms. C. has been an APS client since October 2006.

10.      Madelaine Andrews is an 85-year-old woman living alone in a fourth-floor walk-up apartment in Manhattan.  Ms. Andrews has been an APS client since September 2006.

11.      Mary B. is a 61-year-old woman living with her 45-year old mentally disabled son in Manhattan.  Ms. B. has been an APS client since 2005.

12.      Maureen Curran is a 45-year-old woman living alone in a one-bedroom basement apartment in Staten Island.  Ms. Curran has been an APS client since October 2006.

13.      Defendant Robert Doar is Commissioner of the New York City Human Resources Administration ("HRA").  As such, he is responsible for, inter alia, the administration of protective services to eligible adults, Food Stamps, and Medicaid in New York City, and for ensuring compliance by HRA with all applicable federal and state law.  Commissioner Doar maintains an office at 180 Water Street, New York, New York.

14.      Defendant Gladys Carrion is Commissioner of the New York State Office of Children & Family Services ("OCFS").  As such, she is responsible for the administration of those portions of the New York Social Services Law that mandate the provision of protective services for eligible adults and supervision of the administration of adult protective services by all of the State's local social services districts, including New York City.  Commissioner Carrion maintains an office at 52 Washington Street, Rensselaer, New York.

15.     Defendant David Hansell is the Acting Commissioner of the State of New York Office of Temporary and Disability Assistance ("OTDA").  He is responsible for, inter alia, administration of the Food Stamp program throughout New York State, and supervision of the administration of the Food Stamp program by all of the State's local social services districts, including New York City.  Acting Commissioner Hansell maintains an office at 40 North Pearl Street, Albany, New York.

16.      Defendant Richard F. Daines is the Acting Commissioner of the State of New York Department of Health ("DOH").  He is responsible for, inter alia, the administration of New York State's Federal and state Medicaid programs, and supervision of the administration of the federal and state Medicaid programs by all of the State's local social services districts, including New York City.  Acting Commissioner Daines maintains an office at Corning Tower, Empire State Plaza, Albany, New York.

<u>**CLASS ACTION ALLEGATIONS**</u>

17.     The Named Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.  The proposed class consists of all current and future clients of APS who are not receiving or will not receive the protective services from APS to which they are legally entitled.

18.     The class is so numerous that joinder of all members is impracticable.  As of January 2007, HRA had approximately 6,132 active APS cases.  During that same month, HRA received approximately 1,131 APS referrals.  A significant number of APS clients are not receiving the protective services to which they are entitled.

19.     There are questions of law or fact common to the class as a whole, namely, whether Defendants' customs and practices of, inter alia, (1) discriminating against Plaintiffs on

the basis of their disabilities by (a) failing to provide reasonable accommodations adequate to enable Plaintiffs to obtain and maintain eligibility for Food Stamps and/or Medicaid benefits to which they are entitled, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130; and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51; (b) subjecting Plaintiffs to continued, unnecessary segregation in institutions and failing to provide them with services in the most integrated setting appropriate to their needs, in violation of 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(d); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(d); (c) utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs, in violation of 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(b)(3)(ii); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(b)(3)(ii); (2) depriving Plaintiffs of their liberty interests without due process when involuntarily transferring Plaintiffs from their homes without any form of notice or an opportunity to challenge such involuntary transfer, in violation of the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1; and of the New York State Constitution, N.Y. Const., art. I, § 6; and (3) failing to provide mandated protective services in a timely manner, adequate to maintain Plaintiffs in the community, in violation of N.Y. Soc. Serv. Law § 473 and its implementing regulation, 18 N.Y.C.R.R. § 457.1; and Article XVII of the New York State Constitution, N.Y. Const., art. XVII.

      20.     The Named Plaintiffs' claims are typical of the claims of the class in that the Named Plaintiffs and proposed class members are all clients of APS who are not receiving or

will not receive the protective services and reasonable accommodations they need and to which they are legally entitled.

21.    The Named Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs do not have interests antagonistic to one another or to the interests of the class as a whole.  Plaintiffs are represented by counsel experienced in class action and civil rights litigation generally, and specifically in the areas of government benefits, social services programs, disability discrimination law and laws governing protective services for adults.

22.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief appropriate to the class as a whole.  A class action would also avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions.

23.    Moreover, it would be impracticable for the majority of Plaintiffs, who are by definition mentally and/or physically impaired individuals who are unable to manage activities of daily living and protect themselves from harm, to obtain legal services on an individual basis to pursue their claims.  Hence, Plaintiffs' rights under the law may well be meaningless without certification of a class action seeking common redress.

**STATUTORY AND REGULATORY SCHEME**

**A.**    **Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990**

24.    Section 504 of the Rehabilitation Act of 1973 provides: "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

25.    A "program or activity" is defined as, <u>inter alia</u>, "a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1)(A).

26.    "[I]ndividual with a disability" is defined as any person who "has a physical or mental impairment which substantially limits one or more of such person's major life activities," "has a record of such an impairment," or "is regarded as having such an impairment."  29 U.S.C. § 705(20)(B).

27.    In addition, federal regulations implementing the Rehabilitation Act provide that a covered entity may not:

- "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service,"  28 C.F.R. § 41.51(b)(1)(i);

- "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others,"  28 C.F.R. § 41.51(b)(1)(ii);

- "[p]rovide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 41.51(b)(1)(iii);

- "[o]therwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit or service,"  28 C.F.R. § 41.51(b)(1)(vii); or

- "directly or through contractual or other arrangements, utilize criteria or methods of administration . . . that have the purpose or effect of defeating or

substantially impairing accomplishment of the objectives of the recipient's

program with respect to handicapped persons."  28 C.F.R. § 41.51(b)(3)(ii).

28.    Covered entities must "administer programs and activities in the most integrated

setting appropriate to the needs of qualified handicapped persons."  28 C.F.R. § 41.51(d).

29.    The Americans with Disabilities Act of 1990 ("ADA") was enacted to broaden

the protections of the Rehabilitation Act and "provide a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C.

§ 12101(b)(1).

30.    Title II of the ADA provides: "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.

31.    A "public entity" is, inter alia, "any department, agency, special purpose district,

or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1)(B).

32.    A "qualified individual" is anyone "who, with or without reasonable

modifications to rules, policies, or practices, the removal of architectural, communication, or

transportation barriers, or the provision of auxiliary aids and services, meets the essential

eligibility requirements for the receipt of services or the participation in programs or activities

provided by a public entity."  42 U.S.C. § 12131(2).

33.    A disability is defined as: "(A) a physical or mental impairment that substantially

limits one or more of the major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).

34.     The term "major life activities" includes "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 28 C.F.R. § 35.104(2).

35.     The ADA specifically identifies "the failure to make modifications to existing facilities and practices" and the unjustified segregation of persons with disabilities as forms of discrimination. 42 U.S.C. § 12101(a)(5).

36.     Federal regulations implementing Title II of the ADA provide that a public entity "in providing any aid, benefit, or service, may not, directly or through contractual licensing, or other arrangements, on the basis of disability:"

- "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(i);

- "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that provided to others," 28 C.F.R. § 35.130(b)(1)(ii);

- "[p]rovide a qualified individual with a disability with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefits, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii);

- "[o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service," 28 C.F.R. § 35.130(b)(1)(vii); or

- "utilize criteria or methods of administration . . . "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities" 28 C.F.R. § 35.130(b)(3)(ii).

37.     Further, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  35 C.F.R. § 35.130(d).

38.     Under Section 35.130(b)(7), "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

**B.     Adult Protective Services**

39.     The New York State Office of Children & Family Services ("OCFS") is responsible for the administration of, inter alia, protective services for adults in New York State, pursuant to New York Social Services Law §473, et seq.

40.     OCFS receives federal funding through Title XX of the Social Security Act ("Title XX") for the purposes of, inter alia, "preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests."  42 U.S.C. § 1397(3).

41.     HRA is the local social services district responsible for administering protective services to adults in New York City.  It does so through an HRA program called APS.

42.     New York State law mandates that protective services be provided to adults 18 years of age or older "who, because of mental or physical impairments, are unable to manage their own resources, carry out the activities of daily living, or protect themselves from physical

abuse, sexual abuse, emotional abuse, active, passive or self neglect, financial exploitation or other hazardous situations without assistance from others and have no one available who is willing and able to assist them responsibly." N.Y. Soc. Serv. Law § 473(1).

