UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

MATILDA BELOVIC, by her next friend,
SUELLEN TOZZI; GENEVIEVE C.;
MADELAINE ANDREWS; MARY B.; and
MAUREEN CURRAN, by her next friend,
SARAH T. GILLMAN, individually, and on
behalf of all others similarly situated,                                         07 Civ. _____

                                        Plaintiffs,

                -against-

ROBERT DOAR, as Commissioner of the New
York City Human Resources Administration;
GLADYS CARRION, as Commissioner of the
New York State Office of Children & Family
Services; DAVID HANSELL, as Acting
Commissioner of the New York State Office of
Temporary & Disability Assistance; and
RICHARD F. DAINES, as Acting Commissioner
of the New York State Department of Health,

                                        Defendants.

-------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS
## FOR A PRELIMINARY INJUNCTION AND CLASS CERTIFICATION

YISROEL SCHULMAN, ESQ.
New York Legal Assistance Group
Jane Greengold Stevens, of Counsel (JS 4790)
Sabrina Tavi, of Counsel (ST 2781)
Caroline Hickey, of Counsel (CH 1410)
Deborah Berkman, of Counsel (DB 8086)
Jason Parkin, of Counsel (JP 1919)
450 West 33rd Street, 11th Floor
New York, NY 10001
Tel:  212-613-5000

Attorneys for Plaintiffs

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

     A.     Facts Concerning the Named Plaintiffs ...................................................3

          1.     Matilda Belovic.....................................................................3

          2.     Genevieve C..........................................................................7

          3.     Madelaine Andrews .............................................................10

          4.     Mary B. ................................................................................12

          5.     Maureen Curran ...................................................................15

     B.     Facts Concerning the Class as a Whole ..................................................18

ARGUMENT ..................................................................................................................21

I.     NAMED PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION
     DIRECTING DEFENDANTS TO IMMEDIATELY PROVIDE PROTECTIVE
     SERVICES IN ACCORDANCE WITH FEDERAL AND STATE LAW ......................21

     A.     Named Plaintiffs Are Suffering and Will Continue to Suffer Irreparable
          Harm Unless Defendants Are Enjoined to Provide Protective Services in
          Accordance With Federal and State Law.................................................21

     B.     Plaintiffs Are Likely to Succeed On the Merits of Their Claims ...........................26

          1.     Defendants Are Violating the Rights of Named Plaintiffs Under
               Title II of the Americans with Disabilities Act and Section 504 of
               the Rehabilitation Act ..............................................................26

          2.     Defendants Are Depriving Matilda Belovic of Her Liberty Interests
               Without Due Process of Law In Violation of Her Rights Under the
               Due Process Clause of the Fourteenth Amendment and New York
               State Law ..................................................................................36

          3.     Defendants' Failure to Provide Named Plaintiffs with Timely
               and/or Adequate Protective Services Violates New York State Law ........38

     C.     The Balance of Equities Strongly Favors the Issuance of Injunctive Relief .........42

II.    THE PROPOSED CLASS SHOULD BE CERTIFIED ......................................................43

    A.    The Class Satisfies the Requirements of Rule 23(a)..............................................43

        1.    The Class Is So Numerous that Joinder of All Class Members Is Impracticable..........................................................................................43

        2.    There Are Questions of Law and Fact Common to the Class...................45

        3.    The Claims of the Named Plaintiffs Are Typical of the Claims of the Members of the Class...........................................................................46

        4.    The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Plaintiff Class ....................................................................47

    B.    The Class Satisfies the Requirements of Rule 23(b)(2)........................................48

CONCLUSION................................................................................................................................49

# <u>TABLE OF AUTHORITIES</u>

## CASES

<u>Abreu v. Callahan</u>, 971 F. Supp. 799 (S.D.N.Y. 1997) .................................................................. 24

<u>Addington v. Texas</u>, 441 U.S. 418 (1979) ...................................................................................... 37

<u>Alexander v. Choate</u>, 469 U.S. 287 (1985)..................................................................................... 30

<u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 222 F.3d 52 (2d Cir. 2000) .......................... 47

<u>Bragdon v. Abbott</u>, 524 U.S. 624 (1998)........................................................................................ 34

<u>Caldwell v. Blum</u>, 621 F.2d 491 (2d Cir. 1980), <u>stay denied</u>, 446 U.S. 1311
     (1980)........................................................................................................................................ 23

<u>Consol. Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473 (2d Cir. 1995)........................................ 43

<u>Cortigiano v. Oceanview Manor Home for Adults</u>, 227 F.R.D. 194 (E.D.N.Y.
     2005) ........................................................................................................................................ 46

<u>Cutler v. Perales</u>, 128 F.R.D. 39 (S.D.N.Y. 1989)................................................................... 46, 47

<u>Dan R. v. Bane</u>, 606 N.Y.S.2d 1000 (2d. Dep't 1993) ........................................................... 40, 41

<u>Dopico v. Goldschmidt</u>, 687 F.2d 644 (2d Cir. 1982) .................................................................... 29

<u>Escalera v. New York City Hous. Auth.</u>, 425 F.2d 853 (2d Cir. 1970)......................................... 45

<u>Estevez v. Cosmopolitan Assocs. LLC</u>, No. 05-CV-4318 (JG), 2005 WL 3164146
     (E.D.N.Y. Nov. 28, 2005)....................................................................................................... 25

<u>Folsom v. Blum</u>, 87 F.R.D. 443 (S.D.N.Y. 1980) ......................................................................... 44

<u>German v. Fed. Home Loan Mortg. Corp.</u>, 885 F. Supp. 537 (S.D.N.Y. 1995)...................... 43, 44

<u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970)........................................................................................ 24

<u>Green Party of New York State v. New York State Bd. of Elections</u>, 389 F.3d 411
     (2d Cir. 2004).................................................................................................................... 21, 42

<u>Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York</u>, 201 F.R.D. 326
     (S.D.N.Y. 2001)...................................................................................................................... 46

<u>Haskins v. Stanton</u>, 794 F.2d 1273 (7th Cir. 1986) ...................................................................... 42

<u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261 (2d Cir. 2003)................................... 27, 29, 30, 34

Hughes v. Gates, 614 N.Y.S.2d 1007 (Sup. Ct. Monroe Co. 1994) , rev'd on other grounds, 629 N.Y.S.2d 905 (4th Dep't 1995)........................................................................ 40

In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir. 1992) ................................. 47

In re Janczak, 634 N.Y.S.2d 1020 (Sup. Ct. Ontario Co. 1995)............................................ 40, 41

K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist., 381 F. Supp. 2d 343 (S.D.N.Y. 2005) ........................................................................................................................................ 32

Kamean v. Local 363, Int'l Bhd. of Teamsters, 109 F.R.D. 391 (S.D.N.Y. 1986) ..................... 45

Kathleen S. v. Dep't of Public Welfare of Commw. of Pa., 10 F. Supp. 2d 460 (E.D. Pa. 1998) ................................................................................................................... 33

Kekis v. Blue Cross & Blue Shield of Utica-Watertown, Inc., 815 F. Supp. 571 (N.D.N.Y. 1993) ..................................................................................................................... 23

Lovely H. v. Eggleston, 235 F.R.D. 248 (S.D.N.Y. 2006) .................................................. 32, 48

Marisol A. v. Giuliani, 126 F.3d 372 (2d Cir. 1997) ............................................................ 45, 47

Mayer v. Wing, 922 F. Supp. 902 (S.D.N.Y. 1996) ..................................................................... 23

Mitchell v. Cuomo, 748 F.2d 804 (2d Cir. 1984) ........................................................................ 26

Nat'l Ass'n for the Advancement of Colored People v. Town of E. Haven, 70 F.3d 219 (2d Cir. 1995) ................................................................................................... 21

Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968) ................... 45

Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999) ........................................................ 31, 34

Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J., 698 F.2d 150 (2d Cir. 1983)........................................................................................................................ 45

Raymond v. Rowland, 220 F.R.D. 173 (D. Conn. 2004)............................................................. 49

Reynolds v. Giuliani, 118 F. Supp. 2d 352 (S.D.N.Y. 2000) ..................................................... 44

Reynolds v. Giuliani, 35 F. Supp. 2d 331 (S.D.N.Y.1999) ........................................................ 24

Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993) ........................................................... 43, 44, 46

Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001)............................. 46

Rodriguez v. City of New York, 197 F.3d 611 (2d Cir. 1999)..................................................... 27

Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir. 1995)..................................................... 37

Rodriguez v. DeBuono, 44 F. Supp. 2d 601 (S.D.N.Y. 1999)...................................................... 23, 24

Ryerson Towers v. Jackson, 662 N.Y.S.2d 708 (N.Y. City Civ. Ct. 1997).................................... 41

Saratoga Hosp. v. Ryan, 482 N.Y.S.2d 701 (Sup. Ct. Saratoga Co. 1984) ................................... 41

Shapiro v. Cadman Towers, Inc., 51 F.3d 328 (2d Cir. 1995)................................................ 21, 26

Southeastern Cmty. College v. Davis, 442 U.S. 397 (1979) ........................................................ 29

Vitek v. Jones, 445 U.S. 480 (1980) ........................................................................................... 37

Wiesner v. 321 W. 16th St. Assocs., No. 00 Civ. 1423 (RWS), 2000 WL 1191075
    (S.D.N.Y. Aug. 22, 2000)...................................................................................................... 25

Withrow v. Concannon, 942 F.2d 1385 (9th Cir. 1991) ............................................................... 42

## STATUTES, RULES, AND REGULATIONS

U.S. Const. amend. XIV, § 1 ................................................................................................ passim

29 U.S.C. § 705 ........................................................................................................................... 28

29 U.S.C. § 794.................................................................................................................. 2, 27, 28

42 U.S.C. § 12102 ....................................................................................................................... 28

42 U.S.C. § 12131 ................................................................................................................. 28, 29

42 U.S.C. § 12132 ................................................................................................................... 2, 27

28 C.F.R. § 35.104 ...................................................................................................................... 29

28 C.F.R. § 41.32 ........................................................................................................................ 29

28 C.F.R. § 41.41 .......................................................................................................................... 2

28 C.F.R. § 41.51 ........................................................................................................................ 34

Fed. R. Civ. P. 23(a) .............................................................................................................. 43, 47

Fed. R. Civ. P. 23(b) ........................................................................................................ 43, 48, 49

N.Y. Const. art. XVII.................................................................................................................... 2

N.Y. Soc. Serv. Law § 473 .................................................................................................... passim

18 N.Y.C.R.R. § 457.1 ............................................................................................. 22, 39, 40, 41

18 N.Y.C.R.R. § 457.7 ........................................................................................................... 35, 40

**MISCELLANEOUS**

11 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u>
§ 2948 (1973).................................................................................................. 26

Herbert B. Newberg, <u>Newberg on Class Actions</u> § 3.05 (3d ed. 1992)........................................ 44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
MATILDA BELOVIC, by her next friend,
SUELLEN TOZZI; GENEVIEVE C.;
MADELAINE ANDREWS; MARY B.; and
MAUREEN CURRAN, by her next friend,
SARAH T. GILLMAN, individually, and on
behalf of all others similarly situated,                              07 Civ. _____

                                        Plaintiffs,

                -against-

ROBERT DOAR, as Commissioner of the
New York City Human Resources Administration;
GLADYS CARRION, as Commissioner of the
New York State Office of Children & Family
Services; DAVID HANSELL, as Acting
Commissioner of the New York State Office of
Temporary & Disability Assistance; and
RICHARD F. DAINES, as Acting Commissioner
of the New York State Department of Health,

                                        Defendants.

------------------------------------------------------------ x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION AND CLASS CERTIFICATION

### PRELIMINARY STATEMENT

Named Plaintiffs Matilda Belovic, by her next friend Suellen Tozzi, Genevieve C.,

Madelaine Andrews, Mary B., and Maureen Curran, by her next friend Sarah T. Gillman, are

physically and/or mentally disabled New York City residents who have been accepted as clients

of Adult Protective Services ("APS") because they cannot protect themselves from harm and

have no one who can do it for them, and who are not getting the protective services to which they

are entitled.  Named Plaintiffs are among the many thousands of New York City residents who

are clients of APS who are not being adequately served.  Protective services are mandated in

order to enable adults who cannot carry out the activities of daily living or protect themselves from financial, physical, or psychological harm to remain in their homes and communities, rather than permanently reside in hospitals or nursing homes.

