Suellen K. Tozzi hereby declares, under penalty of perjury, that

am a licensed social worker and the Director of Bronx Jewish Community Council ("BJCC") In Home Services program under contract with the New York City Department for the Aging ("DFTA"). We are an Expanded In Home Services to the Elderly Program ("EISEP") and provide case management services to individuals over 60 years of age to keep them safe in the community.

2. have worked at BJCC for about twelve and a half years and have extensive experience dealing with Adult Protective Services ("APS") and their clients.

3. I make this Declaration, as Matilda Belovic's next friend, in Support of her Motion for a Preliminary Injunction because I believe that as a result of the actions and inactions of APS, Matilda has been wrongly removed from her home and she is now in danger of losing her ability to return to that home.

4. Matilda Belovic is a single, 94 year-old woman who is a client of APS.

5. Matilda is now living at the Jewish Home and Hospital, a nursing home located at 100 West Kingsbridge Road, Bronx, as a result of APS's failure to take reasonable steps to try to maintain her safely in and return her to the community in a less restricted environment than a nursing home.

6. Matilda is desperate to return to her home, and I believe that with proper services she could safely do so.

APS failed to provide or ensure that other agencies provided the services she needed to maintain her safely at home and instead, in October 2006, took her to a nursing home

without any notice or preparation. Further, APS has failed to take steps necessary to enable her to return home.

8.      Matilda has now lost or is in imminent danger of losing her Section 8 voucher, without which she cannot maintain her apartment

9.      Since Matilda was moved to a nursing home in October 2006, APS has been in control of her apartment, and APS has long been aware that she had a Section 8 voucher. As I detail below, and as is described in Sabrina Tavi's Affirmation, APS failed to recertify Matilda's Section 8 subsidy or arrange for an inspection of Matilda's apartment by Section 8 while Matilda has been in the nursing home.

**Background**

10.     In this Declaration, I will briefly describe the events that led to Matilda's removal to a nursing home and what I believe, based on my professional experience, should have been done, and could now be done, to return Matilda to the community.

        first met Matilda Belovic in August 2004 when she was referred to BJCC for assessment and provision of Meals on Wheels.

12      Matilda lived at 246 East 199th Street, Bronx, New York 10458, in apt GD. She had a Section 8 voucher issued by the New York City Housing Authority ("NYCHA") which helped to pay her rent, making it possible for her to stay in that apartment.

13      visited her in her home for the first time on August 17, 2004 to do an assessment. Between then and when she was taken to a nursing home by APS in October 2006, I visited her at home at least several times a year and I supervised social work students who visited her almost every week. As such, I have had extensive contact with Matilda since August 2004.

2

14. Matilda was born on January   , 1913. Her Social Security number is 103 34 3095

5 Ms. Belovic was born in Croatia and came to this country in 1960. In Croatia, she had been a Catholic nun and spent years as a prisoner of war in Nazi labor camps. Matilda has no family in this country, except nieces who are in their 80's and are unable to assist her.

16. Matilda has been diagnosed with mild Dementia NOS and has fixed delusions (ie. that she will win the lottery) and some paranoia (ie. she thinks that people are coming into her home). She also suffers from congestive heart failure, heart disease, hypertension, osteoarthritis, B-12 deficiency and dental problems.

7. Despite her medical problems, while she remained in the community Matilda was a spirited woman who made the best of being old and alone in an adopted country.

18. After our initial assessment, BJCC did begin to provide Meals on Wheels to Matilda. We investigated the possibility of obtaining home care assistance for her at that time, but she did not want it.   arranged to have a social work student visit her every week and I supervised the work of that student.

19. Shortly after Matilda became a client of BJCC, we became aware that she had received a shut off notice from Con Ed for failure to pay her bill. She then also received a shut off notice from her telephone service provider.

20. Matilda was clearly having difficulty managing her money. Her most persistent delusion is that she will win the lottery. This delusion is apparently based on the fact that she did indeed win a lottery granting her the opportunity to come to the United States as a Legal Permanent Resident ("LPR"), known as the Green Card Lottery.

21. In September or October of 2004, Matilda was referred to APS by West Bronx Housing and Neighborhood Resource Center and by JASA, other social services agencies that were helping her, because of her problems managing her money. Rather than paying her bills, Matilda was sending donations to numerous organizations and answering sweepstakes in the hope of another big win. BJCC was in agreement with this referral.

22. The referring agencies referred her to APS as in need of financial management and consideration for an Article 81 guardianship.

23. Although DFTA does not require case management agencies to do case management for people accepted by APS, BJCC's experience has been that clients have been inadequately served by APS so we continue case management for APS clients in cases in which we deem it necessary.

