**EXHIBIT J**

**Declaration of Sarah T. Gillman**

Sarah T. Gillman, hereby declares, under penalty of perjury, that:

1. I am a staff attorney with The Legal Aid Society's Staten Island Neighborhood Office in Staten Island, New York. I have been a staff attorney at that office for the past five years. The Legal Aid Society's Staten Island Neighborhood Office provides free legal services to individuals residing in Staten Island, New York.

2. I make this Declaration, as Maureen Curran's next friend, in Support of her Motion for a Preliminary Injunction.

3. The information contained in this Declaration is based on my own experiences as an attorney for Ms. Curran and on my conversations with Ms. Curran.

**Ms. Curran's Background**

4. Ms. Curran is a forty-six year old woman living alone in a one-bedroom basement apartment in Staten Island, New York. She has been a client of APS since approximately October 2006.

5. Her sole source of income for the past twelve years has been Supplemental Security Income. She currently receives $710 per month. She also receives $152 in Food Stamps per month. Her rent is $520 per month.

6. Ms. Curran suffers from bipolar disorder, clinical depression, and panic anxiety disorder. She has also been diagnosed with Posttraumatic Stress Disorder ("PTSD") due to severe physical and mental abuse by her daughter's father, multiple sexual assaults, and sexual abuse her by own father during her childhood.

7. Ms. Curran also suffers from arthritis and scoliosis of the spine.

8. Ms. Curran's psychiatric conditions make it difficult for her to manage certain aspects of her life. She gets easily confused and struggle to remember events, times and places. She feels that she cannot keep things straight in her mind and is unable to fully take care of herself.

9. She frequently experiences anxiety attacks that make her unable to function. When she has an anxiety attack, she starts to cry and shake uncontrollably and she cannot breathe. I have seen her several times in this state.

10. Ms. Curran regularly experiences anxiety attacks when she tries to function in the world outside her apartment. Sometimes, her anxiety attacks have been so bad that she cannot stay upright and feels paralyzed until the attack subsides.

11. Her psychiatric conditions also make it difficult for her to take public transportation. In the past, on several occasions when she tried to take the bus she started to shake so badly that other people on the bus thought she was having a seizure.

12. Therefore, if Ms. Curran has an important reason to leave her apartment and she is feeling able to, she will take a cab. However, she cannot afford to do this very often because the cab call out fee is a minimum of $7 and the total ride can be as high as $20.

13. One of the major functional difficulties Ms. Curran experiences is arranging for her medical care. She knows it is important for her to see a mental health professional regularly so that she can receive treatment for her bipolar disorder, PTSD, and depression. She would like to receive regular treatment so that the doctors could help her and maybe her psychiatric condition could improve a little.

14. However, Ms. Curran is unable to locate a psychiatrist or therapist near her home and she does not know how to establish an ongoing relationship with medical professionals.

15. Ms. Curran does not have a primary care physician or a treating psychiatrist or therapist. She is entirely dependent on Emergency Room doctors that she sees infrequently for her medical care, including prescribing the medications necessary to treat her psychiatric conditions.

16. Ms. Curran's current medications are prescribed by a physician called Dr. Cynthia Wong but she does not know who she is. Ms. Curran guesses that she was a doctor in one of the Emergency Rooms that she visited.

17. Sometimes, Ms. Curran has trouble remembering to regularly take her medications and to refill her prescriptions. Some days, she cannot remember if she has taken her medications for that day or not.

18. Ms. Curran thinks that the last time she sought ongoing medical treatment was approximately two years ago. Following a visit to the Emergency Room, she thinks the Emergency Room doctors made an appointment for her at a medical clinic related to the hospital. She went to the medical clinic on the wrong day and time, and she was told she would have to wait seven hours to see the therapist. She was unable to wait that long and she left.

19. After that, Ms. Curran could not manage trying again, so she has not received any regular medical treatment for her bipolar disorder, PTSD, depression, arthritis or scoliosis for the past two years.

20. Because of Ms. Curran's disabilities, she finds it difficult to go grocery shopping or run errands outside of the house. Even inside the house, sometimes her body shakes so much that she finds it difficult to take a shower. She is concerned that she will slip and fall in the shower due to the shaking.

**Ms. Curran's Housing Court Case and Referral to APS**

21. I first met Maureen Curran on September 14, 2006 in the Civil Court of the City of New York, County of Richmond, Housing Part. Ms. Curran was in Court because her landlord commenced a summary holdover proceeding and the first Court date was September 14, 2006.

