**EXHIBIT L**

 **Public Advocate for the City of New York**

# UNPROTECTED

## Adult Protective Services Struggles to Serve Vulnerable Clients

**A REPORT BY PUBLIC ADVOCATE BETSY GOTBAUM**
**DECEMBER 2006**

Visit us on the web at www.pubadvocate.nyc.gov or call us at 212-669-7200.

# Office of the New York City Public Advocate

Betsy Gotbaum
**Public Advocate for the City of New York**

**PREPARED BY:**

**Laurel Tumarkin**
*Director of Policy and Research*

**Daniel Browne**
*Deputy Director of Policy and Research*

**Hannah Toporovsky**
*Policy Research Associate*

**WITH THE ASSISTANCE OF:**

**Lauren Hovel**
*Policy Intern*

**Gail Tang**
*Policy Intern*

2

## EXECUTIVE SUMMARY

In 2006, the first baby boomers turned 60. As the baby boom population ages, the demand for services for the elderly and disabled will increase. Demand will also grow due to the fact that, in the last decade, life expectancy has increased significantly for both men and women in New York City and nationwide. There are now more people over the age of 60 than under the age of 10 in New York City.[1] The 85-and-older population in New York City increased by 18.7 percent between the 1990 and 2000 census, the fastest rate of growth among the city's elderly.[2] As the city's population has aged, the number of individuals with physical and mental impairments has also increased.[3] In 2005, there were 405,334 individuals 65 years and older with a disability in New York City.[4] The rise in life expectancy and concurrent rise in disability among seniors in New York City has been accompanied by a third trend: the growing percentage of seniors living alone with limited incomes.

Adult Protective Services (APS), a division of the New York City Human Resources Administration (HRA), is a state-mandated[5] program that assists individuals over the age of 18, who, because of mental or physical impairment, cannot care for themselves. In order to be eligible for APS, individuals must be incapable of managing their own resources, carrying out activities associated with daily living, or protecting themselves from abuse, neglect, or exploitation without assistance from others. APS clients have no family or friends who are willing or able to assist them responsibly.[6] As of September 2006, APS has 6,154 total active cases in all five boroughs.[7]

Since becoming Public Advocate in January 2002, Betsy Gotbaum has received 252 complaint calls concerning APS. In November 2004, the Public Advocate sent a letter to HRA Commissioner Verna Eggleston inquiring about internal procedures at APS and subsequently issued a press release calling for an investigation and overhaul of the division. In April 2005, the Public Advocate met with Commissioner Eggleston to discuss possible ways to improve APS. The Office of the Public Advocate, however, continued to receive complaints concerning the agency.

In the summer of 2006, the Office of the Public Advocate received numerous calls concerning APS. Callers expressed concern that APS was not serving its clients as efficiently as possible. Following these reports, the Public Advocate and her staff met

---

[1] New York City Council, Committee on Aging, Oversight Hearing, *What Can the City Do to Protect Seniors from Caregivers Who Financially Exploit Them?*, September 26, 2006.
[2] New York City Meals-on-Wheels, Citymeals Quickfacts, *The Growing Elderly Population in New York City*, www.citymeals.org/what_we_do/growing_population.html.
[3] New York City Department for the Aging (DFTA), *Healthy Encounters Project – Linking Mental Health Treatment within Local Senior Centers, A Model Approach*, April 2004, www.nyc.gov/html/dfta/downloads/pdf/trend_healthy_encounter04.pdf.
[4] United States Census Bureau, *2005 American Community Survey*.
[5] NY CLS Soc Serv §473.
[6] *Ibid.*
[7] New York City Human Resources Administration (HRA), Office of Program Reporting, Analysis & Accountability, *HRA Facts*, October 2006, www.nyc.gov/html/hra/downloads/pdf/hrafacts_2006_10.pdf.

3

P00927

with APS workers and representatives of numerous community-based organizations (CBOs). Based on the information provided in these discussions, the Public Advocate has determined that reform of APS is needed to ensure that the city is able to appropriately serve and protect its vulnerable adults. In an interview with the Public Advocate, an APS worker referred to one eviction case in which an overextended worker could not adequately represent a mentally ill elderly man. The worker told the Public Advocate, "We give clients a false hope that we'll protect them when we can't."

## Methodology

During September and October of 2006, the Public Advocate's Office interviewed 30 staff members from CBOs in all five boroughs about their experiences interacting with APS on behalf of individuals served by their organizations. The Office also interviewed 29 APS staff about agency operations. From these interviews, the Public Advocate's Office learned of 57 cases that illustrate problems with APS. (See Appendix B for a full list of cases). APS staff and CBO staff did not reveal clients' names or any other identifying information to the Office of the Public Advocate. After reviewing each case and the information provided by CBO and APS staff, the Public Advocate extrapolated the key findings below.

## Findings

- **APS does not respond to clients in a timely manner, leaving them without vital services.**

- **APS caseworkers are hampered by increasingly high caseloads—as high as 81 cases for a single caseworker—well above the recommended 25 cases per worker,[8] and overloaded with paperwork, leaving little time to care for each of their clients.**

- **APS caseworkers do not consider themselves adequately trained before entering the field.**

- **Caseworkers lack the support they need from senior administration in order to fulfill their job duties efficiently.**

- **APS' heavy-duty cleaning policy,[9] which requires caseworkers to remain in the client's home until cleaning is completed, prevents caseworkers from spending vital time in the field.**

---

[8] National Association of Adult Protective Services Administrators, *APS Compilation of Workload Studies and Caseload Data*, www.apsnetwork.org/Resources/docs/1997CaseloadSurvey.pdf; Texas Department of Protective Services, *Strategic Plan FY2001-2005*, www.dfps.state.tx.us/Documents/about/Data_Books_and_Annual_Reports/strategicplan/STRATPLN.pdf.
[9] An APS supervisor reported to the Public Advocate's Office that heavy-duty cleaning is contracted out to several agencies. Staff of the contract agency goes to the client's home and cleans out all garbage and unwanted materials. It is APS policy that the APS caseworkers remain in the client's apartment during the heavy-duty cleaning process.

P00928

- APS does not work effectively with CBOs that have longstanding relationships with clients to provide clients with the best possible care.

## Recommendations

APS should decrease the number of cases per worker by hiring additional staff.

APS should divide the home care department into two specialized units, one which provides services to the mentally ill and another which provides services to the elderly.

- Caseworkers with elderly clients should not have mentally ill clients and vice-versa. This division will decrease caseloads for APS undercare[10] workers and help ensure that elderly clients attain the basic care they need.
- Caseworkers with mentally ill clients should have a Masters of Social Work (MSW) to ensure that they are prepared to meet their clients' needs.
- Elderly clients with mental disabilities should be served by the unit for the mentally ill.

APS should increase the number of training days for prospective caseworkers and incorporate a greater number of the core competency requirements recommended by the National Association of Adult Protective Services Administrators (NAAPSA).

- Training for APS caseworkers should, at minimum, be comparable in duration and content to caseworker training provided in other states.

APS should provide equipment to its caseworkers so that they are able to work more effectively:

- Each APS caseworker should be provided with a cell phone for use during fieldwork.
  - Caseworkers may be placed in danger or encounter emergencies while conducting work in the field; cell phones would make it possible to call 911 and better protect the safety of caseworkers and clients.
- APS should provide laptop computers for undercare workers.
  - Laptop computers would allow caseworkers to complete paperwork electronically, reducing time spent on paperwork and freeing time for home care visits.
- HRA should provide APS borough offices with city cars for caseworkers with large caseloads to share.
  - Due to high caseloads, many caseworkers have to schedule more than 15 visits a day. Currently, only APS psychiatrists have access to cars to make visits, but caseworkers also have large areas to cover and a high number of cases. Providing caseworkers with cars could increase the number of home care visits they are able to make in a day.

---

[10] Undercare caseworkers are responsible for home care services.

P00929

**APS should change its policies to allow caseworkers to spend more time with clients.**

- APS should change its current heavy-duty cleaning policy.
  - Current APS policy states that an APS caseworker must be present while heavy-duty cleaning takes place. APS caseworkers reported, however, that heavy-duty cleaning can take an entire day, leaving no time to visit other clients. Changing this policy will ensure better service for their clients.
- APS should change its policy to require APS caseworkers to spend three days in the field, rather than two, allowing workers additional time to visit clients.

**APS should create stronger relationships and open communication with CBOs in order to help serve clients more effectively.**

- APS should work with CBOs that have longstanding relationships with clients. CBOs can help APS caseworkers gain an understanding of the client before an APS caseworker conducts an in-home visit, and can help the worker obtain access to new clients' homes. The involvement of a CBO staff person who knows the client can help APS caseworkers establish a trusting relationship with the client.

6

P00930

## INTRODUCTION

From 2000 to 2030, the 65-or-over population in the United States will grow from 35 million to 70 million. Between 2010 and 2020, the number of older adults with mental illnesses will grow from 8 million to 11 million.[11] Disabilities are disproportionately represented among the elderly.[12]

As the health of seniors declines, they often require extra assistance with tasks such as shopping, preparing meals, cleaning, scheduling medical appointments, and applying for city services like home care and Meals-on-Wheels. Disabled adults may also require assistance with these tasks.

There are an array of services and programs to help seniors and the disabled deal with increased cost of living, ranging from neighborhood senior centers and Meals-on-Wheels to the Senior Citizen Rent Increase Exemption (SCRIE) and Disability Rent Increase Exemption (DRIE).

When these services are not sufficient to meet individual needs, Adult Protective Services (APS), a division of the New York City Human Resources Administration (HRA), is responsible for providing additional assistance. Protective services for adults are available, without regard to income, to individuals 18 years of age or older, who, because of mental or physical impairments, are unable to manage their own resources or carry out the activities of daily living and have no one available, willing, and able to assist them responsibly. While APS is not an income-based program, low-income adults are the most likely to need assistance when facing costly problems, such as the need for home health care.

The Office of the Public Advocate has received numerous complaints regarding APS. Since taking office in January 2002, Betsy Gotbaum has received 252 complaint calls concerning APS. Physicians from the Mount Sinai Visiting Doctors Program (VDP) have also brought problems concerning APS to the Public Advocate's attention. In November 2004, the Public Advocate sent a letter to HRA Commissioner Verna Eggleston inquiring about internal procedures at APS. Commissioner Eggleston responded in January 2005 but failed to sufficiently address the questions raised. In January 2005, the Public Advocate sent another letter to Commissioner Eggleston expressing concern regarding the performance of APS and calling for an investigation of the agency's operations. On January 25, 2005, the Public Advocate and VDP physicians issued a press release calling for an investigation and overhaul of APS. In her response to the January letter, dated March 3, 2005, Commissioner Eggleston indicated that she did not believe there were problems with the performance of APS. In April 2005, the Public Advocate met with Commissioner Eggleston to discuss ways to improve APS.

---

[11] Mental Health Association of Westchester, *Preparing for the Elder Boom*, 2004, www.mhawestchester.org/advocates/oelderboomn1903.asp.
[12] New York State Department of Health (NYSDOH), *Disability Among Adults in New York State, 2001-2003: Prevalence and Health Risk Behavior*, Winter 2005, www.health.state.ny.us/nysdoh/brfss/reports/docs/brfss_volume_12_number_1.pdf.

P00931

Since then, the Office of the Public Advocate has continued to receive complaints concerning APS.

