**EXHIBIT O**

1

2  CITY COUNCIL

3

CITY OF NEW YORK

4

------------------------------x

5

THE TRANSCRIPT OF THE MINUTES

6

            of the

7

COMMITTEE ON AGING

8  (Held Jointly With)

COMMITTEE ON GENERAL WELFARE

9

------------------------------x

10

11                  June 14, 2007
                    Start:  1:20 p.m.
12                  Recess: 4:27 p.m.

13                  City Hall
                    Council Chambers
14                  New York, New York

15

        B E F O R E:

16

            MARIA del CARMEN ARROYO
17              Chairperson, Aging Committee

18          BILL DeBLASIO
                Chairperson, General Welfare
19              Committee

20

21

22

23

24      LEGAL-EASE COURT REPORTING SERVICES, INC.
            17 Battery Place – Suite 1308
25          New York, New York 10004
                (800) 756-3410

2

```
 1

 2   A P P E A R A N C E S

 3   Gale Brewer
     Helen Foster
 4   Kendall Stewart
     Vincent Gentile
 5   Matthew Eugene
     Dennis Gallagher
 6   Annabel Palma
     Jessica Lappin
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P00968

3

1

2  A P P E A R A N C E S  (CONTINUED)

3  Public Advocate Betsy Gotbaum

4  Robert Doar
   Commissioner
5  NYC Human Resources Administration

6  Lin Saberski
   Deputy Commissioner of APS
7  NYC Human Resources Administration

8  Wana Ulysse
   Vice President of Political Action
9  Social Service Employees Union, Local 371

10 Faryce Moore
   Vice President
11 Social Service Employees Union, Local 371

12 Rachel Natelson
   Legal Advocate
13 Council of Senior Centers and Services

14 Kim Steinhagen, LMSW
   Director
15 The Geriatric Mental Health Alliance of New York

16 Rhonda Grand, MSW, LMSW
   Executive Director
17 Special Services for Senior Citizens

18 Judy Willig
   Executive Director
19 Heights and Hill Community Center

20 Judith Uman
   Director of Social Services
21 Bronx Jewish Community Council

22 Jane Greengold Stevens, Esq.
   Director, Special Litigation Unit
23 New York Legal Assistance Group

24 Arlene Markarian
   Chief of Elder Abuse Unit
25 Office of Brooklyn District Attorney Hynes

4

```
 1

 2   A P P E A R A N C E S  (CONTINUED)

 3
     Joseph Garber
 4   Corresponding Secretary
     Civil Service Merit Council
 5
     Howard Haskin
 6   Case Manager
     Special Services for Senior Citizens
 7
     Kathy Casey
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

1  AGING AND GENERAL WELFARE COMMITTEES

2              CHAIRPERSON DeBLASIO: Welcome to this

3  joint hearing of the General Welfare Committee and

4  the Committee on Aging is called to order.

5              I would like to thank everyone for

6  being here. It is always helpful to us to have a

7  full house of interested and concerned folks, and I

8  think it always sends a message to our friends in

9  the Administration that a lot of people care about

10 the subject matter at hand, so I want to thank

11 everyone for being here. And I would like to -- I

12 was going to introduce our colleagues, but they

13 seemed to have escaped. I know Council Member

14 Annabel Palma was here a moment ago, and she'll be

15 back, and Council Member Rosie Mendez was also here

16 a moment ago and will be back.

17             I'm going to just say a few opening

18 words and then turn to my colleague Chair Arroyo,

19 and we expect at some point soon to be joined by

20 Public Advocate Betsy Gotbaum, who will also have a

21 few things to say, and then of course, to hear the

22 testimony.

23             Today's topic is particularly

24 important because it is so little understood by the

25 general public. Adult Protective Services, I dare

6

```
 1  AGING AND GENERAL WELFARE COMMITTEES

 2  say, of the many services that HRA provides, may be

 3  one of the ones that gets the least attention, even

 4  though it plays a crucial role in the lives of very,

 5  very vulnerable people. And Adult Protective

 6  Services means so much to seniors in need, it means

 7  so much to people with disabilities in need, it is a

 8  crucial lifeline for thousands of New Yorkers.

 9              The concerns we want to talk about

10  today range from the numbers involved, meaning the

11  number of people receiving the service, which to

12  many of us looks surprisingly low, given the huge

13  number of New Yorkers with disabilities, and the

14  huge number of senior New Yorkers living alone and

15  facing many, many personal and economic challenges.

16              The way that we have organized this

17  agency over time, whether it is sensible for a

18  single agency to try and act both on the needs of

19  seniors and the needs of people who are not seniors

20  with the same methodology, the training of the

21  caseworkers, the equipping of the caseworkers, the

22  number of case workers, all of these issues are of

23  deep concern, and the culture of the agency, and

24  whether in fact this agency is trying to encourage

25  people to come in with their challenges and to work
```

7

1  AGING AND GENERAL WELFARE COMMITTEES

2  with them and to help them get benefits they

3  deserve, or whether in fact a number of people are

4  being turned away who could benefit from the

5  services.

6                This all occurs against the backdrop

7  of a City that is growing, and, in fact, a lot of

8  its growth is coming among seniors. And we have to

9  be cognizant about the fact that the population of

10  this country and the population of this City is

11  going to be increasingly senior over the coming

12  years, and APS will be put into a very crucial

13  position in our City government as that population

14  grows, but also the number of people with

15  disabilities that are so real and so severe that

16  they need help in many, many facets of their daily

17  life is much higher I think than any of us normally

18  recognize. And that population, too, needs to get

19  more help and support from APS, and that's a lot of

20  what we want to look at today.

21                A number of advocates have been

22  working over the years to try and bring attention to

23  APS, to try and make changes. Some have even had to

24  take legal action to get the attention and the

25  change necessary. But when it works, APS is in a

8

```
 1  AGING AND GENERAL WELFARE COMMITTEES
 2  position to have a tremendous impact on the lives of
 3  the people it touches, and one of the things I
 4  particularly appreciate as a huge multiplier effect
 5  is when APS can help a client to get Medicaid that
 6  they're not getting, or SSI or food stamps, that has
 7  a profound impact on their day-to-day life for
 8  months and years thereafter. And also, of course, I
 9  always say the taxpayer should thank any City
10  employee who helped someone get a benefit funded by
11  the federal or State government that that person is
12  eligible for, because they're helping that person
13  and their family, and they're also making sure we
14  get the support we deserve from other levels of
15  government, and ultimately reducing people's need to
16  take advantage of emergency services in the City.
17                We're going to hear from the Public
18  Advocate in a moment. She deserves tremendous credit
19  for having worked on this issue again, not a
20  front-page issue, but a crucially important issue,
21  and particularly looked at the issue of caseloads,
22  and the preparation of the folks who do the work
23  day-to-day, and we're very, very thankful that she
24  has created that focus on the issue.
25                And, of course, after we speak, we'll
```

9

1  AGING AND GENERAL WELFARE COMMITTEES

2  hear from Commissioner Doar. And I've said publicly,

3  I appreciate very much that Commissioner Doar is

4  consistently forthright and cooperative an open. I

5  never find him to be the kind of person who says a

6  problem isn't a problem, and I'm sure he will be

7  talking about some good news, I'm sure, about the

8  agency, including this budget about to be passed,

9  the fact that there is a commitment to more staff to

10 do the front line work, which is something we truly

11 appreciate.

12         So, I'm very, very gratified that

13 we're all here to begin more of a public debate on

14 this very important issue, and with that, I'd like

15 to turn to the very effective and very focused Chair

16 of our Committee on Aging, Maria Arroyo.

17         CHAIRPERSON ARROYO: Thank you, Mr.

18 Chair. The term I liked best was at the press

19 conference, you referred to me as "clever."

20         CHAIRPERSON DeBLASIO: It was true. I

21 sat in the Budget Negotiating Room with her for the

22 last two weeks, she is definitely clever.

23         CHAIRPERSON ARROYO: I always look

24 real smart and very efficient, only because of the

25 work that many of you in this room do, and whenever

1  AGING AND GENERAL WELFARE COMMITTEES

2  I get an opportunity to say thank you to all of you,

3  I do so very proudly and very loudly, without those

4  of you who advocate for those who we are entrusted

5  with protecting. We would not do and look as good as

6  we do publicly, so I want to thank you all for being

7  here again today to discuss a very important issue

8  that affects the seniors in our City, and that is

9  the services provided by Adult Protective Services.

10             And my approach is always one at

11  being part of the solution, not part of the problem,

12  and engaging in conversation and the discussion

13  about the issues, and in coming to a consensus on

14  how we can best address those issues.

15             I look forward to the testimony

16  today. I want to thank my Co-chair Council Member

17  DeBlasio, for agreeing to this joint hearing. And it

18  took us a couple of months to put it together

19  because of all the budget stuff that happens in

20  between, but with his leadership, and in partnership

21  with the General Welfare Committee, I believe that

22  we can make great strides in our partnership, and in

23  particular with the Public Advocate, Betsy Gotbaum,

24  whose report was what helped us focus our attention

25  around this issue.

1  AGING AND GENERAL WELFARE COMMITTEES

2           And many of you have always, and then

3  some of us in our individual offices have

4  experienced the shortcomings a system has, and have

5  been saying something needs to be done.

6           So, Public Advocate, thank you for

7  your work, and your leadership also. And certainly

8  to the agency and the new Commissioner, who I just

9  met and congratulated for his appointment, and

10  sometimes individuals take on these challenges and

11  you almost want to give them your condolences, as

12  well, but the work that lays ahead of us I know is

13  going to be a little difficult, but not something

14  that we cannot overcome, making a commitment to do

15  that work together. And as Chair of the Committee on

16  Aging, certainly you have my commitment to do that,

17  and where we can be helpful we set forward and take

18  the challenge to do that.

19           So, I wish you great success in your

20  position, and look forward to you single-handedly

21  solving the problems with Adult Protective Services.

22  And with that, I turn it back to my Chair.

23           CHAIRPERSON DeBLASIO: Thank you,

24  Chair Arroyo. I think it's excellent that you ended

25  on that point and now if Commissioner Doar doesn't

12
1  AGING AND GENERAL WELFARE COMMITTEES

2  say anything, we can hold him to that.

3            So, I'm glad that he is committed to

4  solving all the problems single-handedly.

5            Again, the Public Advocate has really

6  led the way on this, and we thank her. We now

7  welcome remarks from Betsy Gotbaum.

8            PUBLIC ADVOCATE GOTBAUM: Good

9  afternoon, Mr. Doar. Nice to see you. I, too, would

10 like to say how pleased I am the Commissioner has

11 taken on this extraordinary task, and I'm also

12 pleased to say that he came to my office and we had

13 a very good session and we talked about this

14 particular issue, so I'm looking forward to his

15 testimony.

16            I think as many of you in this room

17 know, this is an issue, a particular concern of

18 mine, and particularly because we know that this

19 population is going to increase by, I don't know,

20 many, many, many hundreds of thousands at some point

21 soon.

22            So, we need to get a handle on it

23 right now, and I think the Commissioner said he's

24 dedicated to doing this. I certainly am, and I know

25 most people in this room are, too.

13

```
1   AGING AND GENERAL WELFARE COMMITTEES

2                So, Commissioner Doar, thank you

3   again, for your optimistic suggestions about how we

4   can move forward.

5                CHAIRPERSON DeBLASIO: Thank you,

6   Public Advocate.

7                And, Commissioner, we always try and

8   open on a reasonably positive note, but you will

9   definitely hear in the questioning a number of very

10  deep concerns. So, I don't want our polite demeanor

11  to fool you. There are some things that we are

12  extremely concerned about, about this agency, but

13  obviously want to give you a chance to give your

14  version of what's going on.

15               Let me say, before you do, first of

16  all a programming note. A lot of you realize the

17  City budget will be voted tomorrow, and until the

18  ink is dry tomorrow there's still a lot of

19  individual details being sorted through.

20               So, Chair Arroyo and I and our

21  colleagues from time to time may be moving in and

22  out of the room because of issues that are coming up

23  in that process, and obviously some people have

24  other hearings they have to be at as well. So, just

25  no disrespect intended, it just tis the season.
```

14

1  AGING AND GENERAL WELFARE COMMITTEES

2              I want to welcome, again, Annabel

3  Palma. I welcomed her before, just left, walked out

4  of the room, but it's okay, I didn't take it

5  personal. Annabel Palma from the General Welfare

6  Committee, of course Gale Brewer from the General

7  Welfare Committee, and Aging, and Council Member

8  Vinnie Gentile, of the Aging Committee, welcome all.

9              I just want to also say, as Chair

10  Arroyo said, we depend so much on the work of the

11  folks who prepare us for these hearings. I want to

12  thank Molly Murphy and Freya Riel, of the General

13  Welfare Committee staff, and Aaron Feinstein and

14  Veronica McNeil of the Finance Division, and Chris

15  Sartori and Shauneequa Owusu of the Aging staff. We

16  thank you all for your energy and efforts to prepare

17  for today's hearing.

18              And now we welcome testimony of

19  Commissioner Doar.

20              COMMISSIONER DOAR: Thank you,

21  Chairperson DeBlasio. And good afternoon,

22  Chairperson Arroyo, Public Advocate Gotbaum and

23  members of the Aging and General Welfare Committees.

24              I am pleased to be here today to talk

25  with you about the Adult Protective Services

15

1  AGING AND GENERAL WELFARE COMMITTEES

2  Program. And also with me today is Lin Saberski,

3  Deputy Commissioner of APS, since 1998.

4               HRA has over a decade of experience

5  in helping families achieve self-sufficiency through

6  personal responsibility. This is an important ethic,

7  but for many elderly and disabled persons, we need

8  to recognize that this is frequently not attainable

9  and all of our support is needed so that the frail

10  elderly can safely remain in the community as

11  independently as possible.

12               APS cannot take on this

13  responsibility alone, but we are a critical

14  component of a broad network of service providers

15  that is likely to grow in the future.

16               Before I mention some of our

17  initiatives, I think it is important to first

18  recognize that with regard to the State and federal

19  governments, there is presently little directive or

20  financial support for this critical set of services.

21               There is no national strategy on the

22  prevention and prosecution of elder abuse that

23  supports the capacity and training needs of this

24  complex system. At the federal level there is a

25  total of $7 million available nationally in the

16

1  AGING AND GENERAL WELFARE COMMITTEES

2  Older Americans Act for Protective Services, which

3  is primarily used for media campaigns.

4                The federal funds we use from the

5  Social Services Block Grant compete against the

6  interests of 26 other allowable social services that

7  the State could choose to fund. We support efforts

8  to pass legislation that would create such a

9  structure, but even with the passage by Congress

10  there is no funding to implement the legislation and

11  its admirable goal of creating not only a dedicated

12  funding stream for APS, but technical assistance and

13  other support to state as well.

14                To further compound the lack of a

15  national strategy, although New York State has

16  steadily increased its support of APS through the

17  provision of additional training for staff, State

18  funding does not yet cover all of the training

19  provided for new caseworkers.

20                The current Adult Protective Services

21  caseload, including the 900 cases served by

22  contract, is approximately 7,220 individuals. This

23  is an increase of 68 percent since January 2002. The

24  total budget for Fiscal Year 2008 is 42.4 million,

25  which includes funding for 458 APS staff.

17

1  AGING AND GENERAL WELFARE COMMITTEES

2               APS provides services to adults who

3  need protection from themselves or others, due to

4  mental and physical impairments, and have no one to

5  responsibly assist them. A majority of APS clients

6  suffer from mental and physical illnesses, are

7  socially isolated and live in poverty, although we

8  do serve all income levels. Roughly 40 percent of

9  APS clients are under 60. This younger clients are

10  especially likely to suffer from severe mental

11  illness, abuse substances and aggressively resist

12  our assistance.

13               Further significant challenges arise

14  from the fact that 50 percent of clients accepted

15  for services are facing eviction when referred.

16               Clients are referred to us through

17  the Central Intake Unit, which is the first level of

18  screening. Referrals are accepted if, based on the

19  intake interview, the client appears to meet the APS

20  eligibility criteria. When Central Intake determines

21  that a client emergency exists, a visit will be made

22  as soon as possible, and no later than 24 hours

23  after referral. When necessary calls are routed by

24  Central Intake directly to 911. Non-emergency

25  referrals are visited within three working days from

18

1  AGING AND GENERAL WELFARE COMMITTEES

2  referral. Less than ten percent of APS clients seek

3  our services voluntarily. Family and friends, the

4  Housing Court, City Marshals, the New York City

5  Housing Authority, hospitals, home care and home

6  health care agencies and community-based

7  organizations, are the most frequent referrers. When

8  their interventions have reached the limit of the

9  voluntary services they offer, they turn to APS.

10                   After intake, clients are visited at

11  home by APS caseworkers who complete a full

12  assessment of mental, physical, social, and

13  environmental risks.

14                   To ensure that their information is

15  accurate and complete, they work with the referral

16  source, landlords, neighbors and family members. In

17  determining eligibility, APS must weight a client's

18  ability to protect themselves from harm against

19  their right to self-determination, which means

20  something different for each and every client.

21                   These decisions are particularly

22  difficult when referrals include allegations of

23  abuse, neglect or financial exploitation. The

24  allegations are very hard to substantiate, because

25  clients frequently deny them.

P00984

19

1   AGING AND GENERAL WELFARE COMMITTEES

2           Once a client is found eligible, the

3   first step in most cases is to request an evaluation

4   by an HRA Office of Health and Mental Health

5   psychiatrist to evaluate the extent of the mental

6   and/or physical impairments observed during the

7   assessment.

8           Our mandate in every case is to

9   utilize the least intrusive measures to enable each

10  eligible client to remain safely in the community

11  with the highest level of independence possible.

12          The starting point is always to seek

13  the client's cooperation in pursuing service plan

14  implementation, but this can be a lengthy process.

15          Although all APS clients are at risk,

16  in many cases the risk is not acute. Many are in a

17  downward spiral and will need to be persuaded over

18  time to accept our help. Absent client consent, we

19  have only a limited number of options available. We

20  can apply to become the representative payee for a

21  client's Social Security benefits, and then pay

22  their monthly expenses. For all other involuntary

23  services, APS works through the Court system. When

24  clients refuse to access to our caseworkers, we can

25  petition the Supreme Court for an Order to Gain

20

1  AGING AND GENERAL WELFARE COMMITTEES

2  Access, executed with the help of the police, an

3  agency psychiatrist, and a locksmith.

4            We also work with the Court system in

5  obtaining protection for the many clients facing

6  eviction by petitioning Housing Court for

7  appointment of Guardians ad Litem.

8            If all other interventions have been

9  unsuccessful, and a client lacks capacity to

10  appreciate the nature of the risks they are facing,

11  APS petitions the Supreme Court for appointment of a

12  Community Guardian.

13           The Community Guardian is then

14  charged with the responsibility to make decisions

15  regarding the client's personal and property

16  interests. APS has made increasing use of Community

17  Guardianship to assist clients lacking capacity who

18  are at risk of eviction.

19           In fact, in 2006, 40 percent of

20  Community Guardianship cases involved an eviction.

21           To give you a better sense of the

22  daily job of a caseworker on a given day, you will

23  find APS staff trying to convince a client whose

24  apartment is filled from floor to ceiling with

25  papers and debris to consent to a heavy duty

21

1    AGING AND GENERAL WELFARE COMMITTEES

2    cleaning; or persuading an elderly client with

3    Alzheimer's Disease to open the door so that

4    allegations of neglect can be investigated; or

5    explaining to a developmentally disabled 50 year old

6    whose life-long caretaker has just passed away that

7    they don't own their apartment and they will have to

8    relocate, because they can no longer afford the

9    rent.

10              These are just a few examples of

11   people in crisis for whom APS caseworkers attempt to

12   advocate, often facing uncooperative neighbors,

13   dangerous dogs, abandoned buildings, bedbug

14   infestation and threats from clients and abusers in

15   the process.

16              As our program has grown and matured,

17   we have learned through experience that our success

18   in resolving the risks faced by our clients comes

19   only with collaboration. Our Borough Offices meet

20   regularly with the New York City Housing Authority

21   social work staff to discuss shared clients.

22   Meetings are also held with Department for the Aging

23   service providers and their Elder Abuse contractors.

24   In addition, a written protocol is currently being

25   developed by our two agencies to jointly investigate

22

1  AGING AND GENERAL WELFARE COMMITTEES

2  abuse and neglect allegations. For close to a

3  decade, APS liaisons have been present in Housing

4  Court to assist with APS referrals. We also work

5  closely with the District Attorney's Offices, the

6  police, and the Department of Health and Mental

7  Health mobile Crisis Teams and intensive case

8  management services.

9              In addition, we regularly hold

10  meetings with community-based organizations.

11  Especially critical are the conversations with

12  hospital social workers to ensure discharge plans

13  are appropriate and safe for APS clients.

14              In looking to the future, there are

15  several key areas that I want to focus on, including

16  making sure we have enough staff to do the job, and

17  that they are well trained, that we maximize

18  resources and become as efficient as possible.

19              Following are some of the key

20  initiatives in these areas:

21              A necessary first step to ensure

22  adequate staffing is to ensure adequate staffing.

23  Fifty-two case workers, 32 that are newly created

24  staff positions, will complete their training at the

25  end of this month. We have also taken steps to

23

1  AGING AND GENERAL WELFARE COMMITTEES

2  ensure that hiring for APS takes place three times

3  annually, following immediately by training. This

4  will minimize lag time in filling vacancies and

5  enable new workers to become productive as soon as

6  possible.

7               Training has also been redesigned and

8  expanded to 30 days. We have incorporated many of

9  the State's core competencies into our curriculum,

10  and added location-based trainers who will provide

11  extra support to our newest members.

12               Finally, to better support Manhattan

13  staff and clients in the borough that has grown the

14  fastest over the last two years, we are dividing the

15  Manhattan Borough Office into two offices, each with

16  its own director.