43.    APS' responsibilities include "receiving and investigating reports of seriously impaired individuals who may be in need of protection" and "arranging for medical and psychiatric services to evaluate and whenever possible to safeguard and improve the circumstances of those with serious impairments." N.Y. Soc. Serv. Law § 473(1)(a), (b).

44.    Within 60 days of the date of an individual's referral to HRA for protective services, APS must create an "assessment/services" plan for that person including, among other things, an assessment of the problems and needs of the individual referred, the specific objectives to be achieved, and the services to be provided to attain these objectives. 18 N.YC.R.R. § 457.2(b).

45.    Notwithstanding the deadline for completion of the assessment/services plan, the service needs of individuals who are being assessed for protective services must be addressed "promptly and appropriately . . . regardless of the date the [APS] assessment/services plan is completed." 18 N.Y.C.R.R. § 457.2(b)(4)(ii).

46.    Protective services that social services officials must provide to eligible individuals include, <u>inter alia</u>:

- "arranging for medical and psychiatric services to evaluate and whenever possible to safeguard and improve the circumstances of those with serious impairments," N.Y. Soc. Serv. Law § 473(1)(b);

- "arranging, whenever necessary, for commitment, guardianship, or other protective placement of such individuals either directly or through referral to

another appropriate agency, provided, however, that where possible, the least restrictive of these measures shall be employed before more restrictive controls are imposed," N.Y. Soc. Serv. Law § 473(1)(c);

- "providing services to assist such individuals to move from situations which are, or are likely to become, hazardous to their health and well-being," N.Y. Soc. Serv. Law § 473(1)(d); and

- providing "other protective services for adults included in the regulations of the department." N.Y. Soc. Serv. Law § 473(1)(f).

47.    State regulations implementing Section 473 further provide that APS must:

- "assess[] the individual's situation and service needs," 18 N.Y.C.R.R. § 457.1(d)(3);

- assist "in the location of social services, medical care and other resources in the community," 18 N.Y.C.R.R. § 457.1(d)(6);

- arrange for guardianship or other protective placements as needed, 18 N.Y.C.R.R. § 457.1(d)(7);

- provide advocacy and assistance in arranging for legal services to assure that individuals in need of protective services receive the rights and entitlements due to them, 18 N.Y.C.R.R. § 457.1(d)(8);

- function "as a guardian, representative payee, or protective payee where it is determined such services are needed and there is no one else available or capable of acting in this capacity," 18 N.Y.C.R.R. § 457.1(d)(9); and

- "provid[e] homemaker and housekeeper/chore services when provided as an integral but subordinate part in the provision of [protective services] to meet

the goal of protection for adults who demonstrate specified functional deficits." 18 N.Y.C.R.R. § 457.1(d)(10).

48.     Additionally, APS must visit its clients who are in the following situations at least once every calendar month: (i) when abuse, neglect or exploitation by another person is suspected or documented; (ii) when environmental conditions exist in the home which are a threat to the health and safety of the client; or (iii) when a client is home bound or when there is no other way to have face to face contact with the client without making a home visit.  18 N.Y.C.R.R. § 457.5(b)(2).  All other APS clients must have face-to-face contact with an APS staff member every calendar month, and APS staff must make a home visit at least once every three calendar months.  18 N.Y.C.R.R. § 457.5(b)(4).

49.     APS must "plan with other public, private and voluntary agencies including but not limited to health, mental health, aging, legal and law enforcement agencies, for the purpose of assuring maximum local understanding, coordination and cooperative action in the provision of appropriate services." N.Y. Soc. Serv. Law § 473(2)(a).

50.     APS must "secure the active participation and cooperation of those community resources providing specific services for adults."  18 N.Y.C.R.R. § 457.7(b).

51.     Other divisions of HRA, such as the division responsible for administering all aspects of the Food Stamp and Medicaid programs, must be "effectively integrated into the [APS] service delivery network." 18 N.Y.C.R.R. § 457.7(e).

**C.     Federal and State Benefits Administered by Defendant Doar**

    1.     <u>Medicaid</u>

52.     The Medical Assistance Program ("Medicaid") is a joint federal-state program established under Title XIX of the Social Security Act ("the Medicaid Act") that provides federal

funding for state programs that furnish medical assistance and rehabilitation and other services to needy individuals.  42 U.S.C. § 1396 et seq.; 42 C.F.R. § 430 et seq.

53.     The agency responsible for the administration of the Medicaid program in New York is the New York State Department of Health ("DOH").  N.Y. Soc. Serv. Law § 363-a(1).

54.     DOH is authorized to delegate and has delegated certain responsibilities for administering the Medicaid program to local districts.  42 U.S.C. § 1396a(a)(1); N.Y. Soc. Serv. Law § 365(1).

55.     HRA is the local social services provider for the district of New York City, and is responsible for the day-to-day operations of certain aspects of the Medicaid program.  N.Y. Soc. Serv. Law § 61; 18 N.Y.C.R.R. § 501.1.  With respect to the administration of the Medicaid program, HRA acts as the agent of DOH.

56.     DOH remains ultimately responsible for the actions of its agents, including HRA, and must supervise and ensure that its agents comply with the federal and state statutes and regulations governing the Medicaid program.  42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.10, 431.50, 435.903; N.Y. Soc. Serv. Law §§ 363-a(1), 364(2).

57.     Under the Medicaid Act, states must provide home health services to, at a minimum, any individual who, under the State plan, is entitled to nursing facility services.  42 U.S.C. § 1396a(a)(10)(D).

58.     New York State has opted to provide several levels of home health services to Medicaid recipients based on their particular medical needs.

59.     "Personal care services," are provided the through Home Care Services Program (HCSP) and administered by HRA.  Personal care services generally include "hands on" assistance provided to a patient in his/her home, including but not limited to "some or total

assistance with personal hygiene, dressing and feeding, nutritional and environmental support functions, and health-related tasks," and other activities that require only minimal medical skill. 18 N.Y.C.R.R. § 505.14(a)(1).

60.    A Medicaid eligible individual who, because of his or her medical condition or disability "requires total assistance with toileting and/or walking and/or transferring and/or feeding at unscheduled times during the day and night" is entitled to receive continuous 24-hour personal care services, provided by more than one person. 18 N.Y.C.R.R. § 505.14(a)(3).

61.    Although the majority of home health care recipients in New York City can be, and are, serviced by HRA through HCSP, many other home health service recipients require a higher, more skilled, level of care than may be provided by HCSP.  Most of these individuals receive their care from Certified Home Health Agencies ("CHHAs"), which are privately-owned vendors under contract with DOH.  10 N.Y.C.R.R. § 763.11(a)(7).

62.    CHHA services generally comprise assistance with tasks requiring some medical skill, such as nursing services, physical therapy and home health aide services.   18 N.Y.C.R.R. § 505.23(a)(3).

63.    DOH and HRA may not exclude any qualified handicapped person from participation in the Medicaid Program, deny any qualified handicapped person the benefits of the Medicaid Program, or otherwise subject any qualified handicapped person to discrimination with regard to the Medicaid Program on the basis of handicap.  45 C.F.R. § 84.4.

2.    Food Stamps

64.    Congress established the federally funded, state-administered Food Stamp Program in 1964 ("Food Stamp Act') in order to "safeguard the health and well-being of the nation's

populations by raising levels of nutrition among low-income households." 7 U.S.C. § 2011; 7 C.F.R. § 271.1.

65.    To be financially eligible for federally funded Food Stamps, a household's net income must be below the federal poverty line.  The resources available to the household may not exceed $2,000 (or, where a household includes a member 60 years of age or older, $3,000). 7 U.S.C. § 2014(c), (g).

66.    The Food Stamp Act mandates that the State agency of each participating State "shall assume responsibility for the certification of applicant households and for the issuance of coupons and the control and accountability thereof." 7 U.S.C. § 2020(a).

67.    In New York State, the Food Stamp Program is administered through 58 local social services districts, including the New York City district. New York Soc. Serv. Law § 95.

68.    The Office of Temporary and Disability Assistance ("OTDA") is the New York State agency which supervises the local districts' administration of the Food Stamp Program. New York Soc. Serv. Law § 95.