Plaintiffs challenge, on behalf of themselves and all others similarly situated, Defendants' unlawful custom and practices of: (1) discriminating against Plaintiffs on the basis of their disabilities by (a) failing to provide reasonable accommodations adequate to enable Plaintiffs to obtain and maintain Food Stamps and Medicaid benefits to which they are entitled, in violation of 42 U.S.C. § 12132; 29 U.S.C. § 794(a); (b) subjecting Plaintiffs to continued, unnecessary segregation in institutions and failing to provide Plaintiffs with services in the most integrated setting appropriate to their needs, in violation of 42 U.S.C. § 12132; 29 U.S.C. § 794(a); and (c) utilizing methods of administration that effectively defeat and/or substantially impair the provision of protective services to Plaintiffs, in violation of 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(3)(ii); 29 U.S.C. § 794; 28 C.F.R. § 41.41(b)(3)(ii); (2) depriving Plaintiffs of their liberty interests without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the New York State Constitution; and (3) failing to provide mandated protective services in a timely manner, adequate to maintain Plaintiffs safely in the community, in violation of New York Social Services Law § 473 and Article XVII of the New York State Constitution.

As set forth in Plaintiffs' Order to Show Cause, Plaintiffs seek a preliminary injunction directing Defendants to provide immediately the protective services Named Plaintiffs need. Plaintiffs also seek certification of a class. Plaintiffs submit this Memorandum of Law in support of their motions for a preliminary injunction and certification of the class.

**STATEMENT OF FACTS**

A.    **Facts Concerning the Named Plaintiffs**

1.    Matilda Belovic

Matilda Belovic is a single, 94 year-old woman who is now living at the Jewish Home and Hospital as a result of APS' failure to take reasonable steps to maintain her safely in her home and return her to the community.  (Declaration of Suellen K. Tozzi, dated Apr. 4, 2007 ("Tozzi Decl.") ¶¶ 4-5, attached as Ex. B to Declaration of Jane Greengold Stevens, dated Apr. 9, 2007 ("Stevens Decl.").)  Ms. Belovic was born in Croatia and came to this country in 1960. In Croatia, she had been a Catholic nun and spent years in Nazi labor camps as a prisoner of war. (Id. ¶ 15.)  Ms. Belovic has no family in this country aside from nieces who are in their 80s and are unable to assist her.  (Id.)  Ms. Belovic has been diagnosed with mild dementia NOS, congestive heart failure, heart disease, hypertension, osteoarthritis, B-12 deficiency, and dental problems.  (Id. ¶ 16.)

Prior to October 17, 2006, when APS took her to a nursing home for admission, Ms. Belovic resided in an apartment in the Bronx and received numerous supportive services at home.  (Id. ¶¶ 12-13.)  A Medicaid-funded home attendant provided Ms. Belovic with home care services three days per week, four hours per day.  (Id. ¶ 53.)  A nurse came once a week to pour Ms. Belovic's medication.  Several New York City Department for the Aging contract agencies also supplied Ms. Belovic with services: the Bronx Jewish Community Council ("BJCC") provided case management, including weekly visits from a student intern and arranged for the provision of daily lunch and supper home-delivered meals; and the mental health unit of JASA provided counseling on a weekly basis.  (Id.)

In September or October of 2004, Ms. Belovic was referred to APS by social services agencies that were helping her, based on her need for financial management and for

consideration of an Article 81 guardianship due to her problems managing her money.  (Id. ¶¶ 21, 22.)  Despite Ms. Belovic's ongoing inability to manage her finances and despite the repeated efforts of BJCC to prompt APS to institute financial management services for Ms. Belovic, APS did not do so until November 2005, over one year after Ms. Belovic was referred to APS.  (Id. ¶¶ 25-27, 29.)  Even after APS instituted financial management, they failed to provide it effectively.  (Id. ¶ 29.)   In November 2005, BJCC began to urge APS to obtain an Article 81 guardian for Ms. Belovic because she was unable to manage her remaining money safely.  (Id. ¶ 31.)  Despite BJCC's continued requests over the next year, APS did not apply for a guardian for Ms. Belovic.  APS also failed to help Ms. Belovic recertify her Food Stamp benefits, which were terminated in July 2006.  (Id. ¶¶ 34, 40.)

On October 17, 2006, Ms. Belovic's APS caseworker went to her home and told her that they were going on a visit.  (Id. ¶ 42.)  He never told Ms. Belovic that it was APS' intent to have her admitted to a nursing home.  (Id.)  She understood that they would look at a nursing home and then she would return home.  (Id.)  However, the APS caseworker took her to Fieldston Lodge Nursing Home and left her there to be admitted.  (Id.)  Prior to removing Ms. Belovic from her home and having her admitted into the nursing home, APS did not notify Ms. Belovic of the impending placement, did not inform Ms. Belovic that she could challenge her removal from home, and did not consult with or inform any of Ms. Belovic's service providers of APS' intentions.  (Id. ¶¶ 42-44.)  Moreover, prior to taking Ms. Belovic to the nursing home, APS made no attempt to maintain her safely in the community by providing more hours of home care or applying for an Article 81 guardian.  (Id. ¶¶ 33, 49.)

Shortly after Ms. Belovic was admitted to Fieldston Lodge Nursing Home, her treatment team at the nursing home determined that she could safely return home with the various services

she had in place prior to being admitted to the nursing home. (Id. ¶ 52.) APS was in agreement with this plan to return Ms. Belovic home. (Id.) With the exception of the home care and visiting nurse services, all of the community-based agencies previously serving Ms. Belovic could simply resume providing their services upon Ms. Belovic's discharge from the nursing home. (Id. ¶¶ 54-55, 67.) However, because of Ms. Belovic's admission to the nursing home, her home care and visiting nurse cases had been closed. (Id. ¶ 55.)

Ms. Belovic was desperate to return home. She attempted to leave her nursing home several times and as a result was transferred to hospitals for psychiatric evaluation (Id. ¶¶ 60, 61.) Each time, the hospital determined that Ms. Belovic was of sound mind and ready to be discharged back to the nursing home. (Id. ¶ 62.) She ended up at Jewish Home and Hospital nursing home where she remains today. (Id. ¶¶ 62-63.) Within less than a week of her admission, Jewish Home and Hospital determined that Ms. Belovic was able to and should be discharged to live in the community with the same services she previously received in addition to increased home care and when assigned, an Article 81 guardian. (Id. ¶ 66; Declaration of Linda Graves, dated Apr. 4, 2007 ("Graves Decl.") ¶ 17, attached as Ex. D to Stevens Decl.)

If Ms. Belovic were to return home, services could immediately be restored by BJCC and the JASA mental health unit, and her home-delivered meals could be restored as well. (Tozzi Decl. ¶¶ 54, 67.) In addition, Ms. Belovic's primary care physician would be able to pour Ms. Belovic's medication on a regular basis. (Id. ¶ 67.) BJCC Home Attendant Services has agreed to provide Ms. Belovic with home care, however, in order to arrange for Medicaid to pay for the home care, the application for home care must be referred through HRA. (Id. ¶ 68.) Jewish Home and Hospital therefore submitted an application for home care to HRA. (Id. ¶¶ 69-72.)

In the course of the nursing home's efforts to obtain appropriate home care for Ms. Belovic, HRA has at times suggested that Ms. Belovic could not receive home care unless she has an Article 81 guardian.  (Id. ¶ 71; Graves Decl. ¶ 15.)  HRA has known since November 2005 that BJCC believed Ms. Belovic needed an Article 81 guardian for financial management, and APS apparently agreed because one of their main stated reasons, no matter how misguided, for having Ms. Belovic admitted to the nursing home in October 2006 was to expedite the application for an Article 81 guardian.  (Tozzi Decl. ¶¶ 31-33, 48.)  APS still has not applied for an Article 81 guardian for Ms. Belovic.  (Declaration of Sabrina Tavi, dated Apr. 9, 2007 ("Tavi Decl.") ¶ 14, attached as Ex. C to Stevens Decl.)  Any delay in obtaining home care for Ms. Belovic because of the absence of an Article 81 guardian is the fault of HRA.

HRA has not made a decision on the pending application for home care submitted by the nursing home.  (Tozzi Decl. ¶ 72.)  HRA's failure to make a timely decision on Ms. Belovic's home care application is impeding her ability to return home.  (Graves Decl. ¶ 17.)  If HRA takes the position that Ms. Belovic now cannot receive home care without an Article 81 guardian in place, a position with which Plaintiffs disagree, APS' failure to obtain an Article 81 guardian would also impede her ability to return home.  (Id. ¶ 16, Tozzi Decl. ¶ 74.)

Ms. Belovic has a Section 8 Rental Voucher Program ("Section 8") subsidy issued by the New York City Housing Authority ("NYCHA") which helps to pay her rent, making it possible for her to maintain her apartment.  (Tozzi Decl. ¶ 12.)  While she lived in the community, APS consistently failed to assist her in recertifying for Section 8.  (Id. ¶¶ 75-76.)  Once Ms. Belovic entered the nursing home, APS was responsible for maintaining her apartment, including complying with all Section 8 requirements.  (Id. ¶¶ 77-79, 83.)  As a result of APS' failure to recertify Ms. Belovic's income eligibility and arrange for an inspection of her apartment by

Section 8, Ms. Belovic's subsidy was terminated effective February 22, 2007.  (Id. ¶¶ 80, 82; Tavi Decl. ¶¶ 4, 6-8.)

It appears that due to efforts by Ms. Belovic's landlord, BJCC, and Plaintiffs' counsel, Ms. Belovic's annual income review was recertified on April 7, 2007.  It is not clear whether APS, at the urging of BJCC and the landlord, assisted in the recertification process.  (Stevens Decl. ¶¶ 12-14; Tavi Decl. ¶¶ 5, 10-11.)  However, Ms. Belovic's subsidy remains in jeopardy because APS still has not arranged for Section 8 to inspect Ms. Belovic's apartment.  (Stevens Decl. ¶ 15.)

    2.    Genevieve C.

 Genevieve C. has been disabled and unable to work since November 11, 2003. (Declaration of Genevieve C., dated Apr. 2, 2007 ("C. Decl.") ¶ 3, attached as Ex. E to Stevens Decl.)  She then developed various debilitating symptoms which were eventually diagnosed as resulting from metal poisoning. (Id.)  The metal poisoning caused Ms. C's health to decline to the point where she is barely able to care for herself: spinal degeneration causes chronic pain and stiffness in both hips and her neck that make it very difficult for her to sit or bend; ulcers in the bladder cause incontinence and urine retention; enlarged uvula, pharyngeal cysts, and nasal polyps cause difficulty swallowing; myasthenia gravis, an autoimmune disease, causes severe muscle pain, muscle weakness in the limbs, and the loss of muscle tone in the face and the grasp reflex in her hands which in turn cause difficulty walking, standing, climbing stairs, and holding objects in her hands.  (Id. ¶¶ 4-5.)  Various other problems result in muscular and vascular pain, impaired digestion, and severe atypical asthma.  (Id. ¶¶ 6, 8-10.)  Ms. C.'s illnesses make her confused and disoriented at times, and cause intermittent memory loss.  She suffers from severe fatigue to the point that she sometimes cannot leave home.  (Id. ¶ 12.)  She has no friends or family able to assist her responsibly.  (Id. ¶ 26.)