24. Based on both my own visits to Matilda and those of the students under my supervision, I was aware of much of what was happening with her bills.

25. During the months following Matilda's referral to APS I regularly contacted the Bronx office of APS, usually by e-mail, informing them of Matilda's continuing problems with her bills and asking for information about her status with APS and when they would begin doing financial management for her.

26. I inquired every month from November 2004 until October 2005. During all that time, there was no progress on Matilda's case. No financial management had been instituted.

27. In March 2005, Matilda again received a turn off notice from Con Ed. I arranged to help Matilda pay the bill and informed Bronx APS about the notice. Financial management was still not in place. APS told me that financial management would begin only when the case was

transferred to "undercare" which had still not happened, six months after Matilda was referred to APS.

28. In June 2005, JASA received a notice stating that APS was denying care to Matilda on the ground that she was not eligible. No reason was stated.  was very surprised by this, as the APS office had been talking to me for months about Matilda as if they had accepted her case. When  contacted APS they told me the notice had been a mistake.

29. In November 2005, over one year after Matilda was referred to APS, her Social Security and Supplemental Security checks were finally diverted to APS so that they could manage her money  Even after that, however, APS failed to notify Con Ed and the telephone company to send Matilda's bills to them  The bills kept going to Matilda who continued to have trouble dealing with them.

30. During the whole year after Matilda was referred to APS and before APS began financial management, no one at APS ever asked us at BJCC to take any actions on Matilda's part and never inquired about what we were doing for her.

3 In November 2005, I was increasingly concerned about Matilda's welfare because of all these financial problems, and I began to urge APS to obtain an Article 81 guardian for Matilda to manage all of her money. Although APS was providing financial management, that only involved APS paying Matilda's rent and utilities; after those were paid, Matilda was left with a sum of money each month to manage on her own. Matilda was continuing to give money in response to various mail scams and requests for donations from illegitimate organizations, as well as making donations that she could not afford to legitimate organizations. We believed that an Article 81 guardian would help limit the access of such scammers to Matilda, as well as help her make long-term decisions about financial and other matters when that became necessary.

5

32. Despite the fact that I continued over the next year to request a guardianship for Matilda, APS did nothing about it, and did nothing to ensure that her needs were being met in other ways.

33. Despite our continuing requests, APS failed to apply for an Article 81 guardian.

Despite the fact that Matilda was a client of APS at the time, BJCC learned on July 21, 2006 that she had not been re-certified for Food Stamps since August 2005. Her food stamps were terminated on July 18, 2006.

35. immediately notified APS that action needed to be taken to restore her food stamps, but we got no response from APS.

36. Because APS had not taken the necessary steps to maintain Matilda's food stamps, and despite the fact that APS had never asked that we assist in that process, in September 2006 BJCC began the process of attempting to help Matilda recertify.

37. We discovered that we could not complete the recertification process without several documents that were in the possession of APS.

We requested those documents from Emmanuel Nwabuzo, Matilda's caseworker, on September 20, 2006. I repeated the request several times to Jose Perez, the Deputy Director of Bronx APS, but with no results.

When we contacted the food stamp office regarding recertification for Matilda, we were told they could not obtain the necessary documents from APS even though their offices were in the same building.

40. As far as I know, APS made no efforts on its own to restore or maintain Matilda's Food Stamps; and I know for a fact, that APS made it impossible for us to help complete the task by failing to provide us necessary documents.

41	Despite my concerns about Matilda's ability to manage her finances, and her resultant need for an Article 81 guardian, continued to believe that she was otherwise safe at home with the support of all the services that BJCC and the other social services agencies were providing.

**Removal to Nursing Home**

42.	On October 17, 2006, Matilda's APS caseworker Emmanuel Nwabuzo went to her home and told her that they were going on a visit. Mr. Nwabuzo never discussed with Matilda at any time that it was APS' intent to have Matilda admitted into the nursing home. She understood that they would look at the nursing home and then she would return home. However, the caseworker took her to Fieldston Lodge Nursing Home and left her there to be admitted.

43.	The APS caseworker did nothing to prepare Matilda for the idea that he was arranging for her to move into the nursing home. He did not have her pack any clothes or other belongings. She arrived at the nursing home with nothing but the clothes on her back.

44.	Prior to removing Matilda from her home and having her admitted into Fieldston Lodge Nursing Home, APS did not consult with or inform any of Matilda's service providers of their intentions. APS did not consult with or inform Matilda's VNS home attendant, her VNS nurse, her JASA mental health counselor, anyone from my agency BJCC, or anyone from RAIN, the agency that provides her home-delivered meals.