22. Ms. Curran was referred to me by the Clerk of the Court. When I met Ms. Curran she was visibly extremely upset and unable to participate in any way in the Court proceeding.

23. In the first five minutes of my conversation with Ms. Curran she told me that she wanted to kill herself and that she could not deal with the summary holdover proceeding that had been brought by her landlord.

24. Ms. Curran was crying and shaking throughout the time that I spoke to her.

25. Ms. Curran was terrified of being evicted and forced to leave her apartment later that day. Despite trying to reassure Ms. Curran that I would represent her and that she would not have to leave her apartment that day, Ms. Curran was not able to stop crying and shaking, or fully comprehend what I was telling her.

26. The Legal Aid Society has an intake procedure that requires all new clients to either call the office or provide preliminary information that is thereafter reviewed by the Attorney-in-Charge of the office. However, within ten minutes of meeting Ms. Curran, because I believed she was so completely unable to protect herself, I made a decision to represent her in the summary holdover proceeding and notified the Court and the landlord's attorney accordingly. The case was adjourned to October 4, 2006.

27. Although I made an appointment for Ms. Curran to come to my office prior to the October 4, 2006 Housing Court date, she did not come and my attempts to call her proved to be unsuccessful. Because of her presentation in Housing Court when I met her and her inability to communicate with me after our initial meeting, The Legal Aid Society made the determination that we had to request the Housing Court to make a referral to Adult Protective Services ("APS") for the appointment of a Guardian *ad Litem* ("GAL") or, if necessary, for the appointment of an Article 81 Guardian.

28. On October 4, 2006, I appeared in Housing Court and requested that the Court make a referral to APS on behalf of Ms. Curran for a GAL and other services to assist Ms. Curran with her housing situation. The request was granted and the case was in adjourned to November 2, 2006.

29. On November 2, 2006, I appeared in Housing Court and was advised by the Court that APS had denied the request for GAL.

30. I and the Court attorney for the Housing Court Judge immediately called APS regarding their decision to deny the request for an appointment of a GAL.

31. We were informed by the Staten Island APS office that Ms. Curran had been assigned an APS caseworker and that the worker had denied the request for an appointment of a GAL.

32. I was further advised by the Staten Island APS office that the APS worker made the decision to deny the request for an appointment of a GAL without first referring Ms. Curran for a psychiatric evaluation. The APS worker appears to have based his decision to deny the GAL request based solely on his own untrained opinion as to her competency.

33. I therefore requested that a psychiatric evaluation be done and that APS make a decision about the appointment of a GAL in the Housing Court case based on a full psychiatric examination. The Housing Court case was adjourned to November 22, 2006.

34. At around this time, two men came to Ms. Currran's apartment. They told her that they were from Adult Protective Services and that they were visiting because of the Housing Court case. One of the men told her he was a psychiatrist.

35. During that visit, the psychiatrist asked Ms. Curran questions about her psychiatric conditions, her daily activities and how she functioned. The psychiatrist did not ask her any questions about the housing court case, about whether or not Ms. Curran had spoken to me, about whether she felt she would be able to go back to Court, or whether she knew if there were any more scheduled dates for the housing court case.

36. Towards the end of the visit, Ms. Curran asked the psychiatrist and APS caseworker about what would happen if she was evicted. She specifically asked about the possibility of emergency housing. The psychiatrist told her there was no such thing as emergency housing. He told her they couldn't help her.

37. On November 22, 2006, I appeared in the Housing Court and was advised by the Court that APS had conducted a psychiatric evaluation of Ms. Curran but that APS was still not going to move for the appointment of a GAL in the Housing Court case.

38. As set forth in the psychiatric evaluation (attached hereto as Exhibit A), APS's decision not to move for the appointment of a GAL was based upon the fact that Ms. Curran had an attorney in the Housing Court case, even though she was determined to have an extremely low Global Assessment of Functioning ("GAF") of 50.

39. A GAF of 50 is defined as "a serious impairment in social, occupational, or school functioning." (DSM-IV, pg. 32)

40. The fact of my legal representation did not obviate the need for the appointment of a GAL on Ms. Curran's behalf. As her attorney, I believed that a GAL was necessary to make decisions on Ms. Curran's behalf.