Pursuant to the New York City Charter, the Public Advocate is charged with reviewing the programs, operations, and activities of city agencies. In September 2006, the Office of the Public Advocate initiated an investigation to assess APS operations. Investigators analyzed APS staff caseloads and resources and evaluated their effect on the well-being of New York City's physically and mentally incapacitated adult population. As part of this investigation, the Public Advocate's Office identified and spoke with staff at community-based organizations (CBOs), guardianship lawyers, doctors, and APS caseworkers to inquire about their experiences with APS. This report is based on the findings of that investigation.

## BACKGROUND

### The Elderly and Disabled in New York City

In 2006, the first baby boomers turned 60. As the baby boom population ages, the demand for services for the elderly and disabled will increase. There are already nearly one million seniors age 65 and older in New York City, representing 12 percent of the city's population.[13] Demographic projections indicate that, by 2015, the city's 60-plus population will increase by 20 percent and represent 18 percent of the overall population.[14]

This increase is due in part to the fact that, in the last decade, life expectancy has increased significantly for both men and women in New York City and nationwide. In New York City, life expectancy is higher than the national average.[15] Life expectancy for male New Yorkers is 75 years, and for female New Yorkers is 80 years.[16] There are now more people over the age of 60 than under the age of 10 in New York City.[17] The 85-and-older population in New York City increased by 18.7 percent between the 1990 and 2000 census, the fastest rate of growth among the city's elderly.[18] In 1990 there were 102,554[19] seniors 85 years and older; in 2005, there were more than 121,710.[20]

As the city's population has aged, the number of senior citizens with physical and mental impairments has also increased.[21] A report conducted by the New York State Department

---

[13] *See 4.*
[14] DFTA, www.nyc.gov/aging.
[15] AARP, *Global Aging Program Idea Exchange with Victor Rodwin and Michael Gusmano*, May 2006, www.aarp.org/research/international/events/may30_06_rodwin.html.
[16] New York City Department of Health and Mental Hygiene (DOHMH), *New Yorkers are Living Longer*, April 2003, http://home2.nyc.gov/html/doh/html/press_archive03/pr037-0421.shtml.
[17] *See 1.*
[18] *See 2.*
[19] United States Census Bureau, *Demographic Characteristics – New York City 1990 and 2000 Census*, www.nyc.gov/html/dcp/pdf/census/demonyc.pdf.
[20] *See 4.*
[21] *See 3.*

P00932

of Health shows that disability among adults in New York State increased between 2001 and 2003.[22] In 2002, there were 377,491 individuals 65 years and older with a disability in New York City.[23] In 2005, there were 405,334 individuals 65 years and older with a disability.[24]

The rise in life expectancy and concurrent rise in disability among seniors in New York City has been accompanied by a third trend: the growing percentage of seniors living alone with limited incomes. There are 25,834 males and 83,770 females 65 years and over living alone below the poverty level in New York City.[25] A 2002 study by the International Longevity Center indicated that the percentage of New Yorkers 65 and older living alone (33 percent) was far greater than the national average (9 percent) and that the percentage of seniors living alone with disabilities in New York City (46 percent of seniors age 65 and older) was 5 points higher than the national rate.[26]

As of 2000, the poverty rate among New York City seniors (17.8 percent) was nearly 8 points higher than the national rate.[27] According to the 2000 Census, nearly 25 percent of all elderly-headed households in New York City earned an annual income below $10,000.[28] In New York City, Social Security accounts for approximately 80 to 90 percent of income for people in the lowest two-fifths of the income spectrum.[29] Yet Social Security often does not cover the high cost of living in New York City. Retired workers in the city receive an average of $1,011 per month from Social Security; widows and widowers receive an average of $947; disabled workers, $943.[30] One-bedroom apartments in New York City typically cost more than $1,000 a month.[31] The high cost of living is reflected in the increase in eviction cases in New York City. As many as 1,751 individuals requested representation in eviction cases in fiscal year 2006, 483 more than in fiscal year 2005.[32]

---

[22] See 12.
[23] United States Census Bureau, *2002 American Community Survey*.
[24] See 4.
[25] Ibid.
[26] International Longevity Center, *Old and Poor in New York City*, 2002, www.ilcusa.org/_lib/pdf/b20021121a.pdf.
[27] Ibid.
[28] DFTA, *Annual Plan Summary*, September 2005. www.nyc.gov/html/dfta/downloads/pdf/public_hearings/publichear_annualplan9-05.pdf.
[29] See 26.
[30] Social Security Administration, Office of Policy, *State Statistics for December 2004 for New York*, www.socialsecurity.gov/policy.
[31] United States Department of Housing and Urban Development, *FY2007 Final Fair Market Rents for Existing Housing*, www.huduser.org/datasets/fmr/fmr2007f/FY2007F_SCHEDULEB_rev2.pdf.
[32] New York City Mayor's Office of Operations, *Mayors Management Report, Supplementary Indicator Tables*, FY05 and FY06.

9

P00933

**Overview of Adult Protective Services**

Adult Protective Services is a state-mandated[33] program charged with assisting individuals over the age of 18, who, because of mental or physical impairment, cannot care for themselves. In order to be eligible for APS, individuals must be incapable of managing their own resources, carrying out activities associated with daily living, or protecting themselves from abuse, neglect, or exploitation without assistance from others. APS clients have no family or friends who are willing or able to assist them responsibly.[34]

Referrals to APS are made by calling the APS Central Intake Unit (CIU) referral line or by completing a web referral. Referrals to APS are made by:
- Friends, relatives, neighbors, and other concerned individuals within the community;
- Medical and social work personnel;
- Private and governmental agencies and courts.

If a referred individual meets the eligibility criteria stated above, the case is sent to one of the five APS borough offices where a pre-assessment is conducted. The referral must first be reviewed to determine the timeframe in which a visit must be conducted—within 24 hours for emergencies, three working days for non-emergencies. The eligible client is then called with notification of the pending visit. Once a visit has been conducted and a caseworker determines the needs of a client, APS may provide a range of services to meet those needs.

Services APS may provide include:
- Referral for psychiatric and/or medical examination,
- Assistance in obtaining Social Security Supplemental Security Income (SSI) or Social Security Disability (SSD) benefits,
- Financial management when the eligible client is unable to pay bills in a timely manner,
- Heavy-duty cleaning services,
- Identification of alternate living arrangements,
- Assistance in obtaining government entitlements.

On the first visit, an in-home assessment is conducted by an undercare[35] caseworker to identify the physical or mental impairments and developmental disabilities of the client in order to assess basic unmet needs. The caseworker must confirm or deny each allegation made in the referral and identify risks not mentioned in the referral. The caseworker must also identify relatives, friends, or service providers involved with the client and obtain their contact information.

---

[33] *See* 5.
[34] *See* 5.
[35] Undercare caseworkers are responsible for home care services.

10

The caseworker contacts the client's family, friends, and service providers to confirm information and to determine whether someone is willing and able to responsibly assist the client.[36] The caseworker must complete an initial assessment form and a closing summary form within 30 days of the initial visit. The information in these forms is entered into an APS automated system, which determines if the client is a "high risk" client in need of immediate assistance.

If a client is not home upon the initial visit, the APS caseworker must attempt to get in touch with the client by contacting others who know him or her, including relatives, neighbors, building superintendent, or landlord, or those serving the client, such as CBOs, senior centers, doctors, social workers, or therapists. A notice of the attempted visit must be completed and left for the client to see before the caseworker returns to the office. A second visit for emergency cases must be conducted within 48 hours. For non-emergency cases, a second visit must be made within four to six days of referral. After two attempted visits in which the client is not home, the caseworker must determine whether to close the case or make a third visit.

If a caseworker is denied access to a client's home, the caseworker is expected to engage others, such as neighbors, superintendent, friends, and relatives and to contact his or her supervisor from the field. The caseworker must also determine whether there is any imminent risk to the client and call 911 if necessary. The caseworker must also determine if an Order to Gain Access (OGA)[37] is needed within fifteen days of the initial referral.

APS policy requires a monthly re-assessment for each client.[38] APS policy states that the caseworker should call the client before each visit and that monthly visits should take place within 30 days of the previous visit.[39] After two visits in which the client is not at home or does not answer the door, alternative strategies must be developed with a supervisor. APS policy requires caseworkers to be in the field two days a week.[40]

Caseworkers can request that clients receive a psychiatric evaluation from HRA's Office of Health and Mental Health Services (OHMHS) in cases in which there is no immediate danger but one or more of the following conditions exists: suicidal or homicidal thoughts without immediate intent or plan, potential danger to the client or others, or imminent eviction. This request must be made electronically and must include a description of the behavior that indicates the need for a psychiatric evaluation. The request should be made as soon as the caseworker determines that the client's Service Plan is likely to include one or more of the services listed below:

---

[36] HRA, *Adult Protective Services Desk Guide*.
[37] An OGA is necessary when a referred client appears eligible for APS services but refuses to grant the caseworker access to his or her home. OGAs are granted by HRA's Office of Health and Mental Health Services.
[38] *See* 36.
[39] *Ibid.*
[40] As reported by an APS supervisor, October 6, 2006.

P00935

1. Guardian ad Litem (GAL) for clients requiring assistance in Housing Court proceedings, such as eviction cases.
2. Financial Management for eligible clients who are unable to pay bills in a timely manner, including victims of financial exploitation.
3. Article 81 Guardian for clients who appear to lack the capacity to make decisions in their best interest, refuse services, and face a risk of harm. This decision is made only when all alternative measures are inadequate to ensure the health and safety of the individual.
4. Order to Gain Access for referred individuals who appear to be eligible for APS services but refuse to grant the caseworker access to their home.

## METHODOLOGY

During September and October of 2006, the Public Advocate's Office interviewed 30 staff members from CBOs in all five boroughs about their experiences interacting with APS on behalf of individuals served by their organizations. The Office also interviewed 29 APS staff about agency operations. From these interviews, the Public Advocate's Office learned of 57 cases that illustrate problems with APS. (Those cases are included in the text of this report and in Appendix B). APS staff and CBO staff did not reveal clients' names or any other identifying information to the Office of the Public Advocate. After reviewing each case and the information provided by CBO and APS staff, the Public Advocate extrapolated the key findings below.

## FINDINGS

**APS does not respond to clients in a timely manner, leaving them without vital services.**

Staff at CBOs reported instances in which APS caseworkers did not visit their clients within the required time frame. APS caseworkers reported that, because they are overburdened with high caseloads and paperwork, they cannot process cases fast enough. In some cases, easily preventable disasters such as home fires and financial exploitation occur while clients wait to receive medical/psychological evaluations and guardianship.

### Case of Client with Dementia
*Mrs. D, age 95, lives alone and suffers from dementia. A social worker from a CBO contacted APS for help concerning this client. APS visited Mrs. D twice to assess the situation, but did not take steps to provide her with home care services on a regular basis. The social worker from the CBO proceeded to provide her with Meals-on-Wheels. The social worker called APS to follow up two weeks later for help with home care. APS did not respond for two weeks. The social worker persistently called APS for several weeks and was then informed that the case had been closed. Because all communication had been exhausted, the social worker called her community liaison at the Department for the Aging (DFTA). APS still did not give Mrs. D appropriate home care. A week after the caseworker contacted DFTA, the client set her apartment on fire while trying to dry clothing using a heater and was hospitalized and placed in a nursing home. The*

12

P00936

*caseworker reported that the client would have been fully capable of living independently if she had been given proper assistance in a timely manner.*

**APS caseworkers are hampered by increasingly high caseloads—as high as 81 cases for a single caseworker—and overloaded with paperwork, leaving little time to care for each of their clients.**

The number of total active APS cases has risen in recent years, but the number of APS caseworkers has not increased accordingly. The National Association of Adult Protective Services Administrators (NAAPSA) recommends a caseload of 25 clients per caseworker.[41] Sixty percent of APS caseworkers have a caseload above this standard. In Manhattan, the average caseload is 42 cases, 68 percent higher than the recommended 25 caseloads. (See Figure 1 for caseloads in all five boroughs).