17               Having the necessary staff on board

18  is only one part of the equation. Maximizing

19  efficiency is another. With State input and

20  approval, we have developed a special initiative

21  called the preventive service program to call for

22  stable clients. These individuals are visited

23  quarterly by our staff and by a designated contact

24  person from the community during the other months,

25  who is then called by APS for an update. Most also

24

1  AGING AND GENERAL WELFARE COMMITTEES

2  receive financial management and/or home care

3  services. With fewer visits needed, a caseworker can

4  manage a caseload of 55 preventive service clients.

5            Infrequently, when a client becomes

6  unstable, they then are reassigned to the regular

7  unit. The program started three years ago and now is

8  close to 600 clients.

9            Roughly one-third of referrals to ACS

10 come from the Department of Investigation, which has

11 oversight of the New York City Marshals. Marshals,

12 through DOI, refer when they are preparing to

13 execute a warrant of eviction, and believe, based on

14 information from landlords, that the individual may

15 be eligible for APS  services.

16           In December of last year, a pilot to

17 screen referrals from DOI at our Central Intake Unit

18 was initiated. This came in response to statistics

19 consistently reflecting that only ten percent of DOI

20 referrals were determined eligible after assessment.

21           Unlike other referrals to APS, these

22 had not been screened at CIU previously because the

23 information provided in the referrals was so

24 minimal, the screening was not feasible.

25           To support the pilot, the Housing

P00990

1  AGING AND GENERAL WELFARE COMMITTEES

2  Court has given APS access to their database, which

3  provides significant information about the legal

4  process facing these clients.

5            The pilot has just been completed.

6  And outcome data shows that 52 percent of DOI

7  referrals to Manhattan are being determined

8  ineligible at intake, based on the APS criteria,

9  saving valuable field time, enabling staff resources

10 to focus on eligible clients. This pilot will soon

11 be expanded Citywide.

12           Efficiencies have also been achieved

13 through the use of liaisons for services both inside

14 and outside HRA, to ensure that requests for

15 benefits and services are carefully tracked and

16 promptly addressed.

17           Liaisons are in place for home care,

18 Medicaid, rental assistance, as well as the District

19 Attorneys' Offices and the Guardians ad Litem.

20           We are also planning to use

21 specialized staff to monitor heavy-duty cleanings

22 and prepare the documents needed to apply for

23 services.

24           These changes will enable caseworkers

25 to spend more time actively assisting clients.

26

1  AGING AND GENERAL WELFARE COMMITTEES

2              Finally, protocols are under

3  development to expedite home care services for APS

4  clients on hospital discharge, to standardized

5  referrals to APS by home health care agencies, so

6  the replacement services can be arranged as soon as

7  possible, and to ensure that hospitals share medical

8  information with APS.

9              APS is constantly seeking to improve

10 service delivery and overall efficiency, and we have

11 been, and will continue to be open to suggestions

12 from others, including the Public Advocate, City

13 Council members, and the union. We believe that

14 there is more that could be done to assist in our

15 efforts and as part of our State Legislative Agenda,

16 we have requested the mandatory reporting of elder

17 abuse and establishment of a State Central Registry.

18              We are seeking to determine better

19 ways to identify mentally impaired, disabled elderly

20 persons at the beginning of eviction proceedings

21 rather than later in the process, and make sure that

22 they know about valuable rental assistance programs

23 that could help avoid eviction.

24              Also, we want to make sure that all

25 of our social services workers are safe and have put

27

1 AGING AND GENERAL WELFARE COMMITTEES

2 forward legislation that would make assaulting a

3 social service worker a felony.

4            In looking to the future, we know

5 that the City's population in general is growing,

6 and the elderly population is expected to increase

7 by almost 50 percent by 2030, the Baby Boomers age.

8            The APS population overall is

9 particularly affected by the high cost of housing in

10 New York, which adds another dimension to this

11 expected population surge.

12            The lack of solid framework and

13 supports at federal and State levels places the bulk

14 of responsibility with the protection of the APS

15 population on the City. This creates a challenge to

16 develop a model APS system now that will meet the

17 needs of our growing and increasingly complex

18 program.

19            This resulting system will need to be

20 a Citywide initiative, that draws upon and

21 strengthens the present collaborations between HRA

22 and other government agencies and the courts and our

23 non-profit provider community.

24            Thank you for your time, and I look

25 forward to your questions and guidance regarding

28

1   AGING AND GENERAL WELFARE COMMITTEES

2   this important program. And I very much appreciate

3   the fact that you have brought to attention the

4   seriousness of this important area.

5                    CHAIRPERSON DeBLASIO: Well, thank

6   you, Commissioner. And as usual, I appreciate that

7   your testimony is not suggesting that we're all

8   living in a rose garden here and everything is

9   perfect. We obviously have real challenges, and I

10  think we all find it easier to work with someone who

11  doesn't try and tell us that our concerns are

12  invalid or that we're seeing things, and so I can

13  see clearly in your testimony that you're

14  recognizing some substantial things that need to

15  change.

16                   Now, let me also note with

17  appreciation your openness to working with everyone

18  here, and as you say also the union. I do want to

19  just remind you when something doesn't involve you

20  but does involve a sister agency, of the unfortunate

21  situation recently with ACS trying to do a major

22  reorganization without having thorough discussions

23  with the union, which I thought was bad form, and it

24  proved to be agreed by all authorities involved that

25  it was bad form, and it was rolled back and started

29

1  AGING AND GENERAL WELFARE COMMITTEES

2  over, but more to the point, the point I made to

3  Commissioner Mattingly here in this room is, every

4  leader of an agency is sort of captain of the ship

5  and has the responsibility for the morale and the

6  sense among their team members that they're all part

7  of something important, and making changes and

8  making improvements that constantly involve the

9  ideas and the concerns of the people who do the work

10  I think is the way to go. And I think the absence of

11  that kind of input suggests to people that their

12  ideas don't matter and that doesn't create morale,

13  that doesn't create a better product for the people

14  we're trying to serve.

15            So, I'm glad that you're saying it

16  from the beginning, and I want to always encourage

17  you to work with the union and obviously to talk to

18  as many individual front-line workers as possible as

19  you make changes.

20            Commissioner, let me begin with a

21  couple of questions. I know my colleagues have a

22  number of questions, as well. But the one that jumps

23  off the page to me is, we had a figure on your

24  current caseload that was a little bit less, but you

25  note also that you included in your number, you have

30

1   AGING AND GENERAL WELFARE COMMITTEES

2   7,220 people, and that includes 900 cases served by

3   contract. I'm still astounded by this number, and I

4   appreciate -- let me just clarify, I don't want it

5   to be a high number, I'd like it to be zero. That's

6   not the real world we're living in with 8 million

7   plus people. So, I'm trying to start from the point

8   of reality, how many people need this service

9   validly who can help. And, again, as you pointed out

10  when you talked about the preventative element of

11  the work, every one we get to at the right time,

12  we're potentially in a position to really make a

13  profound impact and stop decline in their life or

14  stop negative things from happening, or stop

15  additional public services that have to be given

16  later and more intensely.

17          So, if we say that the whole concept

18  of APS is progressive and in many ways preventative

19  by nature, we would want to get to everyone who is

20  truly in need. I don't understand for the life of me

21  how in January 2002 it could only have been 4,000

22  people, or even today 7,200, it just doesn't stand

23  to reason to me that that could encompass all the

24  people under the categories we're talking about who

25  would have a need, unless we assume they're all

P00996

1  AGING AND GENERAL WELFARE COMMITTEES

2  being taken care of by someone else, and I just

3  can't see how that's numerically possible. Could you

4  speak to that?

5          COMMISSIONER DOAR: Well, I think that

6  part of that issue is that we're talking about folks

7  who first have to acknowledge or accept the

8  assistance we're trying to provide, and I think in

9  many, many cases we have very, very, very

10  independent proud people who may not on first

11  instances want to agree that they need the kind of

12  services that APS provides. I think that's a big

13  part of the ingredient.

14          Lin, do you want to add anything to

15  that?

16          DEPUTY COMMISSIONER SABERSKI: No, I

17  think that --

18          CHAIRPERSON DeBLASIO: Please

19  introduce yourself formally.

20          DEPUTY COMMISSIONER SABERSKI: Lin

21  Saberski, Deputy Commissioner of Adult Protective

22  Services.

23          I just want to echo what the

24  Commissioner said. I think that is correct. As he

25  stated in his testimony, the right to

32

1   AGING AND GENERAL WELFARE COMMITTEES

2   self-determination for adults is a very important

3   aspect of doing APS work. Unlike with children, you

4   can't just take adults and mandate that they do

5   something, unless there is a finding of a lack of

6   capacity by a court. So, it's a very high burden.

7               CHAIRPERSON DeBLASIO: And I

8   appreciate that's part of the problem. Again, even

9   with that very much respected as a factor, I still

10  can't believe that this is the actual number, and it

11  suggests to me that we are not getting to a lot of

12  people who truly could be helped, and it also

13  suggests to me that we're still turning down

14  referrals at a very high rate, maybe not

15  appropriately.

16              So, I guess what I'd like to know, as

17  you've looked at the agency, I know you've looked

18  over all of HRA, as you've come in, but how certain

19  are you that the acceptance rate reflects the

20  appropriate numbers and how certain are you that

21  people are being turned down for the right reasons?

22              COMMISSIONER DOAR: I think it's

23  something that I definitely want to constantly

24  monitor and look at. I think the extent to which we

25  were having to deal with referrals, to a large

P00998

33

1   AGING AND GENERAL WELFARE COMMITTEES

2   extent due to the eviction, the previous DOI

3   process, were taking up a lot of time and effort for

4   cases that were clearly not eligible. I hope that

5   will allow us to take a better, closer and more

6   accurate review of the cases that are going to be

7   determined eligible.

8              You know, I took a very close look at

9   the Public Advocate, as she mentioned, at her

10  report, and the issue of failing to accept people

11  that were truly eligible did not come up there, but

12  it's something we have to constantly look at.

13             And we're not, you know, there are

14  lots of services available to senior citizens, or

15  folks who are frail and elderly that are not quite

16  APS, so it's not like we're the only game in town, I

17  think everyone acknowledges that, for helping people

18  who are older and in need of services. So, the

19  number is small, but we're dealing with the most

20  acute cases. The DFTA numbers, the numbers of people

21  that are going to senior centers, those are larger.

22  I think it's important not to confuse these two

23  groups of potential clients of government services.

24             CHAIRPERSON DeBLASIO: I guess I'm

25  going to dwell on this one more moment and then I

34

1  AGING AND GENERAL WELFARE COMMITTEES

2  want to talk to you about --

3           COMMISSIONER DOAR: Can I just say one

4  more thing to you? I'm sorry.

5           CHAIRPERSON DeBLASIO: Yes, I'm sorry.

6           COMMISSIONER DOAR: I don't want to

7  disregard your question. We don't want to turn away

8  people that shouldn't get APS services. And, so, we

9  are cognizant of that issue, because that would be a

10 serious matter.

11          CHAIRPERSON DeBLASIO: And in the

12 statistics you give on the DOI referrals, and other

13 statistics for the rate of acceptance of cases being

14 somewhere around 40 percent of the number referred,

15 clearly, this is not a dynamic where it is likely if

16 your case gets referred that you are going to end up

17 getting services from APS. I'm not value judging.

18 I'm just saying as a factual matter there is

19 evidence here that you're not likely to have that

20 follow-through. And that begins to make me wonder,

21 is it chicken or egg here, because the reality is,

22 and we're looking across the whole work of social

23 services that we do here in the City, there is a lot

24 of reasons a lot of people are not getting benefits.

25 We've talked about it with food stamps, we've talked

1  AGING AND GENERAL WELFARE COMMITTEES

2  about it with the WeCare Program, and some of it is

3  absolutely the choice of the potential clients. No

4  one should ever ignore that fact, and some of it is

5  just basic communication issues, whether because of

6  different languages or just because people don't get

7  the full story about what might be available to

8  them.

9            But at the same time, the rapid

10  growth in a number of people on food stamps is a

11  testament to the fact that if we change some of our

12  approach, we can often reach people in a different

13  way.

14            You and I have talked about with the

15  WeCare Program, for example, when I don't think any

16  of us is satisfied that we're reaching enough people

17  there, in terms of SSI and employment opportunities,

18  but I look now in this are, and I see such a small

19  number of New Yorkers, and I particularly wonder

20  about the people who might be eligible for SSI,

21  Medicaid and food stamps, and I feel like we're

22  really missing an incredible opportunity here.

23            So, I guess I just want your sense of

24  how are you studying what happens if fewer than half

25  the cases get accepted? What are we learning about

1   AGING AND GENERAL WELFARE COMMITTEES

2   why that's happening, and what are we learning about

3   the people who need the help, but for whatever

4   reason, aren't coming to APS or aren't getting

5   referred to APS; what are we doing to understand the

6   universe of people in need who could benefit from

7   APS?

8                    COMMISSIONER DOAR: Lin wants to

9   answer on the question of percentage accepted and

10  referral.

11                   DEPUTY COMMISSIONER SABERSKI: One

12  important point is to look at, you know, there are

13  two stages, the central intake point and then in the

14  borough offices. At central intake, we accept

15  roughly 87 percent of the referrals, because we have

16  to err on the side of caution if there is any chance

17  that a person might be eligible, we must accept at

18  intake. So, part of the reason for the lower

19  percentage rate in the borough offices that we

20  over-accept at intake, and that's a very high accept

21  rate.

22                   And we do monitor the accept rate

23  internally. We do regular reviews, and what we have

24  found is that by and large we are finding that these

25  decisions are sound, that the documentation that

37

1  AGING AND GENERAL WELFARE COMMITTEES

2  supports them is in the record, and that the clients

3  that we are rejecting don't meet eligibility

4  criteria. It's a regular review that we do because

5  this is the most important indicator, beyond making

6  timely visits for people first referred, is making

7  sure that you don't turn away people who should be

8  accepted.

9           CHAIRPERSON DeBLASIO: Well, 87

10  percent, if I heard you correctly, that is a

11  provisional acceptance because --

12           DEPUTY COMMISSIONER SABERSKI:

13  Correct.

14           CHAIRPERSON DeBLASIO: Because you

15  give them the benefit.

16           DEPUTY COMMISSIONER SABERSKI: Right.

17           CHAIRPERSON DeBLASIO: That does not

18  really reflect what the numbers look like after

19  you've fully looked at each case.

20           DEPUTY COMMISSIONER SABERSKI: Right.

21           CHAIRPERSON DeBLASIO: And I'm not

22  even saying the whole discussion should be is it

23  right or wrong that your acceptance level is what it

24  is of the cases that have been presented to you. I'm

25  also asking, are we even dealing with the right

38

1  AGING AND GENERAL WELFARE COMMITTEES

2  universe? Because there is no question in the other

3  examples I used, which is not about your part of the

4  agency, but the Commissioner certainly understands

5  both of them, there is a large universe of people

6  who are not getting a service they are eligible for.

7  We found ways, in one case, to profoundly change

8  those numbers for the better, in another case we're

9  still working on it, and I'm wondering about the

10  universe here. And also, bluntly, and there is a lot

11  of people in this room who know a lot more about

12  this than I, I think a lot of them have made clear

13  to my staff that the agency does not have a

14  particularly good reputation among the people it's

15  serving. And that's not a reflection on you or the

16  front-line workers. I think a lot of people are

17  doing good work, but I think, and I'd love you to

18  speak to it, because, again, sometimes there may be

19  a bad reputation for objective reasons, like, you

20  know, you're trying to deal with very sensitive

21  personal dynamics.

22              But I guess what I'm hearing as a lot

23  of evidence and a lot of indicators, that a lot of

24  people who need it are either not hearing about it,

25  not getting referred to it, not getting accepted,

P01004

39

1 AGING AND GENERAL WELFARE COMMITTEES

2 not getting the kind of experience that would

3 encourage people to come in. And I think there is a

4 great value policy-wise in getting people in the

5 door, particularly for the part of your services

6 that has to do with getting the benefits that they

7 may rightfully have coming to them. So, could you

8 speak to that?

9          COMMISSIONER DOAR: Well, I would like

10 to say one thing, Council Member, is that we'll

11 monitor and listen carefully to the testimony and

12 continue to take input, and listen and be responsive

13 to issues or concerns or facts that are brought to

14 our attention by a variety of others on this issue.

15          The only thing I want to point out is

16 that it's very possible that folks who we're talking

17 about who were not accepted for APS, are also

18 receiving these other benefits that you mention,

19 whether it's Medicare or Home Care or SSI. So, APS

20 is not the gateway to the rest, sometimes we're the

21 last stop after these other forms of services have

22 turned out not to be sufficiently helpful to the

23 client. I just want to make that point.

24          CHAIRPERSON DeBLASIO: No, that's very

25 fair. And I always stand by the fact that, and you

P01005

40

1  AGING AND GENERAL WELFARE COMMITTEES

2  have I have respectfully debated this point, whether

3  it's 200, 300, 400, 500,000 people who should be on

4  food stamps, and numerically, factually qualify and

5  aren't on food stamps. There's plenty to go around,

6  so my suspicion is both points are true, that some

7  people are not getting APS services but do have

8  benefits, might need other elements of what to do,

9  and other people I bet truly would need those

10 benefits, and you would be the best place for that

11 to happen.

12            But I'm looking for your holistic

13 answer. Neither one of you has said everything is

14 perfect. But I also don't hear you speaking to sort

15 of the recent history and the culture of the

16 institution and the fact that the numbers have been

17 surprisingly low over time and what do we need to do

18 more fundamentally to -- I almost feel like to

19 reintroduce the services to the people who could

20 benefit, because I'm sure you're not telling me

21 there are, you know, plenty of New Yorkers with lots

22 of support and lots of family members helping out.

23 I'm sure you would agree there is unfortunately more

24 and more people for whom the family ties are falling

25 apart and they're ending up on their own in all the

P01006

41

1  AGING AND GENERAL WELFARE COMMITTEES

2  age categories.

3              COMMISSIONER DOAR: I want to look at

4  it very carefully, but I do want -- I think we're

5  going to come back to the issue of personal

6  decision-making process by folks who feel they don't

7  necessarily need the kind of services that APS

8  provides.

9              It's not like food stamps or other

10  kinds of programs that are given in a way that

11  allows folks to take advantage, but doesn't

12  necessarily come with restrictions on spending

13  habits or behavior, or people coming into their

14  homes.

15              So, I will look at it. I will

16  definitely look at it, but we do, I think on a daily

17  basis, HRA workers are dealing with people who are

18  in need of help but don't necessarily want to admit

19  they need all the help that APS provides.

20              CHAIRPERSON DeBLASIO: You're too

21  decent a person to badger, but Commissioner, page

22  three of your testimony, do you believe that there

23  are only 7,220 individuals in New York City who

24  rightfully need the services your agency provide and

25  who fit the criteria for receiving those services?

1  AGING AND GENERAL WELFARE COMMITTEES

2           COMMISSIONER DOAR: No. I don't know

3  that certainly on any given -- I don't know what the

4  number is. I want to go look at this issue and look

5  at that.

6           That's what I want to do. I want to

7  listen to what is said today, I want to continue to

8  receive information, I want to talk to Lin and HRA

9  staff. But you know, it's very possible that the

10 agency could be constrained by State, local, federal

11 laws about what we can force upon people that don't

12 want to admit that they are not capable of caring

13 for themselves.

14          CHAIRPERSON DeBLASIO: And I respect

15 that. I appreciate that your answer began with a no.

16 Because I think it stands to reason that that could

17 not possibly be the number. What I would ask of you

18 is two things; one, to help us over time, and I know

19 you are a research-minded person, and that you look

20 at empirical evidence, and we need that, we all need

21 to do that --

22          COMMISSIONER DOAR: Yes.

23          CHAIRPERSON DeBLASIO: To look at what

24 the actual number might be of those who literally

25 fit your definitions of being eligible for the

43

1  AGING AND GENERAL WELFARE COMMITTEES

2  services, and then to do what I think is the smart

3  policy thing for all of us to do, to work backwards

4  and say, what new approaches can we take to make

5  people more willing to engage?

6            We all understand there is a certain

7  number of people in all endeavors of social service

8  who will never engage. We've got that. But, you

9  know, is it, how we're approaching people, is it the

10 number of caseworkers, the training of caseworkers,

11 the way we relate to community organizations, are we

12 doing everything we can to make the services

13 understandable, positive, accessible, to find ways

14 to dispel whatever myths or misunderstandings, to

15 work with people who might be able to intervene in

16 individual cases, to open the mind of the individual

17 involved to taking the services? Are we doing that?

18            And I'm coming from the position, not

19 that you need a whole lot of more business and we're

20 all here to generate a bigger social service

21 apparatus, I come from the position that when you

22 engage the individual, you are not only positively

23 affecting their life, but you're ultimately going to

24 get ahead of problems and do something that's in the

25 taxpayers interests.

P01009

44

1  AGING AND GENERAL WELFARE COMMITTEES

2           COMMISSIONER DOAR: And I think, I

3  should have mentioned that there is a bigger

4  discussion going on with the State and the City,

5  which the City is very much involved in, involving

6  long-term care point of entry, that Deputy Mayor

7  Gibbs is very focused on as well, that looks at the

8  whole array of services that might be available to

9  seniors, short of APS, that may ought to be,

10 certainly ought to be evaluated in a way that gives

11 people a better sense of everything that's available

12 to them, and that might include a case management

13 type of approach that's short of APS case

14 management.

15          So, maybe that's what we're talking

16 by each other, because --

17          CHAIRPERSON DeBLASIO: No, I think

18 that's perfectly valid. And no one is wedded to

19 people getting what they need in one location in

20 another. I think we're all open to whatever gets the

21 job done. But I think bluntly, and you'll hear it

22 from a lot of people in this room, I don't even

23 think we feel like we're at the launching point for

24 getting the job done, because there is not even an

25 understanding of the population we're trying to help

P01010

45

1  AGING AND GENERAL WELFARE COMMITTEES

2  and understanding why we're reaching so few people.

3           So, by no means are we saying APS is

4  the only solution. I think we'd all like to start

5  with a common language of what the problem is and

6  what to do.