69.    The local social services district that administers the Food Stamp Program in New York City is HRA.

70.    The Food Stamp Act's implementing regulations impose a duty on OTDA to supervise HRA's acts or failures to act.  7 C.F.R. § 275.5(a) provides that "[e]ach State agency shall ensure that [local districts] operate the Food Stamp Program in accordance with the Act, regulations, and FNS-approved State Plan of Operation" and requires the State to conduct periodic reviews of HRA's performance so as to provide "a systematic method of monitoring and assessing program operations" and to provide "a basis for [local districts] to improve and

strengthen program operations by identifying and correcting deficiencies." 7 C.F.R. § 275.5(a)(1), (2).

71.     Thus, the Food Stamp Act and its implementing regulations impose an enforceable duty on the State to supervise the City and ensure that "the program provide responsive service to eligible households," and correct deficiencies in program operations. 7 C.F.R. §§ 275.19(a), 275.5(a), 275.16(a).

72.     OTDA and HRA may not exclude any qualified handicapped person from participation in the Food Stamp Program, deny any qualified handicapped person the benefits of the Food Stamp Program, or otherwise subject any qualified handicapped person to discrimination with regard to the Food Stamp Program on the basis of handicap. 7 C.F.R. § 15b.4.

**D.  The New York State Constitution**

73.     Section 6 of Article I of the New York State Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law."

74.     Section 1 of Article XVII, § 1 of the New York State Constitution provides that "[t]he aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine."

**E.  The United States Constitution**

75.     Section 1 of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

## FACTS CONCERNING THE NAMED PLAINTIFFS

**Matilda Belovic**

76.     Matilda Belovic is a single, 94-year-old woman who has been temporarily living in a nursing home since October 2006, as a result of APS' failure to take reasonable steps to maintain her safely in and return her to the community in the most integrated environment appropriate to her needs.

77.     Ms. Belovic was born in Croatia and came to this country in 1960.  In Croatia, she had been a Catholic nun and spent years as a prisoner of war in Nazi labor camps.

78.     Ms. Belovic has no family in this country, except nieces who are in their 80's and are unable to assist her.

79.     Ms. Belovic has been diagnosed with mild Dementia NOS, congestive heart failure, heart disease, hypertension, osteoarthritis, B-12 deficiency and dental problems.

80.     Because of her disabilities, Ms. Belovic is not able to perform many of the functions of daily life.

81.     Prior to October 17, 2006, when APS took her to a nursing home for admission, Ms. Belovic resided at 246 East 199th Street, Bronx, New York, in apartment GD.

82.     While she resided in the community, Ms. Belovic received numerous supportive services at home.  A Medicaid home attendant provided Ms. Belovic with home care services three days per week, four hours per day.  A nurse came one time per week to pour Ms. Belovic's medication.   In addition, several New York City Department for the Aging contract agencies supplied Ms. Belovic with services:  the Bronx Jewish Community Council ("BJCC") provided Expanded In-Home Services for the Elderly Program ("EISEP") case management including

weekly visits from a student intern; RAIN provided daily lunch and supper home-delivered meals; and the mental health unit of JASA provided counseling on a weekly basis.

83.    In September or October of 2004, it became apparent that rather than paying her bills, Ms. Belovic was sending donations to numerous organizations and answering sweepstakes. Ms. Belovic often had problems with her utility company sending shut-off notices as a result of her not paying her bills.  Ms. Belovic was therefore referred to APS by the social services agencies that were helping her, as in need of financial management and consideration for an Article 81 guardianship.

84.    Despite Ms. Belovic's ongoing problems managing her finances and despite the repeated efforts of BJCC to prompt APS to institute financial management services for Ms. Belovic, APS did not do so until November 2005, over one year after Ms. Belovic was referred to APS.

85.    Even after APS began financial management, Ms Belovic had continuing problems, both because APS often did not pay her bills on time and because she could not manage the money that was still under her control.

86.    In November 2005, because Ms. Belovic was continuing to have difficulty managing her finances, BJCC began to urge APS to obtain an Article 81 guardian for Ms. Belovic to manage all of her money.

87.    Despite BJCC's continued requests over the next year, APS did not apply for a guardianship for Ms. Belovic, and did nothing to ensure that her needs were being met in other ways.

88.     APS has failed to maintain Ms. Belovic's Food Stamps, and Ms. Belovic has not been re-certified for Food Stamps since August 2005. As a result, her Food Stamps were terminated on July 18, 2006.

89.     Because APS took no action to reinstate Ms. Belovic's Food Stamps, in September 2006, BJCC attempted to do so. Despite BJCC's repeated requests, APS even failed to provide documents that were needed for the recertification process.

90.     On October 16, 2006, the APS caseworker went to Ms. Belovic's apartment with two individuals from a nursing home. They did not explain to Ms. Belovic why they were there.

91.     On October 17, 2006, Ms. Belovic's APS caseworker went to her home and told her that they were going to visit a nursing home. The caseworker never discussed with Ms. Belovic that it was APS' intent to have Ms. Belovic admitted into a nursing home. She understood only that they would look at a nursing home and then she would return home. However, the caseworker took her to Fieldston Lodge Nursing Home and left her there to be admitted.

92.     The APS caseworker did nothing to prepare Ms. Belovic for the idea that he was arranging for her to move into the nursing home. He did not have her pack any clothes or other belongings. She arrived at the nursing home with nothing but the clothes on her back.

93.     Prior to removing Ms. Belovic from her home and having her admitted into Fieldston Lodge Nursing Home, APS did not consult with or inform any of Ms. Belovic's service providers of their intentions. At no time did APS inform Ms. Belovic that she could challenge her placement in the nursing home.

94.     Prior to taking Ms. Belovic to the nursing home in October 2006, APS never attempted to obtain an increase in home care services for Ms. Belovic.

95.     Shortly after her admission to Fieldston Lodge Nursing Home, the nursing home determined that Ms. Belovic was fit to make the decision to go home.  In addition, Ms. Belovic's treatment team at the nursing home decided that she could safely return home with the various services she had in place prior to being admitted.  APS was in agreement with this plan to return Ms. Belovic home.

96.     With the exception of the home care and visiting nurse services, all of the community-based agencies previously serving Ms. Belovic could simply resume providing their services upon Ms. Belovic's discharge from the nursing home.  However, since Ms. Belovic's admission to the nursing home in mid-October, her home care and visiting nurse cases had been closed.

97.     Thus, new arrangements had to be made to obtain appropriate home care for Ms. Belovic.  APS failed to take all such appropriate steps in a reasonable and timely manner.

98.     Ms. Belovic is desperate to return home.  She has attempted to leave her nursing home on several occasions.  As a result, she was sent to the hospital for psychiatric evaluation twice.  However, each time, she was quickly adjudged ready and able to return to a nursing home.  On December 22, 2006, she was discharged from the hospital to Jewish Home and Hospital, a nursing home in the Bronx where she currently resides.

99.     Within less than a week of her admission, Jewish Home and Hospital determined that Ms. Belovic was able to and should be discharged home to live in the community with the same services she previously received in addition to increased home care and the Article 81 guardian for which BJCC has been advocating for so long..

100.    The nursing home social worker tried to get the cooperation of APS to arrange Ms. Belovic's return home, but had great difficulty doing so.

101.     If Ms. Belovic were to return home, services could immediately be restored by BJCC and the JASA mental health unit, and her home-delivered meals could be restored as well. In addition, Ms. Belovic's primary care physician, Dr. DeBlasio, would be able to pour Ms. Belovic's medication on a regular basis.

102.     BJCC Home Attendant Services has agreed to provide Ms. Belovic with the home care she needs.  However, in order to arrange for Medicaid to pay for the home care, the application for home care must be referred through HRA.  Jewish Home and Hospital therefore has submitted an application for home care to HRA.

103.     In the course of the nursing home's efforts to obtain appropriate home care for Ms. Belovic, HRA has at times suggested that Ms. Belovic could not receive home care unless she has an Article 81 guardian.

104.     HRA has known since November 2005 that BJCC believed Ms. Belovic needed an Article 81 guardian for financial management, and APS apparently agreed because one of their main stated reasons, no matter how misguided, for having Ms. Belovic admitted to the nursing home in October 2006 was to expedite the application for an Article 81 guardian.

105.     APS still has not even applied for an Article 81 guardian for Ms. Belovic.  Any delay in obtaining home care for Ms. Belovic because of the absence of an Article 81 guardian is the fault of HRA.