Because of her disabilities, Ms. C. is unable to perform many of the activities of daily life, including cleaning, laundry, shopping, and cooking.  (Id. ¶¶ 12-13, 15-16.)  She is often unable to travel.  She is sometimes unable to handle her own paperwork or to advocate for herself.  She is unable to locate or arrange for medical care from specialists as has been recommended by her primary doctors.  (Id. ¶ 54.)  Ms. C.'s only income is $137 per month in cash Public Assistance and $155 per month in Food Stamps.  (Id. ¶ 18.)  Her rent is $607 per month, of which Public Assistance pays $215.  (Id.)  She has so little money that she often has to choose between eating and paying for her utilities.  (Id.)  In the past she has had roommates who helped with the rent, but because of her illness and weakened state, her apartment is now too cluttered and messy for anyone else to live there.  (Id.)  Because she has so little money, she owes approximately $4,000 in back rent.  (Id. ¶ 19.)

After Ms. C. could no longer work, she lived on her savings until they were gone.  (Id. ¶ 18.)  Then in December 2005, she sought the assistance of an attorney in applying for Supplemental Security Income ("SSI") benefits and Social Security Disability ("SSD") benefits.  (Id.)  She later found out that he never sent in her SSD application and did not send the proper financial information to document her need for SSI, so that the application for SSI was denied in July of 2006.  (Id.)  She has not been able to take the steps necessary to obtain these benefits since then.  (Id.)  In or around October 2006, Ms. C. was so sick that she could barely manage to feed herself and was doing the minimum amount that she had to do to stay alive.  As a last resort, she called APS.  (Id. ¶¶ 20-21.)  The APS representative interviewed her and told her to call back the next day.  When she called back the next day the APS representative told her that her case had been accepted; nonetheless, no one from APS met with Ms. C. for over one month.  (Id. ¶¶ 21, 23.)

When Ms. C. finally met a caseworker from APS, as well as in phone calls before and after that meeting, she told the caseworker she needed help: cleaning her apartment so that she could find a roommate; appealing the restrictions on her Access-A-Ride services; applying for SSD and reopening her SSI case; getting documentation from her doctors to support her SSI and SSD claims; and maybe getting an attorney to help with those claims. (Id. ¶ 24.) She also told him that she needed financial help to pay her telephone and electric bills, and about $2,000 in rent arrears that she owed her landlord at the time. (Id.) She told him that she was likely to be evicted soon, and needed help either figuring out a way to pay the rent or help finding a new place to live. (Id.) She also said that she needed help applying for home care to help her cook, shop and do laundry. (Id.)

The caseworker appeared sympathetic and told Ms. C. that he could help with all her problems. (Id. ¶ 25.) A few weeks later, however, he told her that APS would not help her after all. He said that APS would not help her with cleaning, the electric bill, or anything else. (Id. ¶¶ 27-28.) He told her APS would not be able to save her apartment because she owed too much in arrears; that APS would not step in until after she received a 5-day notice of eviction; and that she would have to file her own papers in Housing Court. (Id.) He told her that if she was evicted she would be placed in PSCH Residential Services for Adults with Developmental Disabilities ("PSCH"). (Id. ¶¶ 27.) The caseworker told her that it was time for her to give up her apartment and move into a psychiatric residence, that APS did not have the resources to help her, and that Public Assistance would not pay as much as she needed in arrears. (Id. ¶ 29.) Later, a caseworker told her that APS would not help her with her SSI and SSD applications because APS' policy was not to speak to doctors, under any circumstances, and that APS could not help with her rent arrears until she received a notice of eviction. (Id. ¶ 48.) Over the next

months, Ms. C. continued to seek help from APS, telling them that she was barely surviving and sometimes did not have enough money to buy food.  (Id. ¶¶ 37-39.)  APS provided no services.  (Id. ¶ 45.)

On March 30, 2007, Ms. C. was informed that her Access-A-Ride services were going to be discontinued because Access-A-Ride had come to pick her up on a few occasions and she had not been waiting outside.  (Id. ¶ 52.)  She did not know that Access-A-Ride was there on those occasions.  Ms. C. needs help appealing this discontinuance and with her original appeal of her limited Access-A-Ride services grant.  (Id.)

       3.      Madelaine Andrews

Madelaine Andrews is an 85 year-old woman who lives alone in a rent-controlled, fourth-floor walk-up apartment in Manhattan.  (Declaration of Madelaine Andrews, dated Apr. 6, 2007 ("Andrews Decl.") ¶ 1, attached as Ex. F to Stevens Decl.)  She suffers from numerous illnesses, including heart disease and a heart murmur, diabetes, cataracts, and mouth ulcers, and she was recently diagnosed with a mass on her right lung.  (Id. ¶¶ 3-5.)  She has no friends or family in New York City who are able to help her obtain medical care or participate in the activities of daily life.  (Id. ¶ 2.)  Currently, Ms. Andrews is cared for by a Medicare home attendant who visits three days per week for three hours at a time.  (Id. ¶ 8.)  Her only source of income is $974 per month in Social Security payments.  (Id. ¶ 7.)

Ms. Andrews is a prisoner in her own home.  She lost the use of her legs in June 2006, and since then she has been unable to go up or down stairs unless someone is carrying her.  (Id. ¶¶ 9-10.)  She has left her apartment only twice in the past ten months—in August 2006, and recently, in late March, both times when she was taken to the hospital in an ambulance after being carried down the stairs by paramedics.  (Id. ¶¶ 9-11.)

In September 2006, and APS caseworker visited Ms. Andrews and talked with her about her medical treatment and living situation. (Id. ¶¶ 12-15.) The APS caseworker said that she would apply for Medicaid on Ms. Andrews's behalf, and that she would "make a note" of Ms. Andrews's housing situation. (Id.) After several weeks passed without any action being taken on her case, Ms. Andrews made numerous attempts to contact her APS caseworker and the caseworker's supervisor. (Id. ¶¶ 16-20.)

Ms. Andrews eventually learned that her APS case had been transferred to a new caseworker. (Id. ¶ 22.) Ms. Andrews then left numerous messages for the new caseworker but was not able to speak with the caseworker for another several weeks. (Id. ¶¶ 23-24.) The new caseworker finally visited Ms. Andrews in late January or early February 2007; the new caseworker told Ms. Andrews that she would look into the status of her Medicaid application and that she would try to find her a different apartment. (Id. ¶¶ 25-27.) The new caseworker also said that she would help Ms. Andrews obtain Food Stamps. (Id. ¶ 28.)

Ms. Andrews has still not received any of the services she was promised, despite bi-weekly inquiries by Ms. Andrews and her social worker from the Mount Sinai Visiting Doctors Program. (Id. ¶¶ 29-30; Declaration of Helena Ross, dated Apr. 1, 2007 ("Ross Decl.") ¶¶ 6-11, 13, attached as Ex. G to Stevens Decl.) Her health continues to deteriorate while she waits for the protective services to which she is legally entitled. (Andrews Decl. ¶¶ 4, 31, 33-34.) She urgently requires treatment for ulcers and open cuts in her mouth; without necessary treatment she is unable to eat the food provided by Meals on Wheels. (Id. ¶¶ 31-33.) She also needs to see an optometrist so that she can replace the glasses she needs to be able to read, and she needs to see an ophthalmologist to treat her cataracts. (Id. ¶¶ 34-37.) In addition, her doctor has told her that she needs more home care than she is currently receiving. (Id. ¶ 39.) Despite Ms.

Andrews's immediate need for medical attention and services—as well as her desperate need to move into a less hazardous living situation—APS has done nothing to help her since taking her on as a client in June 2006. (Id. ¶¶ 30, 38, 40, 43, 45.)

        4.     Mary B.

Mary B. is a 61 year-old woman who lives in Manhattan with her mentally-disabled adult son. (Declaration of Mary B., dated Apr. 6, 2007 ("B. Decl.") ¶¶ 2, 5, attached as Ex. H to Stevens Decl.) She suffers from numerous physical disabilities, including asthma, diabetes, arthritis, migraine headaches, angina, high cholesterol, high blood pressure, stomach ulcers, and blood clots in her left leg. (Id. ¶ 2.) She is currently being treated for Human Immunodeficiency Virus ("HIV"), for which she tested positive in 2006. She also suffers from schizophrenia and depression. (Id.)

Ms. B. has suffered two strokes, the first in 2002 and the second in 2005. (Id. ¶ 4.) As a result of the second stroke, the right side of Ms. B.'s face is partially paralyzed, she has weakness in her right leg that causes her to walk with a limp, and she has blood clots in her brain, which cause severe memory problems and impair her speech. (Id.) She also has difficulty writing or holding things in her hands, thus making it difficult to perform household tasks such as cooking and handling dishes. (Id. ¶¶ 4, 6.)

In early 2006, an APS caseworker visited Ms. B. at home and told her that APS would help clear up her rent arrears and help pay the rent on time in the future. (Id. ¶ 8.) During that visit, Ms. B. asked the caseworker to help her obtain Food Stamps because she routinely ran out of money for food. (Id. ¶ 9.) The caseworker told Ms. B. that she would apply for Food Stamps on her behalf. (Id. ¶¶ 9-10.) Ms. B. also asked for help to challenge deductions from her monthly Supplemental Security Income ("SSI") check, and the caseworker said she would look

into it.  (Id. ¶¶ 11-12.)   In addition, the caseworker agreed to help Ms. B. access supportive

psychological services available to HIV-positive individuals.  (Id. ¶ 13.)

Despite APS' promise to manage her finances and pay her rent, Ms. B. received no such

help during the next four or five months.  (Id. ¶ 14.)   As a result, she received threatening letters

almost every month from her landlord, the New York City Housing Authority ("NYCHA").  (Id.

¶ 15.)  Some of these letters were accompanied by a document entitled, "THREE-DAY NOTICE

TO VACATE," which caused her intense anxiety.  (Id.; Declaration of Joseph Krummel, dated

Apr. 6, 2007 ("Krummel Decl.") ¶ 18, attached as Ex. I to Stevens Decl.)

In March 2006, Ms. B. received a notice of eviction due to APS' failure to manage her

finances.  (B. Decl. ¶ 16.)  She contacted her caseworker, who did not explain why APS was not

paying her rent and simply suggested that she contact a lawyer.  (Id.)  Ms. B. contacted a lawyer

at New York Legal Assistance Group ("NYLAG") who had represented her previously.  He

agreed to represent her and the case was settled in April 2006.  (Id. ¶¶ 17-19; Krummel Decl.

¶ 16.)

Even after APS began to pay Ms. B.'s rent, Ms. B. continued to receive threatening

letters from NYCHA because APS made the payments late almost every month.  (B. Decl. ¶ 20;

Krummel Decl. ¶ 44.)  During the summer of 2006, NYCHA brought another proceeding against

Ms. B. in housing court, which was discontinued in August 2006 when APS admitted it had

failed to pay her rent for months and arranged for the payment of the arrears.  (Krummel Decl.

¶¶ 23-35.)  Each time she received a late-payment notice from NYCHA, Ms. B. called her APS

caseworker, or the caseworker's supervisor, but nothing changed.  (B. Decl. ¶¶ 20, 22.)  Because

of APS' failure to pay Ms. B.'s rent on time, NYCHA brought another termination of tenancy

proceeding against her.  (Id. ¶ 21.)  She again contacted the attorney at NYLAG, who was able to

settle the matter in January 2007.  (Id.; Krummel Decl. ¶ 43.)  Nonetheless, Ms. B. continues to

receive threatening letters from NYCHA about late payment of rent.  (B. Decl. ¶ 22; Krummel

Decl. ¶¶ 40, 45.)  She has contacted her APS caseworker and the caseworker's supervisor

numerous times, but she continues to receive the letters.  (B. Decl. ¶ 22.)

APS currently takes the full amount of Ms. B.'s rent out of her monthly SSI check even

though she is responsible for only half of the amount.  (Id. ¶ 23.)  Her APS caseworker told her

that she would have to obtain her son's portion of the rent directly from him. (Id. ¶ 24.)  Because

she has difficulty collecting the money from him, she often does not have enough money to

purchase food and other necessities.  (Id.)  Indeed, on several occasions she has had to go to a

food pantry or borrow money for food, and there are days when she goes hungry.  (Id. ¶¶ 25, 31,

36.)  She has asked APS for assistance with this problem many times, but her caseworker has

done nothing aside from sending $10-worth of food one day when she called crying and begging

for help getting food.  (Id. ¶¶ 26, 28.)