45.	In fact, I only learned that APS had removed Matilda from her home and had her admitted into Fieldston Lodge Nursing Home when, on October 18, 2006, happened to run into Mr. Jose Perez, the Deputy Director of Bronx APS. Mr. Perez informed me that Matilda had been taken to Fieldston Lodge Nursing Home and that he was awaiting a report from his caseworker.

46. asked Mr. Perez why APS had taken Matilda to the nursing home, he seemed unclear as to the reason. Mr. Perez said that Mr. Nwabuzo told him that on Tuesday, October 17, 2006, Mr. Nwabuzo had gone to Matilda's apartment and found the door open and that Matilda didn't recognize him.

47. later learned from Matilda's home attendant that on Monday, October 16, 2006, the APS caseworker Mr. Nwabuzo had been to Matilda's apartment with two individuals from a nursing home. They did not explain to the home attendant or Matilda why they were there.

48. In an e-mail dated October 23, 2006, in response to my urgent inquiries, Mr. Perez informed me that Matilda's caseworker had been worried that she was leaving her door open and letting in people she did not know. He further stated that one of the main reasons for the admission to the nursing home was to enable APS to expedite an application for an Article 8 guardian for Matilda and to obtain split-shift home care for Matilda. This made no sense as these were actions that should have been taken in order to maintain Matilda in the community instead of taking her to a nursing home.

49. Prior to taking Matilda to the nursing home in October 2006, APS never attempted to obtain split-shift home care or any increase in home care services for Matilda to my knowledge.

50. Further, my sense that moving Matilda to the nursing home had been a counterproductive action was confirmed when APS informed me on November 20, 2006, that the Article 81 application was rejected because the client was in a nursing home.

51. All through November, Matilda begged us to help her get back home. She hated being in the nursing home, and in fact made several attempts to leave on her own, creating a potentially dangerous situation.

52. On November 8, 2006, spoke with Marion Seabrook, the social worker from Fieldston Lodge Nursing Home, who informed me that a psychiatrist had seen Matilda and deemed her fit to make the decision to go home. Ms. Seabrook further stated that the nursing home wanted to send Matilda home as well. Matilda's treatment team at Fieldstone Lodge Nursing Home decided that she could safely return home with the various services she had in place prior to being taken to the nursing home by APS. APS was in agreement with this plan to return Matilda home.

53. Prior to being admitted to the nursing home in October 2006, Matilda received numerous supportive services at home. In addition to the financial management services provided by APS, a Medicaid home attendant from Visiting Nurse Service ("VNS") provided Matilda with home care services three days per week, four hours per day. A VNS nurse came one time per week to pour Matilda's medication. In addition, several New York City Department for the Aging contract agencies supplied Matilda with services: my agency, the Bronx Jewish Community Council ("BJCC"), provided EISEP case management including weekly visits from a student intern; RAIN provided daily lunch and supper home-delivered meals; and the mental health unit of JASA provided counseling on a weekly basis.

54. Several of these agencies could simply resume their service to Matilda if she were discharged from the nursing home. Both BJCC and JASA mental health were continuing to serve Matilda while she was in the nursing home, and could thus continue serving her at home. And the delivery of her lunch and supper meals could be resumed with no problem as well.

55. However, since Matilda's admission to the nursing home in mid-October, her home care and visiting nurse cases had been closed by VNS. Thus, Fieldstone Lodge arranged for VNS to evaluate Matilda for home care and nursing services. On November 15, 2006, I spoke

with Gail Wallen, a social worker at Fieldston Lodge Nursing Home, who informed me that VNS would not provide home care or nursing services to Matilda unless she had a community back-up.

56.    Because Matilda has no family able to function as her community back-up for the purposes of homecare and nursing services, I arranged for Matilda's primary care physician, Dr. Di Blasio, to sign a mutual care agreement with VNS agreeing to be Matilda's community back-up. VNS rejected this proposal stating that doctors could not function as a community back-up.

57    worked to see if we could find an acceptable alternative for a community back-up but given that Matilda has no family in this country, could not find anyone. It became very apparent that what Matilda needed was an Article 81 guardian who could function as her community back-up.