41. Because APS had declined to appoint a GAL, the Housing Court adjourned the case for a trial on December 21, 2006.

42. On December 21, 2006, I appeared in Court and the Housing Court. Although Ms. Curran told me that she would come to Court on December 21, 2006, she did not appear.

43. Therefore, on December 21, 2006, the Housing Court required the case to go forward and a trial was held without Ms. Curran. At the conclusion of the trial, I moved to dismiss the summary holdover proceeding because the landlord failed to prove his *prima facie* case.

44. On or about January 4, 2007, I contacted the Staten Island APS office about Ms. Curran's situation. I was told by the Staten Island APS office that they advised the Housing Court

that they wanted to know the outcome of the summary holdover proceeding and would assist Ms. Curran with any services that would help with her housing situation.

45. On January 11, 2007, I again contacted the Staten Island APS office about Ms. Curran to inquire about what services had been provided. I was advised that a case worker had spoken with Ms. Curran about shared housing and that the caseworker had apparently confirmed with Ms. Curran that she had made an application for New York City Public Housing.

46. The APS representative I spoke with informed me that APS would drive Ms. Curran to a shelter in the event that the Housing Court made a decision in favor of the landlord.

47. On January 25, 2007, I again spoke to the Staten Island APS office and was told that the caseworker was still looking into shared housing for Ms. Curran. However, no other action had been taken on behalf of Ms. Curran.

48. On February 20, 2007, the Housing Court issued a Decision/Order that dismissed the summary holdover proceeding because the landlord failed to prove his prima facie case.

49. Shortly thereafter, I contacted the Staten Island Office of APS to determine what, if anything, had been done on behalf of Ms. Curran since my last communication with them on January 25, 2007. I was advised that the status of Ms. Curran's case with APS had not changed and that no further action had been taken on her behalf.

50. In or about the second week of March 2007, I received a call from Ms. Curran in which she stated that her landlord had served her with a thirty day notice of termination.

51. As was the case when I first met Ms. Curran on September 14, 2006, when I tried to talk to Ms. Curran about her housing she became very upset and was unable to discuss her housing situation. I told Ms. Curran that the landlord would, after the expiration of the thirty day notice, have to commence a summary holdover proceeding in the Housing Court. I told Ms. Curran that The Legal Aid Society would represent her again in the Housing Court.

52. Although The Legal Aid Society will represent Ms. Curran in the Housing Court when the landlord commences a second summary holdover proceeding, it is imperative that APS appoint a GAL in the Housing Court case.

53. Throughout the summary holdover proceeding that was dismissed by the Housing Court by Decision/Order of February 20, 2007, Ms. Curran was unable to and did not participate in the case. Ms. Curran only appeared in Court on September 14, 2006 and October 4, 2006. Ms. Curran did not appear on any of the other adjourned dates and also did not appear for the trial.

54. On every occasion that I have spoken to Ms. Curran regarding her housing situation, she becomes extremely upset, crying and shaking to the point that she cannot communicate with me regarding the case. I believe that Ms. Curran's inability to participate in her housing case necessitates the appointment of a GAL.

55. Although the first summary holdover proceeding was dismissed by the Housing Court on February 20, 2007, it is unlikely that the second summary holdover proceeding will result in dismissal. Because Ms. Curran resides in "unregulated" housing there are very few defenses available to her and it is unlikely that the landlord will fail to prove his prima facie case for a second time.

**Ms. Curran's Need for Protective Services**

56. Ms. Curran needs APS to appoint a GAL to understand the possible outcomes of a summary holdover proceeding and make reasoned decisions on Ms. Curran's behalf accordingly. A GAL will be able to communicate with me in my capacity as Ms. Curran's attorney and discuss the status of the housing court case. Ms. Curran does not and will not have these abilities.

57. It is also imperative that APS assist Ms. Curran in securing and maintaining alternative housing in case she is evicted. Based upon my experience with Ms. Curran, she is not able to locate and maintain alternative suitable housing for herself without assistance from APS.

58. Although Ms. Curran has been aware of her landlord's intention to evict her since in or about August 2006 when the first notice of termination was served, she has not been able to locate any alternative housing.

59. Ms. Curran thinks she has applied for some kind of public housing, but she is not sure if she applied for public housing or Section 8 or both. Also, attached as Exhibit B is a completed document that concerns public housing in Staten Island. The document states that it should be returned to NYCHA but because Ms. Curran currently has the document in her possession, she thinks she must not have mailed it back. She does not know how this affects her public housing application.