Figure 1

| Borough | Total Active Cases | Total Caseworkers | Mean Caseload | Highest Individual Caseload | Workers with more than 25 cases | % more than 25 cases |
|---|---|---|---|---|---|---|
| Manhattan | 2,426 | 58 | 42 | 77 | 44 | 76% |
| Bronx | 996 | 36 | 28 | 81 | 17 | 47% |
| Brooklyn | 1,347 | 47 | 29 | 54 | 23 | 49% |
| Queens | 1,180 | 35 | 34 | 69 | 23 | 66% |
| Staten Island | 217 | 8 | 27 | 41 | 3 | 38% |

Over the past six years, the number of APS cases has increased dramatically.[42] While in fiscal year 2002 there were 7,919 referrals accepted by APS for assessment, in fiscal year 2006, there were 13,566 referrals accepted for assessment.[43] The chart below illustrates how the number of referrals accepted for assessment has increased over the past six years (See Figure 2). The number of referrals accepted for assessment has increased by 1,222 from fiscal year 2005 to fiscal year 2006 alone.

---

[41] *See* 8.
[42] New York City Mayor's Office of Operations, *Mayors Management Report, Supplementary Indicator Tables*, FY01-FY06, www.nyc.gov/html/ops/html/mmr/mmr_sub.shtml.
[43] *Ibid.*

13

P00937

Figure 2



Workers have also reported an increase in eviction referrals in the last two years. The total number of eviction cases handled by APS rose significantly between fiscal year 2005 and fiscal year 2006[44] (see Figure 3 below).

Figure 3

| Total Number of Guardian Ad Litem Orders Requested for Representation in Eviction Cases[45] | | | | | |
|---|---|---|---|---|---|
| FY 2001 | FY 2002 | FY 2003 | FY 2004 | FY 2005 | FY 2006 |
| 1,000 | 940 | 1,262 | 1,202 | 1,268 | 1,751 |

Eviction cases are especially time-consuming. In order to protect a client from eviction, APS must demonstrate that the client is mentally incapable of managing his or her finances and request a Guardian ad Litem. Guardianship cases require an overwhelming amount of paperwork and also demand that caseworkers be present in housing court for proceedings that often last an entire day. Guardianship cases can take more than eight months, and clients are often evicted from their homes during that time.

Despite the rising number of cases, including difficult eviction cases, there has been almost no increase in full-time APS positions. In fact, the number has remained virtually

---

[44] *Ibid.*
[45] *See* 32.

P00938

the same in the past two years. In fiscal year 2005, there were 380 full time positions; in fiscal year 2006 there were 383 full time positions.[46]

One APS worker reported that high caseloads and inadequate staffing had resulted in a backlog of applications for Social Security and other types of assistance filed on behalf of clients. Other workers reported that high caseloads prevent staff from adequately representing clients in eviction cases and, at the same time, conducting their home care duties. A case manager at a CBO told the Office of the Public Advocate, "To get guardianship is really tough. We've had guardianship cases that should be done as soon as possible take between eight months to a year before we see any results." [47]

Example Case
*A 50-year-old man is currently bed-bound in a small room in a rent-stabilized hotel. Because of his drug addiction, home care agencies refuse to give him services. A judge ordered APS to provide him with 24-hour home care because he cannot take care of himself. His APS worker is applying for guardianship so that the client will receive 24-hour care, but the worker is currently handling more than 60 cases, and the guardianship proceeding is likely to be protracted. The worker does not have time to visit this client daily. At present, the client receives home care only once a month. His room is small, cluttered, and stuffy and he regularly soils himself.*

APS workers reported that they spend many hours on paperwork and not enough time in the field working with clients. There is a minimum of seven forms that APS caseworkers are required by agency regulations to fill out for each of their clients. APS caseworkers must also complete an additional four forms which are mandated by New York State.[48] Additional services such as a psychiatric evaluation, guardianship, and financial management require additional paperwork. The guardianship application itself is ten pages. Workers reported a desire to file for guardianship for more of their clients, but because the paperwork is so time-consuming, they do not pursue guardianship for many. (See Appendix A for a list of paperwork filed by APS caseworkers).

In addition, workers reported frustration with the monthly re-assessment (Progress Notes History Sheet) that APS requires for each client. Because the re-assessment is required even if information concerning the client has not changed, caseworkers end up filling out duplicative paperwork each month. One APS worker stated in an interview, "By the time I get the case, do all the paperwork, I will maybe see the client within two weeks of the referral." Workers also expressed frustration with the agency requirement that they fill out forms by hand when visiting clients and then enter the information into the APS database when they return to the office. APS workers reported that mental illness cases tend to be more time-consuming in terms of both fieldwork and paperwork. They

---

[46] New York City Independent Budget Office, *Programmatic Review of the 2007 Preliminary Budget for Human Resources Administration,* March 2006,
www.ibo.nyc.ny.us/iboreports/agencyBudgets06/HRA%20Program%20Budget_march06.pdf.
[47] Interview with case manager, September 26, 2006.
[48] As reported by an APS representative.

P00939

indicated that time spent attending to paperwork for cases involving the mentally ill prevents them from visiting elderly clients as often as they should.

<u>Example Case</u>
*Ms. D, age 65, was referred to a local CBO by her bank. According to the bank officer, on several occasions a young man accompanied Ms. D to the bank and instructed her to withdraw $35,000-40,000 from her account and request that the bank issue checks in his name. The bank officer reported that the client was confused and, when she hesitated, the younger man became verbally abusive. The CBO contacted APS to make a referral and discovered there had been an APS case concerning the same client referred by a local senior center two years prior. The referral consisted of all the same information concerning a younger man who had been financially exploiting and verbally abusing the client. APS had conducted an assessment and a psychiatric evaluation at the time, but the case had been closed. When the CBO made its referral in January 2006, a new psychiatric evaluation was performed. The evaluation confirmed the client showed signs of dementia and judgment impairment. The psychiatrist then recommended a guardian be appointed to protect the property and well-being of Ms. D. Five months later, the CBO was informed that the case was rejected by APS. As recently as July 2006, the CBO was contacted by the same bank officer stating that the younger man had come to the bank to withdraw another $40,000 from Ms. D's account. The case was reopened by APS and temporary guardianship was granted as of August 2006—7 months after the second referral. In all, the younger man is believed to have taken more than $130,000 of Ms. D's money. The CBO reported to the Public Advocate that APS caseworkers have too many cases and too much paperwork to keep track of even a serious, ongoing case like Ms. D's in a timely manner.*

**APS caseworkers do not consider themselves adequately trained before entering the field.**

APS workers report that they do not spend enough time in training before interacting with clients. A report by the National Association of Adult Protective Services Administrators (NAAPSA) found that the average number of training days for APS caseworkers in New York State is far lower than in most states that responded to the survey. On average, new caseworkers in New York State receive eight days of training, while in California, Indiana, Louisiana, and Florida the average number of training days is 30.[49]

The NAAPSA survey also found that in New York State the basic core competency requirements for APS staff did not fully comply with NAAPSA's suggested requirements. NAAPSA recommends a 23-module training program for APS caseworkers that covers core competency requirements ranging from a basic overview of APS to professional communication skills and an understanding of financial exploitation

---

[49] National Association of Adult Protective Services Administrators, *Report on State Adult Protective Services Training Programs*, 2002,
www.elderabusecenter.org/pdf/publication/TrainingLibraryforAPS040603.pdf.

P00940

and case closure procedures.[50] (Please see Appendix C for full list of core competencies suggested by NAAPSA.) While New Jersey has 10 requirements, including an understanding of financial exploitation and ethics requirements, New York requires only "basic training" and legal training.[51]

Workers reported that the lack of adequate training, particularly time spent "shadowing" a senior worker, makes them unsure of their job performance. One worker told the Office of the Public Advocate that she was expected to go into the field, visit 10 to 15 clients, and perform effectively after her second day on the job.[52]

Example Case
*An APS worker reported to the Office of the Public Advocate that her training was insufficient to deal with the case of a mentally incapacitated elderly man living in an abandoned building. The windows and doors of the building were boarded up and there was no way for the worker to get inside. The worker reported feeling unsafe going to this location to visit her client. She felt she had no resources to offer the client and gave him information on shelters he could go to.*

Example Case
*An APS worker was assigned to conduct a home visit to assess the needs of an elderly client. The client's psychological evaluation deemed her an emergency case requiring a home visit within 24 hours. The client told the worker she had a loaded gun in the apartment. The worker felt uneasy and believed her training was inadequate to deal with the situation.*

**Caseworkers lack the support they need from senior administration in order to fulfill their job duties efficiently.**

APS workers informed the Office of the Public Advocate that they are not provided adequate resources to fulfill their job duties efficiently. For example, individual cell phones are not provided to caseworkers in the field. A worker reported that one cell phone is provided for five caseworkers to share.[53] Workers expressed that they often feel unsafe visiting mentally ill clients in their homes without a cell phone.

APS psychiatrists receive laptops in order to increase their efficiency, but APS caseworkers do not. Currently, caseworkers must fill in all paperwork by hand and then transfer it to the APS data system when they get back to the office. Caseworkers expressed that the use of a laptop to enter information on clients electronically would reduce time spent on paperwork such as the Monthly Home Visit Control Sheet and the APS Home Visit History Sheet and free time for home visits.

---

[50] National Center on Elder Abuse/NAAPSA, *Training Resources Development Project*, November 2005, Core Competencies for APS Caseworkers, www.apsnetwork.org/Resources/docs/CoreCompetencies.pdf..
[51] *Ibid.*
[52] Interview with APS caseworker, September 21, 2006.
[53] Interview with APS supervisor, September 21, 2006.

P00941

Similarly, APS provides cars to psychiatrists but not caseworkers. Caseworkers expressed that the use of city cars would allow them to visit more clients in a shorter period of time.

**APS' heavy-duty cleaning policy prevents caseworkers from spending vital time in the field.**

APS' heavy-duty cleaning policy requires that an APS caseworker be in the client's home while cleaning takes place. Workers reported to the Office of the Public Advocate that cleaning can take up to two days to complete, causing them to neglect other clients. APS workers interviewed by the Office of the Public Advocate considered this policy unnecessary and expressed concern that the chemicals used in heavy-duty cleaning may affect their health.

Example Case
*Mr. D, age 82, suffers from dementia. His apartment is cluttered and infested with roaches. His landlord wants to evict him because of the smell and his neighbor's frequent complaints. An APS worker determined that the apartment needed heavy-duty cleaning. The worker complained to the Office of the Public Advocate that, to comply with APS policy, she had to remain in the apartment during the heavy-duty cleaning. The apartment was so filthy that the APS worker had to take two entire days to deal with the case and did not have time to visit her other clients.*

**APS does not work effectively with CBOs that have longstanding relationships with clients to provide clients with the best possible care.**

APS is often unresponsive to staff at CBOs that have longstanding relationships with clients. CBOs reported that they could be of help when APS caseworkers face difficulty entering a client's home but found that APS caseworkers often close cases rather than contacting CBOs for help. A social worker said, "We tell APS to please keep us informed, and we will go to the clients' home and help them gain access."[54] However, the social worker reported that APS discontinues all communication with the CBO once they accept a case. Staff at every CBO with which the Office of the Public Advocate spoke cited APS's ineffective communication with their agency. CBO staff indicated that calls to APS caseworkers often are not returned and that it is often impossible to leave a message with an APS worker because voicemail boxes are full.