7           Before turning to Chair Arroyo, I

8  just want to welcome Council Member Jessica Lappin,

9  and Council Member and Dr. Matthew Eugene, and now

10  Chair Maria Arroyo.

11           CHAIRPERSON ARROYO: Thank you, Mr.

12  Chair. And I'm not going to badger at all.

13           Two things jump out at me, and I'll

14  focus on that and then leave room for my colleagues

15  to ask questions, because I know that there is a

16  lot.

17           First, in terms of eligibility or the

18  cases that are deemed not eligible, you indicate

19  that ten percent of the cases that are referred by

20  -- I lost my page here-- DOI are determined

21  ineligible at intake, 52 percent are deemed

22  ineligible at intake, it seems to me that maybe we

23  don't have an understanding of what it is that makes

24  an individual eligible. And if we're receiving

25  referrals from DFTA from DOI, from landlords, who

P01011

46

1  AGING AND GENERAL WELFARE COMMITTEES

2  are not social workers, who are not individuals who

3  have a full understanding of what APS services are

4  supposed to provide, then what can we do to better

5  prepare those that are making these referrals to

6  understand what inappropriate referrals is to begin

7  with.

8           Because I think if on the front end

9  we have a better understanding of what we can expect

10  APS to provide, then we can find other means and/or

11  resources to get services to seniors. And it seems

12  throughout eligibility and ineligible individuals

13  becomes a problem. The Public Advocate's report

14  points to the number of individuals that are deemed

15  ineligible, and what are the reasons that make them

16  ineligible.

17           And for us, on the ground level

18  providing services for the advocates, for the

19  service providers, for the individuals that are

20  making these referrals, maybe we need to spend some

21  time helping them understand what makes an

22  individual eligible for the service.

23           COMMISSIONER DOAR: I agree with that.

24           Lin, just give a sense of the kind of

25  cases that are referred, or had been referred in the

P01012

1  AGING AND GENERAL WELFARE COMMITTEES

2  past from the Marshals on eviction that are

3  determined ineligible.

4          DEPUTY COMMISSIONER SABERSKI: Right.

5  The DOI Marshals, when they refer to APS, are

6  getting their information secondhand from landlords

7  who are also getting it secondhand, probably haven't

8  seen this person, so it's very, very general. They

9  will make a referral that says the person receives

10  SSI, or that the person appears elderly. So, that's

11  the reason for the ten percent rejection rate. These

12  are generally speaking not APS-type clients, but

13  these landlords are mandated to notify the Marshal

14  if anyone appears that they might need special

15  assistance before the eviction is carried out.

16          So, they're doing what they're

17  supposed to do, and that's why we have instituted

18  the screening on our part with the help of Housing

19  Court to do a little better what we're doing on the

20  intake.

21          One of the legislative pieces that is

22  pending is to help identify to the Housing Court

23  more quickly, you know, sooner in the process of the

24  litigation, who needs special assistance and might

25  be eligible for APS, because that's where the

48

1  AGING AND GENERAL WELFARE COMMITTEES

2  referrals should come, is at the very start of the

3  Housing Court proceeding, and not after a warrant of

4  eviction issues. So, the legislation is attempting

5  to address that issue.

6           CHAIRPERSON ARROYO: And on the second

7  point is, in your testimony you referred to the

8  State and Federal leadership and support for APS,

9  and there are issues there. What is the agency

10  doing, or the City doing, what do we need to do to

11  help bridge whatever gap seems to exist?

12           COMMISSIONER DOAR: Well, think about

13  it from a perspective of someone who has been

14  involved in lots of social service programs, the

15  Child Support Enforcement Program or the Cash

16  Assistance Welfare Program, or the Medicaid Program

17  or the Food Stamp Program, each one of those have

18  very elaborate structures in the State and Federal

19  governments that provide funding, guidance,

20  leadership, set rules and regulations, they are not

21  always successfully acknowledged, sometimes the

22  guidance we get isn't always the right one, but

23  there is a very intense involvement of the three

24  governmental partners. Here APS at the local level,

25  whether it's in New York City or Chitaqua County, is

P01014

49

1  AGING AND GENERAL WELFARE COMMITTEES

2  pretty much all by itself. There is no State

3  Director of APS, as far as I mean someone who is

4  really focused on it and has a lot of funding

5  available, or at the federal level.

6              So, my view is that that is a really

7  big issue that I look for your help and support in

8  trying to get a greater recognition of this issue at

9  higher government levels.

10             CHAIRPERSON ARROYO: Okay.

11             Madam Public Advocate.

12             PUBLIC ADVOCATE GOTBAUM: Yes, just to

13  continue on that line, the fact that there is only

14  $7 million available; is that correct, in the

15  federal government, for the entire country?

16             DEPUTY COMMISSIONER SABERSKI: Yes.

17             PUBLIC ADVOCATE GOTBAUM: Well, we

18  certainly commit ourselves to helping you do

19  anything about that disgraceful number, because

20  clearly it's completely inadequate.

21             A couple of things that I wanted to

22  ask, I noticed in your testimony, you said that 40

23  percent of the people served by ACS are people under

24  60. And I think we discussed this, Commissioner,

25  when you and I talked, but I just wanted to ask you

50

1  AGING AND GENERAL WELFARE COMMITTEES

2  a couple of questions.

3                Is there any way that that population

4  is, or can be separated from the elderly population,

5  in terms of caseworkers who work for them, the

6  training those caseworkers have? It seems to be

7  different populations there, that have very

8  different needs and very different kinds of case

9  work.

10               COMMISSIONER DOAR: I think it's

11  something worth considering. There is no question

12  that different clients have different needs and

13  different services need to be provided to them,

14  depending on kind of where they fall in the

15  capability spectrum.

16               I'm not sure that an age distinction

17  necessarily is the right one. I think what Lin has

18  done is move toward breaking the caseload into

19  critical or acute and folks who can use, not have

20  quite the kind of intensive oversight in an effort

21  to achieve the proper care for the person. That is

22  the way I think we should go as this caseload grows,

23  but I don't disagree that because of the age

24  difference, maybe that's another way of doing it

25  that might be just as effective. I want to look at

1  AGING AND GENERAL WELFARE COMMITTEES

2  that.

3                PUBLIC ADVOCATE GOTBAUM: And is there

4  a differentiation in the training of the

5  caseworkers? I guess everybody pretty much get the

6  same training?

7                DEPUTY COMMISSIONER SABERSKI: There

8  is no differentiation in terms of who gets trained

9  on what, but we do certainly address special issues

10  that relate to aging, like Alzheimer's Disease, and

11  we'll also look at special skills for engaging

12  resistant clients, which applies more to the younger

13  clients than the elderly.

14                PUBLIC ADVOCATE GOTBAUM: I see.

15                I was very pleased to see that you

16  saw the increase in cases in the Borough of

17  Manhattan, that you increased your attention there,

18  and I think that's a good positive step.

19                How are we doing on getting laptops

20  and blackberries and cell phones? And I think, even

21  though we're talking about getting rid of cars,

22  certainly for those caseworkers that have to go

23  inter-borough, or have to go distances, is there any

24  attempt to do that?

25                COMMISSIONER DOAR: Well, let me start

P01017

52

1   AGING AND GENERAL WELFARE COMMITTEES

2   with phones. Lin has brought this to my attention,

3   and you did in your report, and we're addressing

4   that. We are going to make sure that APS caseworkers

5   have the ability to communicate using a phone, a

6   City-issued phone, should they want one. And not

7   shared. So, we're addressing that.

8              Laptops is a more complicated issue,

9   and I think, Lin, you want to address laptops?

10             DEPUTY COMMISSIONER SABERSKI: Yes.

11             COMMISSIONER DOAR: And cars as well

12  is another subject matter.

13             But I want to say that from my

14  perspective, it's those sort of things that are

15  symptomatic of the fact that APS is located in a

16  large agency which has other big demands on it, and

17  sometimes the demands of a very important and

18  crucial and essential service, but smaller, based on

19  the caseload, doesn't get the attention it deserves,

20  and I'm trying to bring that attention to it.

21             Lin, you want to mention that?

22             DEPUTY COMMISSIONER SABERSKI: You had

23  asked about laptops. Our IT team is working now on a

24  new system for APS. They're going to build it from

25  scratch, and one of the issues that we're analyzing

53

1    AGING AND GENERAL WELFARE COMMITTEES

2    in that context is these probably have something

3    like hand-held devices. Laptops I think would

4    probably be a little more intrusive than we like for

5    the clients.

6              PUBLIC ADVOCATE GOTBAUM: Whatever you

7    do is fine with me.

8              DEPUTY COMMISSIONER SABERSKI: We are

9    looking at whether handhelds would work, and it's a

10   good idea.

11             PUBLIC ADVOCATE GOTBAUM: And I think,

12   Commissioner, we appreciate that comment, and it's

13   just for that reason that we are so passionate and

14   committed to helping you, keeping on your case about

15   making sure that this small, and it is a very small

16   population, which as we've all noted is going to get

17   bigger and bigger.

18             I was particularly interested that

19   you said your PSP Program on page eight -- can you

20   describe that a little bit more? That seems to be

21   answering a bit of the question -- it seems to be

22   answering the question that Council Member DeBlasio

23   had that how are we trying to keep those people from

24   getting into the APS system in the first instance,

25   but also making sure that those who may be coming

P01019

54

1   AGING AND GENERAL WELFARE COMMITTEES

2   eligible get that.

3           DEPUTY COMMISSIONER SABERSKI: Right.

4   The PSP program is designed for people who come into

5   APS with risk, they're facing risks when they come

6   in, they're not stable, but through various services

7   that we offer, we are able to alleviate the risks.

8   For example, someone might come in facing eviction.

9   What we would do is assuming they could pay the rent

10  going forward, apply for a back-rent grant, pay the

11  rent that's owing, apply for financial management

12  going forward, so we get their social security

13  benefit, and we pay their rent, we pay their other

14  monthly expenses going forward.

15          If they remain stable for six months,

16  it has to be a minimum six months before we consider

17  a transfer to that program, we'll move them to a PSP

18  unit. So, they've come in with a risk, we've

19  resolved the risk, we've watched the person, they're

20  not declining, they're stable, they're probably

21  getting financial management, they may also be

22  getting home care. Most of the PSP clients are

23  getting one or both of those services, and then

24  they'll remain pretty indefinitely with APS so that

25  we can continue to provide those services.

P01020

1    AGING AND GENERAL WELFARE COMMITTEES

2              PUBLIC ADVOCATE GOTBAUM: It seems to

3    me that that is a very good program, and in a way of

4    perhaps ultimately saving some money, so if there is

5    some way we can try to persuade the State or Federal

6    Government, this would be a very positive way,

7    efficient way of saving money and perhaps helping a

8    population, and I would personally be very

9    interested in helping you.

10             Just one last question. I was very

11   interested to see that you mentioned specialized

12   staff be monitoring the cleaning of apartments. That

13   was also, for those of you who don't know, a

14   particular issue of mine, that wasting caseworkers'

15   time, sitting around the apartment.

16             COMMISSIONER DOAR: Good point.

17             PUBLIC ADVOCATE GOTBAUM: So, thank

18   you for mentioning it. But can you elaborate a

19   little bit on that, please?

20             COMMISSIONER DOAR: Well, the concern

21   is, is that when it's necessary to do a full-fledged

22   cleaning of an apartment or a residence where an APS

23   client resides, that caseworkers who have a

24   sufficient level, a significant level of training,

25   and ability, and other cases to be concerned about,

P01021

1  AGING AND GENERAL WELFARE COMMITTEES

2  are required, I think for good reasons, to be there

3  while the cleaning is taking place. They have

4  developed a relationship with the client, and the

5  client maybe feels more comfortable in having them

6  there while the cleaning takes place.

7            But it's a lot of time. And it's a

8  lot of time that could be used otherwise. So, we are

9  going to identify staff resources that are not quite

10 at the caseworker status that could serve that role.

11           I don't think we want to not have

12 someone there while the cleaning is taking place,

13 although  -- I don't think we should do that. So,

14 we're going to do this other, which I think should

15 relieve the caseworker.

16           PUBLIC ADVOCATE GOTBAUM: Good. Thank

17 you.

18           Thank you. I'm finished.

19           CHAIRPERSON ARROYO: We have a couple

20 of members that have joined us. Council Member Helen

21 Foster from the Bronx, who is both a member of the

22 Aging and the General Welfare Committee. Council

23 Member Kendall Stewart, who is a member of the

24 Committee on Aging, and I wanted to ask, something

25 occurred to me as you were describing the services

57

1  AGING AND GENERAL WELFARE COMMITTEES

2  of financial management, that you take over the

3  payment of this individual's rent. Do we know how

4  many individuals' income just don't cover the rent

5  and that is the reason why they are facing eviction?

6              How many individuals come to APS with

7  the financial resources that are just not, does not

8  allow them to meet their living need?

9              DEPUTY COMMISSIONER SABERSKI: We

10 don't have a number for that. It does happen. What

11 we do in the first instance in those cases is we do

12 look to see if we can find any family that is

13 willing to contribute and do a third party

14 arrangement. And I mean, there are situations where

15 we do, somebody is going to have to move, it does

16 happen. There isn't a resource that we have

17 available to pay ongoing stipends for rent. I mean,

18 we'll take advantage of SCRIE and DRIE for the

19 elderly or disabled to reduce their rent increases,

20 but the situation is typically where they were

21 sharing the cost of the apartment with someone who

22 passed away and there just isn't the money there.

23             CHAIRPERSON ARROYO: Okay, I don't

24 want to tie us up in a conversation at this hearing,

25 but certainly if you can provide us with that

58

1   AGING AND GENERAL WELFARE COMMITTEES

2   information, the numbers, because I think that begs

3   a different question, separate and apart from the

4   services APS can provide, and certainly this hearing

5   is not the place to have that discussion, but it

6   raises a great deal of concern for me, in terms of

7   what happens then for this individual who is

8   probably just not able to because they don't have

9   the resources, not because they're not able to

10  manage their finances.

11              Council Member Brewer has a few

12  questions.

13              COUNCIL MEMBER BREWER: Thank you very

14  much. First of all, I owe you a phone call,

15  Commissioner, I'm mortified.

16              Number two, Deborah Holtenigh

17  (phonetic) is terrific. I just want to say that. She

18  helps us all the time as your Manhattan Director.

19  And then my next question is, just picking up on the

20  Public Advocate, I think because of the real estate

21  market, we have a huge number of hoarders and I know

22  you talked about lots more cleaning, but is there

23  any kind of special task force? This is more than

24  just cleaning. It's an ongoing process. It stays

25  clean for awhile and then it goes back to what it

P01024

59

1  AGING AND GENERAL WELFARE COMMITTEES

2  was. I'm a hoarder, so I know. Everybody knows I'm a

3  hoarder.

4            My question is, it is heavily the

5  real estate market at least in Manhattan, because

6  for years we were able to conceal ourselves, and now

7  because of the pressure of landlords wanting to get

8  people out, there's a reason that landlords use to

9  do that.

10           So, we obviously want to keep people

11  in their apartment and I know in my wonderful office

12  was Alva Rodriguez and Anne Cunningham and others

13  were often doing the cleaning ourselves.

14           So, what are you going to do about

15  the hoarder situation?

16           DEPUTY COMMISSIONER SABERSKI: I mean,

17  I think you're correct, hoarding is a particularly

18  difficult situation for us to handle for anybody to

19  address, because with our clients, you know, it is

20  reflective of an illness.

21           COUNCIL MEMBER BREWER: Oliver

22  Koppell, he said he's a hoarder, too.

23           Go ahead. I'm joking. I'm just

24  letting you know. I'm joking, but it's very serious.

25  I'm having fun with it, but I'm serious.

60

1  AGING AND GENERAL WELFARE COMMITTEES

2            DEPUTY COMMISSIONER SABERSKI: I was

3  very careful to say with our clients.

4            COUNCIL MEMBER BREWER: Yes.

5            DEPUTY COMMISSIONER SABERSKI: But we

6  do provide special training on hoarding. There are

7  special symposiums offered, which our staff attend.

8  And this could be one of the types of cases as we

9  look into where we might need specialized units to

10  address special issues, this would be something that

11  would probably be a good candidate to look at within

12  that context, because it really does take special

13  skills, and it's an intensive process. It's not just

14  straightforward case management.

15            PUBLIC ADVOCATE GOTBAUM: You give us

16  the address and time of that training, we'll make

17  sure the Councilwoman gets it.

18            COUNCIL MEMBER BREWER: I know some

19  clients graduate from APS under the assumption that

20  they no longer need it, but many come back to our

21  office for more help. How do you determine when a

22  case is no longer applicable, and can they come back

23  for help?

24            DEPUTY COMMISSIONER SABERSKI: Yes.

25  There is no limit on reapplying for assistance. You

P01026

61

1   AGING AND GENERAL WELFARE COMMITTEES

2   know, we try to apply the eligibility criteria as

3   uniformly as possible. It's very subjective,

4   obviously, whether someone is at risk, has the

5   capacity to address the risk, but there is no time

6   line, there is no limit on being rereferred by

7   someone else or referring yourself.

8               COUNCIL MEMBER BREWER: I know you've

9   been working with the Housing Court sharing

10  databases and so on, which is really helpful. I was

11  just wondering what percentage of your caseload is

12  eviction cases, and I assume, but I don't know for

13  sure, that that number is growing. And I just was

14  wondering, again, the specific resources you have to

15  deal with clients at risk of eviction, how many

16  housing specialists? You know, how do you work with

17  this very challenging, trying to keep people in

18  their apartments, and unfortunately you have a lot

19  of real estate situations going against you.

20              DEPUTY COMMISSIONER SABERSKI: Roughly

21  one-third of the referrals come from DOI the

22  Marshals. Those are all eviction. And if you look at

23  the under care caseload, which is those cases that

24  have been accepted, a full 50 percent of the active

25  under care caseload of accepted clients had eviction

62

1   AGING AND GENERAL WELFARE COMMITTEES

2   units when they were -- sorry, eviction issues when

3   they were referred.

4              Most of the evictions are

5   non-payment. That's overwhelming majority of

6   evictions. And, so, the application through HRA for

7   back rent grant, we've done already over 1,000 this

8   fiscal year. We're very successful with the back

9   rent grants and financial management going forward,

10  and the Guardians ad Litem. Those three services are

11  the most frequent that we will implement when a

12  client is facing eviction.

13             COUNCIL MEMBER BREWER: Do you have

14  some sense and numbers as to how many of the clients

15  were able to stay in their housing, how many had to

16  find alternative, how many ended up getting evicted,

17  or do you have those numbers?

18             DEPUTY COMMISSIONER SABERSKI: Right

19  now we don't have those numbers. Those are the first

20  numbers I want to get into the new system as we

21  bring it on line, because they are critical. You're

22  absolutely right.

23             COUNCIL MEMBER BREWER: And do you

24  also know, sometimes the same thing with Con Ed, we

25  do get a lot of people complaining that the Con Ed

P01028

1  AGING AND GENERAL WELFARE COMMITTEES

2  is being shut off and there is a challenge there

3  also; do you have those numbers?

4              DEPUTY COMMISSIONER SABERSKI: No. We

5  don't have those numbers. As long as we know that a

6  cutoff is threatened, we can address that. The

7  problem is that these notices very often go to the

8  clients. We visit once a month in most cases, and so

9  if they got a notice and didn't tell us, we don't

10  know, because this might be someone whose money

11  we're not managing. But if we are paying the

12  financial management, there shouldn't be any issues

13  with the cutoff.

14              COUNCIL MEMBER BREWER: Okay. The

15  other thing I had mentioned earlier was the concept

16  of coordination with other agencies; how do you do

17  that?

18              I mean, I know NYCHA makes us a

19  little upset because people who are living in our

20  wonderful developments, they are paying a certain

21  percentage of income, they're constantly, NYCHA,

22  sending eviction notices to your clients. So, I'm

23  wondering, do you coordinate?

24              DEPUTY COMMISSIONER SABERSKI: We do.

25  We actually send NYCHA every month a list of clients

64

1  AGING AND GENERAL WELFARE COMMITTEES

2  who are receiving financial management services

3  through APS, and they have agreed not to send

4  eviction notices to those clients.

5            COUNCIL MEMBER BREWER: When did they

6  agree to that?

7            DEPUTY COMMISSIONER SABERSKI: Several

8  years ago.

9            COUNCIL MEMBER BREWER: Something

10  happened. Do you, like, share databases or

11  something?

12            DEPUTY COMMISSIONER SABERSKI: Yes, we

13  do. We send them a list.

14            COUNCIL MEMBER BREWER: Could we pull

15  that database? Could we like -- that's not working.

16            DEPUTY COMMISSIONER SABERSKI: Okay.

17  We're meeting with them next month, so we will take

18  that back.

19            COUNCIL MEMBER BREWER: Commissioner,

20  I mean --

21            COMMISSIONER DOAR: I got it. I got

22  it. I'm on it.

23            COUNCIL MEMBER BREWER: Okay. And then

24  how do you -- I won't get into it anymore. How do

25  you work with community-based organizations? Is

P01030

1  AGING AND GENERAL WELFARE COMMITTEES

2  there a book? Is there like a case book of

3  community-based organizations that could be helpful?

4  Because sometimes these CBOs could really work with

5  your clients.

6              DEPUTY COMMISSIONER SABERSKI: We

7  welcome that. We have a community resource guy that

8  we developed in 2005, and also a housing resource

9  guide, and we try to keep them both as up-to-date as

10  possible.

11              COUNCIL MEMBER BREWER: So, they're

12  like guide books. And they could be on line if you

13  did like a tablet or something like that. I'm for

14  the laptops either, they're too heavy. Something

15  that could have that info.

16              DEPUTY COMMISSIONER SABERSKI: Right.

17  That's the way it will be --

18              COUNCIL MEMBER BREWER: Paul Cospeth

19  (phonetic) can do that for you.