106.     HRA has not made a decision on the pending application for home care submitted by the nursing home.  HRA's failure to make a timely decision on Ms. Belovic's home care application is impeding her ability to return home.

107.    If HRA takes the position that Ms. Belovic now cannot receive home care without an Article 81 guardian in place, a position with which Plaintiffs disagree, APS' failure to obtain an Article 81 guardian would also impede her ability to return home.

108.    Ms. Belovic has a Section 8 Rental Voucher Program ("Section 8") subsidy issued by the New York City Housing Authority ("NYCHA") which helps to pay her rent, making it possible for her to maintain her apartment.

109.    Prior to being taken to the nursing home in October 2006, Ms. Belovic had problems maintaining her Section 8 voucher.  On several occasions, BJCC attempted to help Ms. Belovic because APS was failing to assist with her Section 8 and she was in danger of losing her subsidy.

110.    After APS took Ms. Belovic to the nursing home in October 2006, APS was in charge of the apartment, and since they were in charge of her financial management, of her mail.

111.    Since her admission to the nursing home in October 2006, APS assured BJCC that because it was the goal to have Ms. Belovic return home, APS was maintaining her apartment and ensuring that her rent was paid.

112.    Despite these assurances, on February 22, 2007, Ms. Belovic's Section 8 subsidy was terminated because of APS' failure to take steps to recertify Ms. Belovic's Section 8 eligibility and make her apartment available for inspection.  After receiving the notice of termination, Ms. Turuk spoke with Section 8 who agreed to make a payment for March 2007.

113.    Prior to terminating Ms. Belovic's Section 8 subsidy, Section 8 attempted to inspect Ms. Belovic's apartment on two occasions since Ms Belovic was admitted to the nursing home.

114.     A Section 8 worker came to the apartment but given that nobody was home, they were unable to conduct the inspection.

115.     And in January 2007,  Ms. Belovic's landlord, faxed a letter that she had received from Section 8 to Ms. Belovic's APS caseworker stating that Section 8 wished to inspect the apartment and called him with the date of the inspection so APS could let in the Section 8 inspector.  APS did not do so.

116.     Recently, Ms. Belovic's landlord received a letter from Section 8 stating they were terminating Ms. Belovic's lease because she had not returned from the nursing home.  The landlord called Section 8 and explained to the caseworker that Ms. Belovic will be returning home.  The Section 8 caseworker agreed to extend the lease and made another payment to cover Ms. Belovic's rent for the month of April 2007.

117.     It appears that due to efforts by Ms. Belovic's landlord, BJCC, and Plaintiffs' counsel, that Ms. Belovic's annual income review was recertified on April 7, 2007.  It is not clear whether APS, at the urging of BJCC and the landlord, assisted in the recertification process.

118.     APS still has not arranged for Section 8 to inspect Ms. Belovic's apartment.

**Genevieve C.**

119.     Genevieve C. is a forty seven-year-old woman living alone in a one bedroom apartment in Queens, New York.

120.     Ms. C. is severely disabled and has been unable to work since November 2003. She has been an APS client since approximately October 2006.

121.     Her sole source of income is $137 per month in cash public assistance and $155 per month in Food Stamps.  Ms. C.'s rent is $607 per month, of which $215 is paid by public assistance.

122.    Ms. C. has no friends or family in the community who are able to assist her and she suffers from many functional deficits that prevent her from adequately caring for herself or protecting herself from harm.

123.    Ms. C. suffers from many severe and debilitating illnesses including metal and chemical poisoning, spinal degeneration along her entire spine, interstitial cystitis (ulcers in her bladder, incontinence, urine retention and an irritable bladder), uterine fibroids, ovarian cysts, myasthenia gravis (autoimmune disease that causes severe muscle pain, muscle weakness, and a loss of muscle, fat, and the grasp reflex in her hands), fibromyalgia, facial neuralgia, severe hypoglycemia, Sjogren's syndrome, (another autoimmune disease), asthma, and severe chronic fatigue syndrome.

124.    Because of her disabilities, Ms. C. is not able to perform many of the functions of daily life.  She experiences great difficulty standing and walking, and it is virtually impossible for her to climb stairs.

125.    She cannot leave her apartment without taking prescribed stimulants and can only take the public bus very short distances. It is very difficult for her to go anywhere that requires a bus transfer or a subway ride.

126.    She cannot clean her apartment and has an extremely difficult time doing laundry, grocery shopping, or cooking.

127.    The illnesses leave her confused and disoriented, and cause her mental fugues and memory loss.

128.    Ms. C. attempted to apply for Supplemental Security Income ("SSI") and Social Security Disability ("SSD") but her SSD application was never successfully filed and her SSI

application was denied. Because she suffers from weakness and confusion resulting from her disabilities, she has not been able to pursue these applications on her own.

129.    Ms. C. has so little money that she often has to choose between eating and paying for her utilities.  In the past she has had roommates who helped with the rent, but because of her illness and weakened state, her apartment is now too cluttered and messy for anyone else to live there.

130.    Ms. C. has been unable to pay her landlord the full rent in over a year, and owes him over $4,000.  While he has not yet begun an eviction proceeding against her, she has heard that he plans to do so.  She is very worried about losing her home.

131.    In or around October 2006, Ms. C. was so sick that she could barely manage to feed herself and was doing the minimum amount that she had to do to stay alive.  On October 16, 2006, as a last resort, she called the APS central intake line.

132.    No one from APS met with Ms. C. until November 26, 2006, over one month later.  Ms. C. received a "Notice of Eligibility Determination" dated December 16, 2006, which stated that she had been accepted as an APS client.

133.    During her first meeting with an APS caseworker, as well as before and after that meeting, Ms. C. told her caseworker she needed help cleaning her apartment so that she could find a roommate, appealing the restrictions on her Access-A-Ride services, applying for SSD and reopening her SSI case.  She also told the caseworker that she needed financial help to pay her phone and electric bill and about $2,000 in rent arrears that she owed her landlord, and a lawyer to represent her at her upcoming SSD hearing. She told him that she was likely to be evicted soon, and needed help either figuring out a way to pay the rent or help finding a new place to

live.   She also said that she needed help applying for home care to help her cook, shop and do laundry.

134.    Although Ms. C.'s caseworker initially said that APS could help Ms. C with these problems, APS did not end up helping her with any of these things, despite many desperate phone calls.  In fact, Ms. C.'s initial caseworker was transferred off Ms. C.'s case and when Ms. C. called APS to beg for help, she was told that APS could not help her because she had no caseworker, and that she would not be helped until she was assigned a new caseworker.

135.    Ms. C. recently had treatment for metal poisoning and has become a little bit stronger.  During March 2007, she was able to reopen her application for SSI and submit her application for SSD, and submit an application for a Section 8 Housing Rental Voucher. However, she does not have the strength to contact all of her doctors and gather the medical documentation she will need to substantiate her SSD and SSI claims, or look for alternative housing.

136.    On March 29, 2007, two APS workers visited Ms. C. at home. They had not been briefed on her case and were unaware of her limitations, but one of them said she was going to be Ms. C.'s new case worker, and that they were there only to check if she was OK.

137.    Ms. C. told them that she was not OK and that she needed help preventing her impending eviction, finding alternative housing, cleaning her apartment, obtaining documentation from her doctors in order to support her SSD and SSI claims, appealing her partial Access-A-Ride denial, and finding an attorney to help with her SSD and SSI claims.  The caseworker told her that APS' policy was not to speak to doctors under any circumstances and that APS could not help her with her rent arrears until she received a notice of eviction.

138.    On March 30, 2007, Ms. C. was informed that her Access-A-Ride services were going to be discontinued because Access-A-Ride had come to pick her up on a few occasions and she had not been waiting outside.  She did not know that Access-A-Ride was there on those occasions. Ms. C. needs help appealing this discontinuance and with her original appeal of her limited Access-A-Ride services grant.

139.    Ms. C. still needs help cleaning her apartment so that she can get a roommate to help pay the rent.

140.    Ms. C.'s primary care physician has told her that she should see a toxicologist and a neurologist, but she has not been able to find a toxicologist or a neurologist who has expertise in myasthenia gravis and accepts Medicaid.  She does not have the strength to do so on her own and needs APS to help her locate such specialists.