APS has failed to assist Ms. B. in obtaining Food Stamps despite her many requests for

such help.  In mid-2006, Ms. B. received a letter stating that her Food Stamp application had

been denied; she called her caseworker and the supervisor, but they took no action to address the

situation.  (Id. ¶¶ 29-31.)  Recently, Ms. B. received notices indicating that she was eligible for

$13 in Food Stamps per month, which is insufficient to keep her from going hungry each month.

(Id. ¶¶ 34-36.)  Additionally, as of January 1, 2007, Ms. B.'s SSI benefits increased from $564

per month to $606 per month, but the amount APS sends her each month has remained the same.

(Id. ¶ 38.)  She has not heard back from APS about her problems with the rent payments, SSI

deductions, or HIV support services.  (Id. ¶ 37.)

5.    <u>Maureen Curran</u>

Maureen Curran is a 46 year-old woman who lives alone in a one-bedroom basement apartment in Staten Island.  She has been a client of APS since approximately October 2006. (Declaration of Sarah T. Gillman, dated Apr. 6, 2007 ("Gillman Decl.") ¶ 4, attached as Ex. J to Stevens Decl.)  Ms. Curran's sole source of income for the past twelve years has been $710 per month in Supplemental Security Income benefits.  (<u>Id.</u> ¶ 5.)  She also receives $152 in Food Stamps per month.  (<u>Id.</u>)

Ms. Curran suffers from bipolar disorder, clinical depression, panic anxiety disorder, and Posttraumatic Stress Disorder ("PTSD") due to severe physical and mental abuse by her daughter's father, multiple sexual assaults, and sexual abuse her by own father during her childhood.  (<u>Id.</u> ¶ 6.)  Ms. Curran also suffers from arthritis and scoliosis of the spine.  (<u>Id.</u> ¶ 7.) Her psychiatric conditions make it difficult for her to manage many aspects of daily life.  She gets easily confused and struggles to remember events, times, and places.  She feels that she cannot keep things straight in her mind and is unable to take care of herself properly.  (<u>Id.</u> ¶ 8.)

It is difficult for Ms. Curran to leave her apartment and she rarely does so.  Her disabilities make it difficult for her to use public transportation, and she finds it difficult to go grocery shopping or run errands outside of the house.  (<u>Id.</u> ¶¶ 11, 20.)  When she tries to go out, she often experiences anxiety attacks that cause her to cry, shake uncontrollably, and have difficulty breathing.  (<u>Id.</u> ¶ 9.)  Her anxiety attacks are sometimes so severe that she cannot stay upright and feels paralyzed until the attack subsides.  (<u>Id.</u> ¶ 10.)  Even inside her apartment, her body sometimes shakes so much that she finds it difficult to take a shower because she is afraid that she will slip and fall.  (<u>Id.</u> ¶ 20.)

Ms. Curran is unable to arrange for regular medical care on her own.  (<u>Id.</u> ¶ 14.)  She does not have a primary care physician or a treating psychiatrist or therapist, and she is entirely

dependent on Emergency Room doctors for medical care.  (Id. ¶¶ 14-15.)  As a result, she has not received any regular medical treatment for her bipolar disorder, PTSD, depression, arthritis, or scoliosis for the past two years.  (Id. ¶¶ 18-19.)

In the fall of 2006, Ms. Curran went to Housing Court because her landlord commenced a summary holdover proceeding.  (Id. ¶ 21.)  Being in Housing Court made Ms. Curran so upset that she was unable to participate in any way in the court proceeding.  (Id. ¶ 22.)  She was terrified of being evicted and forced to leave her apartment immediately.  She was crying and shaking, and she felt like she wanted to kill herself.  (Id. ¶¶ 23-24.)  Sarah T. Gillman, a lawyer at The Legal Aid Society who agreed on the spot to represent her, assured Ms. Curran that she would not have to leave her apartment that day, but Ms. Curran was not able to stop crying and shaking, or fully comprehend what she was told.  (Id. ¶ 25.)

Based on Ms. Curran's presentation at Housing Court and her inability to communicate with Ms. Gillman about her case, Ms. Gillman requested that the Court make a referral to APS on behalf of Ms. Curran for a guardian ad litem and other services to assist Ms. Curran.  (Id. ¶¶ 26-28.)  APS denied the request for a guardian ad litem without first referring Ms. Curran for a psychiatric evaluation.  (Id. ¶¶ 29, 32.)  Upon the urging of Ms. Gillman, an APS caseworker and a psychiatrist visited Ms. Curran and conducted an evaluation.  (Id. ¶¶ 33-35.)  In response to Ms. Curran's questions about what would happen if she was evicted and whether APS could help her find emergency housing, she was told there was no such thing as emergency housing and that APS could not help her.  (Id. ¶ 36.)

Despite the fact that Ms. Curran was determined to have an extremely low Global Assessment of Functioning ("GAF") of 50, APS determined that it would not seek appointment of a guardian ad litem in the Housing Court case because Ms. Curran had an attorney.  (Id. ¶¶ 37,

38) (A GAF of 50 is defined as "a serious impairment in social, occupational, or school functioning." (Id. ¶ 39.))

While Ms. Curran's Housing Court case was still pending, her attorney, Ms. Gillman, contacted APS about Ms. Curran's situation and was told that APS had advised the Housing Court that it wanted to know the outcome of the summary holdover proceeding and that APS would assist Ms. Curran with services to help with her housing situation. (Id. ¶ 44.) Ms. Gillman was subsequently told that APS was looking into shared housing for Ms. Curran and that APS would drive her to a shelter in the event that the Housing Court made a decision in favor of the landlord. (Id. ¶ 46.) Ms. Curran's Housing Court case went to trial without her and was eventually dismissed. (Id. ¶¶ 42-43, 48.)

In or about the second week of March 2007, Ms. Curran's landlord served her with a thirty day notice of termination, thus paving the way for a new Housing Court action. (Id. ¶ 50.) Whenever Ms. Curran has spoken with Ms. Gillman about her housing situation she becomes so upset that she is unable to communicate about the case. (Id. ¶¶ 51, 54.) Although the first summary holdover proceeding was dismissed, it is unlikely that the second proceeding will result in dismissal; Ms. Curran resides in "unregulated" housing and therefore has very few defenses. (Id. ¶ 55.)

Ms. Curran desperately needs the services of APS. Due to the likelihood of eviction, she needs APS to assist her in securing and maintaining alternative suitable housing now. (Id. ¶ 57.) She will also need APS to appoint a guardian ad litem to make decisions on her behalf when the summary holdover proceeding is commenced. (Id. ¶ 56.) Without these protective services, Ms. Curran will become homeless. (Id. ¶¶ 58-61.) Given her severe psychiatric problems, this would be extremely detrimental to her health and safety. (Id. ¶ 61.) She was raped in a homeless

shelter about seven years ago and she is terrified of returning to the shelter system.  (Id.)  Ms. Curran also needs APS to help her arrange for regular medical care and attention, home care. and transportation services for people with disabilities.  (Id. ¶¶ 62-63, 64.)

Despite Ms. Curran's many needs, APS has taken no action to assist her.  (Id. ¶ 49.)  Ms. Curran has not spoken with anyone at APS for at least a few months, and she does not think they are currently doing anything to help her.  (Id. ¶ 67.)

### B.    Facts Concerning the Class as a Whole

The New York State Office of Children & Family Services ("OCFS") is responsible for the administration of adult protective services on a state-wide basis, while the New York City Human Resources Administration ("HRA") is responsible for the administration of adult protective services to eligible residents of New York City.  HRA carries out these responsibilities through its Adult Protective Services program ("APS").

As of January 2007, approximately 6,130 New York City residents had active APS cases. (Stevens Decl. ¶ 3.)  Class members are individuals who, because of a physical or mental impairment, are substantially limited in their ability to carry out major life activities.  Thus, they need protective services and reasonable accommodations in order to be able to survive unharmed in the community.  Their disabilities limit their ability to engage in regular activities of daily life such as traveling, standing in line, keeping scheduled appointments, completing paper work, retaining documents, and making repeated phone calls to reach busy government phone numbers.

Many APS clients are not receiving the public benefits to which they are entitled.  It is extremely difficult, and in some cases impossible, for APS clients to negotiate the social services system on their own, and Defendants are not providing effective assistance to class members to ensure that they obtain and maintain the public benefits for which they are eligible.  (Tozzi Decl.

¶¶ 65-74; C. Decl. ¶¶ 24, 28, 33, 34, 39; Andrews Decl. ¶¶ 12-13, 16-24, 27, 29-30, 41-43, 45; Gillman Decl. ¶ 63.)

APS routinely involuntarily removes its clients from their homes and has them admitted to nursing homes or other institutional settings even though those individuals are able to safely live in the community in more integrated settings. (Tozzi Decl. ¶¶ 42-50; Uman Decl. ¶¶ 3-4.) APS does so without informing its clients of its intent to do so and without giving them an opportunity to challenge their institutionalization. (Id.) Because all APS clients are either mentally or physically impaired, it is often difficult or impossible for them to arrange to leave the nursing homes or other institutional settings on their own. (Tozzi Decl. ¶ 51.) APS also routinely fails to assist those individuals to return to the community or to less restrictive settings. (Id. ¶¶ 51-74.)

New York City's APS caseworkers are overworked and under-trained. (Id. ¶ 89; Uman Decl. ¶ 7.) Approximately 60 percent of APS caseworkers in New York City have caseloads higher than that recommended by the National Association of Adult Protective Services Administrators ("NAAPSA"). (Stevens Decl. ¶ 8.) For example, in Manhattan, as of December 2006, the average caseload for a single APS caseworker was approximately 42 cases, 68 percent higher than the 25-case limit recommended by NAAPSA. (Id. ¶ 9.) Furthermore, the basic core competency requirements for APS staff do not comply with NAAPSA's recommended requirements. (Id. ¶ 10.) APS caseworkers are therefore not capable of assessing or meeting the complex and sensitive needs of APS clients.

Despite a significant increase in the number of applications for and referrals to APS in the last several years, there has been almost no increase in APS staff. From 2005 to 2007, the number of active APS cases increased by 1,153 and the number of APS referrals increased by

1,222. During that same time period, however, the total number of APS staff increased by only three. (Id. ¶¶ 3, 5-6.) Not surprisingly, APS caseworkers frequently fail to return phone calls and email messages from clients and social services organizations seeking to help APS clients. (Tozzi Decl. ¶¶ 35, 38, 64; Ross Decl. ¶¶ 7-8, 10; Uman Decl. ¶ 7.) APS caseworkers' voicemail boxes are frequently full, making it impossible for clients and other social services organizations to leave them messages. (Krummel Decl. ¶ 25.) APS caseworkers do not effectively coordinate their efforts with other public agencies or community based organizations that are or could be assisting APS clients. (Uman Decl. ¶ 6.)

APS is failing to protect its clients from harm. APS caseworkers frequently promise clients that they will take care of matters and then fail to do so. (Tozzi Decl. ¶¶ 58-59, 78-83; C. Decl. ¶¶ 25-28, 30, 49-50; Andrews Decl. ¶¶ 19, 43; B. Decl. ¶¶ 8-14, 18; Krummel Decl. ¶¶ 20, 21.) APS clients rely on such promises by their APS caseworkers and thus make no efforts to find other help, or make such efforts only much later when it is more difficult to prevent the threatened harm. APS routinely fails to assist its clients: to obtain and maintain public benefits to which they are entitled (Tozzi Decl. ¶¶ 34-40, 80, 82; Tavi Decl. ¶¶ 4, 6-8; C. Decl. ¶ 48; Andrews Decl. ¶¶ 29, 30; Ross Decl. ¶¶ 6-13; B. Decl. ¶ 37; Gillman Decl. ¶¶ 63-65; Uman Decl. ¶ 5); to arrange for medical and psychiatric services needed by APS clients (Andrews Decl. ¶¶ 12-13, 16-24, 27, 29-38, 41-43, 45; C. Decl. ¶¶ 39, 54; B. Decl. ¶¶ 2, 13-14, 32, 37; Gillman Decl. ¶¶ 13-19, 62-63, 65, 67); to institute actions necessary to arrange for commitment, guardianship, or other protective placements in a timely manner (Uman Decl. ¶ 4); to arrange for timely and/or adequate housekeeping and/or home-maker services (C. Decl. ¶¶ 24-29); to assist clients in finding necessary legal services; to provide adequate financial management services (Tozzi Decl. ¶¶ 84-88; B. Decl. ¶¶ 14-22, 38; Uman Decl. ¶¶ 4-5); and to assist in locating

appropriate, alternative housing (Gillman Decl. ¶¶ 45, 47, 49; Andrews Decl. ¶¶ 15, 19, 27, 29, 44; C. Decl. ¶ 56)..