58.    On November 20, 2006, received an email from Jose Perez, in response to my inquiries, stating that the Article 81 guardianship application submitted by APS was rejected due to Matilda being in the nursing home but that APS had re-submitted the application for reconsideration

59.    On December 13, 2006, Brad Silver, the Executive Vice President of BJCC, sent a letter to Lin Saberski, Director of APS, informing her of Matilda's situation and requesting that action be taken by APS to return her home promptly. Ben Antinori, Director of Client Services for APS, responded to Mr. Silver on Ms. Saberski's behalf stating that "APS will request a re-evaluation of Ms. Belovic's application for an Art 81 community guardian by HRA Office of Legal Affairs (OLA) consultation attorney." This was over three weeks after Mr. Perez informed me that APS had already re-submitted the application for reconsideration

60. During this time while APS and the nursing home were trying to get homecare put in place, Matilda was desperate to return home. On November 17, 2006, she attempted to leave Fieldston Lodge Nursing Home and was found in the lobby of the nursing home with her coat on.

61. On December 15, 2006, Matilda was sent to North Central Bronx Hospital for a psychiatric evaluation because she had attempted to leave Fieldston Lodge Nursing Home again. She was not admitted, and was returned to Fieldston Lodge. That same afternoon, she was sent to Gracie Square Hospital for a psychiatric evaluation apparently because of her attempts to leave the nursing home.

62. On December 19, 2006, spoke with Catherine, a social worker at Gracie Square Hospital, who informed me that Matilda was seen by a psychiatrist and it was determined she was of sound mind. She further informed me that the hospital was ready to discharge Matilda back to the nursing home.

63. On December 22, 2006, Gracie Square Hospital discharged Matilda to the Jewish Home and Hospital nursing home where she remains today.

64. Within less than a week, the social worker from Jewish Home and Hospital nursing home told me that they believed that Matilda could and should go home and that she was trying to reach APS to arrange her return home, but could not reach them.

**APS' Failure to Obtain an Article 81 Guardian has Impeded Matilda's Obtaining Home Care**

65. I have since then worked with the Jewish Home and Hospital nursing home social worker and with APS and others in an effort to get Matilda home.

66. Matilda's treatment team, including her doctors, nurses and social worker, at the Jewish Home and Hospital all believe that she can, and should, return home. They have

determined that Matilda should return with the same services she previously received in addition to increased home care.

67. If Matilda were to return home, BJCC could immediately restore EISEP case management and her home-delivered meals could be restored. The JASA mental health unit has continued to provide Matilda therapy during her stays at Fieldston Lodge Nursing Home and Jewish Home and Hospital, and would be able to continue with Matilda in her home. In addition, Matilda's primary care physician, Dr. DeBlasio, who she regularly saw in the community prior to being admitted to the nursing home is able to pour Matilda's medication on a regular basis.

68. And finally, BJCC Home Attendant Services has agreed to provide Matilda with home care. However, in order to arrange for Medicaid to pay for the home care, the application for home care must be referred through HRA.

69. On January 12, 2006, Jewish Home and Hospital submitted an M11Q application for homecare to APS. Mr. Perez informed me that on January 18, 2007, APS sent the M11Q to the 94th Street CASA for their consideration.

70. On February 13, 2007, HRA sent a notice to Matilda stating that "since you currently have no legal guardian in the outside community, it was felt that your health and safety needs should be met by a level of care that is higher than that which a home attendant can offer. A higher level of care is suggested."

71 On February 15, 2007, I spoke with Linda Graves, the social worker from Jewish Home and Hospital nursing home regarding her conversation with Arlene Kelly at the 94th Street CASA about HRA's February 13th Notice. Ms. Kelly informed Linda Graves the CASA was concerned about returning Matilda home because there was no Article 81 guardian in place and

12

also because the CASA believed Matilda needed more hours of home care than was requested by the nursing home.

72      Thus, on March 14, 2007, the nursing home and I submitted a new M11-Q application for home care services to APS. The application requested increased home care services for Matilda in the amount of two 12-hour shifts to address the CASA's concern that Matilda not be left alone. While this request for increased home care services addressed one of the CASA's reasons for denying the initial home care application, the lack of an Article 81 guardian remains an impediment to Matilda receiving home care.

73      Although one of APS' main stated reasons for initially taking Matilda to the nursing home back in October 2006 was that they believed it would help expedite their application for an Article 81 guardian on her behalf, as of this date, they still have not had a guardian appointed. Even though it has been the plan to return Matilda home since early November 2006, Jose Perez informed me that APS did not file an application for an Article 81 guardian until as recently as March 13, 2007, approximately five months after Matilda was admitted to the nursing home.

74.     Now APS' failure to obtain a guardian may be impeding Matilda's ability to return home. Everyone, including APS, agrees that Matilda needs a guardian for financial management and now the lack of a guardian may also be impeding Matilda's ability to receive home care services.