60. Ms. Curran does not know what to do or how to check on the status of her public housing application, or how to go about looking for other housing if she gets evicted. She has looked in the newspaper but there seems to be no apartment that she can afford on her limited income.

61. If APS is not required to act on behalf of Ms. Curran by appointing a GAL for her in the Housing Court summary holdover proceeding and by assisting her with obtaining and maintaining alternative suitable housing, Ms. Curran will become homeless. Given Ms. Curran's severe psychiatric problems, this would be extremely detrimental to her health and safety. Ms. Curran stayed in a homeless shelter about seven years ago and she was raped at the shelter. She is terrified of being homeless, but she does not feel that she can go back to another homeless shelter.

62. Ms. Curran also needs APS to help her arrange for regular medical care and attention.

63. Ms. Curran thinks that maybe if she had a home attendant for several hours per week, she may be able to manage to regularly go grocery shopping with the home attendant and perhaps the home attendant could also accompany her to medical appointments. Nobody

from APS has ever discussed the possibility of home care with Ms. Curran, nor has APS offered to help her apply.

64. Ms. Curran has had applications for Access-a-Ride Services and Reduced Fare Metrocard for People with Disabilities for approximately two years but she has never managed to actually complete and submit the application forms. Last summer, she got the necessary photographs for the applications but she has not managed to get the physician's section completed.

65. Nobody from APS ever asked Ms. Curran about whether she had applied for either of these benefits or offered her assistance with completing and submitting the application forms.

66. Ms. Curran does not know when or how, but she believes that she has an APS caseworker named "Valentine" because she has a note with that name and an APS telephone number and address written on it. Mr. Valentine never visited her.

67. It has been at least a few months since Ms. Curran has spoken to anyone at APS. She does not think they are currently doing anything to help her.

Dated: April 6, 2007

Staten Island, New York

*[signature]*

SARAH T. GILLMAN

# EXHIBIT A

THE CITY OF NEW YORK
HUMAN RESOURCES ADMINISTRATION
CUSTOMIZED ASSISTANCE SERVICES
OFFICE OF HEALTH AND MENTAL HEALTH SERVICES

Psychiatric Evaluation Report

Doctor: WESLEY STRADOJIE, M.D.

Date of Evaluation: 11/14/2006
Client: MAUREEN CURRAN
Address: 701 SOUTH AVENUE, 1ST, STATEN IS 10303
Telephone #: 718-477-5878
Client #: 46048 - 11/06/2006 - 1
Caseworker: ALAN DOMINA

Evaluation at Client's Address: Yes

### Chief Complaint and History of Present Illness:

Cl is a 45 yo SWF living in a 1 bdrm basement apt in a private house owned by James Kennedy facing holdover eviction. Cl was referred for psychiatric evaluation by APS due to her eviction process. Cl was previously evaluated by this writer on 1/4/01 for a similar problem, please refer to it for further details. Cl's interview was attended by Mr Domina of APS. Cl is a poor historian at times having difficulty recalling detailed personal hx, and some hx provided today contradicts hx cl provided in 2001. Cl reports she is facing eviction from her current apt, because James Kennedy has a new girlfriend, Thai Vasquez, living upstairs. Cl reports she was romantically involved w/James Kennedy during her 3+ year tenancy in the house. Cl reports he told her in 8/06 that he wanted her to move out, and he offered cl $3,000 to relocate, but she refused the money saying she could not find another affordable apt w/the money. Cl reports she last paid rent to James Kennedy in 8/06. Cl reports she was paying him $520/mo, which included the cable bill. Cl reports her income is $690/mo from SSI, and $151/mo in food stamps. Cl reports she applied for NYCHA housing in 9/06, and cl believes there is a good chance she could get emergency housing at Cassidy Cove Houses soon, because of her girlfriend's experience there of getting housing within 2 months. Cl reports she is scheduled for her first housing court appearance today at 2:30PM, but Mr Domina reports cl's Legal Aide attorney, Sarah Gilman, left him a telephone message indicating the housing court date was scheduled for 11/15/06. Cl was encouraged to contact her attorney to determine the correct housing court date/time.