Example Case
*Four elderly clients, ages 82, 88, and two in their mid-80s, all live together in one house. Three of the four have Alzheimer's disease. There are two young men who also reside in their house. A local CBO opened a case with APS concerning the residents of the house more than eight months ago. The caseworker at the CBO reported to the Office of the Public Advocate that APS conducted an initial visit and assessment and determined that the clients are in need of both Medicaid and guardianship, but the CBO caseworker has not received any updates on the progress of his clients' case since the initial assessment.*

---

[54] Interview with CBO social worker, September 8, 2006.

P00942

*He reported trying to call the APS caseworker over the course of four months, but the caseworker never returned his call. On December 7, 2006, the CBO caseworker finally reached the APS supervisor in charge of the case, who informed him that the case had been declined. According to the CBO caseworker, the APS worker said, "we don't have any idea why it's closed. The caseworker will try again but she's having a hard time getting documentation from the clients to get Medicaid." The CBO is currently providing Meals-on-Wheels for the clients. The CBO caseworker explained, "I've been screaming here to get these people help and their situation is spiraling out of control and no one wants to help these people." One client gave one of the younger residents of the house thousands of dollars so he could attend a psychiatric program. The CBO caseworker believed this to be a case of financial exploitation. The CBO caseworker reported that the only agency that has been responsive to his concerns is the NYPD. APS only visited the house once.*[55]

## RECOMMENDATIONS

**APS should decrease the number of cases per worker by hiring additional staff.**

**APS should divide the home care department into two specialized units, one which provides services to the mentally ill and another which provides services to the elderly.**

- Caseworkers with elderly clients should not have mentally ill clients, and vice-versa. This division will decrease caseloads for APS undercare workers and help ensure that elderly clients attain the basic care they need.
- Caseworkers with mentally ill clients should have a Masters of Social Work (MSW) to ensure that they are prepared to meet their clients' needs.
- Elderly clients who are mentally ill should be served by the unit for the mentally ill.

**APS should increase the number of training days for prospective caseworkers and incorporate a greater number of the core competency requirements recommended by NAAPSA.**

- Training for APS caseworkers should, at minimum, be comparable in duration and content to caseworker training provided in other states.

**APS should provide equipment to APS caseworkers so that they are able to work more effectively:**

- Each APS caseworker should be provided with a cell phone for use during fieldwork.

---

[55] Case reported to the Public Advocate's Office, December 2006.

19

- Caseworkers may be placed in danger or encounter emergencies while conducting work in the field; cell phones would make it possible to call 911 and better protect the safety of caseworkers and clients.
- APS should provide laptop computers for undercare workers.
  - Laptop computers would allow caseworkers to complete paperwork electronically, reducing time spent on paperwork and freeing time for home care visits.
- APS should provide its borough offices with city cars for caseworkers with large caseloads to share.
  - Due to high caseloads, many caseworkers have to schedule more than 15 visits a day. Currently, only APS psychiatrists have access to cars to make visits, but caseworkers also have large areas to cover and a high number of cases. Providing caseworkers with cars could increase the number of home care visits they are able to make in a day.

**HRA should change its policies to allow caseworkers to spend more time with clients.**

- APS should change its current heavy-duty cleaning policy.
  - Current APS policy states that an APS caseworker must be present while heavy-duty cleaning takes place. APS caseworkers reported, however, that heavy-duty cleaning can take an entire day, leaving no time to visit other clients. Changing this policy will ensure better service for their clients.
- APS should change its policy to require APS caseworkers to spend three days in the field, rather than two, allowing workers additional time to visit clients.

**APS should create stronger relationships and open communication with CBOs in order to help serve clients more effectively.**

- APS should work with CBOs that have longstanding relationship with clients. CBOs can help APS caseworkers gain an understanding of the client before an APS caseworker conducts an in-home visit and can help the worker obtain access to new clients' homes. The involvement of a CBO staff person who knows the client can help the APS worker establish a trusting relationship with the client.

P00944

**APPENDIX**

**A. Paperwork APS fieldworkers must complete for each client.**

| |
|---|
| Monthly Home Visit Control Sheet (general information about client) |
| Case Record Information Sheet (CRIS) |
| Intake Referral (DSS3602a) |
| Eligibility Re-determination (DSS3603) |
| Eligibility Determination Service Plan (DSS3602b or DSS3602c) |
| Eligibility Determination Notice to Client (W101A) |
| Eligibility Determination Notice to Referral Source (W101) |
| Application (DSS2921) |
| Progress Notes History Sheet (W25) (monthly for each client) |
| Assessment History Sheets (W150Z) |
| Quality Assurance Review Sheet |

**Additional paperwork APS fieldworkers must complete for some clients.**

| |
|---|
| Eligibility Determination (Marshall Letter) (W101H) |
| Notice of Intent to Discontinue (W105) |
| Application/Job Profile (W680B) |
| Collateral Visit History Sheet |
| Not-At-Home History Sheets |
| Notices of Attempted Visit |
| Hospital Contact History Sheets |
| Transfer Summary |
| Closing Summary |
| Eviction Deposition (761K) |
| Other (Case notes or case entries like the Supervisory Review Sheet) |
| Referrals for Services |
| Office of Legal Affairs (OLA) |
| Financial Management (FM) |
| Medical Assistance Program |
| Home Care (H/C) |
| Psychiatric Evaluations |
| Heavy Duty Cleaning |
| Guardian Ad Litem – eviction (Article 81) |
| Correspondence (all letters from CBO's or other Collaterals – doctors, neighbors, relatives, superintendents – and Letters of Complaints) |

P00945

**B. CASES**

During September and October of 2006, the Public Advocate's Office interviewed 30 staff members from CBOs in all five boroughs about their experiences interacting with APS on behalf of individuals served by their organizations. The Office also interviewed 29 APS staff about agency operations. Information concerning the following cases were gathered from these interviews. APS staff and CBO staff did not reveal clients' names or any other identifying information to the Office of the Public Advocate.

Case #1
In January 2006, Mr. G called the Office of the Public Advocate and reported that he was in housing court facing eviction. Mr. G's APS worker told him that his case had been given emergency status in November 2005, but as of January 2006, Mr. G had not received any news from APS. The Office of the Public Advocate called Mr. G's worker and supervisor to check on the progress of his case. The APS worker called back and said that he was aware of the case and that Mr. G's worker was waiting for the Financial Management Unit to process his application for financial management. Many months later, Mr. G is still waiting to learn the status of his case.

Case #2
Ms. S, a woman about 50 years old, had been declared incompetent and was facing eviction. In February 2005, she was appointed a legal guardian. Her guardian reported to the Office of the Public Advocate that he asked APS if the agency would pay the back rent for Ms. S; APS said the case was closed. Concerned that APS had not taken steps to resolve Ms. S's case while it was open, her guardian urged the agency to help Ms. S keep her apartment or he would petition the state to intervene. APS declined to re-open the case. Ms. S's guardian applied for rental assistance to help Ms. S keep her home, and reported to the Office of the Public Advocate that APS should have taken the same action months earlier.

Case #3
Ms. M, an elderly woman, was appointed a guardian in June 2006. A CBO serving Ms. M reported to the Office of the Public Advocate that she owed substantial back rent and that her apartment was cluttered and needed heavy-duty cleaning. Ms. M was hospitalized and subsequently placed in a nursing home. Her appointed guardian is trying to get Ms. M back into her apartment with a home health aide. The CBO reported that APS was in contact with Ms. M for more than a year but did not do enough to help Ms. M retain her apartment and remain in the community.

Case #4
In early August 2006, Ms. R, a 92-year-old woman suffering from dementia, was appointed an Article 81 guardian because she lacked the capacity to make decisions on her own. According to Ms. R, APS was aware that a man had coerced her to write checks to him for more than $100,000. Her guardian reported to the Office of the Public Advocate that he saw copies of the checks. Ms. R told her guardian that, before he was appointed, APS had done little to stop this financial exploitation. Furthermore, Ms. R

22

P00946

said that, despite the fact that she had not seen a doctor in the several months since the guardian had been appointed (and possibly longer) and had told APS representatives that she did not feel well, an APS physician did not come to give her an examination. Ms. R's guardian reported that during his visit with her she had discomfort/pain in her chest. Ms. R's guardian called APS on her behalf, but a doctor never showed up. Subsequently, Ms. R had a stroke.

Case #5
An APS worker reported to the Office of the Public Advocate that a mentally incapacitated elderly man was facing eviction from his apartment. The worker reported that the client did not have a guardian and that he was unable to advocate for himself due to his mental condition. He was eventually evicted from his apartment and had nowhere to go. The APS worker reported that she was upset that she could not do more and that she believed her client must have entered the shelter system. The APS worker explained, "We give clients a false hope that we will protect them when we can't."

Case #6
Ms. C, a 73-year-old woman, has suffered a series of mini-strokes and falls. A local CBO reported to the Office of the Public Advocate that her apartment is stuffy, hot, and infested with roaches that crawl over her table and her computer. Also, Ms. C's bathroom is dirty and has had a series of leaks, which have been inadequately repaired. The CBO reported that Ms. C is alert and oriented but seems to have delusions or hallucinations. In August 2003, APS referred her to the CBO for Meals-on-Wheels service. At the time, APS was providing Ms. C with financial management, helping her pay her rent, and was beginning an application for guardianship. In December 2004, however, APS told the CBO that, because Ms. C has "no psychological impairment" she would not be appointed a guardian. In November 2005, APS reported to the CBO that Ms. C was in danger of losing her Social Security benefits because she did not submit her financial statements, despite the fact that APS was supposedly providing financial management for the client. In February 2006, APS told the CBO that repairs to Ms. C's apartment had been completed. In March 2006, however, a caseworker from the CBO reported to the Public Advocate's Office that she had visited Ms. C and found that water was leaking into the kitchen and that her stove was broken. In April 2006, the CBO reported that Ms. C's rent receipts showed that APS was paying only $516 of her $550 rent. In June 2006, the CBO informed APS that there seemed to be a change in Ms. C's mental status and that she required a mental health evaluation. The CBO reported that, over the summer, Ms. C was hospitalized twice. She was hospitalized again in September 2006 and will be discharged to an adult home. The CBO told the Public Advocate's Office that Ms. C should have been referred for a psychological evaluation and guardianship early in her involvement with APS. The CBO believes that it would have been possible to keep the client in the community if she had been provided adequate support.

Case #7
Mr. L, an elderly man, reported to the Office of Public Advocate that he resides in a cluttered apartment. Due to the smell and fire hazard created by the clutter, his landlord

23

called APS to request heavy-duty cleaning. Mr. L reported, however, that APS refused to take his case without explanation. Because APS did not take his case, his landlord conducted heavy-duty cleaning and charged Mr. L $5,000, an amount he is unable to pay. Mr. L filed suit against HRA for its refusal to assist him.

Case #8

Ms. P is an elderly woman living in a cluttered apartment. She reported to the Office of the Public Advocate that her landlord referred her to APS and requested heavy-duty cleaning. Ms. P reported to the Office of the Public Advocate that APS came to her home to conduct an assessment and deemed her apartment in need of major cleanup and also determined that Ms. P needs home care nursing. Ms. P told the Office of the Public Advocate that APS came briefly to clean up the garbage but failed to provide home care.

Case #9

Mr. M, an elderly man, has been a client of APS since 2005. Mr. M reported that he does not receive his Social Security checks in time to pay his monthly bills on time. A representative of the Public Advocate's Office called the APS supervisor in charge of Mr. M's case, but her voicemail was inoperative, making it impossible to leave a message. Mr. M told the Office of the Public Advocate he is worried that his late payments will lead to his eviction.