20              All right, thank you very much.

21              CHAIRPERSON DeBLASIO: Thank you,

22  Council member.

23              Now we have a question from Council

24  Member Stewart.

25              COUNCIL MEMBER STEWART: Thank you,

66

1  AGING AND GENERAL WELFARE COMMITTEES

2  Mr. Chair.

3              Commissioner, I wanted to find out if

4  you do coordinate with SSI Administration, in terms

5  of what you're doing for seniors? Because I found

6  that something is -- I'll give an example. A senior

7  was given an opportunity to go to stay at a relative

8  in another State for two months, all expenses paid,

9  and when the Administration knows about that, they

10 then made an adjustment as to whatever allowance

11 they get from Social Security office, and that means

12 now that there is a reduction in the allowance and

13 they can't meet their payments.

14             You just mentioned awhile ago that

15 you may assist in rent. Do you coordinate that with

16 Social Security so that at least they know, and

17 they're not going to be deducting from that

18 allowance that they give to the client? Do you

19 understand what I'm saying?

20             DEPUTY COMMISSIONER SABERSKI: I'm not

21 100 percent clear.

22             COUNCIL MEMBER STEWART: All right.

23 Some clients, they get Social Security from the

24 Administration, and if they're given -- every so

25 often they have to be interviewed, and asked if they

P01032

67

1   AGING AND GENERAL WELFARE COMMITTEES

2   got anything from a relative or anything from

3   anybody, and if they do and they admit to that,

4   there is an adjustment. I'm saying is there a

5   regular coordination?

6               COMMISSIONER DOAR: Is there any

7   sharing of information automatically.

8               COUNCIL MEMBER STEWART: Right.

9               DEPUTY COMMISSIONER SABERSKI: No.

10              COUNCIL MEMBER STEWART: There is no

11  sharing of information?

12              COMMISSIONER DOAR: Not from APS.

13              COUNCIL MEMBER STEWART: It does mean

14  now that I think there should be sharing of

15  information, because sometimes the client goes in

16  for a face-to-face with this Administration, and

17  they ask these questions, where were you? Did you

18  travel? Sometimes they get a trip from a cousin or a

19  nephew to the Caribbean, you have to bring in that

20  travel voucher to show what monies were spent, and

21  they calculate the time they spent overseas or

22  wherever, as long as they're not in the State, and

23  that is being calculated and that has to be repaid.

24  So, I'm trying to figure out, how do you handle a

25  situation like that?

68

1  AGING AND GENERAL WELFARE COMMITTEES

2           COMMISSIONER DOAR: Well, we do have a

3  broader relationship with SSA that goes far beyond

4  APS, in the fact that we, in the welfare world, for

5  instance, many folks who are disabled or have a

6  disability issue apply for SSI benefits for

7  disability. And we have periodic meetings with them,

8  and I would be happy to talk to them, and talk to

9  you some other time about this particular issue so

10  that we can try to find a way to protect people from

11  unnecessary interruptions of their benefits. In the

12  case of APS, it's certainly not because we're

13  disclosing to SSA information about clients'

14  benefits.

15           COUNCIL MEMBER STEWART: Right. That

16  goes without saying. If you also ask, or made a

17  statement that said you try to see if you can get

18  relatives who might be able to help, and sometimes a

19  relative is reluctant to disclose that information

20  or even deal with that, because if the SSA knows

21  about that, they then make a readjustment in terms

22  of their calculations also. So, I just want you to

23  be aware of that.

24           COMMISSIONER DOAR: Okay. Okay. That's

25  a fair point.

69

1  AGING AND GENERAL WELFARE COMMITTEES

2           COUNCIL MEMBER STEWART: I don't know

3  if this question was asked before, but what are the

4  current qualifications for newly hired caseworkers?

5           COMMISSIONER DOAR: It was not asked.

6           And do you want to answer that?

7           DEPUTY COMMISSIONER SABERSKI: For

8  Adult Protective Services, we require a college

9  education, which is a basic case worker requirement.

10  But in addition, we require credits or experience in

11  a related field. So, we do have additional

12  qualifications, required on top of the generic

13  caseworker requirements for the City --

14           COUNCIL MEMBER STEWART: When you say

15  a college education, you know, that's kind of broad.

16  Is it kind of an Associate Degree, Bachelor's

17  Degree, Master's Degree? What is it?

18           DEPUTY COMMISSIONER SABERSKI: A

19  Bachelor's Degree.

20           COUNCIL MEMBER STEWART: A Bachelor's

21  Degree in social work? In what field?

22           DEPUTY COMMISSIONER SABERSKI: A

23  Bachelor's Degree can be in any field. But what we

24  do require is 24 credits that are in a related

25  field. Twenty-four of the credits in a related field

70

1   AGING AND GENERAL WELFARE COMMITTEES

2   or 12 in one discipline. Twelve of those in one

3   discipline.

4               COUNCIL MEMBER STEWART: And if one is

5   hired with a Bachelor's Degree, and may not have met

6   all those credits, you have some type of training

7   that they go through to deal with a case?

8               In other words, what I'm saying,

9   there are a lot of folks with a Bachelor's Degree,

10  they may have a Bachelor's Degree in Mathematics,

11  but that doesn't mean that you qualify to deal with

12  seniors.

13              DEPUTY COMMISSIONER SABERSKI: Right.

14  I mean, anyone who meets the basic criteria for the

15  caseworker position, we provide additional training

16  once we hire them.

17              COUNCIL MEMBER STEWART: In terms of

18  the paperwork, I don't know if this was answered,

19  what, if anything, are you doing to reduce paperwork

20  that the caseworker has to go through?

21              DEPUTY COMMISSIONER SABERSKI: What

22  we've done already is, the automated system that we

23  have in place now has what we call "e-forms" as part

24  of it, so that all the forms can be generated

25  directly from your own PC at your desk, and the

71

1  AGING AND GENERAL WELFARE COMMITTEES

2  parts that relate to the client you're working on,

3  your name, address, all the repetitive information,

4  is put in automatically, so you don't have to repeat

5  that.

6           We're also looking at having some of

7  the community associates who we expect to be doing

8  the heavy duty cleanings, to do more of the filling

9  out of applications and documents that are necessary

10  to apply for services, because I don't think we need

11  caseworkers to be doing all of that.

12           COUNCIL MEMBER STEWART: In other

13  words, you're saying all the information that one

14  would need to handle a case would have been there,

15  that client would have gone for let's say food

16  stamps, or any other of the social services that we

17  provide?

18           DEPUTY COMMISSIONER SABERSKI: The

19  forms that we have on line are the specific APS

20  forms, for example, on line for a Guardian ad Litem

21  or Community Guardian, for food stamps we have to

22  use the same forms that everybody else uses.

23           COUNCIL MEMBER STEWART: All right.

24  Thank you.

25           Thank you, Mr. Chair.

P01037

72

1  AGING AND GENERAL WELFARE COMMITTEES

2              CHAIRPERSON DeBLASIO: Thank you,

3  Council Member.

4              Now we have questions from Council

5  Member Helen Foster.

6              COUNCIL MEMBER FOSTER: Thank you.

7  Good afternoon.

8              What I was sitting here thinking of

9  is, especially when Council Member Brewer was

10  talking, is what we can do to be proactive so that

11  we can maybe identify signs. Like, you know, I think

12  I'm not a hoarder because I have two parents that

13  are a hoarder. They've lived in the same house for

14  40 something years. Like my dad, he still has the

15  suit he marched in from Sellman and Montgomery, and

16  probably can fit it, which is a whole 'nother story.

17  But what can we do, or is there an in-service or a

18  reaching out that you can do to community-based

19  organizations?

20              Churches. I know that, especially in

21  the black community, if seniors go nowhere, they're

22  going to church, and that is kind of the first mark.

23  You know, the church ladies will know if someone

24  looks a little off, or if anything like that.

25              For example, I have a Senior Council

P01038

1  AGING AND GENERAL WELFARE COMMITTEES

2  meeting monthly in my office. These are most likely

3  the seniors that won't need your service but know

4  others that may. So, is there a type of in-service

5  at what to look for? How to potentially address

6  hoarding issues before it gets, you know, too bad?

7  COMMISSIONER DOAR: Well, I want to

8  say to Lin and say to you that I think we have some

9  materials that are available, but I don't know that

10  we get out from behind our desks at HRA at the

11  senior level and go out and talk to community groups

12  and Council Member staff about what we have

13  available, and I don't know it's as well known as it

14  should be, or these very, you know, they're not

15  elementary issues. They're complicated, and I'm

16  going to direct Lin and her staff to be more

17  outgoing in that regard, both with themselves and

18  with material we can put on the Internet and on the

19  website. But with regard to the specific issue about

20  hoarding, I'm going to have to ask Lin to answer if

21  we've got any specific material.

22  DEPUTY COMMISSIONER SABERSKI: As I

23  said, the training does include issues about

24  hoarding, and we recently had one of the community

25  service providers approach us and ask if they could

74

1  AGING AND GENERAL WELFARE COMMITTEES

2  present material about hoarding, because they

3  specialize in that issue, and we've agreed to do

4  that. So, we're hoping to do that in all of our

5  borough offices very soon.

6              So, we're very open always to offers

7  with people from specialized knowledge and areas

8  like that. And we do frequently go, you know,

9  whenever somebody, a community-based organization

10 asks APS, one of our borough offices, to come and

11 make a presentation to their staff, we're more than

12 happy to do that. If someone asks to come in and

13 present to our staff, we do that as well.

14             COUNCIL MEMBER FOSTER: I just think

15 that it's an opportunity to get the information kind

16 of at the source, be it in senior meetings, or,

17 again, the churches are big in terms of seniors,

18 that that type of information, and I don't know that

19 people know to ask for it, to say, hey, why don't we

20 do this, and I just think if we can start making

21 people more aware at the earliest level, that

22 hopefully by the time, hopefully it won't get to

23 you, but if it does, then we have people that kind

24 of can see the signs and can do it and do it early

25 on.

P01040

75

1    AGING AND GENERAL WELFARE COMMITTEES

2              COMMISSIONER DOAR: It's a good idea.

3              COUNCIL MEMBER FOSTER: Thank you.

4              CHAIRPERSON DeBLASIO: Thank you.

5              I want to take you back through a

6    couple of other issues, and then Chair Arroyo might

7    have some concluding questions, or the Public

8    Advocate. Let me raise one other statistic which I

9    think frames the extent of the problem, because

10   we've talked about this question of what is the real

11   universe of people we should be reaching. We got our

12   statistics from the Council of Senior Centers and

13   Senior Services of New York City earlier, and tell

14   me if you agree with this statistic. Thirty-one

15   percent of older men and 45 percent of older women

16   live alone in New York City. So, I find that a

17   really striking statistic in terms of the potential

18   need and potential universe, 31 percent of older

19   men, 45 percent of older women.

20             And also that New York City's elderly

21   poverty rate is approximately 20 percent, is double

22   the national average of approximately ten percent.

23   So, I just want to put the first thing first, that

24   putting those two statistics together suggests a

25   substantial group of people in need. Do you in any

P01041

76

1    AGING AND GENERAL WELFARE COMMITTEES

2    way disagree with those statistics?

3              COMMISSIONER DOAR: I don't question

4    those statistics. I don't have any comment on either

5    one of them. I believe they are both correct, but I

6    don't know, and I acknowledge the point you're

7    making, and I think you know also that I think those

8    services may not -- that those folks need are

9    broader than necessarily APS.

10             CHAIRPERSON DeBLASIO: Right.

11             COMMISSIONER DOAR: But we're on the

12   same page.

13             CHAIRPERSON DeBLASIO: No, I just

14   wanted to put that out there.

15             Now, from your testimony, page six, I

16   really want to thank you, because I think your very

17   compassionate description of what your staff deals

18   with, you point out the apartment filled from floor

19   to ceiling, or someone with Alzheimer's Disease that

20   you have to try and reason with, or telling someone

21   that their caretaker has passed away, these are

22   extremely difficult circumstances. Talk to me about

23   what you think the current morale is, the level of

24   morale among the workers who do this difficult work.

25             COMMISSIONER DOAR: Well, here is what

77

1  AGING AND GENERAL WELFARE COMMITTEES

2  I know: the new class of APS workers who are going

3  through training, I went up to speak to them, on I

4  think their fourth day or early in the training, and

5  was at APS and went around and talked to folks. I

6  think that the -- I don't want to sugarcoat it, I

7  think they appreciated me coming and I think they

8  sense possibly that there are opportunities for

9  change and greater attention, but this is a hard

10  job, and these are difficult challenges. So, I think

11  it's -- I want to say that it's improving, but we

12  need to keep working on it, and we need to keep

13  reminding them and each other of the very, very

14  important work that they do for the City of New

15  York, and for people who are really in need, and how

16  greatly we appreciate it.

17          CHAIRPERSON DeBLASIO: And I assume,

18  we're just going to interpret your remarks to say

19  there are morale challenges, and they're very

20  objective, based on the kind of work, and I would

21  assume none of these workers is being luxuriently

22  paid or given lots of perks, so, talk to me about

23  the current attrition level.

24          COMMISSIONER DOAR: Lin briefed me

25  before this, I think she said it was ten percent a

P01043

78

1  AGING AND GENERAL WELFARE COMMITTEES

2  year.

3              DEPUTY COMMISSIONER SABERSKI: Right.

4              CHAIRPERSON DeBLASIO: Do you consider

5  that high? Do you consider that normal for social

6  services? What do you think of that?

7              COMMISSIONER DOAR: I want to go talk

8  to the people in Personnel at HRA and compare it to

9  the rest of HRA, but it's possible that it's higher

10  than the rest of HRA. I would bet it is.

11              CHAIRPERSON DeBLASIO: And, again, we

12  are thankful to you and to the Mayor that there is

13  additional money for caseworkers in the budget, but

14  is it in fact just allowing us to keep up with

15  attrition, or are we making any net gain there?

16              COMMISSIONER DOAR: I think there is a

17  gain, and I think we will begin to bring it down,

18  the caseworker to client ratio down to the ratios

19  where they should be. So, I think it is a net gain.

20  But, you know, we have to keep monitoring and

21  watching and balancing our resources appropriately

22  to where the need is greatest.

23              CHAIRPERSON DeBLASIO: The total

24  number of caseworkers again, roughly?

25              DEPUTY COMMISSIONER SABERSKI:

79

1    AGING AND GENERAL WELFARE COMMITTEES

2    Two-hundred and sixteen plus 32.

3              CHAIRPERSON DeBLASIO: Almost 250. And

4    the total number of new hires?

5              DEPUTY COMMISSIONER SABERSKI:

6    Thirty-two.

7              CHAIRPERSON DeBLASIO: Thirty-two. So,

8    it's a little more than ten percent, but my point

9    being, even though obviously new hires mean more

10   work, more service, obviously new hires also have a

11   learning curve and a time to really acclimate. I'm

12   assuming if you're essentially just replacing those

13   lines that are open, and at any given point, you

14   know, the reality is there is still ten percent

15   that's not filled at any given point, you're making

16   a type of progress but you're not making profound

17   progress. I'm not saying that to belittle the

18   achievement, I'm saying a managerial point that

19   obviously, we would like to reduce that attrition

20   level while simultaneously benefitting from the

21   additional personnel and hopefully having them stay

22   a long time so that that accumulated experience will

23   mean something.

24             COMMISSIONER DOAR: I agree.

25             CHAIRPERSON DeBLASIO: I wanted to

P01045

80

1   AGING AND GENERAL WELFARE COMMITTEES

2   just ask you again, on the numbers of cases, just a

3   couple of questions. Could you give us any numbers

4   around how many cases are initially denied and then

5   later accepted, when another referral is made or a

6   different referral is made?

7              DEPUTY COMMISSIONER SABERSKI: I don't

8   have recent numbers on that. We did do that analysis

9   several years ago, and it was very small at that

10  time.

11             CHAIRPERSON DeBLASIO: So, relatively

12  few get accepted on a later referral?

13             DEPUTY COMMISSIONER SABERSKI:

14  Correct.

15             CHAIRPERSON DeBLASIO: Okay.

16             DEPUTY COMMISSIONER SABERSKI: It's

17  not unusual to have a case rereferred, but it's

18  usually the same decision is reached the second

19  time.

20             CHAIRPERSON DeBLASIO: Okay. And,

21  again, that would give me a little pause, in light

22  of the overall low numbers. And in general, as you

23  look at your number of acceptances, versus your

24  number of denials, you know, any analysis of what is

25  constituting the reason for denials, breakouts of

81

1  AGING AND GENERAL WELFARE COMMITTEES

2  what types of cases are more readily accepted, which

3  are more readily denied? That would be very helpful

4  for us to see, unless you have some of those

5  statistics now.

6              Okay, and, again, Commissioner,

7  you've been very good about getting back to us. We

8  always do send our letters to help jog that process

9  along, but we would appreciate responses as quickly

10 as possible.

11             And then you talked very honestly

12 earlier about one of the profound problems you face

13 of people who do not want the service at the outset,

14 and turn it down. What about the number of people

15 who start down the road and then turn down your

16 services at some point along the way; is that a

17 significant trend?

18             DEPUTY COMMISSIONER SABERSKI: No,

19 it's usually right at the outset.

20             CHAIRPERSON DeBLASIO: All right. So,

21 then what would be helpful for us to know is the

22 percentage of cases that either are never opened or,

23 you know, quickly closed, because of client refusal

24 as opposed to other factors?

25             In other words, if the figures I

1  AGING AND GENERAL WELFARE COMMITTEES

2  roughly heard earlier were roughly correct, 40

3  percent of cases were being accepted, you know, of

4  the 60 percent that were not, how much of that was

5  because a client refused as opposed to other

6  factors.

7           Okay, now, I just want to give you a

8  little variety here. So, back on the issue of

9  cleaning, which was talked about earlier by one of

10  my colleagues. One of the things we've heard, is

11  that there is a real sort of cost benefit analysis

12  problem of case workers having to be present for the

13  cleaning process which can be very time consuming

14  and not necessarily great for people to be exposed

15  to all of the  chemicals and all that go into the

16  cleaning process on a regular basis, but really to

17  the point of you don't have enough people and

18  they're trying to do a lot of work and it's

19  difficult, is there potentially a different or

20  better way to handle the cleaning in terms of

21  whether the personnel has to be present, whether

22  some other personnel could be present for that,

23  rather than caseworkers? And tell me if I'm

24  understanding the current protocol appropriately.

25           COMMISSIONER DOAR: Well, I think I

P01048

1  AGING AND GENERAL WELFARE COMMITTEES

2  mentioned earlier that we are intent on making it so

3  that caseworkers don't have to be present at the

4  cleaning.

5           CHAIRPERSON DeBLASIO: Okay. I'm sorry

6  if I missed that.

7           So, you're saying that you will, on a

8  policy level, disconnect those two pieces?

9           COMMISSIONER DOAR: It is our

10  intention to do that, and we will make that happen.

11  There will be an HRA employee present at the

12  cleaning.

13          CHAIRPERSON DeBLASIO: Right.

14          COMMISSIONER DOAR: But it may not be

15  a caseworker.

16          CHAIRPERSON DeBLASIO: Excellent. That

17  is good news.

18          Okay, now, just I think you've made

19  clear that you wanted, and let me just go a little

20  bit back over something, just make sure I got it

21  right, you're clear the number of folks you're

22  bringing in now, the new hires, we've talked about

23  the attrition rate, we've talked about wanting to

24  bring caseloads down, do you -- just to clarify, do

25  you have a goal, a caseload goal, and obviously in

84

1  AGING AND GENERAL WELFARE COMMITTEES

2  the case of ACS recently we spent a lot of time

3  talking about a goal and talk about how to get to

4  it, and we understand that is often an elusive, an

5  elusive effort to get the caseload where you want on

6  a consistent basis, but I just want to understand

7  what your goal is.

8            COMMISSIONER DOAR: Well, I think it

9  depends on the type of case. I think in the

10  testimony I gave, we talked about the cases that are

11  less acute, this kind of case that doesn't require

12  the intensive services, the caseload, the caseworker

13  to case ratio is about 55. For the typical or the

14  traditional case, more acute issues, I think that

15  the goal that the State has set, it's not us, it's

16  25. So, that's the ball park of the two different

17  kinds of cases. And then we have to, it seems to me,

18  report to you and the to the public on where we are

19  on both kinds of cases.

20            CHAIRPERSON DeBLASIO: So, your goal

21  on the more difficult cases is the 25 to one, which

22  is the State and I think the national standard. Are

23  you saying that's really the goal you're trying to

24  reach?

25            COMMISSIONER DOAR: That's the goal,

P01050

85

1  AGING AND GENERAL WELFARE COMMITTEES

2  the framework they expect us to be striving for.

3               CHAIRPERSON DeBLASIO: Do you have a

4  sense of what the realistic time line to get to

5  that? Or a goal for that?

6               COMMISSIONER DOAR: I want to get back

7  to you on that, because I want to see exactly the

8  casework. I want to be sure I'm right before I tell

9  you that.

10              CHAIRPERSON DeBLASIO: I appreciate

11  that. The Public Advocate's report was only a few

12  months back. I do want to note that in the cases,

13  you looked at it borough-by-borough, and the highest

14  individual caseload, which I know can be an

15  aberration, but I also think it tells us something,

16  you know, in the case, the highest in the Bronx was

17  81, the highest in Manhattan was 77, the highest in

18  Queens was 69, you know, it seems to me that we're

19  probably substantially off the mark. I think it's

20  crucial to define the goal and the time line. I

21  think that's the only way to get action. So, I would

22  imagine few things are more damaging to morale and

23  efficiency than more than a higher caseload.

24              Bear with me a moment. And then I

25  know you've talked some about training and we've

1  AGING AND GENERAL WELFARE COMMITTEES

2  talked some about training. I want to just focus on

3  one piece of training that is sort of the safety and

4  security of the folks who do the work. Again, in

5  ACS's case, we've talked about this a lot. I think

6  it's time to talk about it with APS as well.

7            The Public Advocate's Report pointed

8  out a case of a client who told the worker, when

9  confronted by the worker, that the client said she

10  had a loaded gun in the apartment, and the worker

11  was not clear what to do in that situation. How much

12  of the training is focused on, you know, basics of

13  safety and security and what to do in potentially

14  dangerous situations?