141.    Ms. C. owes over $4,000 to her landlord and is afraid she will soon be evicted. She needs help applying for a Public Assistance one-shot payment and arranging for a roommate so she will have the future ability to pay her rent.

142.    If her eviction cannot be prevented, Ms. C. needs help finding alternative housing. Because of her illness, she does not believe she would not be able to function in a homeless shelter.

143.    Despite her desperate need for help, Ms. C. has received no help from APS.

**Madelaine Andrews**

144.    Madelaine Andrews is an 85-year-old woman who lives alone in a rent-controlled, fourth-floor walk-up apartment in Manhattan.

145.    She suffers from numerous illnesses, including heart disease and a heart murmur, diabetes, cataracts, and mouth ulcers, and she was recently diagnosed with a mass on her right lung.

146.    Because of her disabilities, Ms. Andrews is not able to perform many of the functions of daily life.  She has no friends or family in New York City who are willing or able to assist her.

147.    Currently, Ms. Andrews is cared for by a Medicare-funded home attendant who visits three days per week for three hours at a time.  Ms. Andrews needs more hours of home care.

148.    Ms. Andrews's only source of income is $974 per month in Social Security payments, and she receives free meals from Meals on Wheels.

149.    Ms. Andrews is a prisoner in her own home.  She lost the use of her legs in June 2006, and, since then, she has been unable to go up or down stairs unless someone carries her. She has left her apartment only twice in the past ten months— in August 2006, when she was admitted to New York Presbyterian Hospital, and in March 2007, when she was again admitted to New York Presbyterian Hospital for what the doctors told her was a mild heart attack. Because she was taken to the hospital by an ambulance both times, paramedics carried her down the four flights of stairs.

150.    In September 2006, Ms. Andrews was visited by an APS caseworker who spoke with her about her medical treatment and living situation.

151.    The APS caseworker indicated that she would apply for Medicaid on Ms. Andrews's behalf so that she could obtain more home care, and that the caseworker would "make a note" of Ms. Andrews's housing situation.

152.    After several weeks passed without any action being taken on her case, Ms. Andrews made numerous attempts to contact her APS caseworker and the caseworker's supervisor.

153.    Ms. Andrews eventually learned that her APS case had been transferred to a new caseworker.  She then left numerous messages for the new caseworker but was not able to reach her for another several weeks.

154.    The new APS caseworker visited Ms. Andrews in late January or early February 2007.  The new caseworker told Ms. Andrews that she would look into the status of her Medicaid application and that she would try to find her a different apartment.

155.    Ms. Andrews still has not received any of the services she was promised and has been told to be patient and wait for the caseworker to call her.  Ms. Andrews's social worker from the Mount Sinai Visiting Doctors Program, Helena Ross, also has made numerous attempts to contact APS about Ms. Andrews's Medicaid application, to no avail.

156.    Ms. Andrews's health continues to deteriorate while she waits for the protective services to which she is legally entitled.  She urgently requires treatment for ulcers and open cuts in her mouth, without which she is unable to eat.  She also needs to see an optometrist so that she can obtain new glasses in order to be able to read, and she needs to see an ophthalmologist to treat her cataracts.  Ms. Andrews is unable to obtain this care without help.

157.    Ms. Andrews's doctor has told her that she needs more home care than she is currently receiving, but Ms. Andrews is unable to arrange that on her own.

158.    Despite Ms. Andrews's immediate need for medical attention and services—as well as her desperate need to move into a less hazardous living situation—APS has done nothing to help her since taking her on as a client in or around September 2006.

**Mary B.**

159.    Mary B. is a sixty-one-year-old woman who lives in Manhattan with her mentally-disabled adult son.

160.    She suffers from numerous physical illnesses, including asthma, diabetes, arthritis, migraine headaches, angina, high cholesterol, high blood pressure, stomach ulcers, and blood clots in her left leg.  She also suffers from schizophrenia and depression.

161.    Ms. B. is currently being treated for Human Immunodeficiency Virus ("HIV"), for which she tested positive in 2006.  She is proceeding anonymously because she does not want anyone to find out that she is HIV-positive.

162.    Ms. B. has suffered two strokes, the first in 2002 and the second in 2005.  The first stroke resulted in temporary numbness on the right side of her body.  The second stroke resulted in permanent partial paralysis of the right side of her face and weakness in her right leg that causes her to walk with a limp.  The second stroke also resulted in blood clots in her brain, which cause severe memory problems and impair her speech.  She also has difficulty writing or holding things in her hands, thus making it difficult to perform household tasks such as cooking and handling dishes.

163.    Because of her disabilities, Ms. B. is unable to perform many of the functions of daily life.

164.    Ms. B. found out that she was a client of APS in late 2005 when an APS caseworker came to her home while she was in the hospital.  Ms. B's son told the caseworker that she would be home from the hospital soon, and the caseworker promised to return another day.

165.    In or about early 2006, about one month after Ms. B. was released from the hospital, the APS caseworker visited Ms. B. at home.  The caseworker told Ms. B. that she was

her APS caseworker, that she knew that Ms. B. had been having trouble paying her rent on time, and that APS would help her clear up the arrears and pay the rent on time in the future.

166.    Ms. B. asked the caseworker to help her obtain Food Stamps because she routinely ran out of money for food.  The caseworker stated that she would apply for Food Stamps on Ms. B.'s behalf.  Ms. B. also asked for help to challenge deductions from her monthly SSI check, and the caseworker said she would look into it.  The caseworker also agreed to help Ms. B. access services available to HIV-positive individuals, which Ms. B. needs in order to learn about her diagnosis and how to care for herself properly.

167.    Due to the SSI deductions and lack of Food Stamps, Ms. B. is unable to buy the food and personal items such as soap, shampoo, powder, and medicinal ointment that she needs.

168.    Despite the APS caseworker's promise to help Ms. B. with her problems, she received no such help during the next four or five months.  APS did not did not perform the promised financial management and did not pay her rent.

169.    As a result, Ms. B. received threatening letters almost every month from her landlord, the New York City Housing Authority ("NYCHA").

170.    In March 2006, Ms. B. received a notice of eviction due to APS' failure to manage her finances.  She contacted her caseworker, who did not explain why APS was not paying her rent and simply suggested that she contact a lawyer.

171.    Ms. B. contacted Joseph Krummel, a lawyer at the New York Legal Assistance Group ("NYLAG"), who had represented her previously.  Mr. Krummel agreed to represent her but it was still necessary for Ms. B. to go to housing court on more than one occasion.  The case was settled in late April 2006.

172.    Despite the eviction proceeding, APS still did not begin paying Ms. B.'s rent until the summer of 2006.

173.    Even after APS began to pay Ms. B.'s rent, it made the payments late almost every month, so she continued to receive threatening letters from NYCHA, which were usually accompanied by a "THREE DAY NOTICE TO VACATE."  Each time she received one of these notices, Ms. B. called her APS caseworker or the caseworker's supervisor, but she was not always able to reach them and the problems continued.  The letters from NYCHA made her very worried and afraid that she would lose her home.

174.    During the summer of 2006, NYCHA brought another proceeding against Ms. B. in Housing Court which NYCHA discontinued in August of 2006, when APS admitted it had failed to pay Ms. B.'s rent for months and arranged for the payment of the arrears.

175.    Because of APS' continued failure to pay Ms. B.'s rent on time, NYCHA brought another termination of tenancy proceeding against her.  She again contacted Mr. Krummel and he was able to settle the matter in January 2007.  Nonetheless, Ms. B. continues to receive threatening letters from NYCHA about late payment of rent.

176.    APS currently takes the full amount of Ms. B.'s rent out of her monthly SSI benefits even though she is responsible for only half of the amount.  When she raised this issue with her caseworker, she was told that she would have to obtain her son's portion of the rent directly from him.  However, she has difficulty collecting the money from him and, as a result, she often does not have enough money each month to purchase food and other necessities.

177.    APS does not send Ms. B.'s SSI benefits to her until the ninth or tenth of each month.  She often runs out of money for food while waiting for her benefits to arrive.

178.    APS failed to arrange for Ms. B. to obtain Food Stamps as they promised they would.  Ms. B. called her caseworker and the caseworker's supervisor numerous times after her initial contact with APS to report that she did not have enough food, but nothing was done.

179.    In mid-2006, Ms. B. received a letter stating that her Food Stamp application had been denied; she called her caseworker and the supervisor, but they took no action to address the situation.