## ARGUMENT

**I.    NAMED PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION DIRECTING DEFENDANTS TO IMMEDIATELY PROVIDE PROTECTIVE SERVICES IN ACCORDANCE WITH FEDERAL AND STATE LAW**

"To obtain a preliminary injunction the moving party must show, first, irreparable injury, and, second, either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor." Green Party of New York State v. New York State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004). For the reasons that follow, Plaintiffs amply satisfy the criteria for preliminary injunctive relief.

**A.    Named Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm Unless Defendants Are Enjoined to Provide Protective Services in Accordance With Federal and State Law**

The Second Circuit considers "a showing of irreparable harm to be the most important prerequisite for the issuance of a preliminary injunction." Nat'l Ass'n for the Advancement of Colored People v. Town of E. Haven, 70 F.3d 219, 224 (2d Cir. 1995). "[T]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks and citation omitted).

Defendants' failure to provide necessary protective services in accordance with federal and state law is causing palpable irreparable harm. APS clients are, by definition, suffering from "mental or physical impairments" that cause them to be "unable to manage their own resources, carry out the activities of daily living, or protect themselves from physical abuse, sexual abuse, emotional abuse, active, passive or self neglect, financial exploitation or other hazardous situations without assistance from others and have no one available who is willing and able to

assist them responsibly." N.Y. Soc. Serv. Law § 473(1). Defendants are obligated to provide or ensure the provision of a range of protective services to APS clients in accordance with federal and state law. See N.Y. Soc. Serv. Law § 473(1); 18 N.Y.C.R.R. § 457.1(d). Each of these services is essential for the safety and survival of APS clients—every day that Defendants deprive APS clients of their full protective services is a day of extreme hardship, exposing Plaintiffs to physical and emotional injury that cannot be compensated with later payments or other monetary awards.

All Named Plaintiffs are being irreparably harmed by Defendants' failure to help them obtain Medicaid and/or locate and secure medical care and social services that they desperately need. Ms. Belovic is suffering irreparable injury because she is unable to leave the nursing home and return to her own home without assistance obtaining appropriate home-care services. (Tozzi Decl. ¶¶ 65-74.) Ms. Andrews is suffering because she has an acute need for medical care she cannot locate or arrange by herself: she needs to see a periodontist to treat ulcers and open cuts in her mouth, she needs to see an ophthalmologist for treatment of her cataracts, and she needs to see an optometrist to get glasses so that she is able to read. (Andrews Decl. ¶¶ 12-13, 16-24, 27, 29-38, 41-43, 45.) Genevieve C. is suffering because she is not getting all the medical care she needs: she needs help finding a toxicologist and neurologist who accept Medicaid and specialize in her particular illnesses, and she needs Medicaid-funded home care. (C. Decl. ¶¶ 39, 54.) Ms. Curran is suffering because she is unable to locate and arrange for regular treatment of her numerous physical and mental disabilities, and because she does not have the Medicaid-funded home care she needs to help her with the activities of daily life. (Gillman Decl. ¶¶ 13-19, 62-63, 65, 67.) Mary B. needs help obtaining supportive services available to HIV-positive individuals. (B. Decl. ¶¶ 2, 13-14, 32, 37.) By failing to help Named Plaintiffs obtain Medicaid and receive

vital medical care and social services, Defendants are causing Named Plaintiffs irreparable harm. See, e.g., Caldwell v. Blum, 621 F.2d 491, 498-99 (2d Cir. 1980) (irreparable harm existed where plaintiffs "would, absent relief, be exposed to the hardship of being denied essential medical benefits"), stay denied, 446 U.S. 1311 (1980) (Marshall, J., in chambers); Rodriguez v. DeBuono, 44 F. Supp. 2d 601, 623 (S.D.N.Y. 1999) ("[D]enial of any home care [to elderly, sick, and frail plaintiffs] could have a devastating effect on their health and safety, causing irreparable harm that cannot be compensated with damages."), rev'd on other grounds, 197 F.3d 611 (2d Cir. 1999); Mayer v. Wing, 922 F. Supp. 902, 909 (S.D.N.Y. 1996) (reduction or discontinuance of home care services constitutes irreparable injury); Kekis v. Blue Cross & Blue Shield of Utica-Watertown, Inc., 815 F. Supp. 571, 584 (N.D.N.Y. 1993) ("[I]nasmuch as this deprivation [of medical treatment] would permanently affect [plaintiff's] health (although the extent of this effect is unknown), it is not the type of deprivation that could be compensated with monetary relief in the future.").

Named Plaintiffs are also suffering irreparable harm because they are unable without assistance to obtain public benefits to which they are entitled, and Defendants are failing to provide that assistance. Mary B. needs help appealing the reduction of her SSI benefits and/or obtaining a hardship waiver. (B. Decl. ¶¶ 11, 14, 32, 37.) Without such help from Defendants she has no possibility of obtaining a higher SSI grant. Without that increase, Ms. B. often goes hungry. (Id. ¶¶ 25-29, 36.) Genevieve C. needs help pursuing her SSI and/or SSD applications and the proper level of Access-A-Ride services. Without Defendants' help she cannot obtain these benefits (C. Decl. ¶¶ 17-19, 24, 27-28, 35, 38-39, 44, 46, 48-50, 52, 55), and therefore Ms. C. does not have enough money to pay her rent or buy enough food, may have to forego medical treatment because she cannot afford the travel expenses, and is limited in her ability to travel.

(Id. ¶¶ 18-19.)  Ms. Curran needs Defendants' help applying for the Section 8 program, Access-A-Ride services, and/or a Reduced Fare Metrocard for People with Disabilities, without which she is currently facing an eviction proceeding and is limited in her ability to travel.  (Gillman Decl. ¶¶ 55, 59-61, 64-65.)  Deprivations of these types of public benefits and services constitute irreparable harm.  See, e.g., Abreu v. Callahan, 971 F. Supp. 799, 821 (S.D.N.Y. 1997) (deprivation of SSI and Food Stamps constitutes irreparable harm); Rodriguez, 44 F. Supp. 2d at 623 (deprivation of Medicaid constitutes irreparable harm), rev'd on other grounds, 197 F.3d 611 (2d Cir. 1999); Reynolds v. Giuliani, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); see generally Goldberg v. Kelly, 397 U.S. 254, 260-65 (1970).

Ms. Andrews is also suffering irreparable injury because she is unable to find an accessible apartment without Defendants' assistance and Defendants are doing nothing to help her.  (Andrews Decl. ¶¶ 14-24, 27, 29-30, 44-45.)  Ms. Andrews is physically unable to leave her own home—her physical disabilities make it impossible to walk up or down stairs, thus confining her to her fourth-floor walk-up apartment unless she is carried down the stairs.  She cannot go outside to carry out the activities of daily life.  (Id. ¶¶ 9-11, 44-45.)  She would be completely trapped in her apartment in the event of a fire or other emergency.

Named Plaintiffs are also suffering irreparable harm due to Defendants' failure to help them avoid eviction and/or arrange for appropriate alternative living situations.  For example, Mary B., Genevieve C., and Ms. Curran are all threatened with eviction at various procedural stages, yet Defendants are taking no action to prevent their evictions or to identify appropriate alternative living situations in the likely event that they are forced to leave their homes.  (B. Decl. ¶¶ 15-22, 32, 37; Krummel Decl. ¶¶ 44-45; C. Decl. ¶¶ 19, 24, 27-29, 39, 46, 48-50, 55-56;

Gillman Decl. ¶¶ 56-61.)  Ms. Belovic's Section 8 subsidy is in jeopardy because Defendants

failed to take all steps necessary to maintain it.  (Stevens Decl. ¶ 15.)  As a result of Defendants'

failures, these Named Plaintiffs are in serious danger of losing their homes and having nowhere

to live.  (B. Decl. ¶¶ 15-22, 32, 37; C. Decl. ¶¶ 19, 24, 27-29, 39, 46, 48-50, 55-56; Gillman

Decl. ¶¶ 56-61.)  "The threat of eviction and the realistic prospect of homelessness constitute a

threat of irreparable injury, and satisfies the first prong of the test for preliminary injunctive

relief."  McNeill v. New York City Hous. Auth., 719 F. Supp. 233, 254 (S.D.N.Y. 1989); see

also Estevez v. Cosmopolitan Assocs. LLC, No. 05-CV-4318 (JG), 2005 WL 3164146, at *3

(E.D.N.Y. Nov. 28, 2005) (finding irreparable injury where plaintiffs faced eviction and loss of

Section 8 benefits); Wiesner v. 321 W. 16th St. Assocs., No. 00 Civ. 1423 (RWS), 2000 WL

1191075, at *7 (S.D.N.Y. Aug. 22, 2000) (finding irreparable injury "because of the likelihood

that the Defendants will proceed with eviction, coupled with the unlikely prospect that [plaintiff]

could find alternative, affordable housing in New York").

        Defendants' failure to provide adequate financial management is causing irreparable

harm to Mary B.  By failing to pay Ms. B.'s rent on time and failing to give her the full balance

of her SSI benefits—as is Defendants' obligation as the representative payee for her SSI

benefits—Defendants have placed her in jeopardy of eviction and, ultimately, homelessness.  (B.

Decl. ¶¶ 15-22, 32, 338.)  As explained above, such real threats of eviction and homelessness

constitute irreparable injury.  See, e.g., Estevez, 2005 WL 3164146, at *3; Wiesner, 2000 WL

1191075, at *7; McNeill, 719 F. Supp. at 254.

        Defendants are also irreparably harming Ms. Belovic by failing to seek a guardian for

her.  Although Ms. Belovic is in need of a guardian pursuant to Article 81 of the New York

Mental Hygiene Law for when she returns home, Defendants have made no effort to arrange for

one.  (Tavi Decl. ¶ 14.)  Ms. Belovic is unable to protect her interests because she is unable to

manage her finances, and Defendants' failure to arrange for the appointment of an Article 81

guardian may be responsible in part for her difficulty in obtaining home care and thus her

continued confinement in a nursing home against her will.  (Tozzi Decl. ¶¶ 31, 65-74.)

Finally, Plaintiff Belovic is suffering irreparable harm due to Defendants' removal of her

from her home against her will without notice or an opportunity to challenge the removal, and

Defendants' failure to provide or ensure the provision of the services she needs to live safely in

the community.  (Tozzi Decl. ¶¶ 3, 5, 42-44, 73; Graves Decl. ¶¶ 3, 10-12, 14-17.)  Such an

involuntary deprivation of her liberty violates Plaintiff Belovic's basic due process rights and

constitutes irreparable harm.  See Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) ("When

an alleged deprivation of a constitutional right is involved, most courts hold that no further

showing of irreparable injury is necessary.") (quoting 11 Charles Alan Wright & Arthur R.

Miller, Federal Practice and Procedure § 2948, at 440 (1973)).

There is no doubt that, for people whose very health and safety hinges on their receipt of

protective services, the deprivation of these services constitutes harm that is "actual and

imminent and that cannot be remedied by an award of monetary damages."  Shapiro, 51 F.3d at

332.  Named Plaintiffs have therefore shown that they are suffering and will continue to suffer

irreparable harm unless a preliminary injunction is granted.