**APS' Failure to Maintain Matilda's Section 8 Subsidy**

75.     During the period in which Matilda has been our client, she has had several problems maintaining her Section 8 voucher. While Matilda was at home, or our students who visited Matilda regularly, checked her mail to watch for any important notices. When notices

appeared from NYCHA about Section 8, BJCC attempted to help Matilda directly or to obtain help for her from APS.

76. For example, in March 2006, Matilda's landlord, Ms. Rezika Turuk, informed a student intern at my organization, Tiffany, that Ms. Turuk had received a notice of possible termination from Section 8 and called APS about it but the APS caseworker never returns her calls. Because APS was not responding to Section 8 and Matilda was in danger of losing her subsidy, BJCC called Section 8 directly and provided the necessary documents to recertify Matilda's Section 8 subsidy.

77. After APS took Matilda to the nursing home in October 2006, BJCC no longer had access to Matilda's apartment. We therefore stopped seeing her mail. APS was then in charge of the apartment, and since they were in charge of her financial management, of her mail. Thus after Matilda was admitted to the nursing home in October, we were not aware of any notices from Section 8.

78. Approximately once a month since Matilda was admitted to the nursing home on October 17, 2006, BJCC has checked with APS to make sure they were paying her rent. APS informed us that because it was the goal to have Matilda return home, they were maintaining her apartment and ensuring that her rent was paid.

79. As recently as March 6, 2007, a student intern in my office, Erica Eaton, called Matilda's APS caseworker, Mr. Nwabuzo, to confirm that everything was up to date with Matilda's apartment. Mr. Nwabuzo informed Erica that the rent and bills had all been paid and were up to date.

80. Despite Mr. Nwabuzo's assurance on March 6th that APS was paying Matilda's rent, I later learned that in fact APS had failed to recertify Matilda's Section 8 and her subsidy had

been terminated. On March 6, 2007, after Erica spoke with Mr. Nwabuzo, I spoke with Matilda's landlord, Ms. Rezika Turuk, regarding Matilda's apartment. Ms. Turuk informed me that she had received a letter from Section 8 stating that they would terminate Matilda's Section 8 subsidy due to a failure to recertify and to make her apartment available for inspection. Ms. Turuk faxed me a copy of this letter. See Ex. A  The letter indicates that Matilda's Section 8 subsidy terminated on February 22, 2007. Ms. Turuk informed me that she spoke with the Section 8 caseworker, Ms. Farah, who indicated that Section 8 would make one final payment for the month of March.

81    Ms. Turuk also told me that when she spoke to Emmanual Nwabuzo, Matilda's APS caseworker about this, he told her that APS was trying to keep Matilda in the nursing home. This was completely contrary to all the conversations I had about Matilda with Jose Perez, the Deputy Director of Bronx APS.

82.    Apparently, APS did nothing to ensure that Matilda's Section 8 eligibility would be recertified and her voucher kept in effect.

83.    Since Matilda was taken from her apartment to the first nursing home in October 2006, APS has been paying her rent in its capacity as her financial manager and has had control of the apartment. APS was therefore in a position to maintain her Section 8 voucher.

**Patterns of Behavior by APS**

84.    Unfortunately, the problems I have described here are not unique to Matilda Belovic. In the course of my employment at BJCC, I have had many clients who were in need of protective services from APS. Many of these clients have not received the services they needed, and others received them only after many efforts on BJCC's part to get APS to act.

85. In January, 2006, I attended a meeting with staff from DFTA, Bronx APS, and the central office of APS, including Ben Antinori, the Director of Client Services of APS, about problems we had been having with APS.

86. After that meeting, I sent Mr. Antinori an e-mail describing the then current problems of three APS clients, focusing on problems in the provision of financial management.

87. Both Bronx APS and the Director of Client Services of APS, are aware, and have been aware for a long time, of APS's failure to provide services needed to protect their clients from harm. I am sure they are aware of this from other sources as well, but I know they are aware of these problems from communications with me.

88. Among the problems I have described to APS, and for which I have sought help for my clients are, failure to obtain and maintain benefits such as food stamps, home care, and Section 8; long delays in the provision of financial management; failures to perform financial management in a competent fashion; and failures to timely apply for Article 81 guardianships.

89. My experiences with APS show me that their caseworkers are inadequately trained and inappropriately burdened with case loads that are so big that they are unmanageable.

WHEREFORE, I respectfully request that this Court grant the motion for a Preliminary Injunction directing the defendants to promptly provide or ensure the provision of the services needed to return Matilda Belovic to her home in a safe situation.

*Suellen K. Tozzi*
Suellen K. Tozzi

Dated: April 4, 2007
Bronx, New York