### Past Psychiatric History:

Cl reports hx of 5 psychiatric hospitalizations for depression, but cl denied hx of psychiatric hospitalizations in 2001. Cl reports 4 of her psychiatric hospitalization occurred before 2001, but cl provides only vague details. Cl reports she was first hospitalized 15-20 years ago at St Vincent Hospital on Staten Island for 1 month when she overdosed on her Lithium following a domestic violence incident w/her common law husband. Cl reports hx of 3 more psychiatric hospitalizations between 1983 and 1988, including 2 at St Vincent's Hospital and 1 at Staten Island Hospital, but cl

Page 1 of 5

Client:   MAUREEN CURRAN
Client #:  46048 - 11/06/2006 - 1
Visit Dt:  11/14/2006

### Psychiatric Evaluation Report

cannot recall specific details. Cl denies hx of psychiatric hospitalizations between 1988 and 2004, but cl reports she was last hospitalized at St Vincent Hospital in 3/05 for 2 weeks for depression. Cl reports cutting her wrists superficially w/a razor blade at age 23 (1984), but cl was discharged home from St Vincent's Hospital ER. Cl denies having current outpatient psychiatric treatment providers, and cl cannot recall her last psychiatric treatment providers name or date of treatment. Cl later reports hx of briefly attending outpatient MICA treatment centers at Castleton and Bayley Seton, but cl cannot recall the names of any treating psychiatrists. Cl reports she is diagnosed w/bipolar disorder and PTSD, but cl does not describe any hx of mania, nightmares, or flashbacks. Cl reports hx of depressed mood and anxiety. Cl has prescriptions bottles of Fluoxetine 20 mg QAM, and Trazadone 150 mg QHS prescribed by Dr Jose Catian on 10/18/06, and cl implied he was a psychiatrist, but later reports he is an emergency room physician who gave her the prescriptions. Cl denies other hx of suicide gestures or attempts besides the two described earlier. Cl denies current suicidal/homicidal ideation, intent, or plan, and cl denies suicidal ideation for the past 15 years. Cl reports poor sleep unless she takes Trazadone, which allows her 5-6 hrs of sleep nightly. Cl reports good appetite w/o significant weight change.

### Substance / Alcohol Abuse History:

Cl reports she last drank 3 shots of Remy Martin yesterday, and cl reports drinking at least weekly. Cl reports she last used marijuana at 13 yo, and cocaine 8 years ago. Cl denies other drug use. Cl reports hx of alcohol detoxification treatment twice, 5 years ago at Staten Island Hospital for 28 days, and 15 years ago at Bayley Seton for 7 days. Cl reports hx of two alcohol rehabilitation treatments, one at Conifer Park for 1 month 15 years ago, and the second one at Arms Acres for 5 days 12 years ago, but cl left Arms Acres against medical advice.

### Medical History:

Cl reports hx of seizures, arthritis, scoliosis diagnosed last year, and partial hysterectomy for ovarian cancer on 12/3/93. Cl denies having a primary care provider. Cl reports she goes to various doctors as needed, and cl reports often seeking medical treatment at various local hospital ER's as needed. Cl reports being given Lidocaine 5% patches BID by Dr Keller for pain, but cl only has sample pack, and reports she threw away the box. Cl has samples of Prilosec OTC 20 mg, and cl reports taking once daily. Cl has a bottles of Ibuprofen 200 mg tablets which she reports taking twice daily. Cl uses no cane or walker to assist ambulation, and her ambulation appears normal in the apt traversing stairs and walking, but she complains of severe back pain due to her arthritis and scoliosis. Cl describes walking significant distances daily to maintain her mobility. Cl reports her last seizure was in 9/06 on a day she was scheduled for housing court, but cl is not currently taking any medication to control or reduce seizure activity. Cl has no home care or VNS services.

### Social / Family / Work History:

Cl was born in Brooklyn, and cl was raised by her mother w/2 brothers and 1 sister after her parents separated and divorced when cl was 11 yo. Cl reports she stopped school in 8th grade to go to work to leave her mother's home. Cl reports she had 8 jobs, and her longest job lasted 3 years. Cl was last

Page 2 of 5

Client: MAUREEN CURRAN
Client #: 46048 - 11/06/2006 - 1
Visit Dt: 11/14/2006

### Psychiatric Evaluation Report

working in 1995, and cl got her SSI in 1995. Cl reports today she was given SSI for bipolar disorder and PTSD, but in 2001 cl indicated she was awarded SSI for a physical problem. Cl reports she is single, never married, but in 2001 cl reported she was married. Cl reports today having two common law marriages. Cl reports having 4 children, 3 daughters and 1 son (21 yo daughter- Danielle in the Air Force stationed in Iraq, 17 yo daughter-Patricia living w/cl's sister in SI, 13 yo daughter-Jennifer living w/her father in SI, and 11 yo son-Robert living w/his father in SI). Cl reports her first common law husband (Raymond Clifford) was murder gangland style on 9/28/83, cl's older brother shot himself to death in 1983, and cl's father died 2 weeks afterward in 1983. Cl reports her second common law husband (Douglas Estep) died last year.