Case #10

Ms. W, an 89-year-old woman, was referred to APS by a neighbor in June 2005 and was later appointed a temporary guardian. Ms. W called the Office of the Public Advocate with a complaint about her home health aide. She reported that the aide would say she was going out to get her food and be gone for many hours. The lawyer assigned to be Ms. W's temporary guardian spoke with the aide's supervisor and requested that she be replaced. Ms. W had a court hearing in August 2005 for a permanent guardian. Five months later, Ms. W called the temporary guardian and said she still had not received a new home health aide. The temporary guardian called APS on Ms. W's behalf, but as of April 2006, APS still had not sent a new home health aide.

Case #11

Mr. and Mrs. B are an elderly couple living in a cluttered studio apartment. Due to chronic illnesses, including Mrs. B's severe osteoarthritis and Mr. B's epilepsy and dementia, the couple is homebound and unable to properly care for their apartment and two cats. The strong odor emanating from their apartment caused their neighbors to complain to both the landlord and the Department of Health and eventually culminated in a threat of eviction if the odor was not eliminated. A CBO told the Office of the Public Advocate that at the same time that the couple contacted the organization for assistance, the landlord referred the case to APS. The CBO reminded APS of the need for heavy-duty cleaning so the couple could keep their apartment but APS did not conduct heavy-duty cleaning for ten months after opening the case. During the ten months, APS simply sent a caseworker once a month. The entire time, the couple lived under threat of eviction unable to advocate for themselves because of their frail condition.

24

**Case #12**

Ms. B, an elderly woman, was sued for back rent by her landlord. An APS worker reported to the Office of the Public Advocate that, according to the landlord, APS had underpaid Ms. B's rent by hundreds of dollars each month for three years. The APS worker said that the financial management unit was unable to help Ms. B because the financial management unit was overextended. Her client reported fear of eviction because APS was not protecting her adequately and she did not have the funds to pay the back rent she owed.

**Case #13**

A case manager for a CBO called the Office of the Public Advocate and reported that he had tried to contact APS concerning one of his clients, but when he called the Central Intake Unit, the individual who answered the phone was rude and hung up on him in mid-sentence. Mr. O told the Public Advocate that this discouraged his CBO from making further contact with APS on behalf of its clients.

**Case #14**

Mr. G contacted APS about a neighbor downstairs and the odor emanating from her apartment. APS sent someone to check on Mr. G's neighbor and told Mr. G that the agency would call him in a few days to follow up. Mr. G reported to the Office of the Public Advocate, however, that APS failed to get in touch with him. When he determined that the odor was still present, Mr. G called APS and found that it had not undertaken heavy-duty cleaning because the woman did not let APS representatives into her home. Mr. G expressed frustration because APS could have issued an Order to Gain Access in order to conduct an assessment of his neighbors' apartment.

**Case #15**

Ms. W is an elderly woman whose only income is her Social Security checks. She was a client of APS and told the Office of the Public Advocate that she never received her Social Security benefits from APS. APS eventually closed her case and referred her to Social Security. Social Security told her that APS had her Social Security checks and that the checks could not be re-issued until APS returned the un-cashed checks. Ms. W told the Office of the Public Advocate that the issue took several months to resolve during which time she had no income to buy food and pay for her other basic needs. She held the disorganization and inadequate staffing at APS responsible for her situation.

**Case #16**

Mr. D, an elderly man, was evicted from his apartment because he was unable to pay back rent. His belongings were put in storage by one of APS' contracted case management agencies. Mr. D reported to the Office of the Public Advocate that APS never paid his storage fees, and the contract agency eventually sold his belongings, including a number of valuable art works.

**Case #17**

Mr. F is an elderly man living in a cluttered apartment. A CBO reported to the Office of the Public Advocate that Mr. F had bed bugs and vermin in his apartment. APS

25

determined there was a need for heavy-duty cleaning. When APS arrived unannounced to perform the cleaning, Mr. F was in the hospital. The contracted cleaning agency threw away all of Mr. F's belongings without his knowledge. After he was released from the hospital, he had to purchase many new possessions on his limited income.

### Case #18

Ms. A, age 62, suffers from diabetes, a thyroid condition, glaucoma, and muscular degeneration. Ms. A had a stroke in 1994 and was diagnosed with cancer more than three years ago. A CBO serving Ms. A reported to the Office of the Public Advocate that she appears anxious and depressed but alert and oriented. Ms. A has a cluttered apartment infested with rodents; her medical evaluation revealed mouse-bites. Ms. A was referred to APS in December 2004 by the CBO. APS told the CBO that she was not paying her bills and had refused heavy-duty cleaning. In June 2005, Ms. A told the CBO that she was four months behind in her rent, and she had received a notice from Con Edison that her electricity would be turned off. In February 2006, APS informed the CBO that Ms. A's rent and Con Edison bills had been brought up to date. In March 2006, however, Ms. A told the CBO that she was still $2,000 behind in her rent and electricity bills. A month later, the CBO called Con Edison and determined that Con Edison had no knowledge that Ms. A was represented by APS and that it was not her fault that her bills were not being paid on time. The CBO obtained information on Ms. A's Con Edison arrears and rent arrears and faxed it to APS. APS responded by e-mail that Ms. A's utility arrears predated her involvement with APS and therefore the agency declined to provide a grant to help her pay her back rent. In July 2006, the CBO e-mailed pictures of Ms. A's apartment to APS and faxed consent from Ms. A for heavy-duty cleaning. In August 2006, Ms. A refused heavy-duty cleaning because APS would not inform her of the date it planned to perform the cleaning.

### Case #19

Mr. D, an elderly man with lung cancer, was facing eviction because he could not pay his rent on time. An APS worker, although hesitant to provide details due to the sensitive nature of the case, reported to the Office of the Public Advocate that, because Mr. D was not mentally incapacitated, "All we could do is relocate him. We usually send them to a shelter." Mr. D did not want to leave his apartment or go to a shelter. The APS worker reported that Mr. D ended up starving to death.

### Case #20

An APS worker contacted home care service agencies on behalf of Mr. A, a 50-year-old bed-bound man who was living alone in a small room. The agencies refused to provide Mr. A with services because he is a drug abuser. A judge ordered that he receive 24-hour home care due to the severity of his condition. He cannot perform his daily functions without help and defecates in his bed if he is not properly cared for. The worker hoped to apply for guardianship for Mr. A, but does not have much time to spend with him because the worker is handling more than 60 other cases. The worker reported that the guardianship case could take more than eight months, and that Mr. A's condition is too severe to wait that long.

P00950

Case # 21

Ms. K, an elderly woman, cannot afford her current rent of over $800 on her income of about $700 a month. Ms. K owes more than $8,000 in back rent. Ms. K's APS worker reported to the Office of the Public Advocate that Ms. K cannot get a grant from the rental assistance unit at HRA because she cannot ensure that she will be able to pay her rent without assistance in the future. The worker reported that she has over 75 cases, is still receiving new cases daily, and in fact, received three emergency cases the day she spoke to the Office of the Public Advocate. She explained that, in order to deal with emergency cases, she has to neglect clients whose cases are not emergencies. She said that she does not have time to help Ms. K.

Case #22

Elderly and bed-bound, Ms. C lives alone in a sixth-floor walk-up apartment with a monthly income that cannot cover her living expenses. About to face eviction, Ms. C was referred to a CBO, which helped her apply for an ongoing stipend from a private agency to help with her finances. The stipend was granted on the condition that Ms. C would receive formal money management, so she was referred to APS. The CBO reported to the Office of the Public Advocate that it took APS nearly seven months to provide money management. In fact, the CBO reported that, because the assigned caseworker would not return phone calls, the CBO had to call the senior supervisor, the director of the financial management unit, and the director of Manhattan APS, before APS took any action. The caseworker denied the fact that he never returned the calls, even though it was documented in Ms. C's case file at the CBO. The CBO reported that, even after APS assumed responsibility for Ms. C's money management, her bills continued to go unpaid, resulting in a temporary suspension of her phone service. The CBO reported that APS was responsible for paying Ms. C's bills but was not providing any financial management. The CBO decided to fax the bills to APS in order to prompt the agency to help Ms. C with her finances. The CBO reported that its request that a new worker be assigned to Ms. C was denied.

Case #23

Mrs. A, who suffers from a mobility impairment and dementia, was being cared for by her mentally ill daughter. The daughter was unable to manage their finances, spending most of their money by mid-month. She was forced to let bills go unpaid and beg for food and loans. A CBO serving Mrs. A reported to the Office of the Public Advocate that it continuously urged APS to provide guardianship but that APS only planned to apply for Medicaid on Mrs. A's behalf. The CBO further reported that the APS caseworker failed to prepare the Medicaid application in a timely manner, so the CBO did it. Eventually, both mother and daughter had to be hospitalized for various ailments. The CBO reported that, when the hospital refused to release the clients until additional supports were in place for them, APS finally decided to pursue guardianship and sent both mother and daughter to a nursing home to await the result of their case. Pursuant to APS' request, the CBO sent the agency documentation in January 2006 certifying Mrs. A's need for guardianship. The CBO reported that in May 2006, however, the APS caseworker again requested this information, claiming he never received it. According to the CBO, it took APS nearly six months to prepare the case for its in-house lawyer. Mrs. A and her daughter are still living in a nursing home in the Bronx, awaiting the outcome of a guardianship hearing.

27

**Case #24**

According to a CBO familiar with her case, Mrs. H's APS caseworker fails to call in advance before making his required monthly visit. As a result, both Mrs. H and her home attendant are often absent. The CBO reported to the Office of the Public Advocate that the home attendant estimates that when the APS caseworker does see Mrs. H he never stays longer than 10 minutes. In addition, the home attendant has notified the APS caseworker that Mrs. H has difficulty functioning and a problem concerning her son's payment of her bills, but the APS worker has not offered any input or assistance with these matters.

**Case #25**

Mrs. R, age 83, had advanced dementia, hypertension, cardiac arrhythmia, unsteady gait, and vision impairment. Mrs. R lived alone in a two-bedroom apartment and was not capable of taking care of herself. She had authorization for home attendant services. Ms. R's doctor reported to the Office of the Public Advocate that she did not show up to her medical appointments, forgot to take prescribed medications, and wandered outside unsupervised during late night hours. According to her doctor, her home environment—no food in the refrigerator, an infestation of roaches and mice—was not conducive to her physical and mental health. Her cognitive status had been deteriorating, and she was becoming more verbally abusive and physically aggressive towards the home attendants. Mrs. R had no family support and her godson was allegedly exploiting her financially and abusing her verbally. APS was unable to obtain guardianship or an order of protection against Mrs. R's godson and failed to help her pay her rent. Mrs. R moved to a nursing home where she passed away.

**Case #26**

Mr. X, a 62-year-old man with advanced dementia and a tendency to fall, was living alone in a studio apartment in June 2003 when a CBO in his community contacted APS for help. The CBO found that Mr. X was being financially exploited by strangers he met on the street. Though Mr. X's family members brought him food and groceries, they did not visit him frequently enough to take care of him properly. Though Mr. X had access to his Social Security checks, he never had money to pay for his medications or food. APS did not accept the case until August 2006—more than three years after the initial referral. The CBO reported to the Office of the Public Advocate that, by that time, Mr. X barely had any money left to support himself because he had given so much away to strangers.