15            DEPUTY COMMISSIONER SABERSKI: We

16  actually added into 2005 a special segment of the

17  training called "Worker Safety," and we work with

18  HRA Security to provide that. So, it's very

19  important.

20            CHAIRPERSON DeBLASIO: And what, in a

21  nutshell what are people told to do if there is a

22  case where they feel they are in immediate danger?

23            DEPUTY COMMISSIONER SABERSKI: There

24  are two options. Depending on the level of danger

25  that they feel, they should either ask for a

87

1  AGING AND GENERAL WELFARE COMMITTEES

2  supervisor or another caseworker to go with them, or

3  they should ask for the police to accompany them.

4  And if there is any report of a loaded gun in the

5  apartment, the instruction is to call the police

6  immediately.

7              CHAIRPERSON DeBLASIO: To leave the

8  scene and call the police? Or call from the place?

9              DEPUTY COMMISSIONER SABERSKI: It

10 depends on what's happening.

11             CHAIRPERSON DeBLASIO: And, again, we

12 asked a lot of these questions in the difficult

13 months after the Nixzmary Brown case, and found in

14 the case the ACS worker, that even though there was

15 a theoretical willingness to bringing another

16 caseworker along or to having the police escort, the

17 reality was it was very difficult to make that

18 happen, functionally speaking.

19             Do you have a sense of how easy or

20 hard it is for someone, if they feel the need for

21 that support, to actually get someone to work with

22 them on that?

23             DEPUTY COMMISSIONER SABERSKI: I think

24 we are successful with that by and large.

25             CHAIRPERSON DeBLASIO: Is it simply,

88

1   AGING AND GENERAL WELFARE COMMITTEES

2   do they go to their supervisor and ask for back-up?

3   Or how does it work?

4            DEPUTY COMMISSIONER SABERSKI: You

5   know, I would have to check with the individual

6   offices to find out exactly how they do it in each

7   case, but I know that, at earlier points in my

8   tenure, this was an issue that came to my attention

9   frequently, and it is not coming to my attention

10  now. So, I think one of the things we found was that

11  working with the crime prevention officers in the

12  precincts is very helpful, that they're really

13  oriented to exactly that kind of situation.

14           CHAIRPERSON DeBLASIO: Okay. I have

15  one more question. Again, I'm not sure if Chair

16  Arroyo, or the Public Advocate has a question. I

17  know Gale Brewer does have a couple of questions. My

18  last one is really about creating accountability

19  systems. And I think, again, your testimony

20  certainly represented a great clear interest and

21  more accountability, but you know, I remember before

22  the police had Compstat, I remember what those days

23  were like, and I remember how profoundly Compstat

24  has helped them. I'm very hopeful about ChildStat

25  over at ACS. Are you going to borrow that type of

89

1  AGING AND GENERAL WELFARE COMMITTEES

2  idea in some fashion for tracking cases going

3  forward?

4           COMMISSIONER DOAR: I believe it's

5  part of the planning for the system redesign that

6  APS is undertaking, and certainly something that I

7  found to be very useful in parts of HRA. So, it

8  would be something that I would like to --

9           CHAIRPERSON DeBLASIO: Something that

10  I know you, unlike say the ACS Commissioner have a

11  particularly diverse set of pieces within your

12  agency that you have to balance, but is that the

13  kind of thing that you from time to time would

14  personally sit in on to get a sense of what is

15  working and what's not?

16          COMMISSIONER DOAR: Yes. Yes. Yes.

17          CHAIRPERSON DeBLASIO: Excellent.

18          Okay, I'm now going to give right of

19  first refusal to Chair Arroyo. Any further

20  questions?

21          CHAIRPERSON ARROYO: Yes.

22          CHAIRPERSON DeBLASIO: Yes. Chair

23  Arroyo.

24          CHAIRPERSON ARROYO: We're going to

25  continue to badger. Two subjects. One around staff

P01055

1 AGING AND GENERAL WELFARE COMMITTEES

2 training and the other around language capabilities.

3 The training you mentioned has been changed and

4 extended to a 30-day training. Is the same level of

5 training provided to caseworkers and assessment

6 workers? What are the qualifications for the

7 different titles? And what incentives does the

8 agency have for professional development of

9 individuals who may want to go back to school to

10 further their education? How many MSWs do you have

11 on staff? One of the things that, from the Committee

12 on Aging we tried to work on this year into the

13 budget was a scholarship for MSW students that

14 specialize in gerontology, or those who are Spanish

15 speaking, in order to get the workforce more

16 culturally appropriate to those that they serve.

17 What, if anything, around professional development,

18 besides the on-the-job training that you provide?

19             DEPUTY COMMISSIONER SABERSKI: The

20 assessment workers are our caseworkers. They work in

21 different types of unit but just to clarify what may

22 have been --

23             CHAIRPERSON ARROYO: They're not

24 different titles?

25             DEPUTY COMMISSIONER SABERSKI: They're

91

1  AGING AND GENERAL WELFARE COMMITTEES

2  not different titles, right. It's a functional

3  difference, but it's all civil service caseworker

4  title. And we actually got, working with Fordham

5  University several years ago, a grant from the

6  Hartford Foundation that funds credits towards a

7  master's degree in a related field, and it's for

8  APS, home care, and I think the AIDS Services

9  Program are all eligible. It's small but it's a

10  start, and we are also starting up this fall an

11  internship program to bring social work interns into

12  APS.

13            CHAIRPERSON ARROYO: Okay. I think we

14  need to have more conversation around this issue.

15  Certainly we ran into a technical problem with

16  regard to the Initiative that we wanted to get into

17  the budget this year, because scholarships are

18  considered payouts and there is some kind of

19  mechanism or restriction on the use of tax levy

20  dollars for that. But I'm sure that through the

21  agency there is a mechanism in place to be able to

22  get those that are already working in the system to

23  further their professional careers, it is something

24  that we have a responsibility to do.  I think

25  workplace or morale in the workplace, professional

92

1  AGING AND GENERAL WELFARE COMMITTEES

2  development and the ability for individuals to

3  further their education is certainly one of the

4  factors that contribute to good employee morale. And

5  we have a pool of individuals who certainly are

6  deserving of consideration and some assistance from

7  wherever we can make it happen in order for them to

8  continue their education so that we can have a

9  better trained workforce on all levels.

10            Now, on the issue of language, do we

11  know what percentage of the clients don't speak

12  English and what translation services are provided,

13  or how many staff members are able to handle the

14  language needs of the clients?

15            DEPUTY COMMISSIONER SABERSKI: I don't

16  have a number for you but we do have an HRA

17  translation service that is available to us, and in

18  a very broad wide range of languages. So, when we

19  need that for clients, either on the phone or in the

20  field, we are able to access it.

21            We give preference in hiring to

22  people who speak Spanish and Russian, because those

23  are the two major languages that we encounter in the

24  field.

25            CHAIRPERSON ARROYO: Okay. Now, on the

1  AGING AND GENERAL WELFARE COMMITTEES

2  collaboration with CBOs and the others that are

3  involved in the lives of the individuals that come

4  to APS, what kind of connection is there between the

5  caseworker and a CBO that may be making a referral?

6  Is there a requirement for the caseworker to get

7  back to the CBO with status and/or outcomes of a

8  particular case? Do they have a guidebook or

9  something they can use? One of the complaints is

10  that the referrals are made and then they kind of,

11  they get lost. We don't find out what happens to the

12  client after the referral is made.

13          DEPUTY COMMISSIONER SABERSKI: It is a

14  requirement for the caseworker to contact the

15  referral source. Ideally, they would speak to the

16  referral source before they make the first home

17  visit. That may not be possible because they just

18  may not be able to connect by phone before the

19  mandate of visiting within three working days

20  passes. But it is definitely a mandate. It is

21  something we stress in training, how they work

22  together on an ongoing basis really depends on the

23  relationship that that agency that's referring has

24  with the client how much they want to stay involved.

25  I know it's a chronic complaint, can't reach APS,

P01059

94

1   AGING AND GENERAL WELFARE COMMITTEES

2   caseworkers are in the field a good deal of the

3   time, but we have -- they all have supervisor

4   numbers on their voicemail, we have general numbers

5   that are on the Internet. We have numbers that we

6   think make us easy to call and get somebody who can

7   get you in touch with somebody else.

8            CHAIRPERSON ARROYO: I guess that

9   speaks to, what was it, the blackberries? The Public

10  Advocate has gone. The voicemails are full, they

11  can't accept messages. Those are things that are not

12  impossible to overcome, and functioning from the

13  perspective that individuals are responsible and

14  return phone calls, of course, that we all strive to

15  do that. And that where it is a problem where an

16  individual is just not returning phone calls, that

17  is a real serious concern. And certainly that is not

18  the accusation here, but I think we need to

19  eliminate every single barrier possible to gain

20  access to the worker, and that is something that we

21  need to pay close attention to.

22           I think Council Member Brewer has a

23  few more questions, and then Council Member Stewart.

24           COUNCIL MEMBER BREWER: Thank you very

25  much. First, thanks for your testimony. And thanks

95

1    AGING AND GENERAL WELFARE COMMITTEES

2    for all of the work done by the workers. We have

3    some clients who have children. Obviously not

4    seniors, who are on your caseload. The two that I

5    know are in wheelchairs with grandchildren. And I'm

6    just wondering, how do you coordinate with ACS?

7    Maybe it's not very common. I don't know how many

8    clients you have who have children, and how do you

9    coordinate with ACS?

10           DEPUTY COMMISSIONER SABERSKI: It is a

11   small number. We have special liaisons that have

12   been identified at ACS for each of our borough

13   offices. We met with them last year to set that up

14   because it's a small number, but when they're there,

15   it's very important that we be able to talk to them.

16           COUNCIL MEMBER BREWER: The other

17   thing is, I think one of the problems which I know

18   you are improving, is just getting payments made on

19   time so we don't just end up with your clients in

20   Housing Court. Is that something that you're working

21   on and that the new system will help you do?

22           In other words, the rent has to be

23   paid. Sometimes the client doesn't tell you that the

24   rent is due, or the Con Ed is due, et cetera. You

25   know, that's why you're there. But sometimes when

96

1  AGING AND GENERAL WELFARE COMMITTEES

2  you have the case, it still doesn't happen. So, I

3  didn't know if a new caseload processing and

4  whatever kinds of technology you're using will help

5  keep track of when these payments are due? It seemed

6  to be a chronic problem. I don't know.

7           DEPUTY COMMISSIONER SABERSKI: We get

8  the, you know, the Social Security checks come in

9  from Social Security Administration, and we did

10 speed that up by arranging by electronic deposit.

11 But it's a large number that have to be processed

12 every month, and we are looking at our staffing in

13 the financial management unit to see if there is a

14 way to speed that up.

15          COUNCIL MEMBER BREWER: Okay, so

16 that's where the problem comes in. And then the

17 other thing is, I have had very good experience, as

18 I have told the Commissioner, with your HRA staff in

19 Housing Court, but the whole issue of one-shots,

20 which are sometimes very important for your clients,

21 and I'm just wondering what's your experience about

22 how long they take to process? Is that something

23 that could also be sped up? Because my guess is a

24 lot of your clients do need what I call one shots.

25          DEPUTY COMMISSIONER SABERSKI: We have

1  AGING AND GENERAL WELFARE COMMITTEES

2  special liaisons for the one-shots, and we can get

3  them on an emergency basis when it's absolutely

4  needed. Otherwise the turn-around time is usually

5  within a week to ten days, what my borough directors

6  have told me.

7           COUNCIL MEMBER BREWER: Okay. Thank

8  you, Mr. Chair.

9           CHAIRPERSON DeBLASIO: Council Member

10  Stewart.

11          COUNCIL MEMBER STEWART: Thank you,

12  sir. I want to go back to a couple of questions. One

13  is caseloads. For JASA you have a cap for

14  caseworkers; why is it that APS doesn't have a cap

15  on their caseworkers?

16          DEPUTY COMMISSIONER SABERSKI: With

17  JASA the arrangement is contractual. So, we pay them

18  to take a specific number of cases. We can't go

19  above that number because we're not paying them for

20  it.

21          COUNCIL MEMBER STEWART: Right.

22          DEPUTY COMMISSIONER SABERSKI: At APS

23  we have to take all-comers.

24          COUNCIL MEMBER STEWART: Yes. But what

25  I'm trying to look at is a caseworker, you think a

98

1   AGING AND GENERAL WELFARE COMMITTEES

2   caseworker can do justice to 81 or 75 cases without

3   a problem?

4               DEPUTY COMMISSIONER SABERSKI: No, we

5   don't think that. That's why we've hired the

6   additional staff.

7               COUNCIL MEMBER STEWART: What did it

8   show in the Preliminary Budget?

9               DEPUTY COMMISSIONER SABERSKI:

10  Thirty-two additional caseworkers is what we believe

11  will bring the ratios into compliance with the State

12  recommendation.

13              COUNCIL MEMBER STEWART: Which is?

14              DEPUTY COMMISSIONER SABERSKI: 25.

15              COUNCIL MEMBER STEWART: Twenty-five.

16  So you believe that -- and how soon will you be able

17  to hire these folks?

18              DEPUTY COMMISSIONER SABERSKI: They're

19  already hired. And as the Commissioner said, we need

20  to look at exactly how quickly their caseloads will

21  build up so that we know when we'll be in compliance

22  with the ratios.

23              COUNCIL MEMBER STEWART: On another

24  issue, because of a lawsuit that was brought against

25  you, what are the criteria used to make the

99

1  AGING AND GENERAL WELFARE COMMITTEES

2  recommendations or to have folks transferred to

3  nursing homes. Do you have a criteria, or

4  recommendation? What do you use to do that?

5              DEPUTY COMMISSIONER SABERSKI: The

6  nursing homes require there's a special form that

7  has to be filled out, and the nursing home would

8  evaluate whether the person is eligible. It's not a

9  decision we would make. We would talk to the client

10  if we think it's a possibility and something that

11  would serve them better. But it's not ultimately our

12  decision. It's the client's decision and the nursing

13  home's decision.

14              COUNCIL MEMBER STEWART: You say it's

15  the client's decision, but a number of times the

16  client cannot make a decision, or one has to make a

17  decision.

18              DEPUTY COMMISSIONER SABERSKI: Right.

19              COUNCIL MEMBER STEWART: Who do you

20  refer to?

21              DEPUTY COMMISSIONER SABERSKI: If a

22  client can't make a decision, then that would be a

23  case that would have to be referred to a Community

24  Guardian, and  they would be responsible for

25  placement for that client. We can't do it without

100

1  AGING AND GENERAL WELFARE COMMITTEES

2  the client's consent.

3              CHAIRPERSON DeBLASIO: Let me just

4  jump in. The Commissioner is about to get in trouble

5  with his boss, I understand he's late for a meeting.

6  So, if the Deputy Commissioner could remain for the

7  last few questions, that would be great.

8              COMMISSIONER DOAR: I apologize.

9              CHAIRPERSON DeBLASIO: You are

10  politely dismissed. Take care, Commissioner.

11             COUNCIL MEMBER STEWART: So, what

12  you're saying is that you don't ultimately make the

13  decision whether someone is being transferred to the

14  nursing home. Do you make recommendations based on

15  what you observe, what the situation is?

16             DEPUTY COMMISSIONER SABERSKI:

17  Correct.

18             COUNCIL MEMBER STEWART: All right,

19  thank you.

20             CHAIRPERSON DeBLASIO: Thank you,

21  Council Member.

22             One last question, just to be clear.

23  We've talked about cell phones and we've talked

24  about laptops and blackberries, do your caseworkers

25  currently all have e-mail addresses; is that a

1  AGING AND GENERAL WELFARE COMMITTEES

2  standard?

3              DEPUTY COMMISSIONER SABERSKI: Yes, it

4  is.

5              CHAIRPERSON DeBLASIO: Absolutely

6  everyone?

7              DEPUTY COMMISSIONER SABERSKI: Yes.

8              CHAIRPERSON DeBLASIO: Good. And do

9  they work?

10             DEPUTY COMMISSIONER SABERSKI: Yes.

11             CHAIRPERSON DeBLASIO: Do they use

12  them? Thank you, Chair Arroyo. Is everyone up to

13  speed and using them on a regular basis?

14             DEPUTY COMMISSIONER SABERSKI: It's a

15  good question and it's an important issue. Our

16  directors actually do make sure that people use them

17  by testing. They send out e-mails and they see who

18  reads them. So, it's something we actually audit.

19             CHAIRPERSON DeBLASIO: Okay. Thank you

20  very much for your testimony and your time here with

21  us. We appreciate it. And obviously we'd like

22  written follow-up here on a number of the items that

23  were outstanding, and our Counsel will follow-up

24  with you.

25             Thank you very much.

1   AGING AND GENERAL WELFARE COMMITTEES

2            DEPUTY COMMISSIONER SABERSKI: Thank

3   you.

4            CHAIRPERSON DeBLASIO: Our next panel.

5   Let's see now, we actually have so many people for

6   the next panel, we may want to break it into two.

7   On, I'm sorry, no, no, that's the third panel. The

8   next panel is perfectly sized. We have two people.

9   James Lewis, who is an APS worker, and I'm sorry, I

10  take back James Lewis. Faye Moore, from Local 371

11  and Wana Ulysse from Local 371. We're confused but

12  we're still trying to help.

13           Thank you. Who would like to start?

14  Wana.

15           MR. ULYSSE: Good afternoon. Good

16  afternoon, Chairpersons DeBlasio, Arroyo and

17  Committee members. Like mentioned before, I'm the

18  Vice President of Political Action for Social

19  Service Employees Union, Local 371, which represent

20  caseworkers and supervisors in the Adult Protective

21  Services.

22           We had intended today to come with

23  workers to testify, but workers are nervous due to

24  regards to retaliation and not feeling safe and

25  comfortable to testify. So, once again, we are

P01068

1  AGING AND GENERAL WELFARE COMMITTEES

2  testifying on behalf of the workers that we cover.

3            For a long time, APS has been a

4  neglected part of HRA. It has historically been

5  understaffed and overlooked. We believe this is a

6  time for change.

7            APS has a particularly difficult

8  population to serve. The current housing crisis and

9  aging population in various court cases have

10  resulted in a rapidly rising caseload. Although

11  caseloads are high throughout the City, the Boroughs

12  of Manhattan and Brooklyn have critical situations

13  in which high caseloads make it very difficult to

14  provide services to clients. And one thing that I

15  see as a common thread today, is we need more staff.

16  We need more staff for outreach. We need more staff

17  to do in-work, we need more staff to help in

18  reducing the caseload, but that is the underlying

19  issues, we need more staff.

20            We would like to suggest important

21  areas of improvement. The heavy-duty cleaning we had

22  last year, had an agreement to create a pilot

23  program to have community titles do this job,

24  freeing up the caseworkers. But this has not moved

25  forward as of yet.

1   AGING AND GENERAL WELFARE COMMITTEES

2               And the issues also with heavy-duty

3   cleaning, and the issues of the epidemic of the bed

4   bugs. These issues are important issues for the

5   workers, whether they're using using appropriate

6   safety materials, the Hazmat suits, whether the

7   chemicals affect their health, what are the

8   chemicals that they are using, and as well as having

9   someone else do this function while they freeze up

10  their time to do more case management duties.

11  There's a lot of issues with the heavy-duty

12  cleaning, and it's the issue of safety for both the

13  worker and the client.

14              We've also suggested court liaisons

15  in each borough to cut down the time the caseworkers

16  have in courts, in regards to the Article 81, which

17  is the Guardian cases, the application to apply for

18  guardianship. Now, these applications are very

19  lengthy, and when you send them over to the

20  attorneys, they are kicked back. The workers have

21  asked for training in how to appropriately fill out

22  these documents. Again, it's not just training for

23  the new workers, it's also training for the veteran

24  staff that are there. Because we also know times are

25  changing, the information that they require on these

105

1   AGING AND GENERAL WELFARE COMMITTEES

2   forms change, and they need to know what is it that

3   they are required to put on these forms so that

4   they're not kicked back, which lengthen the time of

5   assistance for workers as well.

6                   Also, we've also requested additional

7   psychiatrists to be provided for evaluations, and

8   exploring special social work units that deal with

9   severely mentally ill clients.

10                  Again, some of these clients require

11  a specialized type of care. We have requested to

12  have units for specialized clients, so that also

13  will reduce the caseloads for those and just put

14  them together and receive specialized care.

15                  We also had requested training for

16  particularly violent clients. We have violent

17  clients in all aspects, whether you work with

18  children or whether you work with adults.

19  Particularly now if you have a lot of violent

20  clients, workers are not feeling comfortable, that

21  they are not adequately able to handle these

22  clients, or what are they supposed to do when

23  certain situations arise? They are constantly

24  requesting training. One of the two biggest issues

25  we are having is training and staffing.

1   AGING AND GENERAL WELFARE COMMITTEES

2              So, to sum up, I welcome the City

3   Council looking at APS and welcome its oversight. We

4   hope to work positively with both the Council and

5   the agency to make improvements in this vital

6   program. The premise that we can do more with less

7   is not working. We need training and we need more

8   workers.

9              CHAIRPERSON DeBLASIO: Thank you very

10  much, Wana. We appreciate all your help in thinking

11  about these issues, and you really helped us prepare

12  for this hearing in many ways. And I also do think

13  it sounds like there is some real receptivity on the

14  heavy duty cleaning issue to making fundamental

15  change. So, I think your advocacy is timely. I think

16  the Commissioner is admitting that that's an area

17  that's been particularly handled poorly and not

18  using people's time ideally.

19              And the other thing I want to note

20  is, I think the points you raised about the

21  guardianship process really do mirror a lot of

22  things we've been talking about in terms of Family

23  Court in terms of what happens on the ACS side, and

24  the fact that so much time, so much caseworker time

25  gets jammed up on things that are not actually

1   AGING AND GENERAL WELFARE COMMITTEES

2   serving people. We need to continue to sort of clear

3   the way for caseworkers to be able to do the work

4   they're there for and that they want to do.