180.    Several times, Ms. B. has had to go to a food pantry or borrow money for food from a friend—there are also days when she simply goes hungry.  She has asked APS for assistance with this problem many times, but her caseworker has done nothing aside from sending $10-worth of food one day when she called crying and begging for help getting food.

181.    A new APS caseworker visited Ms. B. in late February 2007, and Ms. B. told him about all of her needs.

182.    Two weeks later, the new caseworker visited Ms. B. and said he would apply for Food Stamps on her behalf.

183.    A couple of weeks later, Ms. B. received notices indicating that she was eligible for Food Stamps in the amount of $13 per month.

184.    Additionally, as of January 1, 2007, Ms. B.'s SSI benefits increased from $564 per month to $606 per month, but the amount of money that APS sends her each month has remained the same.

185.    APS is still not paying Ms. B.'s rent on time, has done nothing about her problems with SSI, and has offered no HIV support services.

**Maureen Curran**

186.     Maureen Curran is a forty-six-year-old woman who lives alone in a one-bedroom basement apartment in Staten Island.  She has been a client of APS since approximately October 2006.

187.     Ms. Curran's sole source of income for the past twelve years has been $710 per month in SSI benefits.  She also receives $152 in Food Stamps per month.

188.     She suffers from bipolar disorder, clinical depression, panic anxiety disorder, and Posttraumatic Stress Disorder ("PTSD") due to severe physical and mental abuse by her daughter's father, multiple sexual assaults, and sexual abuse her by own father during her childhood.  Ms. Curran also suffers from arthritis and scoliosis of the spine.

189.     Because of her disabilities, Ms. Curran is not able to perform many of the functions of daily life.  She gets easily confused and struggles to remember events, times, and places.  She feels that she cannot keep things straight in her mind and is unable to fully take care of herself.

190.     Because of Ms. Curran's psychiatric conditions, it is very difficult for her to leave her apartment and she rarely does so.  Ms. Curran regularly experiences anxiety attacks when she tries to function in the world outside her apartment.  When she has an anxiety attack, she starts to cry and shake uncontrollably and she cannot breathe.  Her anxiety attacks have been so bad that she cannot stay upright and feels paralyzed until the attack subsides.

191.     Ms. Curran does not have a primary care physician or a treating psychiatrist or therapist.  She is entirely dependent for medical care on Emergency Room doctors.  She is unable to arrange for regular medical care on her own, and she has not received any regular

medical treatment for her bipolar disorder, PTSD, depression, arthritis or scoliosis for the past two years.

192.    Because of Ms. Curran's disabilities, she finds it difficult to go grocery shopping or do anything outside of the house.  She also has a very difficult time using public transportation.  Even inside the house, the anxiety can cause her body to shake so much that she finds it difficult to take a shower because she is afraid that she will slip and fall.

193.    On September 14, 2006, Ms. Curran went to Housing Court because her landlord commenced a summary holdover proceeding.

194.    Being in Housing Court made Ms. Curran so upset that she was unable to participate in any way in the Court proceeding.  She was crying and shaking, and she felt like she wanted to kill herself.  She was terrified of being evicted and forced to leave her apartment later that day.

195.    Sarah T. Gillman, a lawyer at The Legal Aid Society agreed on the spot to represent her.  She assured Ms. Curran that she would not have to leave her apartment that day, but Ms. Curran was not able to stop crying and shaking, or fully comprehend what she was told. Ms. Gillman was able to get Ms. Curran's Housing Court case adjourned to October 4, 2006.

196.    Although Ms. Gillman made an appointment for Ms. Curran to come to her office prior to the next Housing Court date, Ms. Curran did not appear and Ms. Gillman's attempts to call her were unsuccessful.

197.    On October 4, 2006, Ms. Gillman appeared in Housing Court and requested that the Court make a referral to APS on behalf of Ms. Curran for a guardian ad litem ("GAL") and other services to assist Ms. Curran with her housing situation based on Ms. Curran's earlier

experience in Housing Court and Ms. Curran's inability to communicate with her since then. The case was adjourned to November 2, 2006.

198.    On November 2, 2006, Ms. Gillman appeared in Housing Court and was advised by the Court that APS had denied the request for a GAL.

199.    According to the Staten Island APS office, Ms. Curran had been assigned an APS caseworker and the worker had denied the request for an appointment of a GAL.

200.    Ms. Gillman requested that a psychiatric evaluation be done and that APS make a decision about the appointment of a GAL in the Housing Court case based on a full psychiatric examination.  The Housing Court case was adjourned to November 22, 2006.

201.    At around this time, two men came to Ms. Currran's apartment.  They told her that they were from Adult Protective Services and that they were visiting because of the Housing Court case.  One of the men told her he was a psychiatrist.  During that visit, the psychiatrist asked Ms. Curran questions about her psychiatric conditions, her daily activities and how she functioned, but asked her nothing about the housing court case or whether she felt she would be able to appear in court.

202.    Towards the end of the visit, Ms. Curran asked the psychiatrist and APS caseworker about what would happen if she was evicted.  She specifically asked about the possibility of emergency housing.  The psychiatrist told her there was no such thing as emergency housing.  He told her they couldn't help her.

203.    On November 22, 2006, Ms. Gillman appeared in the Housing Court and was advised by the Court that APS had conducted a psychiatric evaluation of Ms. Curran and even though she was determined to have an extremely low Global Assessment of Functioning ("GAF") of 50, APS was still not going to move for the appointment of a GAL because Ms.

Curran had an attorney in the Housing Court case. A GAF of 50 is defined as "a serious impairment in social, occupational, or school functioning."

204.    Because APS had declined to appoint a GAL, the Housing Court adjourned the case for a trial on December 21, 2006. Ms. Curran did not appear in Housing Court on December 21, 2006, and the case went to trial without her.

205.    On or about January 4, 2007, Ms. Gillman contacted the Staten Island APS office about Ms. Curran's situation and was told that APS had advised the Housing Court that they wanted to know the outcome of the summary holdover proceeding and would assist Ms. Curran with any services that would help with her housing situation.

206.    On January 11, 2007, Ms. Gillman contacted the Staten Island APS office about Ms. Curran to inquire about what services had been provided. She was advised that a case worker had spoken with Ms. Curran about shared housing and that the caseworker had apparently confirmed with Ms. Curran that she had made an application for New York City Public Housing. The APS representative informed Ms. Gillman that APS would drive Ms. Curran to a shelter in the event that the Housing Court made a decision in favor of the landlord.

207.    On February 20, 2007, the Housing Court issued a Decision/Order that dismissed the summary holdover proceeding against Ms. Curran because the landlord failed to prove his prima facie case.

208.    Shortly thereafter, Ms. Gillman contacted the Staten Island Office of APS to determine what, if anything, had been done on behalf of Ms. Curran since her last communication with them. She was advised that the status of Ms. Curran's case with APS had not changed and that no further action had been taken on her behalf.

209.    In or about the second week of March 2007, Ms. Curran's landlord served her with a thirty day notice of termination.  Because Ms. Curran resides in "unregulated" housing there are very few defenses available to her and it is unlikely that this second holdover proceeding will be dismissed.

210.    Due to Ms. Curran's likelihood of eviction, it is imperative that APS assist her in securing and maintaining alternative suitable housing.

211.    Ms. Curran thinks she has applied for some kind of public housing, but she is not sure if she applied for public housing or Section 8 or both.  She does not know what to do or how to check on the status of her application, or how to go about looking for other housing if she gets evicted.  She has looked in the newspaper but there seems to be no apartment that she can afford on her limited income.

212.    If APS is not required to act on behalf of Ms. Curran by assisting her with obtaining and maintaining alternative suitable housing, Ms. Curran will become homeless. Given Ms. Curran's severe psychiatric problems, this would be extremely detrimental to her health and safety.  Ms. Curran stayed in a homeless shelter about seven years ago and she was raped at the shelter.  She is terrified of being homeless, but she does not feel that she can go back to another homeless shelter.

213.    Ms. Curran also needs APS to help her arrange for regular medical care and attention.

214.    Ms. Curran needs a home attendant for several hours per week to help with grocery shopping and accompanying Ms. Curran to medical appointments.  Nobody from APS has ever discussed the possibility of home care with Ms. Curran, nor has APS offered to help her apply.