**B.**    **Plaintiffs Are Likely to Succeed On the Merits of Their Claims**

1.    Defendants Are Violating the Rights of Named Plaintiffs Under Title II of
the Americans with Disabilities Act and Section 504 of the Rehabilitation
Act

Defendants are violating the rights of the Named Plaintiffs under Title II of the

Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act of

1973 ("Section 504") in three distinct ways.  They are failing to provide the reasonable

- 26 -

accommodations these disabled Plaintiffs need to obtain Food Stamps and Medicaid, basic public benefits under Defendants' control.  They are failing to maintain Plaintiffs safely in their own homes and instead unnecessarily dumping them into institutions, as well as failing to take the necessary steps to return them home.  And they are using methods of administration in the APS program that effectively deny Plaintiffs the adult protective services to which they are entitled.

Title II of the ADA ("Title II") mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, Section 504 mandates that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  In general, because Section 504 and the ADA "impose identical requirements," the Second Circuit "consider[s] the claims in tandem."  Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999); see also Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

In order to prevail on a claim under these statutes, the Second Circuit requires plaintiffs to demonstrate (1) that they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA and/or Section 504; and (3) that "plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities."  Henrietta D., 331 F.3d at 272.

Named Plaintiffs are disabled under the meaning of the ADA and Rehabilitation Act. Both the ADA and the Rehabilitation Act define a disability as "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual.  42 U.S.C. § 12102(2)(A); 29 U.S.C. § 705(9)(B).  APS clients are, by definition, individuals "who, <u>because of mental or physical impairments</u>, are unable to manage their own resources, carry out the activities of daily living, or protect themselves from physical abuse, sexual abuse, emotional abuse, active, passive or self neglect, financial exploitation or other hazardous situations without assistance."  N.Y. Soc. Serv. Law § 473(1) (emphasis added).  Thus all five Named Plaintiffs have been found by Defendants to have disabilities that limit one or more major life activity.

It is equally clear that all Defendants are public entities as they are all departments, agencies, or other instrumentalities of New York State or New York City, making them subject to Title II.  <u>See</u> 42 U.S.C. § 12131(1)(B).  Additionally, all Defendants receive federal funding and are thus subject to Section 504.  <u>See</u> 29 U.S.C. § 794(a).

Finally, as set forth in more detail below, it is clear that Named Plaintiffs are eligible for the public benefits and adult protective services at issue and are being discriminated against by being wrongfully denied those benefits.

> a.   Defendants Doar, Daines, and Hansell Are Discriminating Against Named Plaintiffs By Failing to Provide Them With Reasonable Accommodations Necessary to Enable Them to Access Food Stamp and Medicaid Benefits

Named Plaintiffs are likely to succeed on their claim that Defendants Doar, Daines, and Hansell are discriminating against them by not providing them with reasonable accommodations necessary to enable them to receive the public benefits to which they are legally entitled.

The Second Circuit has interpreted Title II of the ADA and Section 504 to require covered entities to make reasonable accommodations to ensure that qualified individuals with

disabilities receive benefits and services to which they are entitled.  See Henrietta D., 331 F.3d at 273-75.  Named Plaintiffs meet the legal eligibility criteria for the Medicaid benefits that they seek, thus rendering them "qualified individuals" under Title II and Section 504.  See 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § 41.32(b); Southeastern Cmty. College v. Davis, 442 U.S. 397, 406 (1979); Henrietta D., 331 F.3d at 277-78; see also Declarations of Named Plaintffs.

As described above, see supra pp. 22-23, the Named Plaintiffs are unable, because of their disabilities, to apply for and maintain Medicaid benefits, administered by Defendant Doar under the supervision of Defendants Hansell and Daines.  The Second Circuit has held that "the demonstration that a disability makes it difficult for . . . plaintiff[s] to access benefits that are available to both those with and without disabilities" entitles those plaintiffs to a reasonable accommodation to assist them in obtaining those benefits.  Henrietta D., 331 F.3d at 277.

Title II of the ADA and Section 504 mandate that agencies take affirmative steps to make the reasonable accommodations necessary to provide meaningful access to public benefits and services.  For example, in Dopico v. Goldschmidt, 687 F.2d 644, 652 (2d Cir. 1982), the Second Circuit commented in the context of public transportation that:

> denial of access cannot be lessened simply by eliminating discriminatory selection criteria; because the barriers to equal participation are physical rather than abstract, some sort of action must be taken to remove them. . . .  It is not enough to open the door for the handicapped . . . ; a ramp must be built so the door can be reached.

Id.  (emphasis added and internal quotations and citations omitted).  The Second Circuit has since extended its "ramp" analysis from claims seeking physical access to claims seeking access to public benefits and services.  See Henrietta D., 331 F.3d at 272-80 (finding that city and state

defendants' failure to provide facially eligible plaintiffs with reasonable accommodations to public benefits and services violated Title II and Section 504).

Defendants Doar, Daines, and Hansell have failed to provide such an accommodation or "ramp" to Medicaid benefits, thus discriminating against Named Plaintiffs in violation of Title II and Section 504. See, e.g., Alexander v. Choate, 469 U.S. 287, 301 (1985) (finding that, in the provision of Medicaid, "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made").

Although HRA's APS program may purport to act as a reasonable accommodation, the fact that Named Plaintiffs remain without the benefits to which they are legally entitled indicates that Defendants are not providing meaningful access to those benefits. The Second Circuit addressed a similar argument in Henrietta D. There, a class of New York City residents suffering from AIDS and other HIV-related illnesses sued the city and the state under, inter alia, Title II and Section 504. 331 F.3d at 264. Although New York City had established the Division of AIDS Services and Income Support ("DASIS") to help HIV-afflicted residents access federal, state, and local welfare benefits which were also available to qualifying non-disabled persons, the plaintiffs asserted that DASIS had systematically failed as a reasonable accommodation. Id. at 264-65. The Second Circuit agreed, and affirmed the district court's finding that "the plaintiffs' disabilities prevent[ed] them from accessing public services insofar as the plaintiffs face[d] challenges that ma[d]e it impossible for them meaningfully to access services absent accommodation." Id. at 277.

Plaintiffs here, like the plaintiffs in Henrietta D., are requesting that Defendants provide them with the reasonable accommodations they need to obtain public benefits available to all eligible people, disabled and non-disabled. Defendants have provided, in accordance with state

law, a program, APS, that is charged in part with helping Plaintiffs obtain such access, just as the defendants in Henrietta D. provided DASIS.  Id. at 265.  In Henrietta D., the Court found that even though DASIS might have been a sufficient accommodation if it had been effective, the district court's finding that "the accommodative regime [was] dysfunctional" justified relief.  Id. at 282.  Plaintiffs' claim here is the same: APS is simply not functioning properly and therefore does not provide Plaintiffs the reasonable accommodation for them meaningfully to access the Medicaid benefits for which they are eligible.

> b.    Defendants Are Discriminating Against Matilda Belovic By Subjecting Her to Unnecessary Segregation and Failing to Provide Her With Services in the Most Integrated Setting Appropriate to Her Needs

 "The ADA both requires all public entities to refrain from discrimination, see [42 U.S.C.] § 12132, and specifically identifies unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination,' see [42 U.S.C.] §§ 12101(a)(2), 12101(a)(5)."  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 583 (1999); see also 28 C.F.R. § 35.130(d) (public entities are required to administer programs "in the most integrated setting appropriate to the needs of qualified individuals with disabilities").

    In Olmstead, the Supreme Court examined whether Georgia's refusal to provide services to mentally disabled persons in community settings, instead of institutions, violated Title II.  527 U.S. at 593.  On its review, the Supreme Court held that "unjustified isolation . . . is properly regarded as discrimination based on disability" and that such action violates Title II "when the State's treatment professionals determine that . . . [community] placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  527 U.S. at 597.

APS' failure to maintain Ms. Belovic in her home in the community constitutes a violation of Title II.  First, Ms. Belovic is qualified to be maintained in a community-based setting.  She is eligible for a range of benefits and services—including home health care services—which would make it possible for her to reside in the community.  (Tozzi Decl. ¶¶ 52-54, 67-68, 72-73; Graves Decl. ¶ 10-12.)  Second, Ms. Belovic desperately wishes to return home to live in the community (Tozzi Decl. ¶ 51), and her nursing home treatment professionals have determined that returning her to the community is appropriate and advisable (Graves Decl. ¶ 8).  Third, APS can return Ms. Belovic to her home by taking steps to restore the services that she received before she was unlawfully taken to the nursing home in October 2006, and arranging for additional services such as increased home care and eventually an Article 81 guardian.  (Tozzi Decl. ¶¶ 52-57, 66-74; Graves Decl. ¶¶ 10-12.)

Even if APS had determined at some point that Ms. Belovic was in danger and could not stay safely at home without more care than she had in place, APS had an obligation under Title II and New York Social Services Law § 473(1)(c) first to make all reasonable efforts to obtain additional care so she could remain safely in the community, and then, if that was not possible, to take all necessary steps to ensure that Ms. Belovic could safely return home as soon as possible. They have done neither.

Segregation of disabled persons violates Title II.  For example, in <u>Lovely H. v. Eggleston</u>, Judge Swain held that disabled welfare recipients had a substantial likelihood of success on their claim that New York City's plan to transfer their cases involuntarily to separate "hub" welfare centers was prohibited by Title II's anti-segregation provision.  <u>See</u> 235 F.R.D. 248, 261 (S.D.N.Y. 2006); <u>see also</u> <u>K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.</u>, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005) (finding that "[e]ating lunch with other students could be

considered an integral part of the public school experience, one in which [the plaintiff] would be entitled to participate if a reasonable accommodation for his disability would make it possible").

In an analogous case in the Eastern District of Pennsylvania, a group of psychiatric hospital residents sued the Pennsylvania Department of Public Welfare ("DPW") for failing to provide services to the residents in the most integrated setting appropriate to the residents' needs. Kathleen S. v. Dep't of Public Welfare of Commw. of Pa., 10 F. Supp. 2d 460, 462-63 (E.D. Pa. 1998). The district court held, inter alia, that DPW violated Title II by failing to initiate plans sufficiently in advance to ensure the necessary placements in the community within a reasonable time after it was determined that community placement was the most integrated setting appropriate to the residents' needs. Id. at 471, 473. So too in the case at bar: APS' utter lack of planning is the very reason Ms. Belovic ended up in the nursing home in the first place, and its continuing failure to make the simplest of plans for her release has kept her there for over five months and is keeping her unnecessarily institutionalized and outside mainstream society. As the district court found in Kathleen S., "in passing the ADA, Congress intended to reiterate and strengthen its mandate . . . that discrimination in the form of segregation be ended once and for all, and that people with disabilities be integrated—to the greatest extent possible—into the mainstream of American life." Id. at 468.

Defendants' placement of Ms. Belovic in a nursing home, instead of ensuring her safety at home in the community, thus constitutes unlawful segregation in violation of Title II.

          c.       Defendants Doar and Carrion Are Discriminating Against Named Plaintiffs By Utilizing Methods of Administration That Effectively Defeat and/or Substantially Impair the Provision of Protective Services to Which Named Plaintiffs Are Entitled

Defendants Doar and Carrion are violating Named Plaintiffs' rights under Title II and its implementing regulation, 28 C.F.R. § 35.130(b)(3)(ii), and Section 504 and its implementing

regulation, 28 C.F.R. § 41.51(b)(3)(ii), by utilizing, and allowing the utilization of, methods of administration that effectively defeat or substantially impair the provision of the protective services that APS is mandated to provide.

Covered entities violate Section 504 and Title II when they utilize methods of administration that result in their failure to provide services to which disabled people are entitled. The U.S. Department of Justice ("DOJ") regulations implementing Title II prohibit public entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(ii). Further, DOJ regulations implementing Section 504 state that a recipient of federal funds may not "utilize criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons."  28 C.F.R. § 41.51(b)(3)(ii).