### Environment:

Cl lives alone in a clean 1 bdrm basement apt in a 1 family private house, and cl shares the 1st floor kitchen area w/Thai Vasquez. Cl has lived in the apt for over 3 years.

### Mental Status Examination:

**Appearance:** Cl appears older than her stated age and in no apparent distress. Cl is well groomed and neatly dressed in casual clothes. Cl is pleasant and cooperative to interview. Cl makes good eye contact during the interview.

**Motor Activity:** Cl displays no abnormal movement, except for tremulous hands.

**Affect:** Cl's affect appears nearly full, congruent, and appropriate to mood.

**Mood:** "Okay...depressed."

**Speech:** Cl's speech is of normal volume, normal rate, fluent, and coherent.

**Thought Form:** Cl's thought processes are logical and organized w/some circumstantiality evident.

**Thought Content:** Cl denies hallucinations, delusions, or IOR. Cl does not appear to be responding to internal stimuli during the interview. Cl denies SI/HI.

**Cognitive Testing:** Cl is awake, alert, and oriented to person, place, and time. Cl is able to do calculations, serial subtractions, and spells WORLD forward/not backward. Cl recalls 0/3 objects at 5 min. Cl displays fair FOK, and fair-good recall of personal hx. Cl demonstrates good immed, fair recent, and fair-good remote memory. Cl is able to abstract and generalize per proverb interpretation and comparisons.

**Insight:** Fair.

**Judgement:** Intact.

MAR-13-2007 13:56   THE LEGAL AID SOCIETY   7188157523   P.004

Client:   MAUREEN CURRAN
Client #:   46048 - 11/06/2006 - 1
Visit Dt:   11/14/2006

### Psychiatric Evaluation Report

**Impulse Control:** Good per interview.

**Diagnosis:**

**Axis I:**

| | | |
|---|---|---|
| 303.90 | | Alcohol Dependence |
| 311.00 | | Depressive Disorder NOS |
| 296.80 | R/O | Bipolar Disorder NOS |
| 309.81 | R/O | Posttraumatic Stress Disorder |

**Axis II:**

301.90   R/O       Personality Disorder NOS

**Axis III:**

Scoliosis
Arthritis
Partial Hysterectomy
Ovarian Cancer
Seizure Disorder

**Axis IV:**

Problems with primary support group
Housing Problems

**Axis V:**

Global Assessment of Functioning (GAF) = 50

**Recommendations:**

Out-Pt Medical Treatment
Alcohol/Drug Treatment
Out-Pt Psych Treatment
Obtain Psychiatric Records for My Review

**Formulation:**

Cl is a 45 yo SWF living alone in a 1 bdrm basement apt in a private house facing holdover eviction. Cl's presentation is consistent w/unspecified depressive disorder and alcohol dependence. Cl may have

Page 4 of 5

MAR-13-2007  13:56         THE LEGAL AID SOCIETY         7188157523         P.006

Client: MAUREEN CURRAN
Client #: 46048 - 11/06/2006 - 1
Visit Dt: 11/14/2006

### Psychiatric Evaluation Report

an unspecified bipolar disorder and posttraumatic stress disorder. Cl obtained a Legal Aide attorney, Sarah Gilman, who is currently working on her housing court case, which was confirmed by Mr Domina of APS, so GAL is no currently indicated. Cl has applied for emergency housing at Cassidy Cove/NYCHA, and cl expects a response soon. Cl seeks outpatient medical treatment and outpatient MICA psychiatric treatment when she feels it is needed either through local hospital ER's or as a walk-in cl at outpatient MICA treatment centers on Staten Island, but cl could benefit from regularly scheduled outpatient medical treatment and outpatient MICA psychiatric treatment appts. No further involuntary APS interventions are currently warranted. APS to attempt to obtain cl's medical records for review.

WESLEY STRADONE, M.D.