**Case #27**

Ms. J, age 93, lives alone and has no family or friends for support. Due to her poor nutritional habits, including the lack of liquids in her diet, she has been repeatedly hospitalized for dehydration. Ms. J's apartment is unmanageably cluttered and her hygiene is poor. A CBO serving Ms. J reported to the Office of the Public Advocate that throughout APS's two-year involvement with her, she has had three separate caseworkers, all of whom have, according to the CBO, neglected her needs. For example, Ms. J often falls in her apartment and each time she falls, she is hospitalized for a few days and then sent home without any APS services. The CBO reported that the last

P00952

time Ms. J fell, she was found on the floor lying in a pile of garbage and again taken to the hospital.

**Case #28**

Mr. X, Mr. Y, and Mr. Z are mentally ill brothers, ages 35 to 55, living with their mother in the Bronx. A CBO familiar with the family reported to the Office of the Public Advocate that APS encountered the family in early 2002 after being informed they were going to be evicted by their landlord. APS immediately put Mr. X, the eldest brother, in a nursing home. APS did not provide assistance to Mr. Y, the middle brother, when it was time for him to reapply for SSI and Medicaid, and he lost both benefits, despite the fact that he was qualified for both. As Mr. Y often has severe asthma attacks and seizures, losing Medicaid put his health at great risk, and the loss of SSI meant his family had less money to spend on food. APS never applied for food stamps on the family's behalf, and the sons remained significantly underweight.

**Case #29**

In 2005, Mr. N was assigned a guardian from an agency under contract with APS. APS was responsible for Mr. N for the two years prior to the assignment of the guardian. Mr. N spent months living in a hospital because his apartment was filthy and full of vermin. Mr. N's guardian reported to the Office of the Public Advocate that, during his hospital stay, his APS caseworker had repeatedly assured both the hospital and guardian agency that APS had applied for Medicaid on Mr. N's behalf, which was necessary in order to secure his release from the hospital and much-needed home care. The guardian discovered, however, that the APS caseworker had never applied for Medicaid for Mr. N, increasing the length of his hospital stay. The guardian further reported that the APS caseworker rarely returned phone calls and did not meet with the guardian agency, despite regulations requiring three joint visits.

**Case #30**

A CBO reported to the Office of the Public Advocate its concern regarding Ms. M, a client who was admitted to a nursing home in October 2006 without the CBO's knowledge. The nursing home was unaware that Ms. M was receiving Meals-on-Wheels from the CBO. A week before she was admitted, Ms. M's APS caseworker visited her but mentioned nothing about the nursing home, according to the CBO staff member who was present at the time. The CBO called JASA Mental Health, which had been sending a representative to visit the client regularly, and found out that APS had also neglected to inform JASA about the move to the nursing home. A CBO caseworker visited Ms. M at the nursing home, and Ms. M told her she wanted to go home. Ms. M said she wasn't told the truth; she was told she was going somewhere that would "make her happy." Ms. M was crying the entire time that the CBO caseworker was visiting. APS told the CBO that it is working on obtaining guardianship for Ms. M, but the process could take a long time.

**Case #31**

In January 2005, 81-year-old Mr. G went to a CBO to request legal assistance. He was being evicted from his apartment and his rent, phone, and Con Edison bills were all five

29

months in arrears. The legal department took his case and referred him to another CBO, which discovered that Mr. G was an active client of APS, due to a long history of mental illness. The CBO reported to the Office of the Public Advocate that its director made several unreturned phone calls to APS before finally hearing from the caseworker, who had not visited Mr. G in nine months, even though she was mandated to visit every three months. APS had no idea that Mr. G was being evicted or that his bills were in arrears. The CBO reported that though it was clear that Mr. G did not have enough money to meet his monthly expenses, APS had never investigated grant options for him. Furthermore, the CBO maintained that APS was unwilling to cooperate with its advocacy on Mr. G's behalf; instead, APS told the CBO it would close Mr. G's case and cancel his home care if the CBO took his case. According to the CBO, home care is a necessary part of Mr. G's care plan; without it he is unable to live independently in the community. In sum, the CBO reported to the Office of the Public Advocate that APS is unwilling to work with a community agency to meet Mr. G's needs, yet it does not do on its own what is necessary to meet his needs.

Case #32

Ms. M, age 94, lives alone. She has been diagnosed with dementia, has frequent fixed delusions and paranoia, and suffers from congestive heart failure, heart disease, dental problems, and frailty. A CBO serving Ms. M reported to the Office of the Public Advocate that she has a tendency to spend all her money entering sweepstakes, which she is sure she will win. She does not save money for food, clothes, toiletries, or bill payment. The CBO referred Ms. M to APS in September 2004 for financial assistance. Ms. M was assigned a caseworker in November 2004. According to the CBO, in March 2005, APS decided that guardianship for Ms. M was not necessary. Then, in November 2005, APS referred Ms. M to a hospital but did not inform her CBO case manager. In July 2006, Ms. M began receiving bogus checks from a sweepstakes and tried to cash them at her bank. The CBO case manager put in emergency requests to APS to apply for guardianship; APS took no action. In September 2006, after Ms. M tried to cash another bogus check, the CBO made five calls to Ms. M's APS caseworker without receiving a response. The CBO further reported that, in addition to providing a guardian, APS needed to help Ms. M recertify for food stamps. According to the CBO, to date, APS has still not provided a guardian, recertified Ms. M's food stamps, or responded to her mental health needs. The CBO complained that APS consistently fails to return its phone calls in a timely manner.

Case #33

Mr. K, an 86-year-old man disabled on his left side by a stroke, has been involved with APS for more than two years. Mr. K's doctor reported to the Office of the Public Advocate that, though APS was responsible for his financial management, it did not investigate the reason he lacked adequate clothes, food, or personal items for more than two years. The doctor further reported that APS is seeking guardianship of Mr. K, but the process can take eight months or longer, so Mr. K is likely to remain in this deplorable state for some time.

30

P00954

**Case #34**

Ms. D, a 77-year-old woman in declining health with some cognitive deficits, is facing eviction from her apartment. A CBO serving Ms. D reported to the Office of the Public Advocate that her psychiatric evaluations showed that she needed financial management, which APS agreed to provide. Ms. D's doctors, however, reported to the Office of the Public Advocate that it took APS almost a year to obtain guardianship for Ms. D, leaving her in a vulnerable state.

**Case #35**

Ms. E, age 82, lives alone. Her apartment is filthy, her appearance unkempt, and she hasn't had adequate medical coverage for four years. A CBO serving Ms. E asked APS to apply for guardianship but was denied. The CBO reported to the Office of the Public Advocate that, without APS guardianship, it is difficult to help Ms. E obtain cleaning, home care, and financial management. The CBO reported that it will try to refer the case to APS again.

**Case #36**

Mr. F, age 80, has a drinking problem and difficulty managing his finances. A CBO reported to the Office of the Public Advocate that its request to APS for guardianship was denied. The CBO reported that Mr. F was found sleeping on the street and ended up in a nursing home, but, had guardianship been granted, he could have remained in the community with support from the CBO.

**Case #37**

APS was awarded guardianship for Ms. A, age 77. She has advanced dementia and is living in a cluttered, dirty apartment. Her shower is filled with papers so she is unable to properly bathe herself. A CBO serving Ms. A reported difficulty contacting her guardian, who often waited long periods before returning phone calls. The CBO reported to the Office of the Public Advocate that it took more than three months for Ms. A to receive a guardian after guardianship was awarded because APS contract agencies seem to be understaffed. Voicemail is often the only means of communication with APS and its contract agencies. APS caseworkers do not have individual e-mail addresses, and some contract agencies have limited access to e-mail.

**Case #38**

An APS worker was assigned to conduct a home visit to assess the needs of an elderly client. The client's psychological evaluation deemed her an emergency case requiring a home visit within 24 hours. The client told the worker she had a loaded gun in the apartment. The worker felt uneasy and believed her training was inadequate to deal with the situation.

**Case #39**

According to a CBO, Mr. B, age 86, is financially exploited by his daughter, a drug addict. The daughter presented herself well to Mr. B's APS caseworker and therefore the caseworker did not see her as a threat, but in fact, she was stealing Mr. B's monthly Social Security checks. A CBO serving Mr. B told the Office of the Public Advocate that

P00955

the APS caseworker should be trained more thoroughly to identify signs of exploitation and abuse to protect clients like Mr. B.

**Case #40**
Mr. W requested financial management after experiencing increased symptoms of dementia related to Parkinson's disease. He specifically requested that an APS caseworker assist him with rent and bill payments since he was no longer able to keep track of or physically write out checks. APS rejected the request for financial management and did not inform the CBO serving Mr. W of its decision. APS arranged for a distant relative's friend who Mr. W does not know to manage his finances once a month. Mr. W expressed to the CBO his discontent with this arrangement but feared that rejecting it would leave him facing unpaid bills or even eviction from his apartment. The case remains open with APS. The CBO wrote a letter to APS urging that the case be reexamined, but APS has yet to respond.

**Case #41**
A doctor called the CBO serving his client, Ms. M, to recommend that she be referred to APS immediately. Ms. M has advanced dementia and has been seen wandering around her neighborhood asking for help locating her apartment. The CBO called APS to request a home visit and assessment. When the APS caseworker arrived, Ms. M was not at home. The CBO reported to the Office of the Public Advocate that the APS caseworker expressed anger that the client was never home for an interview. APS contacted the downstairs neighbor and asked him if he would assist with bill payment for the client. The CBO reported to the Office of the Public Advocate that the neighbor should not be managing Ms. M's bills because he is a stranger to her and Ms. M is very vulnerable. The APS caseworker eventually conducted a preliminary evaluation and determined that Ms. M did not require APS services because she was not physically impaired and in no imminent danger. Ms. M cannot afford home care on her own. The CBO reported that APS caseworkers need better training to identify when a client is mentally incompetent.

**Case #42**
Ms. A, a 91-year-old widow, lives alone. Her apartment is cluttered and roach-infested, so a CBO referred her to APS for home care. Ms. A told the CBO that because of her poor health and impaired mobility she cannot adequately clean herself or take care of her laundry. In July 2002, the CBO referred her to APS for guardianship and heavy-duty cleaning, but she received neither, and APS closed her case in March 2005. The CBO referred her to APS again at that time. Not until July 2006 did the CBO receive word that her case was submitted for guardianship. The CBO told the Office of the Public Advocate that the APS response to Ms. A's case was too slow. She missed payment on several bills, her home is still in poor condition, and she still needs home care.

**Case #43**
Ms. A, an elderly woman, lives on her Social Security checks. After paying her monthly rent, she barely has enough money left to get by. Her APS caseworker applied for food stamps on her behalf. Ms. A must wait for a PIN number to access her food stamps. She

P00956

has been waiting for more than two months for APS to inform her that her food stamp application has been processed and to provide her with the PIN number, but she has received no word.

**Case #44**
An APS worker reported to the Office of the Public Advocate that her training was insufficient to deal with the case of a mentally incapacitated elderly man living in an abandoned building. The windows and doors of the building were boarded up and there was no way for the worker to get inside. The worker reported feeling unsafe going to this location to visit her client. She felt she had no resources to offer the client and gave him information on shelters he could go to.

**Case #45**
A CBO serving Ms. G, age 78, reported to the Office of the Public Advocate that it had difficulty reaching Ms. G's APS caseworker. When the CBO contacted the caseworker's supervisor to explain the problem, the supervisor seemed to be overwhelmed and threatened to hang up.

**Case #46**
Ms. R, an elderly woman, is facing eviction. Her APS worker reported to the Office of the Public Advocate that she is trying to apply for guardianship for Ms. R. The guardianship proceeding began in August 2006 and is still being processed. The APS worker has applied for a psychiatric evaluation for her client to show that she is in need of protection from eviction. Meanwhile Ms. R could be evicted. The worker had a caseload of more than 70 clients and reported that she simply did not have the time to devote her full attention to this case.