5                    I know Gale Brewer has a question.

6   Faye, did you have testimony, too?

7                    MS. MOORE: No, I'm just here to

8   support the question and answer part.

9                    CHAIRPERSON DeBLASIO: Thank you very

10  much.

11                   Okay, Gale Brewer.

12                   COUNCIL MEMBER BREWER: Thank you for

13  your testimony. You may or may not know, we've been

14  frustrated by the issue of bed bugs everywhere.

15  We've had some legislation that isn't going

16  anywhere, and I think the Administration feels that

17  we only need to educate people.

18                   So, I mention that because we could

19  use some assistance, and there is actually a bed bug

20  task force, and I'd love to have the union's

21  participation. So, we could talk later about that,

22  but I think it's education for your workers, clients

23  and just New Yorkers in general, and I won't talk

24  more about it, because people are sick of me talking

25  about bed bugs. I would love to have your help, and

1  AGING AND GENERAL WELFARE COMMITTEES

2  thank you very much for mentioning it.

3           CHAIRPERSON DeBLASIO: Thank you. And

4  now Chair Arroyo.

5           CHAIRPERSON ARROYO: Hi. Thank you for

6  being here and for your testimony.

7           There has been additional staff hired

8  and training has changed. Do you disagree with the

9  numbers and the type of training? Help me on this

10  then. Because you're asking for something that

11  apparently has already been started.

12          MS. ULYSSE: Well, I can speak from

13  the work I have done.  I've been going on location

14  all the last three weeks, and the workers right now

15  are asking for training. They haven't gotten it. So,

16  maybe it's something that's ongoing on paper, but

17  has not come to fruition. Because the workers I've

18  spoken to, we have some, you know, that have been in

19  the audience that were listening to some of the

20  testimony and they're saying it over and over again.

21  We have not gotten this training. Even with, I'll

22  give the example, the reason why I used the bed

23  bugs, they're asking for training on how to

24  appropriately wear the suit to not cause reinfection

25  somewhere else, reinfestation somewhere else. They

109

1 AGING AND GENERAL WELFARE COMMITTEES

2 do not have this training. So, they may have it in

3 the works, but I'm not prepared to say that

4 everybody has been trained.

5           CHAIRPERSON ARROYO: So I get from

6 your testimony that the union has not been briefed

7 on how training has changed, or what the outline or

8 the format of the training is for you to be able to

9 say whether it addresses the points that you're

10 making in your testimony.

11           MS. ULYSSE: Well, the union actually

12 raised the issue of people going into the homes

13 where the bedbugs are without protective gear to the

14 agency about six months ago. We actually raised the

15 issue and they said they would provide protective

16 equipment, but then they didn't tell people how to

17 use the equipment.

18           In the initial training that the new

19 hires received, the agency just recently extended

20 the training. The union has been telling them for

21 years that the two-week training that they were

22 giving APS workers was simply not enough.

23           On the hiring piece, we do have 32

24 workers coming in but the attrition rate, the people

25 actually leaving HRA all together is one number.

1 AGING AND GENERAL WELFARE COMMITTEES

2 There's another number of people that will transfer

3 out of APS, committed civil servants that want to

4 continue to provide social services on a

5 professional level will go to another part of HRA

6 because the work is so difficult at Adult Protective

7 Services.

8         CHAIRPERSON ARROYO: Okay. Maybe I

9 didn't make myself clear. Has the union had an

10 opportunity to look at the training curriculum to

11 see if the training portions and/or addresses the

12 training concerns that you're raising here today.

13         MS. ULYSSE: The agency hasn't shared

14 their more recent curriculum with us.

15         CHAIRPERSON ARROYO: Okay, thank you.

16 That's important to know.

17         CHAIRPERSON DeBLASIO: Thank you very

18 much again. And we appreciate the constant

19 collaboration.

20         Oh, I'm sorry. Before I tell you

21 about my appreciation, I will turn to Council Member

22 Kendall Stewart.

23         COUNCIL MEMBER STEWART: Yes, I just

24 want to follow up on what you just said. Because the

25 Deputy Commissioner awhile ago said that 32 new

1  AGING AND GENERAL WELFARE COMMITTEES

2  staff members will be added and that will bring it

3  into state compliance.

4               But you just mentioned that with

5  attrition and transfer and all of that, there might

6  be a problem. So, you think that we will need more

7  workers, will need to have more workers lined up

8  because of the fact that if you have attrition and

9  transferred, it would not be 32 anymore. It would be

10  much less than that.

11               MS. ULYSSE: I think if the

12  Administration is as serious about improving

13  services for adult protective services, they need to

14  hire on a continuing ongoing basis. This way they

15  will have enough staff to handle the current

16  caseload. They will have staff in anticipation of a

17  higher caseload, and they will also have staff in

18  anticipation of attrition and transfers.

19               COUNCIL MEMBER STEWART: And would you

20  say hiring on a continuous, you mean every year?

21               MS. ULYSSE: I think the Commissioner

22  mentioned in his testimony they planned to hire

23  three times in the next fiscal year. If they would

24  look to the ACS model, ACS hires two classes, so at

25  any given time there are two classes being trained

P01077

112

1  AGING AND GENERAL WELFARE COMMITTEES

2  to do child protection. APS could learn a lot by

3  looking at that model as a way of reducing their

4  attrition rate, their transfer and impact that the

5  loss of staff has on the people that stay in the

6  program.

7          COUNCIL MEMBER STEWART: And the

8  people who leave the program, most of the time it's

9  because of the heavy load in our caseloads, and of

10 the fact they don't feel they've been trained

11 properly to deal with the situations?

12         MS. ULYSSE: And also poor morale. I

13 mean, they have a heavy caseload, they want

14 training, they feel no one else wants to work there.

15 They transfer out to try to find --

16         COUNCIL MEMBER STEWART: Okay. Mr.

17 Chair, I think we need to put some heat on the

18 Administration, make sure that what they say is what

19 they do, because if they are not in compliance with

20 the State regulation, we would like to force the

21 issue on that.

22         CHAIRPERSON DeBLASIO: Well, I agree,

23 Councilman. And this is obviously not the last time

24 we'll visit this issue and we intend to aggressively

25 follow-up. There are a number of answers we didn't

P01078

113

1   AGING AND GENERAL WELFARE COMMITTEES

2   get today, and we intend to aggressively follow-up.

3               Again, thank you, to our friends from

4   the union. We really appreciate the substantive help

5   you've provided in preparing this, and we look

6   forward to making sure with you that we get the

7   answers we need going forward, and to continue to

8   press for improvements in the agency. Thank you.

9               MS. ULYSSE: Thank you.

10              MS. MOORE: Thank you.

11              CHAIRPERSON DeBLASIO: Now, for our

12  next panel, it has actually grown to six people, so

13  we're going to do it two different panels, just for

14  logistics sake. And I will ask everyone now at this

15  portion of the day to please summarize whenever

16  humanly possible, rather than read testimony. And

17  please be mindful of all the testimony we've heard

18  to date.

19              There is the famous phrase,

20  "everything has been said but not everyone has said

21  it." So, please, you know, we welcome all new

22  contributions and we welcome you, but please, if you

23  have written testimony that basically reiterates a

24  lot of what we heard, we would ask for your

25  indulgence.

114

1  AGING AND GENERAL WELFARE COMMITTEES

2            The first panel, Bobbie Sackman,

3  Council of Senior Centers and Services, Rhonda Grand

4  of Special Services for Senior Citizens, and

5  Kimberly Steinhagen, of the Geriatric Mental Health

6  Alliance of New York.

7            Okay, we welcome you. Who would like

8  to go first? Please, in each case introduce yourself

9  before you testify.

10            MS. NATELSON: Good afternoon. My name

11  is Rachel Natelson, and I'm Legal Advocate at

12  Council of Senior Centers and Services. First, on

13  behalf of CSCS, and the members that we serve, we'd

14  like to thank Council Members Arroyo and DeBlasio

15  and their respective committees for arranging the

16  hearing. We're also grateful to HRA Commissioner

17  Robert Doar and his staff for their participation

18  and acknowledge the positive first steps that they

19  have recently taken to facilitate reform at APS.

20            More, however, can still be

21  accomplished and we hope to work together

22  productively to implement a range of much needed

23  changes.

24            As the City agency charged with

25  protecting such vulnerable groups as the frail

115

1   AGING AND GENERAL WELFARE COMMITTEES

2   elderly, the mentally incapacitated, and the abused

3   and exploited, APS is accountable for the welfare of

4   New Yorkers most in need of social services, and

5   least likely to obtain them without significant and

6   intensive support.

7              Given the agency's mandate to

8   integrate a variety of professional disciplines and

9   maximize the resources of a range of City agencies,

10  good management and comprehensive training are

11  indispensable to its successful operations. For many

12  years, however, these qualities have been notably

13  deficient at APS.

14             In light of -- I'm just now going to

15  move on to our recommendations. In light of APS's

16  mandate to coordinate services with other public and

17  private agencies, our chief recommendation is for

18  the agency to strengthen its alliances with local

19  community-based organizations. By turning to other

20  City agencies and private social service providers,

21  APS could enhance its training resources immensely.

22  Such organizations offer invaluable expertise in

23  matters ranging from eviction assistance to benefits

24  enrollment to the sensitive treatment of hoarding

25  and dementia.

P01081

1  AGING AND GENERAL WELFARE COMMITTEES

2          Additionally, APS might learn from

3  the Administration for Children's Services, an

4  agency currently addressing similar institutional

5  challenges. Like ACS, the Office of Adult Protective

6  Services, could benefit from contracting out more of

7  its services to community-based organizations, with

8  distinct areas of expertise and additional staff

9  capacity.

10          Additionally, the Committees on

11  General Welfare and Aging should expand efforts to

12  impose caps on ACS caseload sizes in order to ensure

13  an equally timely and comprehensive response to APS

14  reports.

15          Another area right for the reform is

16  guardianship services. Since the main deficiency in

17  APS's existing approach is the bureaucratic

18  obstacles to timely intervention, we recommend that

19  the agency establish a separate fast track for these

20  proceedings. Given the immediacy of the risk that

21  confront incapacitated adults, APS must accelerate

22  the process by which it affords legal protection

23  against financial exploitation, housing insecurity

24  and other potential threats to health and well

25  being.

1   AGING AND GENERAL WELFARE COMMITTEES

2            In addition, the agency might also

3   advocate for the expansion of the New York Court

4   system's Community Guardianship Program for those

5   who have already been deemed incapacitated. Unlike

6   individuals, non-profits can employ a range of

7   professionals to work as a team in order to provide

8   more comprehensive service.

9            On a related note, we feel obligated

10  to register our concerns over the Department for the

11  Aging's intention to replace neighborhood-based case

12  management catchments with broader service areas, a

13  decision that threatens to have an especially

14  pernicious affect on APS clients, given the value of

15  intensive personalized services in early

16  intervention for at-risk seniors.

17            Thanks again for allowing me to

18  testify today, and we look forward to working with

19  you to make protective services available to the

20  City's most vulnerable older adults.

21            MS. STEINHAGEN: Good afternoon. My

22  name is Kim Steinhagen, and I am the Director of the

23  Geriatric Mental Health Alliance of New York. We are

24  an advocacy group that was formed by the Center for

25  Policy and Advocacy of the Mental Health

118

1   AGING AND GENERAL WELFARE COMMITTEES

2   Associations of New York City and Westchester in

3   January 2004, to confront the Mental Health

4   challenges of the elder boom. We currently have

5   2,400 members. We have work groups on policy and

6   advocacy in New York City and in Albany. We also

7   have consensus groups on long-term care in mental

8   health, housing and workforce development.

9            We sponsor a series of presentations

10  on best practices with national experts, have

11  co-sponsored numerous conferences and provide

12  technical assistance service models and funding.

13           We are also planning for the

14  development of a training center on geriatric mental

15  health, which would include providing training and

16  technical assistance for non-mental health

17  providers, such as APS workers.

18           As you know, over the next 25 years,

19  the number of older adults in New York City is going

20  to increase 60 percent from 900,000 to 1.5 million.

21  This will result in a rise in numbers of older

22  people with mental disorders, from 180,000 now to

23  300,000 in 2030. Our helping systems cannot meet the

24  needs of this current population. Without action

25  now, we certainly will not be able to meet the

119

1  AGING AND GENERAL WELFARE COMMITTEES

2  mental health needs of the elderly population.

3            The majority of clients served by APS

4  have mental and behavioral problems that are often

5  quite severe. Mental disorders include dementia,

6  depression, anxiety, paranoia and schizophrenia.

7  Behavioral problems include hoarding, wandering,

8  refusal of or inability to follow prescribed

9  treatment, belligerence or abuse of family or other

10  caregivers. And adult protective services are not --

11  workers are not trained to address these complex

12  problems and they often don't know where to refer

13  for appropriate services.

14            So, as a result, a lot of clients who

15  could be managed the community by well-trained

16  workers are sent to nursing homes. In order to work

17  more effectively with clients who have an illness,

18  APS needs to do a variety of things, many of which

19  you've already heard today, lower caseloads, provide

20  a general overview of mental illness to all staff,

21  develop a core staff who specialize in serving

22  clients with severe behavioral or mental disorders,

23  establish a clinical consultation unit to which

24  protective service workers can turn to for help with

25  assessment and planning, and cultivate working

P01085

120

1  AGING AND GENERAL WELFARE COMMITTEES

2  relationships with mental health providers in the

3  community.

4            Additional funding will obviously be

5  key to ensure that these changes take place, and

6  additional funding is also needed to develop more

7  community-based mental health services, including

8  housing alternatives to nursing homes.

9            On a final note, a few New York City

10  providers and advocates have already met with APS

11  leadership, who appear to be entirely clear about

12  APS's problems working with clients with mental

13  disorders and to be committed to change. They

14  obviously need resources to train staff, to reduce

15  caseloads, and thus to provide more effective

16  services, and we urge the City to provide the

17  necessary funding.

18            Thank you for the opportunity to

19  testify today, and if you need any background

20  information on geriatric mental health, please feel

21  free to call us.

22            MS. GRAND: My name is Rhonda Grand,

23  and I am Executive Director of Special Services for

24  Senior Citizens. I'll wait until you get the

25  testimony. Okay. My name is Rhonda Grand and I have

1  AGING AND GENERAL WELFARE COMMITTEES

2  been Executive Director for Special Services for

3  Senior Citizens for the past 26 years. We are a

4  not-for-profit voluntary neighborhood-based agency,

5  serving community district 18 in Brooklyn, that

6  includes Bergen Beach, Canarsie, Flatlands,

7  Georgetown, Mill Basin and Marine Park. We provide

8  case management, entitlement and benefits

9  assistance, information referral, transportation and

10  arrange and coordinate home care, housekeeping and

11  Meals-On-Wheels for more than 436 older adults.

12            I applaud the City Council Committees

13  on General Welfare for its proactive position to

14  reform New York City Adult Protective Services due

15  to its failure to protect the unprotected.

16            APS is charged by statute to care for

17  adults at risk, yet in the absence of APS

18  interventions, the most vulnerable subset, the frail

19  elderly, remain at risk and susceptible to

20  self-neglect, abuse and exploitation.

21            I have attached case examples for

22  greater understanding. In the interest of brevity, I

23  list only a few examples of why at-risk elderly

24  continue to fall into the APS abyss of inefficacy

25  and inefficiency.

122

1   AGING AND GENERAL WELFARE COMMITTEES

2              One, APS attempts to reject clients

3   at intake and assessment, despite presumptive

4   eligibility.

5              Two, what APS considers a

6   comprehensive assessment is merely one conducted

7   through a small crack in an apartment door and from

8   that develops a plan of care.

9              APS is not in compliance with

10  mandated time frames to conduct home assessments and

11  psychiatric evaluations. Once APS obtains

12  Meals-On-Wheels for at-risk elderly, they neglect

13  further intervention to ensure safety and

14  well-being.

15             Once an at-risk elder refuses

16  service, APS closes the case based upon their right

17  to self-determination. However, regarding

18  involuntary services, a study by the National

19  Association of APS Administrators concluded the

20  focus is not on serving adults against their will,

21  but rather on assurance that the critical services

22  are not denied because the adult in need lacks

23  capacity to consent to receive essential services.

24             I offer the following

25  recommendations. Create an APS Advisory Council with

123

1   AGING AND GENERAL WELFARE COMMITTEES

2   oversight responsibilities, the locus of services

3   should be contracted to neighborhood-based senior

4   service agencies because of their judicious

5   comprehension of geriatric issues. And three,

6   transfer APS to DFTA, because the needs of elders

7   are significantly different from younger adults.

8                    In 2001 and 2005, there was City

9   Council public hearings on APS, but they produced no

10  reform. Therefore, my question to these committees,

11  which is a parity of the Verizon TV commercial, is

12  what makes you hear me now? As the axiom states,

13  when the student is ready, the teacher will appear.

14  Are you ready to invest the effort and the funding

15  to reform APS to ensure the unprotected are indeed

16  protected.

17                   In conclusion, APS should have only

18  one motive to reform that all clients at risk have

19  the inalieable right to life, liberty and the

20  pursuit of happiness. Thank you.

21                   CHAIRPERSON DeBLASIO: Thank you very

22  much. I appreciate the ideas you have, and it's

23  clear, I want to be very clear that we are not going

24  to be satisfied with a lack of results coming out of

25  this process. You're right to say that the Council

124

1  AGING AND GENERAL WELFARE COMMITTEES

2  like any other legislative body can shine a light

3  from time to time on something, and then it can go

4  back into the shadows. But we are I think very, very

5  focused, both committees, in making sure there are

6  some specific changes. And I think there are some

7  objective reasons, like demographic change that

8  really cry out for it.

9            I also was struck at the

10  Commissioner's answer on the number of people

11  they're reaching. I'm not going to say I heard

12  everything I wanted to hear, but at least he started

13  his answer with a no, we're not reaching everyone we

14  should be. So, that's an opening for all of us.

15            Council Member Stewart.

16            COUNCIL MEMBER STEWART: Thank you,

17  Mr. Chair. I would just like you to explain a little

18  bit more, when you say transfer APS to DFTA, I want

19  to know, how is that going to benefit seniors, the

20  elderly and the other folks?

21            MS. GRAND: Basically what I was

22  referring to was the comments that were already made

23  here today, which is that the senior population has

24  very different needs than a younger population. And

25  secondly, APS is too big. That's the reason why you

P01090

125

1  AGING AND GENERAL WELFARE COMMITTEES

2  moved Agency for Children's Services out of HRA and

3  made it its own agency.

4            So, I think that because of the high

5  level of need, and the diversity of need of the

6  older population, I think that we need to work with

7  a smaller group.

8            COUNCIL MEMBER STEWART: Yes, but I

9  just feel that if you transfer to DFTA, you're

10  making DFTA much -- and some of these folks would be

11  lost, in terms of getting these kind of services.

12            MS. GRAND: Oh, no. No, no, no. Let me

13  explain what I'm saying. I'm not saying that if we

14  transfer them to the Department for the Aging, that

15  they're no longer considered at risk, what I'm

16  saying is that there needs to be a unique unit

17  within the Department of Aging, because they're

18  dealing with older adults as it is, why not also

19  deal with those older adults at risk within that

20  structure?

21            COUNCIL MEMBER STEWART: I'm not too

22  sure I understand that. Because I know DFTA is one

23  agency that is dealing with seniors in general, and

24  APS now deals with anyone that is at risk that can't

25  help themselves. And if you combine them or put them

126

1   AGING AND GENERAL WELFARE COMMITTEES

2   into DFTA, I just felt that somewhere, somehow, it

3   might even have -- if all those folks that are not

4   really served by DFTA right now, if you put them

5   into DFTA, they will be lost or so in a sense. So, I

6   think it should be separate. You know, we can have a

7   disagreement, but I think --

8               MS. GRAND: No, I think we're saying

9   the same thing but just in different ways.

10              I agree it should be separate -- what

11  I'm saying is that the older population should be

12  separated out from the younger population. And I

13  wasn't saying anything more than that. My reference

14  to the Department for the Aging is that they are

15  already dealing with the older population, so

16  perhaps that separate unit can be housed underneath

17  DFTA, and address those clients that are at risk.

18              COUNCIL MEMBER STEWART: All right.

19  Thank you.

20              CHAIRPERSON DeBLASIO: Thank you very

21  much. We appreciate all of your testimony, and we

22  appreciate, Rhonda, your participation earlier in

23  our press conference.

24              And now our next part of the same

25  panel, Judy Willig of Hudson Hill Community Council

1   AGING AND GENERAL WELFARE COMMITTEES

2   and Judith Uman of Bronx Jewish Community Council.

3              Who would like to go first?

4              MS. WILLIG: I am going to go first.

5              CHAIRPERSON DeBLASIO: All right.

6              MS. WILLIG: My name is Judy Willig,

7   and for the past 20 years I've been the Executive

8   Director of Heights and Hill Community Council.

9   Heights and Hill is a 36-year-old community-based

10  non-profit organization that provides social

11  services to the elderly of Brooklyn Heights, Cobble

12  Hill and Boerum Hill in Brooklyn. Our mission is to

13  ensure that our older neighbors can live safe and

14  independent lives as members of our community,

15  thereby avoiding or delaying costly and impersonal

16  institutionalization.

17             Special emphasis in our agency is

18  placed on those who are frail and without family

19  supports. Services include Meals-On-Heels,

20  transportation, health promotion, education and our

21  core service which is case management.

22             In my professional career there are a

23  number of cases that stand out as particularly

24  disturbing. These are the cases I always jokingly

25  say will be a chapter in my book when I write

128

1  AGING AND GENERAL WELFARE COMMITTEES

2  professional memoirs.

3              CHAIRPERSON DeBLASIO: I'm going to

4  stop you for just a moment.

5              MS. WILLIG: Yes.

6              CHAIRPERSON DeBLASIO: Because you

7  know I'm a big fan of yours, but we're going to need

8  some summarization here because you've got a lot of

9  detail in your cases, so give us the punchline part.