215.    Ms. Curran needs assistance applying for Access-a-Ride Services and Reduced Fare Metrocard for People with Disabilities.

216.    It has been several months since Ms. Curran has spoken to anyone at APS.  She thinks they are currently not doing anything to help her.

### FACTS CONCERNING THE CLASS

217.    New York State allocates a portion of its Title XX allotment to local social services districts to reimburse them for the cost of providing, inter alia, protective services for adults.

218.    As of January 2007, HRA had approximately 6,130 active APS cases.  In that same month, HRA received over 1,130 APS referrals.

219.    All APS clients have been determined to be eligible for protective services because they are individuals who, because of mental or physical impairments, are unable to manage their own resources, carry out the activities of daily living, or protect themselves from physical abuse, sexual abuse, emotional abuse, active, passive or self neglect, financial exploitation or other hazardous situations without assistance from others.

220.    All Plaintiffs are individuals who because of a physical or mental impairment are substantially limited in their ability to carry out major life activities, such as caring for themselves.

221.    All Plaintiffs need protective services and reasonable accommodations in order to be able to survive unharmed in the community.

222.    The mental and physical disabilities of APS clients limit their ability to engage in regular activities of daily life such as traveling, standing in line, keeping scheduled

appointments, completing paper work, retaining documents, and making repeated phone calls to reach busy government phone numbers.

223.    It is extremely difficult, and in some cases impossible, for APS clients to negotiate the social services system on their own.

224.    The mental and physical disabilities of APS clients create significant barriers to obtaining and maintaining federal and state benefits and services.

225.    Because of their physical and mental impairments, APS clients need reasonable accommodations in order to obtain and maintain eligibility for Food Stamps and Medicaid benefits to which they are entitled.

226.    Defendants Doar, Hansell and Daines are failing to provide effective assistance necessary for Plaintiffs to obtain and maintain eligibility for Food Stamp and/or Medicaid benefits to which they are entitled.

227.    Defendants Hansell and Daines are failing to supervise Defendant Doar to ensure that he provides effective assistance necessary for Plaintiffs to obtain and maintain eligibility for Food Stamp and/or Medicaid benefits.

228.    As a result of Defendants' failures, plaintiffs are not receiving the Food Stamps and Medicaid benefits to which they are entitled.

229.    APS routinely takes Plaintiffs from their homes and takes them for admission to nursing homes or other institutional settings when those individuals are able to live in the community in more integrated settings.

230.    Because Plaintiffs are mentally or physically impaired, it is often difficult or impossible for them to arrange to leave the nursing homes or other institutional settings on their

own.  APS has a custom and practice of failing to assist its clients to return to the community once those clients have been institutionalized.

231.    Defendants Doar and Carrion have a custom and practice of unnecessarily segregating Plaintiffs and of failing to maintain Plaintiffs in the most integrated setting appropriate to their needs.

232.    Defendant Carrion has a custom and practice of allowing Defendant Doar to unnecessarily segregate Plaintiffs and failing to maintain Plaintiffs in the most integrated setting appropriate to their needs.

233.    APS routinely takes Plaintiffs for admission to nursing homes or other institutional settings involuntarily, and without informing those individuals of its intent to do so, and fails to provide those individuals with an opportunity to challenge their institutionalization.

234.    Defendant Carrion has a custom and practice of failing to provide or to ensure the provision of notice when APS involuntarily removes Plaintiffs from their homes, and of failing to provide an opportunity to challenge that involuntary removal.

235.    Defendants Doar and Carrion have a custom and practice of failing to adequately staff or to ensure adequate staffing of APS offices.

236.    Approximately sixty percent of APS caseworkers in New York City have caseloads higher than that recommended by the National Association of Adult Protective Services Administrators ("NAAPSA").

237.    In Manhattan, as of December 2006, the average caseload for a single APS caseworker is approximately forty-two cases, 68% higher than the twenty-five case limit recommended by NAAPSA.  Some caseworkers have caseloads as high as eighty-one cases.

238.    Defendants Doar and Carrion have a custom and practice of failing to adequately train or to ensure the training of APS caseworkers and supervisory staff.

239.    The basic core competency requirements for APS staff do not comply with NAAPSA recommended requirements

240.    Additionally, despite a significant increase in the number of applications for and referrals to APS in the last several years, there has been almost no increase in APS staff.  From 2005 to 2007, the number of active APS cases increased by 1,153 and the number of APS referrals increased by 1,222.  However, during that same time period, the total number of APS staff increased by only three people.

241.    APS caseworkers frequently fail to return phone calls and email messages from clients and from other social services organizations seeking to help clients.

242.    APS workers' voicemail boxes are frequently full, making it impossible for clients and workers from other social services agencies to even leave them messages.

243.    Defendants Doar and Carrion utilize and allow utilization of methods of administration that effectively defeat and/or substantially impair the provision of protective services to APS clients.

244.    Defendants Doar and Carrion have a custom and practice of failing to provide or ensure the provision of timely and/or adequate protective services to Plaintiffs.

245.    APS caseworkers routinely promise clients that they will take care of matters, such as recertifying clients for public benefits, or assisting with cut offs of utilities or threatened evictions, and then fail to do so.

246.    APS clients routinely rely on such promises by their APS caseworkers and thus make no efforts to find other help, or make such efforts only much later when it is harder to prevent the threatened harm.

247.    APS routinely fails to assist its clients in applying for and/or maintaining eligibility for federal and state benefits and services, including Food Stamps, Medicaid, SSI, Section 8 vouchers, Disability Rent Increase Exemption, and Senior Citizen Rent Increase Exemption benefits.

248.    Defendant Carrion routinely fails to supervise Defendant Doar and ensure that he assists clients in applying for and maintaining eligibility for federal and state benefits.

249.    APS clients routinely fail to get federal and state benefits to which they are entitled because of Defendants' failures to help them obtain and/or maintain those benefits.

250.    Defendants Doar and Carrion have a custom and practice of failing to provide or to ensure the provision of timely and/or adequate eviction prevention and/or housing relocation services to APS clients.

251.    Defendants Doar and Carrion have a custom and practice of failing to provide or to ensure the provision of timely and/or adequate housekeeping and/or home-maker services and/or heavy duty cleaning services to APS clients.

252.    Defendants Doar and Carrion have a custom and practice of failing to provide or to ensure the provision of timely and/or adequate financial management and/or to function adequately as a representative or protective payee for APS clients in need of such services.

253.    Defendants Doar and Carrion have a custom and practice of failing to apply, and/or of failing to apply in a timely manner for guardianship under Article 81 of the New York Mental Hygiene Law for clients in need of such applications.

254.    Defendant Carrion has a custom and practice of failing to ensure that Defendant Doar applies and applies in a timely fashion for Article 81 guardianships for clients in need of such applications.

255.    Defendants Doar and Carrion have a custom and practice of failing to petition for the appointment of guardians ad litem ("GAL") under New York Civil Practice Law and Rules §§ 1201 and 1202 for clients in need of such GALs.

256.    Defendant Carrion has a custom and practice of failing to ensure that Defendant Doar applies for appointment of GALs for clients in need of them.

257.    Defendants Doar and Carrion have a custom and practice of failing to co-ordinate and communicate with other local social services district offices and community-based resources to obtain needed services for APS clients.

258.    Defendant Carrion has a custom and practice of failing to ensure that Defendant Doar co-ordinate and communicate with other local social services district offices and community-based resources to obtain needed services for APS clients.

259.    Defendant Carrion has a custom and practice of failing to supervise Defendant Doar in its provision of protective services, and of failing to ensure that Defendant Doar lawfully provides protective services to it clients.

## FIRST CAUSE OF ACTION

260.    Defendants Doar, Daines, Hansell, and Carrion are failing to provide and to supervise and/or ensure the provision of the reasonable accommodations Plaintiffs need to obtain and maintain eligibility for Food Stamp and/or Medicaid benefits to which they are entitled, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130; 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51; 7 C.F.R. §

15b.4 (Food Stamps); and 45 C.F.R. § 84.4 (Medicaid); and N.Y. Soc. Serv. Law § 473(1)(f) and 18 N.Y.C.R.R. § 457.1(d)(6).

## SECOND CAUSE OF ACTION

261.    Defendants Doar and Carrion are discriminating against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions and by failing to provide them with services in the most integrated setting appropriate to their needs in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(d); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(d).  Defendant Carrion is failing to supervise and/or ensure that Defendant Doar does not discriminate against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions and failing to provide them with services in the most integrated setting appropriate to their needs in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(d); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(d).