Courts look to the DOJ regulations implementing the ADA and Section 504 to guide their analysis of Title II and Section 504 claims.  See, e.g., Henrietta D., 331 F.3d at 273-74 ("In interpreting the statutory terms we look to the views of the Justice Department, which was charged by Congress with issuing regulations implementing both the ADA and Section 504."); see also Olmstead, 527 U.S. at 597-98 (observing that the DOJ regulations "warrant respect" and "'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'") (quoting Bragdon v. Abbott, 524 U.S. 624, 642 (1998)).

Plaintiffs easily satisfy the criteria for a claim for discriminatory methods of administration under Title II and Section 504.  First, all members of the Plaintiff class have been

accepted as clients by APS.  It is therefore beyond question that they are all disabled and all qualified for the benefit of APS services.

Second, Defendants Doar and Carrion are utilizing methods of administration that are defeating or, at the very least, substantially impairing the mandated goal of APS.  The goal of APS and its supervising state agency, OCFS, is to protect disabled adults from harm.  As described in detail above, see supra Part I.A, APS is failing to accomplish that goal.  Defendants are flagrantly disregarding professional standards by inadequately training APS caseworkers and assigning caseloads that are much too large to manage properly.  (Stevens Decl. ¶¶ 9-11.)  These facts alone inevitably result in APS' utter failure to communicate with its clients and to respond to their requests for help.

Named Plaintiffs, or their representatives, have called their APS caseworkers and left numerous unreturned messages and, in many instances, have not been able to leave a message because the caseworkers' mailboxes were full.  (Tozzi Decl. ¶¶ 35, 76; Andrews Decl. ¶¶ 16, 23; C. Decl. ¶ 39; B. Decl. ¶¶ 20, 31; Ross Decl. ¶¶ 7-8, 10; Krummel Decl. ¶¶ 25-28.)  Because Defendants Doar and Carrion allow, indeed demand, that APS caseworkers have unmanageable caseloads, the workers simply do not have time to return calls, listen carefully to what their clients tell them, or fully assess their needs.  This is not only frustrating for APS clients, but it results in APS' failure to provide the help they need.

Defendants' methods of administration also make it impossible for APS caseworkers to coordinate with and make meaningful use of other social services and community based organizations, which is crucial in actually providing mandated services and is required by New York Social Services Law § 473(2)(a) and 18 N.Y.C.R.R. § 457.7(b).  These and other

deficiencies in Defendants' methods of administration result in APS' failure to accomplish the goal of protecting its clients from harm.

Because Named Plaintiffs are eligible for the services of APS, because APS services are covered by Title II and Section 504, and because Defendants have failed to provide meaningful access to those services, Plaintiffs are likely to succeed on the merits of their claim that Defendants Doar and Carrion are using methods of administration that violate Title II and Section 504.

      2.    <u>Defendants Are Depriving Matilda Belovic of Her Liberty Interests Without Due Process of Law In Violation of Her Rights Under the Due Process Clause of the Fourteenth Amendment and New York State Law</u>

Plaintiffs are likely to succeed on the merits of their claims that Defendants Doar and Carrion are violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and New York Social Services Law § 473-a by failing to provide to Plaintiffs the protective services they need to survive safely in the community prior to any involuntary removal from their homes and by failing to provide meaningful notice and an opportunity to challenge removal from their homes and placement in more restrictive settings against their wishes.

Plaintiff Matilda Belovic has been involuntarily confined since October 17, 2006, when her APS caseworker took her from her apartment and had her admitted to a nursing home against her will.  (Tozzi Decl. ¶ 42.)  Defendants did not first take all reasonable steps to maintain her safely in the community in order to avoid institutionalization, and they did not obtain a court order permitting them to impose such an involuntary protective service on Ms. Belovic or provide Ms. Belovic with any substitute procedures to protect her due process rights.  (<u>Id.</u> ¶¶ 42-43, 48-49.)

Since October 2006, Ms. Belovic has been transferred between nursing homes and hospitals, but she has not been permitted to return home or assisted in obtaining the services she needs to live safely at home.  (Id. ¶¶ 61-63, 73-74.)  On several occasions, she attempted to leave her nursing home on her own; as a result she is now forced to wear an ankle bracelet alarm that sounds if she tries to enter the elevator on her floor of the institution.  (Stevens Decl. ¶ 12.)  Defendants' involuntary placement of Ms. Belovic in a nursing home from which she is not permitted to leave thus has virtually the same effect as an involuntary civil commitment.

"An involuntary civil commitment is a 'massive curtailment of liberty,' . . . and it therefore cannot permissibly be accomplished without due process of law."  Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980)) (citations omitted); see also Addington v. Texas, 441 U.S. 418, 425 (1979) ("civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection") (citations omitted).  New York law acknowledges that involuntary protective services are a restraint on liberty and sets forth procedures to provide due process.  Under New York law, social services officials cannot impose "short-term involuntary protective services"—which include "arranging, when necessary, for commitment . . . or other protective placement," N.Y. Soc. Serv. Law §§ 473-a(1)(b) and 473(1)(c)—without providing notice and an opportunity to challenge the imposition of such services.  See id. § 473-a.

Defendants did not give Ms. Belovic any notice or an opportunity to challenge her involuntary placement.  They did not initiate proceedings under New York Social Services Law § 473-a or offer any comparable substitute due process protections.  In fact, they could not have met the requirements of § 473-a because they could not have shown "that other voluntary protective services have been tried and have failed to remedy the situation, and that a future,

voluntary, less restrictive alternative would not be appropriate or would not be available," and "that remedy of the dangerous situation or condition . . . is not appropriate in existing physical surroundings of the allegedly endangered adult," as required by § 473-a(4)(c)(iv), (v).  See id. § 473-a(9).

Defendants are continuing to violate Ms. Belovic's due process rights by failing to take the steps necessary to remedy the harm caused by their initial, unconstitutional acts.  They are not taking timely or reasonable steps to provide the protective services to which Ms. Belovic is legally entitled and which she needs to return safely to her home.  As a result, Ms. Belovic remains confined to a nursing home against her will.

Thus, Ms. Belovic is suffering a violation of her rights under both the Due Process Clause and New York law.

3.    Defendants' Failure to Provide Named Plaintiffs with Timely and/or Adequate Protective Services Violates New York State Law

Named Plaintiffs are likely to succeed on the merits of their claim that Defendants Doar and Carrion are systematically failing to provide them with adult protective services to which they are entitled, thus violating their rights under New York Social Services Law § 473 and regulations promulgated thereunder, and Article XVII of the New York State Constitution.

New York Social Services Law § 473 mandates adult protective services for people over the age of eighteen, who

> because of mental or physical impairments, are unable to manage their own resources, carry out the activities of daily living, or protect themselves from physical abuse, sexual abuse, emotional abuse, active, passive or self neglect, financial exploitation or other hazardous situations without assistance from others and have no one available who is willing and able to assist them responsibly.

N.Y. Soc. Serv. Law § 473(1).  These protective services include, inter alia, arranging, when necessary, for commitment, guardianship, or other protective placement, provided that where

possible, the least restrictive of these measures shall be employed before more restrictive controls are imposed, id. § 473(1)(c); providing a range of services to assist eligible individuals to move from situations which are, or are likely to become, hazardous to their health and well-being, id. § 473(1)(d); and other protective services mandated by regulations of the state agency that is now OCFS, id. § 473(1)(f).

Regulations implementing New York Social Services Law § 473 specify numerous protective services that must be provided to qualifying adults. 18 N.Y.C.R.R. § 457.1. These services include, but are not limited to:

> (6) assisting in the location of social services, medical care and other resources in the community, including arrangement for day care in a protective setting;
>
> (7) arranging for guardianship, commitment or other protective placements as needed;
>
> (8) providing advocacy and assistance in arranging for legal services to assure receipt of rights and entitlements due to adults at risk;
>
> (9) functioning as a guardian, representative payee, or protective payee where it is determined such services are needed and there is no one else available or capable of acting in this capacity;
>
> (10) providing homemaker and housekeeper/chore services [in specified situations] . . . .

18 N.Y.C.R.R. § 457.1(d)(6)-(10).

New York Social Services Law § 473 further provides:

> In that the effective delivery of protective services for adults requires a network of professional consultants and services providers, local social services districts shall plan with other public, private and voluntary agencies including but not limited to health, mental health, aging, legal and law enforcement agencies, for the purpose of assuring maximum local understanding, coordination and cooperative action in the provision of appropriate services.

N.Y. Soc. Serv. Law § 473(2)(a). This section's implementing regulations explain that the local social services agency responsible for providing adult protective services must "secure the active

- 39 -

participation and cooperation of those community resources providing specific services for adults." 18 N.Y.C.R.R. § 457.7(b).

Defendants Doar and Carrion have conceded that Named Plaintiffs are eligible for adult protective services by accepting them as clients of APS. New York courts have unanimously found that the provision of adult protective services is mandatory to those who are eligible, see Dan R. v. Bane, 606 N.Y.S.2d 1000, 1000-01 (2d. Dep't 1993); In re Janczak, 634 N.Y.S.2d 1020, 1024 (Sup. Ct. Ontario Co. 1995), and that failures to provide mandated services to eligible adults violate New York Social Services Law § 473 and 18 N.Y.C.R.R. § 457.1, see Hughes v. Gates, 614 N.Y.S.2d 1007, 1009-11 (Sup. Ct. Monroe Co. 1994) (failure to ensure that mentally ill patient in public family care home received necessary medical care including eye surgery violated § 473), rev'd on other grounds, 629 N.Y.S.2d 905 (4th Dep't 1995).

Defendants Doar and Carrion are failing to comply with New York Social Services Law § 473 and its implementing regulation in myriad ways, as described above. They are not helping Named Plaintiffs to obtain the necessary medical services and are therefore violating New York Social Services Law § 473(1)(f) and (2)(a), as well as 18 N.Y.C.R.R. § 457.1(d)(6), (8) and § 457.7(b). They are also failing to assist Named Plaintiffs in obtaining other services, including government programs and legal services necessary to ensure that Named Plaintiffs get the full benefits to which they are entitled. (Tozzi Decl. ¶¶ 9, 35-36, 82; Stevens Decl. ¶¶ 12-15; Tavi Decl. ¶¶ 4-8, 10-11; B. Decl. ¶¶ 11, 24-25; C. Decl. ¶ 28; Andrews Decl. ¶¶ 19, 43, 45). Defendants' blatant disregard of Named Plaintiffs' brutal needs violates New York Social Services Law § 473(1)(f) and (2)(a) and 18 N.Y.C.R.R. § 457.1(d).

Defendants Doar and Carrion are also violating New York Social Services Law § 473(1)(d), which mandates that they must provide "services to assist such individuals to move

from situations which are, or are likely to become, hazardous to their health and well-being."  In all the ways described above, Defendants are unlawfully ignoring this obligation.  See, e.g., Ryerson Towers v. Jackson, 662 N.Y.S.2d 708, 711 (N.Y. City Civ. Ct. 1997) (ordering HRA and PSA to investigate and evaluate what they can do to prevent the eviction of a PSA client, on the basis that "HRA and its agencies have the capacity, the authority and the duty to provide eviction prevention services to the respondent in question").

Defendants Doar and Carrion are violating New York Social Services Law § 473(1)(f) and 18 N.Y.C.R.R. § 457.1(d)(9) by failing to provide Ms. B. with adequate financial management and to act appropriately as her representative payee.  (B. Decl. ¶¶ 18, 20, 38.)  See Dan R., 606 N.Y.S.2d at 1001 (holding that the local APS agency must act as representative payee to mentally ill individuals who cannot manage their own affairs and have no one else willing or able to do so).

Defendants Doar and Carrion are further violating New York Social Services Law § 473(1)(c) and 18 N.Y.C.R.R. § 457.1(d)(7), (9) by failing to arrange for guardianship or to act as a guardian for Ms. Belovic, see Janczak, 634 N.Y.S.2d at 1024 (holding that it was the duty of the county commissioner of social services not only to arrange guardianship but also to act as a legal guardian when no one else was available), and they are violating New York Social Services Law § 473(1)(c) by removing her from her home without first taking steps necessary to maintain her safely in the community and failing to obtain and coordinate the care she needs to return home, see Saratoga Hosp. v. Ryan, 482 N.Y.S.2d 701, 703 (Sup. Ct. Saratoga Co. 1984) (holding that the local social services agency failed to provide appropriate adult protective services to a mentally ill patient of the hospital by failing to coordinate the proper care arrangements to enable plaintiff to return home).