**Case #47**
Four elderly clients in their 80s all live together in one house. Three of the four have Alzheimer's disease. There are two young men who also reside in their house. A local CBO, which provides Meals-On-Wheels for the clients, referred them to APS more than eight months ago. The caseworker at the CBO reported to the Office of the Public Advocate that APS conducted an initial visit and assessment and determined that the clients are in need of both Medicaid and guardianship, but the CBO caseworker has not received any updates on the progress of his clients' case since the initial assessment. He reported trying to call the APS caseworker over the course of four months, but the caseworker never returned his call. In December 2006, the CBO caseworker finally reached the APS supervisor in charge of the case, who informed him that the case had been declined. According to the CBO caseworker, the APS supervisor said, "we don't have any idea why it's closed. The caseworker will try again but she's having a hard time getting documentation from the clients to get Medicaid." The CBO caseworker explained, "I've been screaming here to get these people help and their situation is spiraling out of control and no one wants to help these people." One client gave one of the younger residents of the house thousands of dollars so he could attend a psychiatric program. The CBO caseworker believed it to be a case of financial exploitation. The

P00957

CBO caseworker reported that the only agency that has been responsive to his concerns is the NYPD. APS only visited the house once.
(This case was reported to the Public Advocate in December 2006).

Case #48
In 2002, Ms. R, a woman with Alzheimer's disease, met a man who was living in his car. Within two weeks he had moved in with her. This man arranged for Ms. R to divorce her estranged husband and is now married to her. He told Ms. R's CBO case manager several years ago that he was going to leave her in Florida with a former in-law and return to New York to buy a dry-cleaning store. Ms. R's husband has secured an attorney who claims that the two have been a couple for seven years and have known each other for 25 years. The husband claims he was unaware of Ms. K's mental state. APS acknowledges that Ms. K has Alzheimer's but refuses to intervene on the grounds that she has a husband who can manage her affairs.

Case #49
Ms. G, an elderly woman with advanced dementia, was referred to APS for guardianship by a neighbor. Her home was filthy and infested with pigeons, and she was in need of home care. Ms. G had been referred to APS two years prior, and as a result, she went to a CBO in her community for help because she did not want APS involved in her life. This year, APS tried to conduct a home assessment, but Ms. G would not let agency representatives inside, and APS subsequently closed the case. The CBO contacted the Office of the Public Advocate because it believed APS should have made an effort to work with the CBO in order to help Ms. G obtain the services she needs. The CBO reported that they have never had a problem entering Ms. G's apartment. Currently, Ms. G does not have a guardian and her landlord is considering eviction.

Case #50
An elderly woman faced eviction because she could not pay her rent. While the APS worker was reluctant to divulge any details about this case, she reported to the Office of the Public Advocate that there was nothing APS could do to protect her. The client told the worker that she would kill herself if she had to leave her apartment. She was eventually evicted and subsequently stabbed herself in the heart.

Case #51
Mr. D, an elderly man, suffers from dementia. His apartment is cluttered and infested with roaches. His landlord wants to evict him because of the smell and his neighbor's frequent complaints. An APS worker determined that the apartment needed heavy-duty cleaning. The worker complained to the Office of the Public Advocate that, to comply with APS policy, she had to remain in the apartment during the heavy-duty cleaning. The apartment was so filthy that the APS worker had to take two entire days to deal with the case and did not have time to visit her other clients.

Case #52
Ms. H, age 90, has severe dementia characteristic of Alzheimer's disease. Ms. H's bank called her APS worker and told her that someone may be trying to take money from Ms. H. The APS worker reported to the Office of the Public Advocate that she is frustrated

34

with the APS system for obtaining guardianship because she must first submit a
"guardian package" to the APS legal unit for review, a process that can take more than
three weeks. The legal unit then sends the package of paperwork back with questions the
APS worker must respond to. After she has answered all the questions, the legal unit
reviews the package again. The APS worker reported that this process can take 6 to 9
months. The APS worker also reported that she does not feel her client is getting the best
possible care.

Case #53
Mr. H is mentally ill and unable to pay his own rent. He receives financial management
services from APS. His APS worker reported to the Office of the Public Advocate that
Mr. H allows strangers to stay in his apartment without paying rent. The worker has
visited his apartment and found him sleeping outside in the street because he has been
kicked out of his own bed by those he lets stay in his home. The worker reported that this
client needs a guardian to protect him, manage his finances, and provide home care. The
worker has close to 50 cases and is unable to give Mr. H the appropriate level of
attention. The worker reported that an application for guardianship would not be
approved for more than six months, in which time Mr. H could end up on the streets
permanently.

Case #54
Ms. E, an elderly woman, lives alone in a cluttered apartment. Ms. E's APS worker
reported to the Office of the Public Advocate that she is frail and unhealthy, and is unable
to take care of herself. Ms. E has not showered in six months, and her apartment is
infested with roaches and flies. The worker reported being unable to open her mouth
inside the apartment because of the flies. Ms. E had not left her apartment in more than
five months. The worker felt that the process of applying for guardianship and
conducting heavy-duty cleaning was too time-consuming for a client in such a state of
emergency and, although she believed the client could live in the community with the
appropriate supports, instead put Ms. E in a hospital and closed the case.

Case #55
Ms. F, a woman in her 80s, was living alone in her apartment and not mobile enough to
run errands on her own. A social worker used to come to her apartment to deliver food,
but Ms. F has dementia and threatened her with a knife, so the social worker does not
come anymore. Ms. F's only contact with the outside world is her APS worker. When
the worker arrived for her monthly visit this month, Ms. F did not have any food in her
apartment. The worker reported feeling frustrated because she is unable to visit Ms. F
more often.

Case #56
Mrs. D, age 95, lives alone and suffers from dementia. A social worker from a CBO
contacted APS for help concerning this client. APS visited Mrs. D twice to assess the
situation, but did not take steps to provide her with home care services on a regular basis.
The social worker from the CBO proceeded to provide her with Meals-on-Wheels. The
social worker called APS to follow up two weeks later for help with home care. APS did

P00959

not respond for two weeks. The social worker persistently called APS for several weeks and was then informed that the case had been closed. Because all communication had been exhausted, the social worker called her community liaison at the Department for the Aging (DFTA). APS still did not give Mrs. D appropriate home care. A week after the caseworker contacted DFTA, the client set her apartment on fire while trying to dry clothing using a heater and was hospitalized and placed in a nursing home. The caseworker reported that the client would have been fully capable of living independently if she had been given proper assistance in a timely manner.

Case #57
Ms. D, age 65, was referred to a local CBO by her bank. According to the bank officer, on several occasions a young man accompanied Ms. D to the bank and instructed her to withdraw $35,000-40,000 from her account and request that the bank issue checks in his name. The bank officer reported that the client was confused and, when she hesitated, the younger man became verbally abusive. The CBO contacted APS to make a referral and discovered there had been an APS case concerning the same client referred by a local senior center two years prior. The referral consisted of all the same information concerning a younger man who had been financially exploiting and verbally abusing the client. APS had conducted an assessment and a psychiatric evaluation at the time, but the case had been closed. When the CBO made its referral in January 2006, a new psychiatric evaluation was performed. The evaluation confirmed the client showed signs of dementia and judgment impairment. The psychiatrist then recommended a guardian be appointed to protect the property and well-being of Ms. D. Five months later, the CBO was informed that the case was rejected by APS. As recently as July 2006, the CBO was contacted by the same bank officer stating that the younger man had come to the bank to withdraw another $40,000 from Ms. D's account. The case was reopened by APS and temporary guardianship was granted as of August 2006—7 months after the second referral. In all, the younger man is believed to have taken more than $130,000 of Ms. D's money. The CBO reported to the Office of the Public Advocate that APS caseworkers have too many cases and too much paperwork to keep track of even a serious, ongoing case like Ms. D's in a timely manner.

P00960

## C.  CORE COMPETENCIES FOR APS CASEWORKERS

**NCEA/NAPSA Training Resources Development Project**
**November 2005**
**CORE COMPETENCIES FOR APS CASEWORKERS**

**MODULE 1: APS OVERVIEW**

<u>Background Information:</u> History of APS, National issues in APS; Federal legislation, Federal and state funding ,Grants, Training opportunities, History and role of NAPSA

<u>APS Worker Satisfaction:</u>  Care and support for APS workers, Professional development

<u>APS Clients:</u> APS client target populations, Essential needs of dependent adults
APS eligibility criteria, Client benefits and entitlements

<u>APS Legal Framework:</u> Federal Statutes, State statutes and legal definitions
State policies and standards, Roles and responsibilities of APS workers

**MODULE 2: APS VALUES AND ETHICS**

<u>Guiding APS Principles and Values</u>

Balance safety concerns and right to self-determination, Treat people with honesty, care and respect, Retention of civil and constitutional rights, Assumed decision-making capacity unless a court adjudicates otherwise, The right to be safe, The right to accept or refuse services.

<u>APS Best Practices Guidelines:</u> Practice self-awareness and professional use of self, Understand importance and support appropriate casework relationship
Act as client advocate

<u>Understanding Diversity:</u> Cultural competence, Communicating cultural values, Ageism awareness, Disabilities awareness

**MODULE 3: AGENCY STANDARDS and PROCEDURES**

<u>Agency Organizational and Administrative Structure:</u> Organizational/institutional environment or culture; APS services/duties Specialized APS units, e.g. for homeless, after-hours, hospital liaison

<u>Regulations and Policies:</u> Protocols for client emergency needs, Protocols and procedures for facility investigations, Protocols for translation, signing for the hearing impaired, communication services, Arrangements for culturally appropriate services, What to do when the client can't be located

<u>Managing APS Caseloads:</u> Workload standards, Timeframes for response, Caseload size, Time management, Effects of secondary trauma, Burnout and stress management, Coping strategies and staying resilient

<u>Financial Management:</u> Fiduciary responsibility, Agency forms and instructions

**MODULE 4: THE AGING PROCESS**

<u>Facts on Aging:</u> Demographics, Healthy aging, Life expectancy, Social issues and aging, Health care (AIDS and other communicable/infectious diseases), Role of family support for the elderly

<u>Stages of Adult Development:</u> Impact of loss of independence, Impact of poor health, illness, mental illness on client's well being Social/psychological/behavioral changes, Effects of aging process on client's ability to care for self, Public perception of the elderly and ageism

**MODULE 5: PHYSICAL AND DEVELOPMENTAL DISABILITIES**

<u>Overview of Disabilities:</u> Types of disabilities, Definitions – federal/state, Common misconceptions

37

P00961

Effects of Disabilities: Effects of disabilities on client's functioning, Impacts of disability on caregiver and/or family

## MODULE 6: MENTAL HEALTH ISSUES

Common Emotional Difficulties: Coping with one's own aging process, Issues of separation/loss/grieving

Types of Mental Illness: Depression/manic depression (bipolar disorder), Delirium/dementia, Schizophrenia, hallucinations and delusions, Personality disorder, Obsessive compulsive disorder, Suicidal ideations/suicide

## MODULE 7: SUBSTANCE ABUSE

Types of Substance Abuse Issues: Alcoholism, Drugs, Pharmacology, Injuries and illness resulting from substance abuse

Medications: Misuse of medications, Medication side effects, Medication drug dependency

## MODULE 8: DYNAMICS OF ABUSIVE RELATIONSHIPS

Predominant Types of Abuse/Neglect/Exploitation (ANE): Self-neglect, Neglect by caregiver, Financial exploitation, Physical abuse, Sexual abuse