10             MS. WILLIG: I'm going to share two

11  real stories with you, because with all due respect

12  to Commissioner Doar and Deputy Commissioner

13  Saberski, who I have a lot of positive things to say

14  about, I think there is a discrepancy between what

15  they say and what actually happens.

16             And I made a promise to myself

17  regarding Ms. E, that what happened to her won't

18  happen again. She came to us because the bank

19  officer in her bank, who is a friend of mine, when I

20  was doing my personal banking, she came up to me and

21  said we have this customer who is increasingly

22  forgetful and a man named Mike keeps coming into the

23  bank with her, and asking her to withdraw $35,000 to

24  $40,000 at a clip. The bank officer tried to stall

25  and Mike got more and more belligerent with her.

129

1  AGING AND GENERAL WELFARE COMMITTEES

2            Due to banking regulations, the bank

3  was forced to give the money, because the customer,

4  it was her account and it was her money and she had

5  to give it over.

6            I figured out from what they were

7  telling me who this woman was, and coincidentally,

8  she had been referred earlier, the prior week, to

9  our agency by the local senior center for meals. We

10 had called her and she said she no longer wanted any

11 services from us, given the information I now had

12 from the bank, I did a home visit with one of my

13 staff. We were more aggressive than we usually would

14 be. Again mindful of that issue of such

15 determination, which is critical to the work that we

16 all do, but particularly with older people at

17 various stages of dementia, the self-determination

18 issue is a very gray one.

19            When we went to see her, it was

20 January of 2006, a few days after that big snow

21 storm. We found her walking down the street in

22 sandals with bare legs and a thin coat. It was

23 really clear and obvious that this woman had severe

24 cognitive problems. She was in her early nineties,

25 she was a very independent woman. She had never

130

1   AGING AND GENERAL WELFARE COMMITTEES

2   married. She had some relatives around the country

3   but really was no longer involved with them. The

4   only person in her life was this man Mike, who she

5   said was a friend who helped her do things around

6   her house. When I asked her if she paid him for

7   that, she said she did but couldn't recollect how

8   much she gave him, and when I was more specific

9   about had she given him large sums of money, she was

10  horrified and said, absolutely not.

11          There were obvious things going on.

12  She was wearing the same outfit I had seen her wear

13  Thanksgiving, the month before, and for the next six

14  months she wore the same clothes every time we saw

15  her. Obviously wasn't bathing. She gave us the name

16  of a doctor that she said was her doctor. We called

17  the doctor, he hadn't seen her in years. She wasn't

18  getting medical attention. We immediately made a

19  referral to APS, and given my past experiences, I

20  went to the Citywide Director of Client Services,

21  rather than just going through the Central Intake

22  Unit. We had discovered that there had been an open

23  case two years prior to this for the same thing. The

24  senior center had made a referral to APS because a

25  man named Mike had taken $35,000 from this woman,

131

1   AGING AND GENERAL WELFARE COMMITTEES

2   and they said he was verbally abusive to her.

3              APS had made an assessment and a

4   psychiatric evaluation and then closed the case.

5   When we asked them why, they weren't able to provide

6   an explanation. We insisted that they look at this

7   case as an emergency and they ordered an emergency

8   psychiatric evaluation, which I had never see them

9   do before, happened within three days. The

10  psychiatrist, one of my workers joined the

11  psychiatrist, right then and there he recommended

12  that an Article 81 proceeding be instituted and a

13  guardian be appointed to protect her property and

14  the well-being of Ms. E. He also recommended that it

15  be referred to the District Attorney's to prosecute

16  Mike. There were numerous unreturned phone calls to

17  APS. We were finally informed months later the case

18  for guardianship was rejected by APS's internal

19  Legal Department, and the case couldn't be sent to

20  the DA because there wasn't enough evidence and the

21  client didn't have any memory of the events.

22             We were astounded so we asked for a

23  case conference with the Director of Client Services

24  and the Borough Director. We were told at the case

25  conference that the first psychiatric evaluation

132

1  AGING AND GENERAL WELFARE COMMITTEES

2  conducted two years earlier showed similar results,

3  that the woman did suffer from dementia, which we

4  know is a progressive illness, and that she had

5  impaired judgment.

6            CHAIRPERSON DeBLASIO: I'm going to

7  just interrupt for just a second.

8            MS. WILLIG: Okay.

9            CHAIRPERSON DeBLASIO: This has been

10 very compelling, and I'm really glad we're hearing

11 this story, because it points out how bad some of

12 the problems are, but please give the sort of

13 salient points here.

14           MS. WILLIG: Eventually it went for

15 guardianship. It took seven months to get there.

16 During that period of seven months, $130,000 was

17 taken from her. We suspect he walked away with

18 almost $175,000 in total. Three days after the

19 guardian was appointed, she was found on the floor

20 of her apartment having suffered a stroke.

21           Once in the hospital, they determined

22 she had advanced breast cancer and she was sent to a

23 nursing home. We have no idea whether or not earlier

24 medical and financial intervention should have

25 circumvented all of this and she could still be

133

1  AGING AND GENERAL WELFARE COMMITTEES

2  living at home. She's probably going to die in the

3  nursing home. If you'll just let me fulfill my

4  promise to myself that that wouldn't go unheard.

5             My recommendations are very similar

6  to everyone else's. There are bottlenecks everywhere

7  that slow down service delivery. The Administration

8  in the past has often talked about what happens, and

9  then what we see happen is completely different than

10 what we're told. We've had workers tell us that

11 clients that we've referred who clearly have

12 dementia and are wandering, workers don't understand

13 what dementia is and will say, but the client is in

14 great shape, and they close the cases.

15            We've learned how to get our cases

16 accepted. We know what words to say, but that

17 doesn't stop them from being closed, which is what

18 often happens. What you need to hear in response to

19 some of your questions before about why are the

20 caseloads that they have so low – I've stopped

21 having my staff make referrals, unless there is

22 something critical that needs to be done that only

23 they can do. Because we're better at what they're

24 supposed to do.

25            I agree with Rhonda that I think one

P01099

1   AGING AND GENERAL WELFARE COMMITTEES

2   of the things that should be done is, I came out of

3   the child welfare system and when I met with APS and

4   their workers for these kids conferences, what

5   became clear to me was their priority are those

6   multi-problem families with drug abuse, with

7   violence, with mental illness. The little old ladies

8   with dementia are put on the side because they're

9   not as much of a menace. And you know, Sunday we

10   read reports that some ridiculous number of people

11   by the year 2050 are going to have Alzheimer's

12   Disease - this is going to be a critical problem. I

13   think perhaps separating younger, mentally ill APS

14   from a separate unit for elderly APS clients, might

15   allow that APS, if its under DFTA, might allow the

16   workers to have more information and training on

17   dementia, on elder abuse, which hasn't been

18   discussed yet. I know Arlene Markarian will be

19   talking about that.

20           CHAIRPERSON DeBLASIO: Let me just ask

21   a question though. So, I hear you on the idea of the

22   separation on the -- on the question of whether the

23   non-profits are better situated, which I certainly

24   can see a lot of that reasoning, is it fair to say,

25   and it follows on Rhonda's point, that you'd like to

135

1  AGING AND GENERAL WELFARE COMMITTEES

2  see the elements that non-profits can do effectively

3  moved away from the agency into non-profits? Or are

4  you saying there are certain things that only APS

5  can do effectively that a non-profit doesn't have

6  the power to do?

7              MS. WILLIG: We are voluntary

8  agencies, so our tools are limited. We don't make

9  referrals to APS unless we hit a brick wall, and at

10  that point there are tools that APS has, one of them

11  being, and most of the cases that we refer are cases

12  where the elderly people need guardians, there are

13  various stages of dementia and they don't have

14  family. And a guardianship needs to be appointed to

15  make sure they're getting medical care, to make sure

16  that they are paying their bills, perhaps to make

17  sure that they get home care and that it's overseen.

18  And maybe they can avoid institutionalization.

19              I don't know if that's answering your

20  question. I have one other recommendation. There has

21  been so much talk here about hoarding, and Deputy

22  Commissioner Saberski talked about the

23  community-based organization hoarding, that's me, I

24  have the dubious distinction of being the "hoarding

25  lady" in the City. I was one of the founding members

136

1   AGING AND GENERAL WELFARE COMMITTEES

2   of the New York City Hoarding Task Force, and I've

3   done training nationally and around the State on

4   hoarding, and I'm a little bit concerned about what

5   I've been hearing about heavy-duty cleaning, and I

6   think a distinction has to be made between heavy

7   duty cleaning for people who are just dirty and who

8   are being evicted because of that, and people who

9   are hoarders. Hoarding is a mental illness, and I

10  have seen people decompensate and need to be

11  hospitalized because of the heavy-duty cleaning. So,

12  to say that somebody doesn't need to be there, I

13  almost have the opposite reaction, which is a mental

14  health professional needs to be there, if a heavy

15  duty cleaning is done with a hoarder. I submit that

16  there has been research, and it's in my testimony,

17  over the past ten years that shows that hoarding is

18  a mental illness, and there are some ways to treat

19  it and one of the things that we do know about

20  hoarding is the worst thing you can do for a hoarder

21  is to intervene involuntarily with heavy duty

22  cleaning.

23            I would just want to say --

24            CHAIRPERSON DeBLASIO: Just to clarify

25  on that one, too, but obviously the caseworker is

137

1   AGING AND GENERAL WELFARE COMMITTEES

2   one thing, the mental health professional is

3   another.

4           MS. WILLIG: But I think one of the

5   situations that has to be done in these situations

6   is there needs to be some sort of a mental health

7   assessment if the person is a hoarder.

8           And I've been in hoarder's homes, and

9   I know Councilwoman Brewer says she's a hoarder,

10  trust me, I've been in some homes where you would

11  not believe the things, the ways that some people

12  are living, and it is truly a mental illness, and

13  does require intervention of a mental health

14  professional.

15          CHAIRPERSON DeBLASIO: That's very

16  helpful. Thank you. Thank you very much for your

17  testimony.

18          MS. UMAN: Thank you very much. Thank

19  you for the opportunity to testify today. We

20  appreciate your Committee's focusing on this very,

21  very important matter. Many of the persons present

22  today are familiar with the Bronx Jewish Community

23  Council, similar to the Heights and Hills, we've

24  been doing this as a non-profit for over, actually

25  for over 35 years now, and we have offices

138

1  AGING AND GENERAL WELFARE COMMITTEES

2  throughout the Borough of the Bronx.

3              I'm not going to talk too much about

4  what we do, because we have similar situations to

5  many of the other presenters.

6              As a community agency, we interact

7  with older adults and disabled persons facing many

8  difficulties in their lives. We have an extensive

9  web of services that are boroughwide, based in the

10 anti-poverty movement, and funded primarily with

11 government funds.

12             One contract allows BJCC to serve not

13 only the elderly and disabled, but those less than

14 60 years of age at neighborhood walk-in sites. Our

15 daily social work practice brings us in touch with

16 home-bound and ambulatory, frail and mentally

17 disabled, those threatened by eviction, the hungry

18 and the needy, the confused and the distraught. The

19 isolated and those suffering from dementia.

20             Our services are limited by contract

21 obligations, social service law and our role in the

22 spectrum of services available to those most

23 vulnerable individuals. Although each of our

24 offices, which is nine in number, is supervised by

25 LMSWs, there are restrictions as to what we are able

139

1  AGING AND GENERAL WELFARE COMMITTEES

2  to provide, and like other agencies, we turn to

3  adult protective services when we can no longer

4  present -- we can no longer meet the needs of the

5  clients who are in danger, facing eviction or being

6  abused or exploited.

7                  Our long-term relationships with many

8  of our clients often positions us to help APS staff

9  with their more comprehensive services, reluctant

10  clients often need their community social worker to

11  be the bridge so they will accept the services which

12  APS can provide, and our experience is that APS

13  staff does not work collaboratively, and they do not

14  include us in their care plans and it makes their

15  jobs more difficult. And we have a policy of calling

16  and calling and calling.

17                  Just recently I made a referral, I

18  made the referral, the case was accepted very

19  quickly. I called the worker up. I called the worker

20  up, I called the supervisor up. Finally the worker

21  called me back and we went on a joint home visit.

22  That was ten days ago. I called the client, has the

23  worker called you back? What is she doing about your

24  eviction situation? What is she doing about your

25  psychotic, schizophrenic brother? She has not heard

140

1   AGING AND GENERAL WELFARE COMMITTEES

2   from her. She has not responded to my calls, as

3   well. And you hit a brick wall, because you are as

4   busy as they are, we might not have 81 cases per

5   worker, but we have difficult cases and contractual

6   obligations as well, and it makes life for the APS

7   worker more difficult when we send out a need for a

8   psychiatrist. We specifically say we have a

9   relationship with this person, won't you let us know

10  when you're coming? And more often than not we are

11  never told we never know if the psychiatrist goes

12  out with the APS worker to visit the client, and

13  we're left in the dark, and frequently we're the

14  agency with the case that is now being prosecuted --

15  that's not the right word, where the case of the

16  person who was taken out of her home. And we've been

17  there with that client for several years now, and we

18  would just like to ask for more coordination of

19  services.

20          CHAIRPERSON DeBLASIO: Thank you. I

21  also appreciate both your testimonies. It's obvious

22  that there's a lot of concerns about the agency, and

23  we have expressed a certain amount of sympathy for

24  what the caseworkers and the employees are going

25  through, cleaning issues, caseload issues, et

141

1  AGING AND GENERAL WELFARE COMMITTEES

2  cetera, attrition. But no one should ever say that

3  that means (a) every caseworker and every employee

4  is being as responsive as they should be, including

5  to the community-based organizations that have so

6  much of the information, and are playing such a

7  crucial role. And I think there's kind of a common

8  enemy here in that, you know, high caseloads and

9  pressure to perform leads to an instinct to close

10  the case, whether appropriate or not. That's in the

11  caseworkers interest, the client's interest, your

12  interest, any interest, I think that comes up in the

13  system for everyone, and I don't want to say that,

14  you know, rationalizing caseworker ratios is a

15  panacea, but I do think it is one of the underlying

16  ways to allow people to get back to giving a case

17  the time it deserves, and not having the kind of

18  click-on-the-trigger instinct to close the case.

19          So, I appreciate the points you've

20  raised in your testimony.

21          MS. WILLIG: Might I make one other

22  recommendation? Agencies like Judy's and mine which

23  are DFTA-funded case management agencies, we often

24  wait to refer a case until we see that a client

25  needs guardianship. One idea that's come up is,

P01107

142

1  AGING AND GENERAL WELFARE COMMITTEES

2  could there be a way to fast track those cases?

3  What's necessary for an Article 81 proceeding is a

4  psychiatric evaluation. We're not mental health

5  agencies so we don't have access to that, and legal

6  representation, which we don't have. Some of the

7  agencies have access to private attorneys, but

8  guardianship proceedings cost money.

9          I wonder if there isn't a way that

10 particularly elderly clients who are case managed by

11 a community-based agency, is there a way that we

12 could be doing the paperwork that needs to be done

13 to initiate the guardianship proceeding so it

14 doesn't have to take seven to eight months.

15         CHAIRPERSON DeBLASIO: I appreciate

16 your point. That will be part of our follow-up for

17 sure.

18         MS. WILLIG: Thank you.

19         MS. UMAN: Thank you.

20         CHAIRPERSON DeBLASIO: We appreciate

21 it.

22         We have one last panel and then three

23 people who have signed up for public testimony. The

24 next panel is Jane Greengold Stevens, and Arlene

25 Markarian. And a reminder to this panel to please

143

1  AGING AND GENERAL WELFARE COMMITTEES

2  summarize and a reminder to the people to do public

3  testimony. We have a consistent rule of two minutes

4  per person for public testimony and it's something

5  we do at every hearing.

6            That's for the public testimony. You

7  get a little more time grace because you're on one

8  of the preassigned panels. Who would like to start?

9            MS. GREENGOLD STEVENS: Good

10 afternoon. I know it's late. My name is Jane

11 Greengold Stevens. I'm an attorney at the New York

12 Legal Assistance Group, which as I hope you all know

13 is a non-profit legal services organization serving

14 the poor and near poor in New York.

15            I am not going to repeat to you the

16 testimony in my written testimony, which is very

17 similar to that that you've been hearing all day. I

18 have a few points I'd like to make that are really

19 responsive to what's been said here already, and one

20 I think is really important. The people who came

21 here today from the union who testified said that

22 they're workers didn't want to come because they

23 were worried about reprisals. And I think that might

24 tell us all a lot about morale in the union, that it

25 was hard for them to get workers to come, and I

P01109

144

1  AGING AND GENERAL WELFARE COMMITTEES

2  think that may be indicative of the difficulty there

3  is in morale.

4           As I think you know, we have filed a

5  lawsuit, a class action lawsuit in federal court

6  challenging many failures by the agency, and in the

7  description in the lawsuit, we are criticizing

8  caseworkers right and left for things they've done.

9  I could spend a lot of time criticizing caseworkers,

10 but these are people who really need to do the work,

11 and we really need their morale to be good, and we

12 really need enough of them, and we need them to be

13 hired carefully, people who are sympathetic, who are

14 going to be non-judgmental, we need them to be

15 trained and we need them to be enough of them. And I

16 think the fact that they're afraid to come and talk

17 to you means that they're really struggling. It's an

18 incredibly hard job. And while we were getting this

19 case together, we talked to a lot of clients and it

20 gave us a lot of empathy for caseworkers who were

21 struggling with these clients. But I just think it's

22 important to note that these caseworkers were afraid

23 to come here today or hesitant to come.

24           I'd like to state an opinion on this

25 question that's been raised about the possibility of

145

1   AGING AND GENERAL WELFARE COMMITTEES

2   separating people with disabilities from the

3   elderly. I really think it's a terrible idea, for

4   two significant reasons: Nobody needs adult

5   protective services help just because they're old.

6   People only need it if they're disabled. By

7   definition, the people who need this service are

8   disabled. And I know it's very trendy to fund things

9   for the elderly, but I worry that if there's a

10  separation that more money will go to the elderly

11  and the disabled, who are not aged, are going to be

12  left behind and there's going to be some creaming

13  (sic) and some discrimination, and it's really the

14  disabled who need this help. So, I would like to

15  speak against that trend.

16            I think that coordination with other

17  agencies is key. You've heard that again and again.

18  There's talk about liaisons from the Commissioner,

19  but really it just doesn't work and they need

20  concrete specific plans for working with other

21  agencies because it just isn't happening. The

22  Councilwoman was talking about NYCHA, which is a

23  really good example, there isn't a good liaison

24  system. They actually -- I feel like my own

25  relationship with NYCHA is sometimes as good as the

P01111

146

1  AGING AND GENERAL WELFARE COMMITTEES

2  caseworkers, because of all the times I've sued

3  them.

4              I mean, they really need to work much

5  harder, and actually what that suggests is that the

6  Council needs to be pushing the other City agencies

7  as well to work with APS, because it's not a one-way

8  street. NYCHA needs to be setting up liaisons to

9  work with APS, and so do all the other City

10  agencies.

11             So, I really think that those are my

12  major points. I would be happy to answer other

13  questions. I guess I have a tiny point about

14  heavy-duty cleaning, since everybody is talking

15  about this. I think the idea of having community, a

16  different set of workers stay while cleaning is

17  going on probably saves caseworkers a lot of time,

18  and is a good idea, we have been thinking from our

19  interactions with our hoarder clients, really it

20  needs to be done, they need to set up a different

21  contractual model so that people who are having

22  trouble with cleaning can have it done gradually.

23  And there was just testimony about how it can be

24  psychologically difficult for people. They have one

25  model, they've told us this over and over again,

147

1 AGING AND GENERAL WELFARE COMMITTEES

2 either some agency goes in and does it in one

3 fell-swoop or they don't do it at all, but they need

4 to set up a way to do it so that people can tolerate

5 it emotionally.

6          I think I should stop and let you

7 finish.

8          CHAIRPERSON DeBLASIO: Well, I just

9 want to say I appreciate what you're saying. It must

10 be incredibly hard to figure out the balance point,

11 because it's almost, it's so individual, and the

12 amount of support someone would need would be so

13 great, that sort of how do you end up not being

14 paralyzed between wanting to clean for all the

15 reasons you need to, and trying to figure out how

16 not to put a shock into the person's system, and it

17 feels like a real slippery slope and almost an

18 impossible balance to strike.

19          MS. GREENGOLD STEVENS: Well, that's

20 true. But you know, this slippery slope and the

21 difficulty of how to manage these clients

22 emotionally is a problem throughout the entire

23 process of most of these clients.

24          Some clients are only physically

25 disabled, and they need APS help only because of

148

1  AGING AND GENERAL WELFARE COMMITTEES

2  physical disabilities, and they have no emotional

3  overlay. But that's a limited number so that

4  caseworkers are having to deal with these problems

5  in every respect. That's what makes the job so hard.

6            So, there is no simple solution to

7  this problem for sure. I just think having only one

8  model may not be the right solution to this.

9            CHAIRPERSON DeBLASIO: I appreciate

10  that very much.

11            Thank you. And Ms. Markarian.

12            MS. MARKARIAN: Hi, everybody. I'm

13  Arlene Markarian, Chief of the Elder Abuse Unit in

14  the Brooklyn DA's Office, and I'm here because I

15  work very closely with many agencies that were here

16  today, are here now.

17            I work with APS as closely as I can

18  as well. One of the things I want to mention is that

19  I read the report and it was a real concern of mine

20  that elder abuse was not addressed in the report,

21  and as a prosecutor you could understand why that

22  would glare out at me. And what also concerned me

23  was there was no mention that adult protective

24  services is the only mandated agency in the State to

25  report adult abuse. And that's an important thing to

149

1   AGING AND GENERAL WELFARE COMMITTEES

2   repeat because New York State is not a mandated

3   reporter state for elder abuse, like many states in

4   this country. In fact, I think we're in the

5   minority, if I recall correctly there are only eight

6   states that don't have mandated reporting laws, and

7   we're one of them.