## THIRD CAUSE OF ACTION

262.    Defendants Doar and Carrion are discriminating against Plaintiffs by utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(b)(3)(ii); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(b)(3)(ii). Defendant Carrion is failing to supervise and/or ensure that Defendant Doar does not discriminate against Plaintiffs by utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its

implementing regulation, 28 C.F.R. § 35.130(b)(3)(ii); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(b)(3)(ii).

## FOURTH CAUSE OF ACTION

263.    Defendants Doar and Carrion are depriving Plaintiffs of their liberty interests without due process by involuntarily removing Plaintiffs from their homes without any form of notice or opportunity to challenge such involuntary removal, in violation of Plaintiffs' rights under the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, U.S. Const., amend XIV, § 1, and of the New York State Constitution, N.Y. Const., art. I, § 6. Defendant Carrion is failing to supervise and/or ensure that Defendant Doar does not deprive Plaintiffs of their liberty interests without due process when involuntarily removing Plaintiffs from their homes without any form of notice or opportunity to challenge such involuntary removal, in violation of Plaintiffs' rights under the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, U.S. Const., amend XIV, § 1, and of the New York State Constitution, N.Y. Const., art. I, § 6.

## FIFTH CAUSE OF ACTION

264.    Defendants Doar and Carrion are failing to provide Plaintiffs with and/or ensure the provision of timely and/or adequate protective services to which they are legally entitled, in violation of Plaintiffs' rights pursuant to N.Y. Soc. Serv. Law § 473 and 18 N.Y.C.R.R. § 457; and the New York State Constitution, art. XVII. Defendant Carrion is failing to supervise Defendant Doar to ensure that Defendant Doar provides Plaintiffs with adequate protective services to which they are legally entitled, in violation of Plaintiffs' rights pursuant to N.Y. Soc. Serv. Law § 473 and 18 N.Y.C.R.R. § 457; and the New York State Constitution, art. XVII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and others similarly situated, respectfully request that this Court:

1.      Enter an Order, pursuant to Rule 10(a) of the Federal Rules of Civil Procedure, permitting Plaintiffs Mary B. and Genevieve C. to proceed anonymously; Enter an Order, pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, that this action be maintained as a class action;

2.      Certify, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, a Plaintiff class defined as:

> All current and future clients of Adult Protective Services in New York City who are not receiving or will not receive protective services from Adult Protective Services to which they are legally entitled.

3.      Enter a preliminary injunction directing Defendants to provide timely and adequate protective services and/or reasonable accommodations to the Named Plaintiffs as requested in Plaintiffs' Order to Show Cause for a preliminary injunction and class certification.

4.      Enter a final judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 54, 57 and 58 of the Federal Rules of Civil Procedure declaring that:

> a.      Defendants Doar, Daines, and Hansell, and Carrion are failing to provide and to supervise and/or ensure the provision of the reasonable accommodations Plaintiffs need to obtain and maintain eligibility for Food Stamp and/or Medicaid benefits to which they are entitled, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130; 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51; 7 C.F.R. § 15b.4 (Food Stamps); and 45

C.F.R. § 84.4 (Medicaid); and N.Y. Soc. Serv. Law § 473(1)(f) and 18 N.Y.C.R.R. § 457.1(d)(6).

b.      Defendants Doar and Carrion are discriminating against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions and by failing to provide them with services in the most integrated setting appropriate to their needs in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(d); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(d).

c.      Defendant Carrion is failing to supervise and/or ensure that Defendant Doar does not discriminate against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions and by failing to provide them with services in the most integrated setting appropriate to their needs in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(d); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(d).

d.      Defendants Doar and Carrion are discriminating against Plaintiffs by utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs, in violation of Plaintiffs' rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28 C.F.R. § 35.130(b)(3)(ii); and 29 U.S.C. § 794 and its implementing regulation, 28 C.F.R. § 41.51(b)(3)(ii).

e.      Defendant Carrion is failing to supervise and/or ensure that Defendant

Doar does not discriminate against Plaintiffs by utilizing methods of

administration that effectively defeat and/or substantially impair the

provision of protective services to Plaintiffs, in violation of Plaintiffs'

rights pursuant to 42 U.S.C. § 12132 and its implementing regulation, 28

C.F.R. § 35.130(b)(3)(ii); and 29 U.S.C. § 794 and its implementing

regulation, 28 C.F.R. § 41.51(b)(3)(ii).

f.      Defendants Doar and Carrion are depriving Plaintiffs of their liberty

interests without due process by involuntarily removing Plaintiffs from

their homes without any form of notice or opportunity to challenge such

involuntary removal, in violation of Plaintiffs' rights under the Due

Process Clauses of the Fourteenth Amendment to the United States

Constitution, U.S. Const., amend XIV, § 1, and of the New York State

Constitution, N.Y. Const., art. I, § 6.

g.      Defendant Carrion is failing to supervise and/or ensure that Defendant

Doar does not deprive Plaintiffs of their liberty interests without due

process by involuntarily removing Plaintiffs from their homes without any

form of notice or opportunity to challenge such involuntary removal, in

violation of Plaintiffs' rights under the Due Process Clauses of the

Fourteenth Amendment to the United States Constitution, U.S. Const.,

amend XIV, § 1, and of the New York State Constitution, N.Y. Const., art.

I, § 6.

h.      Defendants Doar and Carrion are failing to provide Plaintiffs with and/or ensure the provision of timely and/or adequate protective services to which they are legally entitled, in violation of Plaintiffs' rights pursuant to N.Y. Soc. Serv. Law § 473 and 18 N.Y.C.R.R. § 457; and the New York State Constitution, art. XVII.

i.      Defendant Carrion is failing to supervise Defendant Doar to ensure that Defendant Doar provides Plaintiffs with adequate protective services to which they are legally entitled, in violation of Plaintiffs' rights pursuant to N.Y. Soc. Serv. Law § 473 and 18 N.Y.C.R.R. § 457; and the New York State Constitution, art. XVII.

5. Enter a final judgment granting Plaintiffs a permanent injunction enjoining:

a.      Defendants Doar, Daines, Hansell, and Carrion to provide and/or supervise and ensure the provision of the reasonable accommodations Plaintiffs need to obtain and maintain eligibility for Food Stamp and/or Medicaid benefits to which they are entitled;

b.      Defendants Doar and Carrion to refrain from discriminating against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions and by failing to provide Plaintiffs with services in the most integrated setting appropriate to their needs;

c.      Defendant Carrion to refrain from failing to supervise and/or ensure that Defendant Doar does not discriminate against Plaintiffs by subjecting them to continued, unnecessary segregation in institutions and by failing

to provide Plaintiffs with services in the most integrated setting appropriate to their needs;

d.      Defendants Doar and Carrion to refrain from discriminating against Plaintiffs by utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs;

e.      Defendant Carrion to supervise and/or ensure that Defendant Doar refrains from discriminating against Plaintiffs by utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs;

f.      Defendants Doar and Carrion to provide and/or supervise and ensure the provision to Plaintiffs of notice and an opportunity to challenge the involuntary removal of Plaintiffs from their homes;

g.      Defendants Doar and Carrion to provide Plaintiffs with and/or supervise and ensure the provision of timely and/or adequate protective services to which they are legally entitled.

6.   Award reasonable attorneys' fees, as provided by 42 U.S.C. § 1988; 29 U.S.C. § 794a(b); 42 U.S.C. § 12205.

7.   Award costs and disbursements;

8. Grant such other and further relief as this Court deems equitable and just.

Dated:     April 10, 2007
           New York, New York


                                    NEW YORK LEGAL ASSISTANCE GROUP
                                    YISREOL SCHULMAN, ESQ.



                                    By:  /s/_____
                                    Jane Greengold Stevens, of counsel (JS 4790)
                                    Sabrina Tavi, of counsel (ST 2781)
                                    Caroline Hickey, of counsel (CH 1410)
                                    Deborah Berkman, of counsel (DB 8086)
                                    Jason Parkin, of counsel (JP 1919)
                                    450 West 33rd Street, 11th Floor
                                    New York, New York 10001
                                    Tel:  (212) 613-5000

                                    Attorneys for Plaintiffs