In sum, as demonstrated above, Defendants Doar and Carrion have violated Named Plaintiffs' rights under New York Social Services Law § 473 and its implementing regulations, 18 N.Y.C.R.R. §§ 457.1 and 457.7.

**C.   The Balance of Equities Strongly Favors the Issuance of Injunctive Relief**

In determining whether to grant injunctive relief, a court must weigh the respective burdens and determine whether the balancing of the equities tips in the movant's favor. See Green Party, 389 F.3d at 418. In this case, the "balancing of the equities" clearly favors Plaintiffs.

As discussed above, Named Plaintiffs are suffering and will continue to suffer irreparable harm unless Defendants are enjoined to provide protective services in accordance with federal and state law. These deprivations are due solely to Defendants' systemic failure to provide protective services to which Plaintiffs are entitled in accordance with federal and state law.

In contrast to the imminent and severe harm facing Named Plaintiffs, the granting of injunctive relief would place only a minimal burden, if any, on Defendants. This motion simply seeks to ensure that Defendants comply with governing law and provide the protective services to which Plaintiffs are entitled. "An injunction requiring adherence to the regulations . . . imposes no inappropriate obligation on the state." Withrow v. Concannon, 942 F.2d 1385, 1388 (9th Cir. 1991) (enjoining state to comply with requirements of the Medicaid and Food Stamp Acts); see also Haskins v. Stanton, 794 F.2d 1273, 1277 (7th Cir. 1986) ("[B]ecause the defendants are required to comply with the Food Stamp Act under the terms of the Act, we do not see how enforcing compliance imposes any burden on them. The Act itself imposes the burden; this injunction merely seeks to prevent the defendants from shirking their responsibilities under it."). Accordingly, the balance of equities falls decisively on the side of Plaintiffs.

## II.    THE PROPOSED CLASS SHOULD BE CERTIFIED

Plaintiffs bring this action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules

of Civil Procedure on behalf of themselves and a class as defined as:

> All current and future clients of Adult Protective Services who are not receiving
> or will not receive protective services from Adult Protective Services to which
> they are legally entitled.

Because class members satisfy the requirements of Rule 23(a) and of Rule 23(b)(2), and because

class certification is essential to the fair and efficient adjudication of this case, Plaintiffs' motion

for class certification should be granted.

### A.    The Class Satisfies the Requirements of Rule 23(a)

#### 1.    The Class Is So Numerous that Joinder of All Class Members Is Impracticable

Rule 23(a)(1) of the Federal Rules of Civil Procedure requires that the class be "so

numerous that joinder of all members is impracticable."  Impracticability means difficulty or

inconvenience of joinder; it does not require impossibility of joinder.  See, e.g., Robidoux v.

Celani, 987 F.2d 931, 935 (2d Cir. 1993).  The Second Circuit has held that "numerosity is

presumed at a level of 40 members."  Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473,

483 (2d Cir. 1995).  When estimating the number of class members, "[i]t is "permissible for the

plaintiffs to rely upon reasonable inferences drawn from the available facts."  German v. Fed.

Home Loan Mortg. Corp., 885 F. Supp. 537, 552 (S.D.N.Y. 1995).

The proposed class is so numerous that joinder of all members is impracticable.  As of

December 2006, approximately 6,132 residents of New York City were active APS clients.

(Stevens Decl. ¶ 3.)  Although Plaintiffs do not know at this time how many current or future

APS clients have not received or will not receive the protective services to which they are

entitled, Plaintiffs will be able to determine this through discovery.  It is clear, however, that there are more members of the plaintiff class than can be practicably joined.

It is not a barrier to class certification that the exact size of the class and the identity of its members are unknown.  See Robidoux, 987 F.2d at 935 ("Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement."); Reynolds v. Giuliani, 118 F. Supp. 2d 352, 389 (S.D.N.Y. 2000); 1 Herbert B. Newberg, Newberg on Class Actions § 3.05 (3d ed. 1992).  Moreover, "lack of knowledge of the exact number of persons affected is not a bar to certification where the defendants alone have access to such data." German, 885 F. Supp. at 553; see also Folsom v. Blum, 87 F.R.D. 443, 445 (S.D.N.Y. 1980).  Here, Defendants alone have access to their internal records, from which it can be determined how many APS clients are not receiving protective services to which they are legally entitled.

Joinder is also impracticable where, as here, the class is fluid, such that its composition will change as new individuals are referred to APS and become APS clients.  Cf. Folsom, 87 F.R.D. at 445 (explaining that joinder is impractical where class composition will change constantly "as existing [public] benefits are discontinued, and new applications are granted"); see also Reynolds, 118 F. Supp. 2d at 388.

Moreover, it would be impracticable for members of the class in this case to obtain legal services on an individual basis or to proceed pro se.  APS clients are, by definition, suffering from "mental or physical impairments" that cause them to be "unable to manage their own resources, carry out the activities of daily living, or protect themselves from physical abuse, sexual abuse, emotional abuse, active, passive or self neglect, financial exploitation or other hazardous situations without assistance from others and have no one available who is willing and

able to assist them responsibly." N.Y. Soc. Serv. Law § 473(1). Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

For all of the foregoing reasons, Plaintiffs satisfy the numerosity requirement.

2.      There Are Questions of Law and Fact Common to the Class

Rule 23(a)(2) requires that there be questions of law and fact common to the plaintiff class sought to be certified. The commonality requirement is satisfied when defendants apply a common course of prohibited conduct to the plaintiff class. See Escalera v. New York City Hous. Auth., 425 F.2d 853, 867 (2d Cir. 1970). The Second Circuit has approved district court findings of commonality at a "high level of abstraction," such as "whether each [member of the plaintiff class] has a legal entitlement to the services of which that [plaintiff] is being deprived . . . [and] whether defendants systematically have failed to provide these legally mandated services." Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997). Factual disparities, if any, regarding the effect of the challenged actions on class members are irrelevant to the determination that common questions exist. See, e.g., Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J., 698 F.2d 150, 153-54 (2d Cir. 1983); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968).

Here, there are questions of law and fact that are common to the class, including, but not limited to, whether Defendants' conduct has violated class members' rights under Title II of the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and New York law, and whether Defendants have failed systematically to provide the protective services to which class members are entitled. These are the "unifying thread[s] among the members' claims that warrant[] class treatment," Kamean v. Local 363, Int'l Bhd. of Teamsters, 109 F.R.D. 391, 394 (S.D.N.Y. 1986), and amply satisfy the commonality

requirement.  See, e.g., Cutler v. Perales, 128 F.R.D. 39, 44 (S.D.N.Y. 1989) ("All the putative class members in this litigation are concerned with a similar question of law—whether defendants violated the 90-day rule of 42 C.F.R. § 431.244 and perhaps the due process clause of the U.S. Constitution.").

3.    The Claims of the Named Plaintiffs Are Typical of the Claims of the Members of the Class

A named plaintiff's claim is "typical" when it arises from the same course of conduct that gives rise to the claims of other class members and is generally based on the same legal and remedial theories as the claims of the class.  See Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims."  Robidoux, 987 F.2d at 936-37.  In addition, "named plaintiffs satisfy the typicality requirement when all members of the class would benefit from the named plaintiffs' action."  Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York, 201 F.R.D. 326, 332 (S.D.N.Y. 2001); see also Cortigiano v. Oceanview Manor Home for Adults, 227 F.R.D. 194, 206 (E.D.N.Y. 2005) ("That all members of the class would benefit from the named plaintiffs' action demonstrates that the typicality requirement is met.").

The typicality requirement is easily met here.  The claims of all Named Plaintiffs and the members of the proposed class arise from the same illegal conduct by Defendants—i.e., Defendants' systematic failure to provide protective services in accordance with federal and New York law.  All class members would "certainly benefit" by the success of the Named Plaintiffs.  See Cutler, 128 F.R.D. at 45 ("The claims of the named plaintiff are typical of the putative class in that all have allegedly suffered from the practices of defendants.").

4.      The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Plaintiff Class

Rule 23(a)(4) allows a class action to be maintained if the Named Plaintiffs will fairly and adequately protect the interests of the class.  Two elements are incorporated into this requirement: (1) the interests of the named plaintiffs must coincide with the interests of the class; and (2) class counsel must be qualified, experienced, and generally able to conduct the litigation. See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60-61 (2d Cir. 2000); In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992).  Both elements of Rule 23(a)(4) are satisfied in this case.

The interests of the Named Plaintiffs and the proposed class members are entirely co-extensive.  All demand that Defendants comply with the basic statutory and regulatory requirements that set forth the services that APS must provide to its clients, as well as the federal statutory and constitutional requirements that affect how those services must be provided. Likewise all will benefit from a judgment ensuring compliance with these mandates.  See, e.g., Marisol A., 126 F.3d at 378 ("Plaintiffs seek broad based relief which would require the child welfare system to dramatically improve the quality of all of its services, including proper case management.  In this regard, the interests of the class members are identical.").  There are no conflicts among class members, all of whom have been or will be harmed by Defendants' failure to provide protective services in accordance with federal and state law.  Moreover, as Judge Leisure recognized in Cutler, even if the Named Plaintiffs receive the services they are seeking from Defendants, they will still maintain "a continuing interest in the subject of this litigation," because "[i]t is quite probable that the named plaintiff[s] might find [themselves] in similar situations with HRA and the State DSS [now DOH and OCFS] in the future."  128 F.R.D. at 45.

The adequacy of class counsel is beyond question.  The New York Legal Assistance Group ("NYLAG"), counsel for named plaintiffs and the proposed class, is a non-profit legal services organization that serves a clientele with a continuing interest in the issues involved in this litigation.  NYLAG has substantial experience in litigation involving the rights of people with disabilities.  In addition, NYLAG possesses extensive expertise in class-action litigation in state and federal courts.  In short, counsel has considerable resources and substantial experience to adequately protect all members of the class and to advance the interests of all members of the class throughout this litigation.

### B.    The Class Satisfies the Requirements of Rule 23(b)(2)

The proposed class meets the criterion for certification set forth in Rule 23(b)(2), which allows for the maintenance of a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Defendants have acted on grounds generally applicable to the class as a whole. Defendants' systemic failure to provide protective services in accordance with federal and state law violates the class members' rights under Title II of the ADA and its implementing regulations, Section 504 of the Rehabilitation Act and its implementing regulations, the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the New York State Constitution, New York Social Services Law §§ 473 and 473-a and their implementing regulations, and Article XVII of the New York State Constitution.  Any order entered by this Court would, by its terms, inure to the benefit of all members of the plaintiff class.  Class certification is therefore appropriate under Rule 23(b)(2).  See, e.g., Lovely H. v. Eggleston, 235 F.R.D. 248, 257 (S.D.N.Y. 2006) ("Cases . . . alleging systemic failure of

governmental bodies to properly fulfill statutory requirements, have been held to be appropriate for class certification under Rule 23(b)(2).") (quoting <u>Raymond v. Rowland</u>, 220 F.R.D. 173, 181 (D. Conn. 2004)).

## **<u>CONCLUSION</u>**

For the reasons stated herein, Plaintiffs' motions for a preliminary injunction and class certification should be granted.

Dated:  New York, New York
       April 10, 2007


                                  Respectfully submitted,

                                  YISROEL SCHULMAN, ESQ.
                                  New York Legal Assistance Group


                                  By: <u> /s/                              </u>
                                  Jane Greengold Stevens, of Counsel (JS 4790)
                                  Sabrina Tavi, of Counsel (ST 2781)
                                  Caroline Hickey, of Counsel (CH 1410)
                                  Deborah Berkman, of Counsel (DB 8086)
                                  Jason Parkin, of Counsel (JP 1919)
                                  450 West 33rd Street, 11th Floor
                                  New York, NY 10001
                                  Tel:  212-613-5000

                                  <u>Attorneys for Plaintiffs</u>