Theories of Abuse: Power and control, Cycle of violence, Victim/perpetrator dependency, Exchange theory, Caregiver stress, Neglect due to pathologies of aging, Emotional and verbal abuse dynamics

Characteristics of Victims and Perpetrators: Victim/perpetrator dependency, Victim/perpetrator mental health issues, Abusive, neglectful, or exploitive caregivers, Undue influence, Psychology of perpetrators, Dysfunctional families
Abuse of elders living in domestic situations, Abuse of elders living in institutions

Domestic Violence: Domestic violence and elder/adult abuse, Dynamics of power and control, Why victims don't leave their abusers

## MODULE 9: PROFESSIONAL COMMUNICATION SKILLS

Types of Interviews: With victims, With perpetrators, With collateral contacts, With family/groups

Interviewing Skills: Trust and relationship building, Engagement techniques, Open-ended questioning, Listening/reflection of content and feeling, Responding to disclosures, Showing empathy/compassion, Acknowledging religious/cultural beliefs

Handling Special Situations: Dealing with resistance and hostility, Mediation, negotiation, conflict management

Working with Special Populations: Cultural dynamics, People with mental illness, People with physical disabilities, People with developmental disabilities

Communicating with Special Populations: Cognitively, hearing, or visually impaired people, Non-verbal clients, Limited-English speaking clients, Use of interpreters

Communicating with Other Professionals: Health care professionals, Law enforcement, Legal professionals Victim advocates

## MODULE 10: SELF-NEGLECT

Overview of Self-Neglect: Types of self-neglect, Statistics on self-neglect, Indicators of self neglect Assessing level of risk, Environmental safety assessment

Theories of Self-Neglect: Cultural/social aspects of self-neglect, Capacity evaluation, Hoarding behavior, Community attitudes towards self-neglect

Causes of Self-Neglect: Societal causes for self-neglect, Individual causes for self-neglect

P00962

Preventing Self-Neglect

## MODULE 11: CAREGIVER OR PERPETRATOR NEGLECT

Overview of Caregiver or Perpetrator Neglect:  Types of caregiver neglect (unintended, intended, criminal), Statistics on caregiver neglect, Indicators of caregiver neglect, Assessing level of victim risk

Theories of Caregiver Neglect: Caregiver role: voluntary or involuntary, Exchange theory, Personality/behavior of the caregiver Personality/behavior of the patient

Causes of Caregiver Neglect: Cultural/social aspects of caregiver neglect, Individual causes of caregiver neglect (burden of care, co-dependency, caregivers with mental illness, physical impairments or substance abuse)

Preventing Caregiver Neglect

## MODULE 12: FINANCIAL EXPLOITATION

Overview of Financial Exploitation: Types of financial exploitation, Statistics on financial exploitation, Indicators of financial exploitation, Assessing client's financial situation, Assessing level of risk, Assessing undue influence

Theories of Financial Exploitation: Cultural/social aspects of financial exploitation

Causes of Financial Exploitation: Societal causes of financial exploitation, Individual causes of financial exploitation

Preventing Financial Exploitation

## MODULE 13: PHYSICAL ABUSE

Overview of Physical Abuse: Types of physical abuse, Statistics on physical abuse, Domestic violence indicators, Medical indicators of abuse and neglect, Assessing level of risk, Lethality indicators

Theories of Physical Abuse: Dynamics of physical abuse, Cultural/social aspects of physical abuse, Homicide/suicide

Causes of Physical Abuse: Societal causes of physical abuse, Individual causes of physical abuse

Preventing Physical Abuse

## MODULE 14: SEXUAL ABUSE

Overview of Sexual Abuse: Types of sexual abuse, Statistics on sexual abuse, Indicators of sexual abuse, Assessing level of risk

Causes of Sexual Abuse: Societal causes of sexual abuse, Individual causes of sexual abuse

Preventing Sexual Abuse

## MODULE 15: APS CASE DOCUMENTATION/REPORT WRITING

Importance of Case Documentation: Proper case documentation for substantiation of ANE, Identifying data to include in case records

Documentation Overview: Gathering of facts/chains of evidence, Clear, concise and objective documentation, Updating chronological records to monitor client progress, Required forms and instructions, Tracking/recording guidelines, Monitoring services by other agencies, Best practice tips

Documentation Equipment Skills: Cameras, Videos, Tape recorders, Computers, Body maps

Confidentiality of Records: Client permission to share information, Legal issues (e.g. subpoena of records)

Report Writing Skills

39

P00963

**MODULE 16: INTAKE PROCESS**

<u>Preparing for the Initial Client Visit:</u> Does report meet statutory requirements?, Being inclusive--screen in, not out, Reporter's expectations, Reviewing prior client records, Identifying collateral contacts

<u>APS Worker Safety:</u> Safety planning for worker, Assessing for violent or psychotic behavior, Assessing for hazardous materials (drugs, communicable diseases, firearms), Neighborhood safety concerns, Dangerous animals, Location of interview, Working with difficult people, Non-violent crisis intervention, De--escalating potentially dangerous situations, When to contact law enforcement and how to request assistance, Emergency communications—cell phones, Communicable and Infectious Diseases

<u>Investigation: Initial Client Contact:</u> Gaining access, "Who sent you" issues, Establishing rapport at the door, Strategies for dealing with refusal of access by client or to client, Interviewing the suspected abuser, Assessing validity of reports of ANE, Developing safety plans with/for clients

<u>Intake Documentation</u>

**MODULE 17: INVESTIGATION: CLIENT CAPACITY**

<u>Initial Capacity Assessment:</u> Interviewing the suspected abuser , Assessing validity of reports of ANE, Developing safety plans with/for clients, Intake documentation

<u>Capacity Assessment:</u> When and how to refer client for professional capacity evaluation, Interpreting and using assessment information, Client's strengths and social supports, Ability to conduct activities of daily living, Level and type of care needed

<u>Client's Ability to Make Informed Decisions:</u> Cultural influences on client's decision-making, Community standards, Past history of making decisions, Concept of "negotiated consent"

**MODULE 18: INVESTIGATION: RISK ASSESSMENT**

<u>Overview of Risk Assessment:</u> Indicators of immediate risk of ANE, Lethality indicators, Emergency medical or psychiatric situations, Impact of illness/disability on client's ability to protect him/her self, Environmental hazards, What to do when client refuses services

<u>Risk Assessment of Caregiver:</u> Mental Illness, Substance Abuse, Emotional/financial dependence on victim, Suicidal ideation

**MODULE 19: VOLUNTARY CASE PLANNING and INTERVENTION PROCESS**

<u>Overview of Voluntary Case Planning and Intervention:</u> Mutual assessment of needs/goal setting, Supportive counseling, Policies and procedures for response

<u>Types of APS Service Provision:</u> Accessing benefits and entitlements, Safety planning for client, Assuring basic needs are met (e.g. food, heat, transportation), Arranging for shelter and transition housing as necessary, Providing information/referrals, Linking clients and families with respite services and support groups, Assisting clients discharged from hospitals, psychiatric wards and disability centers, Providing emergency services or finding/developing emergency resources, Managing client finances as necessary, Providing respite care, Mediation, Caregiver training

<u>Case Planning and Intervention:</u> Goal setting with clients, Defining intervention strategies/response timeframes, Finding and procuring resources, Promoting coordinated/joint case planning and service delivery, Arranging for culturally appropriate services, Case documentation, Reassessment/follow-up

<u>Preventing ANE:</u> Consumer education

**MODULE 20: INVOLUNTARY CASE PLANNING and INTERVETION PROCESS**

<u>Overview of Involuntary Case Planning and Intervention:</u> Policies and procedures for response, Legal standards for involuntary intervention, Promoting coordinated/joint case planning and service delivery

<u>Case Planning for Involuntary Services:</u> Arranging for culturally appropriate services

P00964

Goal setting with family/care provider, Defining intervention strategies/response timeframes, Finding and procuring resources

<u>APS Interventions:</u> Providing services for caregiver, Respite care, Caregiver training, Providing information/referrals, Assuring basic client needs are met, Accessing benefits and entitlements, Safety planning for client, Coordinating involuntary medical care, Arranging for shelter and transition housing, Coordinating involuntary mental health/substance abuse treatment, Linking clients and families with respite services and support groups, Providing emergency services, Assisting clients discharged from hospitals, psychiatric and development centers, Managing client finances as necessary, Documentation, Reassessment/follow-up

<u>Guardianships and Conservatorships:</u> Statutory definitions, Guardianship process, Competency/incompetency criteria, Probate conservatorship process, Private conservatorship process

## MODULE 21: COLLABORATION and RESOURCES

<u>Overview of Collaboration and Resources:</u> Benefits of working as a team, Roles of various professionals in resolution of ANE

<u>Local and Regional Networks and Community-Based Services:</u> Roles and responsibilities of community resources, Interagency protocols for referrals and service delivery, Local resources contact information

<u>Inter-Agency Relationships and Collaboration:</u> Multidisciplinary review teams, Fatality review teams, Community advisory groups State and local coalitions, Public awareness campaign, Documentation of services and outcomes, Abuse prevention activities

<u>Community Outreach:</u> Public education, Working with the media, Abuse prevention activities

<u>Service Integration with Related Agencies:</u> State Units on Aging, Department of Children and Family Services/Social Services
Domestic violence resources, Victim advocates, Regulatory agencies

<u>Health and Mental Health:</u> Medical Clinics/Hospitals, Department of Mental Health, Mental Health/Counseling Agencies, Medicaid/Medicare, Agency in charge of Developmental Disabilities

<u>Law Enforcement:</u> Police/Sheriff's Department, State Patrol, FBI, Medicaid Fraud, Office of Attorney General, Probation/parole

<u>Legal Resources:</u> Office of District Attorney, Department of Consumer Affairs, OAA legal service providers, Private attorneys

<u>Emergency Resources:</u> Homeless shelters, Domestic Violence Shelters, Group homes, Residential Health Care Facilities, Boarding Homes, Food pantries, Church organizations, Developing emergency resources when none exist.

<u>Financial:</u> Social Security, Banking institutions, Securities firms, Food stamps

<u>Other Resources:</u> Long-term care ombudsmen, Immigration Services, Clergy, Universities and community colleges, National organizations

## MODULE 22: LEGAL ISSUES and LAW ENFORCEMENT

<u>Overview of Legal Issues and Law Enforcement:</u> Role of criminal justice system, State criminal codes, Regulations and policies

<u>Legal Tools:</u> Legal rights of adult clients, Court ordered mediation, Restorative justice, Writing affidavits and petitions, Mandatory reporting, Filing emergency protective/restraining orders, Legal resources for dependent adults, Victims/witness programs, Substitute decision-making on behalf of client, Living wills, health care proxies, do not resuscitate (DNR) orders, Collecting, preserving and analyzing evidence

<u>Working with Law Enforcement and the Judicial System:</u> Differences in APS, law enforcement, and legal institutional cultures, Caseworkers' role in the legal process, Requesting law enforcement assistance, Conducting joint investigations/interviews with law enforcement, Subpoena of case records

41

P00965

<u>Preparing for Court</u>: Case documentation, Initiating court procedures, Assisting victims with court procedures, Legal representation for APS workers, Guidelines for presenting testimony, Responding to cross-examination, Writing court reports

## MODULE 23: CASE CLOSURE

<u>Overview of Case Closure:</u> Reasons for case closure, Issues of grief and loss for client and worker, Client's end of life decision-making process, Carrying out client's end of life wishes (funeral arrangements, client's estate disposition)

<u>Case Termination:</u> Closure for client and worker, Service delivery evaluation, Summary case recording and case documentation
How could abuse, exploitation and neglect have been prevented?

42

P00966