8               So, having said that, APS has got an

9   incredible duty and responsibility, since they're

10  the only mandated reporting agency. And that wasn't

11  mentioned and it needs to be addressed, because I

12  think when it comes to funding that needs to be

13  addressed. So, we're not going to talk about the

14  staffing and everything because we know that all

15  needs funding and that's been repeated. But because

16  I work with elder abuse, I get hundreds of calls

17  throughout the year from people in the community,

18  and I have to say that some of the things that we're

19  talking about, and I think reasonable minds can

20  definitely differ on this, and it's clear that they

21  can, but I think there is a difference between

22  younger adults that are vulnerable, versus older

23  adults. I'm sorry, I just think that there are

24  different issues that apply to a senior population.

25  Alzheimer's is not mental illness. Dementia, the

150

1  AGING AND GENERAL WELFARE COMMITTEES

2  organic reasons, is not mental illness. It is a

3  progressive disease, and it is something that hits,

4  as somebody stated earlier, the numbers are supposed

5  to be very high after the age of 85. People living

6  longer are going to see this more and more. The baby

7  boomers are going are becoming seniors. It's not

8  going away, and when it comes to elder abuse, let me

9  just make one stat, I'm not a big stat gal, I'm

10 really not, but I've got to tell you something,

11 there are over 400,000 seniors in Brooklyn alone,

12 yet in my Bureau on Domestic Elder Abuse, and

13 nationwide it is known, it is clear, the most common

14 offender of elder abuse, the most common perpetrator

15 is going to be a family member. Okay? If we know

16 that, I see 250 cases a year, now for many

17 jurisdictions that's a lot of cases, I would love to

18 believe that only 250 people a year are being abused

19 in Brooklyn. It's not. APS is on the front lines

20 along with these other agencies, and they're our

21 eyes and ears, and APS is the mandated reporter

22 where there may be certain confidentiality issues

23 with other places, like hospitals. APS is mandated.

24 So, when we get involved with them, it's important

25 that they do have the funding and the staffing to

1   AGING AND GENERAL WELFARE COMMITTEES

2   deal with these issues and the training. And I'm

3   going to mention training for this reason.

4                   There's training going on, but I

5   don't know if any of the DA's office is a part of

6   that training. I can speak for my colleagues,

7   because I'm very close with my counterparts in the

8   other counties. Staten Island is Yolanda Rittick,

9   and the Bronx County you have Richard Baker and

10  Ellen Calodny. In Manhattan you have Liz Lowe. In

11  Queens you have Christen Kane, in the Queens DA's

12  office, and you have me in Brooklyn. We all

13  volunteer our time and train police, train DFTA,

14  train JASA, train everybody. I've trained everybody

15  else in the past. They are sponges. They want to be

16  trained. They are so thankful and so appreciative,

17  they want to learn. What do they need to learn? If

18  there is a mandated reporter of elder abuse, we have

19  to learn how to identify it, first of all. Identify

20  the subtlties of it. You have to go figure out how

21  to appropriately report it, which brings me to the

22  issue of having a relationship with NYPD. If they're

23  mandating reporters of elder abuse, I can tell you

24  right now how many calls I've gotten from APS

25  because they walk into a precinct and the police

152

1  AGING AND GENERAL WELFARE COMMITTEES

2  don't know who they are.

3          They don't know what their

4  responsibility is, and they want to report crime

5  against an elderly person and they're being told,

6  oh, that person has to come here and report it

7  themselves. Well, under normal circumstances they

8  would, but not when it's a mandated reporter. The

9  police don't know who they are.

10          They could be using -- if there is a

11  relationship that's built with NYPD, which starts

12  from the top, starts from the top because they are a

13  paramilitary organization, and you go to the brass

14  and it gets trickled down, and they take orders. You

15  start at the top. And if they get a relationship

16  going with APS, they can now have people that can

17  escort them to dangerous situations. Nobody says

18  these folks have to take a bullet for anybody. They

19  don't. And they shouldn't be in the house. The first

20  thing they should be doing is leaving, and then make

21  the call. You don't make the call while the danger

22  is around you, because then you risk everybody. You

23  leave, make the call, and then if they are well

24  known with the precincts in the areas they work in,

25  they'll get the back-up. They'll get the back-up to

153

1  AGING AND GENERAL WELFARE COMMITTEES

2  do their job and protect them. So, this is a very

3  important thing, building the relationship, the

4  training. I'm telling you, there is no DA that I

5  know in this City that's not willing to come own and

6  train adult protective services and teaching them

7  how to file a report, how to articulate the crime so

8  the police know what they're talking about, and how

9  to deal with the issues of elder abuse, including

10  preserving the evidence, people want us to

11  prosecute. We want to prosecute these cases but they

12  could be very difficult without the evidence, and

13  there's valuable evidence that gets lost, because

14  it's not being identified, and it's getting lost,

15  and we then cannot prosecute a lot of these crimes,

16  especially in the financial. I know what Judy Willig

17  was talking about, that case. And by the time the

18  DA's office got wind of it, that money was gone. All

19  right? Say goodbye to it. It's gone. And one of the

20  things that I have listed here, and I don't want to

21  go over my time, but I think just a couple of points

22  here, guardianships. I'm very familiar with

23  guardianships, Article 81. I'm not an expert, but

24  I'm familiar with it because I participate. I will

25  go down to the guardianship part, and testify, and

154

1  AGING AND GENERAL WELFARE COMMITTEES

2  my colleague Peg Coran is my unit coordinator, we

3  will testify at guardianship proceedings regarding

4  elder abuse and what evidence we have to let a

5  guardianship judge know what the issues are

6  regarding this particular AIP, Alleged Incapacitated

7  Person.

8             In addition, we also push for

9  guardianships. And one of the things, being a DA I

10 can do this, I'm very aggressive, you could probably

11 tell by the way I'm speaking, I'm not taking no for

12 an answer and I'm going to keep calling until

13 somebody gives me what I want. And getting

14 guardianship things done, one of the things we've

15 spoken to a lot of civil attorneys about, we have to

16 talk about the legal of HRA. Their staffing. They're

17 six to nine months behind in backlogs in filing

18 guardianship petitions. Six to nine months just to

19 file them. So, what happens to these people that

20 we're saying are allegedly incapacitated? Their

21 money is being bleeded, is bleeding, they're getting

22 injured, all these things are happening. So, what

23 can we do? Well, there's a thing called a temporary

24 restraining order. They can go into court to get a

25 temporary guardian as quick as they can, with a

1  AGING AND GENERAL WELFARE COMMITTEES

2  short amount of time, a short turn-around time, and

3  when they get this temporary guardian, what can this

4  temporary guardian do to help the situation, until

5  we get the case on the calendar and get the

6  proceeding started? Well, does this person need an

7  order of protection? Is there somebody that's

8  physically abusing that needs to be excluded from

9  the home? Does this person's bank accounts need to

10  be frozen, so they can stop the bleeding?

11          Because, yes, great, we'll come here

12  six to nine months later, there's no money left. So,

13  you know, we tried, but nine months went by and he

14  got a hold of all the money.

15          So, they can freeze the accounts and

16  they can appoint a temporary guardian who can pay

17  the bills and do all these things, so they can get

18  everything settled as to whether or not this person

19  needs a guardian. And by the way, guardianship isn't

20  all or nothing. It's not even you're totally

21  incompetent and you need a guardian for everything,

22  there's all kinds of things they can have guardians

23  for. Everything from just the finances to maybe

24  they're safety or the order of protection or perhaps

25  even a case that I'm dealing with with Adult

156

1  AGING AND GENERAL WELFARE COMMITTEES

2  Protective Services right now, getting a

3  guardianship judge to order that the daughter, who I

4  believe is mentally ill, is not capable of caring

5  for her mother, and I believe is abusing her but I

6  can't prove it, but I can at least say under the

7  best case scenario, her mother is becoming seriously

8  injured because according to the daughter, she hurls

9  herself over her own walker. Hurls herself over her

10 own walker, okay? She also doesn't get up when she's

11 being yelled at to get up. Why? Because she can't

12 get up. The daughter has mental illness. So, under

13 the best case scenario, the daughter is just not

14 capable of caring for her mother. So, temporary

15 restraining order. Go in there, she fired all the

16 home care. She fired home care. The judge ordered

17 her, you can't fire home care unless you come see me

18 first. If that much happens at the end of the day,

19 you're doing all right. You really are. Because now

20 somebody is going to be in the house caring properly

21 for this woman.

22          So, training, training, training,

23 relationship with NYPD, they're the mandated

24 reporters. We need to rely on them, until if and

25 when New York ever changes their stand on that.

157

1  AGING AND GENERAL WELFARE COMMITTEES

2           Thank you.

3           CHAIRPERSON DeBLASIO: Thank you. It's

4  very, very helpful. And we appreciate your passion

5  on this issue. Council Member Stewart has a quick

6  question, and then we do need to conclude.

7           COUNCIL MEMBER STEWART: A quick

8  question. Do you have a mechanism whereby you work

9  with the banks to find out if, for example, a

10 senior, monies are being withdrawn, that you can

11 know either at a report to you, or you can get that

12 information to say, well, listen, let's investigate

13 this, there are $10,000 being withdrawn? You know,

14 is there a reporting? Is there something?

15          MS. MARKARIAN: Let me just tell you,

16 first of all, they are not mandated reporters.

17 Basically anything they do is voluntary. There are

18 committees that are in place, I don't do the

19 financial prosecutions, our Rackets Bureau, how it

20 works in our office is our Rackets Bureau does it.

21 However, I know that we go out into the community,

22 we do presentations, almost similar like what you

23 just heard me say, and opening up the gateways for

24 the different banks and everybody to know who to

25 call if something like that happens. The problem is

158

1  AGING AND GENERAL WELFARE COMMITTEES

2  it's not mandatory. So, since it's not mandatory,

3  it's a hit or miss. It's a hit or miss.

4              We're trying to, the DA's association

5  and various committees that I'm on are trying to

6  work with the banking lobby, if you will. The

7  problem is once you put the responsibility on. They

8  don't want the responsibility, if this

9  responsibility is put on them, they know they can be

10 held liable if something doesn't follow through.

11             You're dealing with a lot of issues

12 here, so that would be a great thing to have happen.

13 We try to get the local bankers, and we do have some

14 that will, that call and say, you know what?

15 Something funny is going on. Something funny because

16 she never takes out this kind of money, she takes

17 $50 every week, that's all she ever takes out and

18 now she's coming in and taking out $1,000 and $2,000

19 a pop.

20             COUNCIL MEMBER STEWART: Right. The

21 other question that I have basically is that APS,

22 those folks who are registered with APS, that they

23 get any help and getting all of that, and APS will

24 know their financial status and all of those things?

25             MS. MARKARIAN: Of the clients?

159

1   AGING AND GENERAL WELFARE COMMITTEES

2               COUNCIL MEMBER STEWART: Yes, of the

3   cilents.

4               MS. MARKARIAN: I mean, I can't speak

5   for APS, but I believe the answer is yes, they --

6               COUNCIL MEMBER STEWART: But if they

7   do know, can they have some sort of a relationship

8   whereby the banks, if there's a change in the status

9   the banks will report to them, and they will them --

10              MS. MARKARIAN: If they go and speak

11  to the bankers, they could try. Again, they're under

12  no obligation. So, you're only hoping that people

13  will do what they should do. There is no obligation.

14  No legal obligation to do so. Not unless a

15  guardianship takes place.

16              COUNCIL MEMBER STEWART: I'm just

17  looking to see if there's a way that there is any

18  change, if there is something that looks, seems

19  different, that someone will be able to take note

20  and start investigating. It could be legitimate but

21  still you need some sort of check and balance,

22  saying let's investigate, let's see what's happening

23  here.

24              And if at least a relative or a

25  guardian or the caseworker somehow they should be

160

1  AGING AND GENERAL WELFARE COMMITTEES

2  tied into this, to know if something is going to

3  happen, that they all should be notified. If more

4  than one person is being notified, if there's a

5  worker in the house, an attendant or whatever is

6  doing something, then they know that somebody else

7  is going to know what is happening in this person's

8  account. And if something is wrong, then they will,

9  and then it's a preventative measure in terms of

10  them doing something.

11          MS. MARKARIA: It's always the person

12  who will do it, that's the problem.

13          CHAIRPERSON DeBLASIO: Thank you.

14  Thank you very much for both of your testimony. It's

15  extremely helpful.

16          Lastly, we have three people for

17  public testimony. Again, I'm going to emphasize we

18  are going to universally and consistently apply the

19  two-minute rule in all of our hearings, so we're

20  going to ask everyone to honor that. Howard Haskin,

21  Cathy Casey and Joseph Garber.

22          Mr. Garber, I think since you are a

23  veteran of many City Hall procedures --

24          MR. GARBER: Yes, I've got a bill

25  signing ceremony.

1   AGING AND GENERAL WELFARE COMMITTEES

2            CHAIRPERSON DeBLASIO: You should be

3   the lead-off, and let me just make sure for those

4   who haven't had the opportunity to testify, just

5   recognize there is a clock right across there. We'll

6   show you your countdown so you have something to

7   judge by. And let's start with you, Mr. Garber. We

8   welcome your testimony.

9            MR. GARBER: Good afternoon. My name

10  is Joseph Garber. I'm the Corresponding Secretary of

11  the Civil Service Merit Council, a good government

12  group that supports efficiency, integrity and public

13  service.

14            First of all, if the workers are

15  afraid to come because of retaliation, I would like

16  to remind this Committee that there is a

17  whistle-blowers law, so that has to be enforced.

18            Okay, although I'm well aware of what

19  APS stands for from reading the Mayor's Management

20  Report and the Chief Leaders over the year,

21  approximately five weeks ago I became involved in a

22  personal case.  A civil service worker came home one

23  evening and found a handwritten note addressed to

24  him with his wrong last name, signed by a caseworker

25  of APS that you couldn't even make out what it was.

162

1    AGING AND GENERAL WELFARE COMMITTEES

2    He ignored the letter. When he showed it to me, I

3    prepared a letter to the Commissioner of HRA all the

4    way down to Deputy Commissioner Saberski of APS, to

5    the Director of the Brooklyn Borough Office. This

6    person received calls from a Mr. Filipe Benonme,

7    which Benonme is a French name which means

8    technically "my friend" of the Brooklyn APS office

9    at 250 Livingston Street. If this man is considered

10   a friend of adults, okay, this Civil Service worker

11   is in his fifties, so not a senior citizen, he kept

12   on calling him and calling him and calling him to

13   come down, or to come to his apartment. Finally, I

14   told the civil service worker, arrange to come down

15   to APS. He made an appointment about a week and a

16   half ago to come down to meet Mr. Benonme. When he

17   came to 250 Livingston Street on the second floor,

18   Mr. Benonme wanted to sit with him in a public area

19   to interview him. I approached him and told him do

20   not let anybody else hear your case, he went in a

21   private room. Then when I coached this individual

22   about Betsy Gotbaum's report, so he knew more about

23   APS than Mr. Benonme did. And he asked him what kind

24   of services are you talking about? Can you help me

25   maybe with this if I do need this problem? And how

163

1  AGING AND GENERAL WELFARE COMMITTEES

2  did you get my name? Mr. Benonme refused to tell him

3  who referred the case. Now if you want to get help,

4  you do not go with such an attitude. If APS stands

5  for, it should stand for Adult Retaliation Services

6  or Adult Fear Services, but not Adult Protection

7  Services.

8              CHAIRPERSON DeBLASIO: Thank you.

9              MR. GARBER: You've got to overhaul

10  the whole system. Thank you.

11             CHAIRPERSON DeBLASIO: Thank you, Mr.

12  Garber.

13             Mr. Haskin, before you testify, I

14  just want to let you know, we appreciate also your

15  written testimony, and that will absolutely be

16  entered into the formal record, just so you know

17  that. Please go ahead.

18             MR. HASKIN: Yes, obviously I'm not

19  going to read my full testimony, it's too long.

20             I've been working for the last 14

21  years --

22             CHAIRPERSON DeBLASIO: I'm sorry, push

23  the button.

24             MR. HASKIN: I've been working for 14

25  years as a case manager for special services for

164

1  AGING AND GENERAL WELFARE COMMITTEES

2  seniors, for three years prior to that, I also

3  worked for JASA APS. So, I have the perspective of

4  being on both sides of the fence on this issue.

5              My experience with JASA APS was a

6  very positive one. We have a very small operation. I

7  absolutely welcome case management agencies that

8  would be on my side that I utilized, and we work

9  together in addressing any at-risk client situation.

10             For the last 14 years, having to

11 utilize APS on a situation where my agency has

12 exhausted all possibilities of trying to help this

13 client, like every other case management agency

14 that's testified before me, we don't go there until

15 we have no other choice. We get resistance from the

16 get-go, the referral is met with resistance. When we

17 finally get a case to be accepted, we have to run

18 around looking for caseworkers, who don't return

19 phone calls, I perceive this whole situation as an

20 enemy instead of being looked at as an ally. I think

21 that case management agencies have a lot to offer

22 APS in providing services, every case management

23 agency that's been in here has an investment in the

24 communities that we serve. I think we need to be

25 looked at as an ally. I think we need to have APS

165

1  AGING AND GENERAL WELFARE COMMITTEES

2  look at us as a tool to be used. I also think that

3  if we had services available to us, like heavy-duty

4  cleanings, maybe we wouldn't have to turn to APS for

5  some issues, that maybe we could address it

6  ourselves. But we don't. We have to turn to APS

7  because they have services that we have access to.

8           There's a lot more I'd like to say

9  but time restraints don't allow me to, I appreciate

10 you allowing my testimony to be in the written

11 record, and thank you.

12          CHAIRPERSON DeBLASIO: Thank you. And

13 we appreciate the good work you've done on this

14 issue. Thank you very much.

15          And finally, concluding our day, Ms.

16 Casey, we welcome your testimony.

17          MS. CASEY: Thank you. I'm going to

18 combine statements on questions. I think perhaps you

19 haven't heard about or considered this particular

20 aspect of the issue today, and that is the fact that

21 some people who are not eligible for APS services

22 and certainly not eligible to have guardians

23 appointed for them are harassed in the Housing Court

24 as tenants when landlords are trying to evict them

25 by, to put it crudely, having caseworkers sicked on

166

1   AGING AND GENERAL WELFARE COMMITTEES

2   them for no valid reason, and it becomes quite

3   difficult to extricate oneself from this situation

4   for the tenant because of the formal structures of

5   Housing Court.

6              This aspect of the issue is not

7   addressed in the Public Advocate's report and it has

8   to do with the fact that, as I understand it, some

9   APS workers who may or may not be caseworkers are

10  continually present, assigned to Housing Court on a

11  daily basis, and sometimes called upon by Court

12  attorneys or judges in various situations, I have

13  personally suffered from this, and presently

14  suffering from it in a case in Housing Court where

15  the landlord is trying to evict me for the fifth

16  time in five and a half years, and three different

17  times, twice in Housing Court and once when I wasn't

18  even in a case in Housing Court, APS caseworkers

19  were sent to me in my apartment or in Housing Court.

20             If I may just have a few more

21  seconds?

22             CHAIRPERSON DeBLASIO: Yes.

23             MS. CASEY: I'd like to ask what is

24  the eligibility pool for the candidates to be ad

25  Litem Guardians and to be Article 81 guardians? How

167

1  AGING AND GENERAL WELFARE COMMITTEES

2  are they trained? And how are they compensated?

3               I recently attended a workshop with

4  Attorney Violet Brown of the Brooklyn Legal Aid on

5  this issue, and if I understood her correctly, she

6  stated that the Guardians ad Litem get a $600 flat

7  fee and therefore, if they can dispose of the case

8  in one hour by giving up the tenants'

9  rent-stabilized apartment for no good reason then

10  they get $600 an hour, whereas if they persist, they

11  get say $20 an hour, which is a negative motivation

12  system.

13               And finally, I'd like to ask and

14  suggest that the Council members perhaps seek input

15  on this matter from Fern Fisher, who I understand is

16  the Administrative Judge of Housing Court or perhaps

17  the entire Civil Court, as for the structures and

18  mechanisms of people, figuratively speaking, having

19  their arms twisted, and being metaphorically

20  assaulted in Housing Court to get a guardian --

21               CHAIRPERSON DeBLASIO: Thank you.

22               MS. CASEY: -- When they are not

23  people who should have a guardian and they do not

24  meet the definition of someone who is eligible.

25               CHAIRPERSON DeBLASIO: Thank you. And

168

1  AGING AND GENERAL WELFARE COMMITTEES

2  Ms. Casey, you really raise a very important

3  question, and we will follow up on that. I

4  appreciate it. And it's something we didn't focus on

5  today but very worthy of some attention. And I know

6  some staff in the Council have been in touch with

7  you and we will continue to be helpful in any way

8  that we can. But thank you for raising the question

9  today.

10           Okay, thank you to everyone here. And

11  this joint hearing of the Committee on Aging and the

12  General Welfare Committee is adjourned.

13           (Hearing concluded at 4:27 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

169

```
 1

 2            CERTIFICATION

 3

 4

 5    STATE OF NEW YORK   )

 6    COUNTY OF NEW YORK  )

 7

 8

 9            I, CINDY MILLELOT, a Certified

10    Shorthand Reporter, do hereby certify that the

11    foregoing is a true and accurate transcript of the

12    within proceeding.

13            I further certify that I am not

14    related to any of the parties to this action by

15    blood or marriage, and that I am in no way

16    interested in the outcome of this matter.

17            IN WITNESS WHEREOF, I have hereunto

18    set my hand this 14th day of June 2007.

19

20

21

22

23            ---------------------

24            CINDY MILLELOT, CSR.

25
```

170

```
 1
 2              C E R T I F I C A T I O N
 3
 4
 5
 6
 7
 8
 9          I, CINDY MILLELOT, a Certified Shorthand
10   Reporter and a Notary Public in and for the State of
11   New York, do hereby certify the aforesaid to be a
12   true and accurate copy of the transcription of the
13   audio tapes of this hearing.
14
15
16
17
18
19
20
21
22
23
24              ------------------------
                   CINDY MILLELOT, CSR.
25
```